UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ADIKA CLEMENDOR,
Washington, D.C. 20011,

DAVID MACMILLAN,
Washington, D.C. 20011, *and*

FIREARMS POLICY COALITION, INC.
5550 Painted Mirage Road, Suite 320
Las Vegas, Nevada  89149,                                            Civil Action No.:  24-1955

                             Plaintiffs,

             v.

THE DISTRICT OF COLUMBIA,

PAMELA A. SMITH, in her official capacity as
Chief of the Metropolitan Police Department of the District of
Columbia, 300 Indiana Avenue NW, Washington, DC 20001,
*and*

BRIAN L. SCHWALB, in his official capacity as
Attorney General for the District of Columbia,
400 6th Street, NW, Washington, DC 20001,

                             Defendants.

_____

## **COMPLAINT**

Plaintiffs, by and through counsel of record, bring this Complaint against

Defendants, District of Columbia ("the District"), Chief Pamela A. Smith, and Attorney

General Brian L. Schwalb, for their infringement on the right of law-abiding, peaceable

residents of the District to keep and bear commonly owned firearms for defense of self and

family and for all other lawful purposes, and allege as follows:

# INTRODUCTION

1.      The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms."  U.S. CONST. amend. II.  Under this constitutional provision, Plaintiffs, and other law-abiding, peaceable residents of the District, have a fundamental, constitutionally guaranteed right to keep common firearms for defense of self and family and for other lawful pursuits.

2.      Despite this guarantee, Defendants have enacted and enforced a flat prohibition on the possession of many common semiautomatic firearms—derisively labeled "assault weapons"—by ordinary citizens, making it criminal for law-abiding, peaceable citizens to exercise their fundamental right to keep and bear such arms ("Semiautomatic Firearms Ban" or "the Ban").  D.C. Code §§ 7-2501.01(3A)(A); 7-2502.01(a); 7-2502.02(a)(6); 7-2502.09; 7-2507.06(a).

3.      The District's Semiautomatic Firearms Ban, and Defendants' enforcement thereof, denies individuals who reside in the District, including Plaintiffs, their fundamental, individual right to keep and bear common arms.

4.      The D.C. Circuit previously upheld the laws at issue against a Second Amendment challenge, applying intermediate scrutiny.  *Heller v. D.C.*, 670 F.3d 1244, 1261-64 (D.C. Cir. 2011) ("*Heller II*") ("In short, the evidence demonstrates a ban on assault weapons is likely to promote the Government's interest in crime control in the densely populated urban area that is the District of Columbia.").  The recent Supreme Court case *New York State Rifle and Pistol Association v. Bruen*, however, abrogated that decision, and no governing case law forecloses Plaintiffs' claims.  597 U.S. 1 (2022); *see also Hanson v. D.C.*, No. CV 22-2256, 2023 WL 3019777, at *2 (D.D.C. Apr. 20, 2023) ("The Supreme Court's

decision in *Bruen* last year, however, soundly rejected how the Courts of Appeals interpreted and applied *Heller*, and so calls into question the outcome of *Heller II*.").  In fact, governing case law guides this Court to rule in Plaintiffs favor and against the Ban.

## JURISDICTION & VENUE

5.     This Court has subject matter jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343.

6.     Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201, and 2202 and 42 U.S.C. §§ 1983 and 1988.

7.     Venue lies in this Court under 28 U.S.C. §§ 1391(b)(1) and (b)(2).

## PARTIES

8.     Plaintiff Adika Clemendor is a natural person, a resident of the District, an adult over the age of 21, and a citizen of the United States.  Plaintiff Clemendor is legally eligible under federal law to possess and acquire firearms, and is eligible to register firearms in the District.  Plaintiff Clemendor is a member of Firearms Policy Coalition, Inc. ("FPC").

9.     Plaintiff David MacMillan is a natural person, a resident of the District, an adult over the age of 21, and a citizen of the United States.  Plaintiff McMillan is legally eligible under federal law to possess and acquire firearms, and is eligible to register firearms in the District.  Plaintiff MacMillan is a member of FPC.

10.     Plaintiff FPC is a nonprofit membership organization incorporated in Delaware with a primary place of business in Clark County, Nevada.  FPC works to create a world of maximal human liberty and freedom and to promote and protect individual liberty, private property, and economic freedoms.  It seeks to protect, defend, and advance

the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms, and protect, defend, and advance the means by which individuals may exercise the right to carry, possess, and use firearms.  FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.  FPC's members reside both within and outside the District.

11.     FPC brings in this action on behalf of its members, including the named Plaintiffs herein, who are injured by the operation and enforcement of the District's Semiautomatic Firearms Ban.

12.     Defendant District of Columbia is a municipal entity organized under the Constitution and laws of the United States.

13.     Defendant Pamela A. Smith is acting Chief of Police of the Metropolitan Police Department of the District of Columbia, and as such is responsible for executing and administering the District's laws, customs, practices, and policies.  In that capacity, Defendant Smith is presently enforcing the unconstitutional laws, customs, practices and policies complained of in this action.  Her official address is the Metropolitan Police Headquarters, 300 Indiana Avenue NW, Washington, DC 20001.  Defendant Smith is being sued in her official capacity.

14.     Defendant Brian L. Schwalb is the Attorney General for the District of Columbia, and as such is responsible for executing and administering the District's laws, customs, practices, and policies.  In that capacity, Defendant Schwalb is presently enforcing the unconstitutional laws, customs, practices and policies complained of in this action.  His

official address is 400 6th Street, NW, Washington, DC 20001.  Defendant Schwalb is being sued in his official capacity.

## FACTUAL ALLEGATIONS

### I.  THE DISTRICT'S UNCONSTITUTIONAL SEMIAUTOMATIC FIREARMS BAN

15.     The District applies the inaccurate label of "assault weapon"[1] to many semiautomatic[2] firearms in common use, and criminalizes their possession through a complex regulatory scheme.  D.C. CODE §§ 7-2501.01(3A)(A); 7-2502.01(a); 7-2502.02(a)(6); 7-2502.09; 7-2507.06(a).

16.     Specifically, the District defines "assault weapons" as:

(3A)(A)(i)(IV)     A semiautomatic[] rifle that has the capacity to accept a detachable magazine and any one of the following:

     (aa)     A pistol grip that protrudes conspicuously beneath the action of the weapon;

     (bb)     A thumbhole stock;

     (cc)     A folding or telescoping stock;

     (dd)     A grenade launcher or flare launcher;

     (ee)     A flash suppressor; or

     (ff)     A forward pistol grip;

(V)     A semiautomatic pistol that has the capacity to accept a detachable magazine and any one of the following:

---

[1] D.C. CODE § 7-2501.01(3A)(A).

[2] "With a semiautomatic firearm, the shooter can fire only one time by engaging the trigger. The shooter must release and reengage the trigger to fire another shot."  *Garland v. Cargill*, 602 U.S. 406, 410 (2024); *accord Staples v. United States*, 511 U.S. 600, 602 n.1608 (1994) ("Semiautomatic" means "a weapon that fires only one shot with each pull of the trigger, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired.").

(aa)  A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer;

(bb)  A second handgrip;

(cc)  A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning his or her hand, except a slide that encloses the barrel; or

(dd)  The capacity to accept a detachable magazine at some location outside of the pistol grip;

(VI)  A semiautomatic shotgun that has one or more of the following:

(aa)  A folding or telescoping stock;

(bb)  A pistol grip that protrudes conspicuously beneath the action of the weapon;

(cc)  A thumbhole stock; or

(dd)  A vertical handgrip; and

(VII)  A semiautomatic shotgun that has the ability to accept a detachable magazine; and

(VIII)  All other models within a series that are variations, with minor differences, of those models listed in subparagraph (A) of this paragraph, regardless of the manufacturer

(ii)  Any shotgun with a revolving cylinder; provided, that this sub-subparagraph shall not apply to a weapon with an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition; and

(iii)  Any firearm that the Chief may designate as an assault weapon by rule, based on a determination that the firearm would reasonably pose the same or similar danger to the health, safety, and security of the residents of the District as those weapons enumerated in this paragraph

D.C. CODE § 7-2501.01(3A)(A)(i)(IV)–(iii).

17.     The statute also sweeps into the definition of "assault weapon" a list of approximately 35 "specified" rifles, pistols, and shotguns, singled out by manufacturer name, make and model.  *Id.* § 7-2501.01(3A)(A)(i)(I)–(III).

18.     The District categorically prohibits possession of all unregistered firearms.  *Id.* § 7-2502.01(a) ("Except as otherwise provided in this unit, no person or organization in the District of Columbia shall . . . possess or control any firearm, unless the person or organization holds a valid registration certificate for the firearm.").

19.     The District does not issue registration certificates for "assault weapons."  *Id.* § 7-2502.02(a)(6) ("A registration certificate shall not be issued for a[n]: . . . assault weapon[.]").

20.     A person that possesses any registered firearm that becomes unregisterable under the terms of § 7-2502.02 is subject to immediate revocation of their registration certificate.  *Id.* § 7-2502.09.

21.     Accordingly, as a function of law, no person or entity may register an "assault weapon," nor may they possess an "assault weapon" within the District.

22.     Violation of the District's Ban is punishable by up to five years in prison and a fine between $2,500.00 and $12,500.00.  *Id.* §§ 7-2507.06(a); 22-3571.01.

## THE DISTRICT BANS FIREARMS IN COMMON USE

23.     Semiautomatic firearms "traditionally have been widely accepted as lawful possessions," *e.g., Staples v. United States*, 511 U.S. 600, 612 (1994) (so categorizing an AR-15 semiautomatic rifle); *cf. Garland v. Cargill*, 602 U.S. 406, 430 (2024) (Sotomayor, J., dissenting) ("semiautomatic rifles" like the AR-15 are "commonly available").  And the D.C. Circuit has previously held "it [is] clear enough . . . that semi-automatic rifles and

magazines holding more than ten rounds are indeed in 'common use[.]'" *Heller II*, 670 F.3d at 1261.

24.    Rifles built on an "AR-style" platform are a paradigmatic example of the type of arm the District bans ("AR" is short for ArmaLite Rifle; ArmaLite originally designed the platform), and, in fact, are specifically targeted by the District's Semiautomatic Firearms Ban as prohibited.  *See* D.C. CODE § 7-2501.01(3A)(A)(i)(I)(ee).

25.    AR-15 rifles are among the most popular firearms in the nation, and they are owned by millions of Americans. According to industry sources, approximately 20% of all firearms sold in recent years were rifles of the type banned by the District.  NAT'L SHOOTING SPORTS FOUND., INC., *Firearms Retailer Survey Report, 2021* at 9.  In 2020, more than 20 million adults participated in target or sport shooting with semiautomatic rifles like those banned in the District.  NAT'L SHOOTING SPORTS FOUND., INC., *Sport Shooting Participation in the U.S. in 2020* at iii.[3]

26.    The above-referenced "AR-15 series" and its "variations" include rifles that are widely used in the Civilian Marksmanship Program ("CMP"), which is controlled by the federally-chartered Corporation for the Promotion of Rifle Practice and Firearms Safety. P.L. 105-225, 112 Stat. 1253, 1335 (1998). The CMP functions "(1) to instruct citizens of the United States in marksmanship; [and] (2) to promote practice and safety in the use of firearms . . . ." 112 Stat. at 1337.

27.    The banned semiautomatic firearms, like all other semiautomatic firearms, fire only one round for each pull of the trigger.  They are not machine guns. *Cargill*, 602 U.S. at 410–11; *Staples*, 511 U.S. at 602 n.1; *see also* D.C. CODE § 7-2501.01(10)

---

[3] This citation, and others below that are underscored, are hyperlinks to web-based copies.

(the District separately defines "machine guns" as having the capacity for automatic fire).
What is more, the designation "assault weapons" is a complete misnomer, "developed by
anti-gun publicists" in their crusade against lawful firearm ownership. *Stenberg v. Carhart*,
530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

       28.    Central among the common uses of semiautomatic firearms banned in
the District is self-defense in the home.  An AR-15 rifle is an optimal firearm to rely on in a
self-defense encounter.  Most AR-style firearms are chambered for 5.56x45mm NATO (or
the similar .223 Remington) ammunition.  This is a relatively inexpensive and very
common cartridge that is particularly well suited for home defense purposes because the
relatively small size of the cartridge allows an individual to more easily manage recoil and
aim successive shots. More, it has sufficient stopping power in the event a home intruder is
encountered, but loses velocity relatively quickly after passing through a target and other
objects, thus decreasing the chance that an errant shot will strike an unintended target.
Although most pistol rounds have less muzzle velocity than a 5.56x45mm NATO round,
they have greater mass, maintain velocity after passing through walls and other objects, and
pose substantially greater risk to unintended targets in the home.

       29.    Like the AR-15 generally, the specific features banned by the District
aid home defense.  A flash suppressor, for example, not only reduces the chances that a
home-invader will identify his victim's position, it also protects a homeowner against
momentary blindness when firing in self-defense.  David B. Kopel, *Rational Basis Analysis of
"Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 397 (1994).

       30.    Folding and telescoping stocks increase the likelihood of successful
home defense by permitting safe storage of defense instruments in accessible spaces and

making the rifle maneuverable in confined spaces. *Id.* at 398–99. A telescoping stock also allows a firearm to be better fitted to an individual shooter, thereby enhancing the ability of an individual to use the firearm safely and effectively.

31.    Pistol grips improve accuracy and reduce the risk of stray shots by stabilizing the firearm while firing from the shoulder. *Id.* at 396.

32.    Most common semiautomatic firearms, including those banned under the District's law, can accept a detachable magazine. Detachable magazines not only assist law-abiding shooters in reloading their weapon in stressful defense circumstances, but in the case of some platforms, including the common AR-15, they are required to safely and quickly remedy malfunctions.

33.    Encounters with criminal intruders in the home are not uncommon. For instance, according to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. U.S. Dep't of Justice, Bureau of Justice Statistics, *National Crime Victimization Survey: Victimization During Household Burglary* 1-2 (2010) ([https://bjs.ojp.gov/content/pub/pdf/vdhb.pdf](https://bjs.ojp.gov/content/pub/pdf/vdhb.pdf)). Studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms to defend themselves or their property. Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. OF CRIM. L. & CRIMINOLOGY 150, 164 (1995).

34.    Other common, lawful uses of the banned firearms are hunting and sport. At least a third of all gun owners use a firearm for hunting or sport shooting, and

recreational target shooting is a top reason for owning semiautomatic rifles like those banned by the District.

35.     Here again, the banned features of semiautomatic firearms— mischaracterized as "assault weapons"—serve lawful purposes.  Folding and telescoping stocks, for example, allow for safe transportation, including in a hiking pack, an ATV, or a boat.  These stocks also ease carrying over long distances while hunting.

36.     Both telescoping stocks and protruding grips open hunting and sport-shooting to those for whom recoil poses a challenge.  Detachable magazines have the same benefits in hunting and sport shooting as they do in home defense—improved reloading and remedying of malfunctions.  And flash suppressors promote accuracy in target-shooting and hunting (especially at dawn).

37.     By contrast, one use that is not common for so-called "assault weapons" is crime.  According to a widely cited 2004 study, these arms "are used in a small fraction of gun crimes."  Christopher Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, U.S. Dep't of Just. (2004).  This has long been true.  Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997) (evidence indicates that "well under 1% [of crime guns] are 'assault rifles'").  Indeed, according to FBI statistics, in 2019 there were only 364 homicides known to be committed with rifles of any type, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and 397 with blunt objects.  Expanded Homicide Table 8, Crime in the United States (FBI 2019).

## THE DISTRICT'S LAWS ARE UNCONSTITUTIONAL

38.     The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. CONST. amend. II.

39.      "The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008) (emphasis in original).

40.     "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634–35.

41.     For this reason, "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582 (citations omitted).

42.     When the D.C. Circuit upheld the constitutionality of the District's Semiautomatic Firearms Ban in 2011, it relied on a two-step test that was "one step too many." *Bruen*, 597 U.S. at 19; *see also Heller II*, 670 F.3d at 1252–53. Because the D.C. Circuit concluded that the so-called "assault weapons" at issue here are in common use, it should have held that the ban on ownership of such firearms violates the Second Amendment. *Heller II*, 670 F.3d at 1261; *see also Bruen*, 597 U.S. at 19-20.

43.     In order to justify a law that affects Plaintiffs' Second Amendment rights, the government bears the affirmative burden of proving that the regulation is consistent with our nation's history and tradition.  *Bruen*, 597 U.S. at 19-21.  As a matter of law, any regulation that bans firearm ownership in common use for lawful purposes like self-defense is inconsistent with this nation's history and tradition, and thus violates the Second Amendment.  *Id.* at 21; *Heller*, 554 U.S. at 624.

44.     The firearms at issue in this case are the sorts of bearable arms in common use for lawful purposes that law-abiding people possess at home by the millions. *See Cargill*, 602 U.S. at 430 (Sotomayor, J., dissenting) ("semiautomatic rifles" like the AR-15 are "commonly available").  And they are, moreover, exactly what they would bring to service in militia duty, should such be necessary.  In *Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation."  554 U.S. at 592.

45.     The People have a constitutionally protected right to make use of common firearms for effective self-defense and not to be disarmed by the enforcement of the District's Ban.

46.     Assuming ordinary citizens are not lawfully disqualified from exercising Second Amendment protected rights, the District must permit them to keep and bear common firearms.

47.     The Second Amendment is an "unqualified command."  *Bruen*, 597 U.S. at 24.  The Second Amendment does not accommodate the use of any "means-ends scrutiny" of the kind that the D.C. Circuit applied when it previously upheld the constitutionality of the District's laws.  *Id.*; *Heller II*, 670 F.3d at 1252–53.  When a law—

like the District's Semiautomatic Firearms Ban at issue here—prevents citizens from owning firearms that are in common use for lawful purposes, then the law violates the Second Amendment. *Bruen*, 597 U.S. at 23-24. It cannot be justified by reference to any countervailing governmental interest. *Id.*

48. The right to keep and bear common firearms guaranteed under the Bill of Rights cannot be subjected to laws and regulations that prohibit ordinary, law-abiding citizens from keeping and bearing common firearms—particularly when such schemes place these citizens under constant threat of criminal sanction for violating them.

49. The enshrinement of the right to keep and bear arms in the Second Amendment has necessarily taken such "policy choices off the table." *Heller*, 554 U.S. at 636.

50. Yet, this is precisely how the District's Semiautomatic Firearms Ban operates, completely shutting out ordinary, law-abiding citizens from exercising their constitutional rights in the District.

51. The arms banned as "assault weapons" under the District's Semiautomatic Firearms Ban are not both dangerous *and* unusual.

52. The arms banned as "assault weapons" under the District's Semiautomatic Firearms Ban are common in all respects: 1) they are common categorically, as they are all functionally semiautomatic in their operation; 2) they are common characteristically, as they are all popular configurations of arms (*e.g.*, rifles, shotguns, handguns) with varying barrel lengths and common characteristics like pistol grips and the like; and 3) they are common jurisdictionally, lawful to possess and used in the vast majority of states now and throughout relevant history for a wide variety of lawful

purposes including self-defense, proficiency training, competition, recreation, hunting, and collecting.

53.     There is no constitutionally relevant difference between guns that are prohibited by the Ban and semiautomatic rifles, pistols, and shotguns that are not banned by the District.  While some exterior physical attributes may differ—wood vs. metal stocks and furniture, the number and/or location of grips, having a bare muzzle vs. having muzzle devices, different barrel lengths, etc.—they are, in all *relevant* respects, the same.

54.     Indeed, they are all common firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are functionally semiautomatic in nature.  They are all common firearms that have the same cyclical rate of fire:  one round fired per pull of the trigger pull until ammunition is exhausted or the firearm or feeding device malfunctions.  They are all common under the same jurisdictional analysis.  And they are all subject to the same constitutionally relevant history under which the District's Ban is clearly and categorically unconstitutional.

55.     The District's ban on possessing "assault weapons" is, therefore, a ban on keeping and bearing semiautomatic firearms that are commonly possessed and used for lawful purposes, including self-defense in the home.

## PLAINTIFFS ARE INJURED BY THE BAN

**I.     Plaintiff Clemendor is injured by the Ban because it prevents him from registering and keeping the optimal home defense rifle.**

56.     Plaintiff Clemendor lives in the District.  He is licensed to carry a concealed weapon within the District, and owns firearms legally registered in the District. He intends to exercise his right to keep and bear a so-called "assault weapon" for lawful purposes, especially home defense and target shooting.  Specifically, if allowed, Plaintiff

Clemendor would possess (and would have already been in possession of) a Sig Sauer MCX-Spear, a Daniel Defense DDM4 V7, or a Palmetto State Armory PSA Gen3 PA-10, all of which are AR-style rifles capable of accepting a detachable magazine, with a telescoping stock, pistol grip, and muzzle device.

57.    Plaintiff Clemendor desires to own one of these rifles in large part because of their sophisticated recoil management systems, and ease of use for shooters of all size and strength, due to ergonomic features such as the telescoping stock.  Plaintiff Clemendor lives with his wife and elderly relatives.  If during a home invasion he became incapacitated or injured, or was not home, any one of his elderly relatives or his wife could easily and accurately use any one of these rifles due to their recoil management systems and ergonomic features.

58.    Plaintiff Clemendor would possess one of these rifles now, if not prohibited by the District's Ban.  But these rifles, and others with these common features, are unregisterable and therefore illegal under the District's Semiautomatic Firearms Ban. These rifles either cannot be converted to become compliant with the Ban, or if they can be rendered compliant, for instance by converting to bolt-action, the modifications would defeat the attractive functionality that caused Plaintiff Clemendor to select these rifles in the first place.

59.    Plaintiff Clemendor would immediately receive and possess one of these rifles (and would have done so already) were it not for Defendants' enforcement of the Ban.  In light of Defendants' actions, including the credible threat of arrest, confiscation, prosecution, fine, and imprisonment arising from the Ban's existence and Defendants' recent actions to enforce it, Plaintiff Clemendor has thus far refrained from acquiring and

possessing a Sig Sauer MCX-Spear, a Daniel Defense DDM4 V7, or a Palmetto State Armory PSA Gen3 PA-10, or any similarly prohibited firearm, for home defense and other lawful purposes.

**II.    Plaintiff MacMillan is injured by the Ban because it prevents him from making numerous upgrades to his firearms to improve their accuracy, usefulness, and ergonomics.**

60.    Plaintiff MacMillan also lives in the District.  He is licensed to carry a concealed weapon within the District, and owns firearms registered in the District.  He intends to exercise his right to keep and bear a so-called "assault weapon" for lawful purposes, especially home defense, hunting, and target shooting.  Specifically, if allowed, Plaintiff MacMillan would (and would have already):  (1) attach threaded barrels to his handguns, (2) attach a barrel shroud, spare magazine storage, or second handgrip to his handguns, (3) install an adjustable stock on his hunting rifle, (4) install a thumbhole stock on his hunting rifle, (5) install a semiautomatic bolt carrier in his heavy AR pistol, and (6) modify his AR-15-style rifle to accept detachable magazines.  These upgrades and improvements are prohibited by the District's ban.

61.    Plaintiff MacMillan owns a Sig Sauer P320 X-Compact handgun, chambered in 9x19mm Parabellum, which he duly registered with the Metropolitan Police Department ("MPD") in 2023.  He also owns a subcompact Glock-style handgun of his own design, chambered in 9x19mm Parabellum, which he legally manufactured within his own home using a 3D printer and duly registered with MPD in 2024.  He carries both of these handguns from time to time for personal protection, keeps them in a safe in his home for the protection of his residence, and uses them while participating in self-defense shooting sport competitions. Like most modern handguns, both the Sig Sauer P320 and the Glock-style

handgun can be readily equipped with a threaded barrel to facilitate the attachment of compensators or other accessories.  A pistol compensator is useful for reducing the recoil and muzzle flip from compact handguns, enhancing accuracy in self-defense situations and competitions.  However, the District's Ban defines any semiautomatic handgun with a threaded barrel as an "assault weapon."  But for the District's Ban on semiautomatic handguns commonly owned for lawful purposes, Plaintiff MacMillan would purchase and equip his P320 and/or his Glock-style subcompact handgun with a threaded barrel and pistol compensator for all lawful purposes, including everyday carry, self-defense inside the home, and shooting sport competitions.  Plaintiff MacMillan refrains from doing so out of fear that his firearm registration would be revoked and he could face criminal penalties for violation of the District's Ban.

62.     Plaintiff MacMillan's Sig Sauer P320 handgun is equipped with a forward rail which enables the attachment of various accessories, including lights, lasers, spare magazine storage, a second handgrip, or a stabilizing barrel shroud for mounting an optic.  All of these accessories are commonly owned and useful for lawful purposes, including self-defense.  However, the District's Ban defines any semiautomatic pistol with "a second handgrip", a "barrel shroud", or the "capacity to accept a detachable magazine at some location outside of the pistol grip" as an "assault weapon."  But for the District's Ban on semiautomatic handguns commonly owned for lawful purposes, MacMillan would equip his P320 with a stabilizing barrel shroud of his own design containing spare magazine storage and a second handgrip for all lawful purposes, including self-defense inside the home and shooting sport competitions.  Plaintiff MacMillan refrains from doing so out of

fear that his firearm registration would be revoked and he could face criminal penalties for violation of the District's Ban.

63.     Plaintiff MacMillan owns a Diamondback Arms DB-15 semiautomatic hunting rifle, chambered in 6.5 Grendel, which he duly registered with MPD in 2024.  At the time of registration, he equipped this rifle with a handmade wooden buttstock of his own design to comply with the District's Ban on the registration of certain semiautomatic firearms equipped with adjustable stocks.  The District's Ban defines a semiautomatic rifle with a "folding or telescoping stock" as an "assault weapon."  But for the District's Ban on semiautomatic rifles commonly owned for lawful purposes, Plaintiff MacMillan would equip his hunting rifle buttstock with an adjustable, shock-absorbing buttpad to increase accuracy and comfort while using it for all lawful purposes, including hunting bear and wild boar in surrounding states.  Plaintiff MacMillan refrains from doing so out of fear that his firearm registration would be revoked and he could face criminal penalties for violation of the District's Ban.

64.     Plaintiff MacMillan owns a single-shot Anderson Manufacturing AM-15 pistol, which he duly registered with MPD in 2023.  Plaintiff MacMillan installed a single-shot bolt carrier in the upper receiver of the firearm to render it bolt-action rather than semiautomatic.  If this pistol was restored with a semiautomatic bolt carrier as originally designed, it would be an excellent choice for home defense due to its small size and the ease with which it can be maneuvered, aimed, and fired compared to a handgun.  However, the District's Ban defines any semiautomatic pistol which has the "capacity to accept a detachable magazine at some location outside of the pistol grip" as an "assault weapon." But for the District's Ban on semiautomatic pistols commonly owned for lawful purposes,

Plaintiff MacMillan would install a semiautomatic bolt carrier in this pistol and use it for all lawful purposes, including self-defense inside the home and shooting sport competitions. Plaintiff MacMillan refrains from doing so out of fear that his firearm registration would be revoked and he could face criminal penalties for violation of the District's Ban.

65.     Plaintiff MacMillan owns a semiautomatic sporting rifle of his own design, drawing on the Colt AR-15A3 as a pattern, and chambered in 5.56×45mm NATO, which he legally manufactured within his own home using a 3D printer and duly registered with MPD in 2024.  At the time of registration, he equipped this rifle with a fixed magazine to comply with the District's Ban on the registration of detachable-magazine firearms equipped with certain accuracy-enhancing features.  Because it is equipped with a fixed magazine, it cannot be easily reloaded in a stressful self-defense situation, and malfunctions are more difficult to remedy.  But for the District's Ban on semiautomatic rifles commonly owned for lawful purposes, Plaintiff MacMillan would have manufactured this rifle, and would now modify this rifle, to accept a detachable magazine to use for all lawful purposes, including self-defense inside the home and shooting sport competitions.

66.     More, if allowed, Plaintiff MacMillan would acquire an FN PS90, which is a semiautomatic rifle capable of accepting a detachable magazine, with a thumbhole stock, and muzzle device.  Plaintiff MacMillan would acquire one of these rifles if not prohibited by the District's Ban and Defendants' enforcement thereof.  But these rifles, and others with these common features, are unregisterable and therefore illegal under the District's Semiautomatic Firearms Ban.

67.     In light of Defendants' actions, including the credible threat of arrest, confiscation, prosecution, fine, and imprisonment arising from the Ban's existence and

Defendants' recent actions to enforce it, Plaintiff MacMillan has thus far refrained from acquiring and possessing a FN PS90, or any similarly prohibited firearm, for home defense and other lawful purposes.

68.     In light of Defendants' actions, including the credible threat of arrest, confiscation, prosecution, fine, and imprisonment arising from the Ban's existence and Defendants' recent actions to enforce it, Plaintiff MacMillan has thus far refrained from improving his firearms as described above.  If enforcement of the Ban was enjoined, Plaintiff MacMillan would proceed with his desired upgrades.

## COUNT ONE - AGAINST ALL DEFENDANTS

### 42 U.S.C. § 1983 ACTION FOR DEPRIVATION OF PLAINTIFFS' RIGHTS UNDER THE SECOND AMENDMENT OF THE UNITED STATES CONSTITUTION

69.     Plaintiffs reiterate paragraphs 1 through 72 as if fully set forth herein.

70.     There is an actual and present controversy between the parties.

71.     The Second Amendment to the United States Constitution guarantees ordinary, law-abiding citizens their fundamental right to keep and bear arms, both in the home and in public.

72.     The right to keep and bear arms includes, but is not limited to, the right of individuals to acquire and possess common firearms for all lawful purposes, including self-defense.

73.     The District bans firearms that are commonly used for lawful purposes, arbitrarily singling out features and accessories that do not make any given firearm more powerful or dangerous.  No adequate basis exists to restrict such firearms, which fire only once per trigger pull, like all other semiautomatic firearms.

74.     42 U.S.C. § 1983 creates a cause of action against government actors who deprive individuals of their federal constitutional rights under the color of law.

75.     Defendants, individually and collectively, under color of law and at all relevant times, have deprived residents of the District, including Plaintiffs, of their individual rights through enforcement of the Semiautomatic Firearms Ban challenged here.

76.     For all the reasons asserted herein, Defendants have acted in violation of, and continue to act in violation of, 42 U.S.C. § 1983.

77.     Plaintiffs are therefore entitled to permanent injunctive relief against enforcement of the District's Semiautomatic Firearms Ban.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

1.     A declaratory judgment that Plaintiffs have a fundamental right to keep and bear arms, including by acquiring and possessing those common arms, labelled "assault weapons" by the District, as guaranteed under the Second Amendment to the United States Constitution;

2.     A declaratory judgment that the District's Semiautomatic Firearms Ban and all related regulations, policies, and/or customs designed to enforce or implement the same, prevent Plaintiffs from exercising their fundamental right to keep and bear arms, including by acquiring and possessing those common semiautomatic firearms banned by the District, as guaranteed under the Second Amendment to the United States Constitution;

3.     A permanent injunction prohibiting each Defendant, and Defendants' respective employees, officers, agents, representatives, and all those acting in concert or participation with them, from enforcing the challenged regulations making up, in part, the

District's Semiautomatic Firearms Ban, and all related laws, regulations, policies, and/or customs designed to enforce or implement the same;

       4.     Attorneys' fees, expert fees, and costs pursuant to 42 U.S.C. § 1988, and any other applicable law; and

       5.     Any and all other and further legal and equitable relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper.

Dated:  Tysons, Virginia
       July 3, 2024

FLUET

By: /s/ David S. Panzer
David S. Panzer, Esq. Bar No. 470677
Nicolas J. Rotsko, Esq.*
*Attorneys for Plaintiffs*
1751 Pinnacle Drive
Suite 1000
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
dpanzer@fluet.law
nrotsko@fluet.law

*Application to appear *pro hac vice* forthcoming