## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ADIKA CLEMENDOR, et al.,

               Plaintiffs,

v.

DISTRICT OF COLUMBIA, et al.

               Defendants.

Civil Action No. 1:24-cv-01955-DLF

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR APPLICATION FOR A PRELIMINARY INJUNCTION, TO CONSOLIDATE WITH THE MERITS, AND FOR SUMMARY JUDGMENT

David S. Panzer, Esq. Bar No. 470677
Nicolas J. Rotsko, Esq. (admitted *pro hac vice*)
FLUET
1751 Pinnacle Drive
Suite 1000
Tysons, VA 22102
(703) 590-1234
(703) 590-0366 (fax)
dpanzer@fluet.law
nrotsko@fluet.law
e-file@fluet.law

*Attorneys for Plaintiffs*

July 26, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................. ii

INTRODUCTION ............................................................................................................1

BACKGROUND ..............................................................................................................3

    I.     The District of Columbia Semiautomatic Firearm Ban ...........................................3

    II.    The Plaintiffs are harmed by the Semiautomatic Firearm Ban.............................4

ARGUMENT ....................................................................................................................6

I.     Plaintiffs are likely to succeed on the merits because the Semiautomatic
      Firearm Ban is unconstitutional under *Bruen*. .............................................6

     A.  The District of Columbia bans "Arms" within the plain text of
        the Second Amendment. .............................................................................7

     B.  The Firearms Ban is inconsistent with this nation's history
        of firearm regulation. ................................................................................8

         1.   Arms "in common use" cannot be banned consistent with
            our country's history. ...............................................................................8

         2.   The banned firearms are in common use. ..............................................10

II.    The Seventh Circuit misapplied *Heller* and *Bruen* in its analysis of
      Illinois' semiautomatic firearm ban. .............................................................20

III.   The other preliminary injunction factors favor Plaintiffs. ...........................................23

IV.   The Court should advance the trial on the merits and consolidate it
      with the preliminary injunction, or, in the alternative,
      grant summary judgment to Plaintiffs..........................................................27

CONCLUSION.................................................................................................................28

## TABLE OF AUTHORITIES

**Cases**                                                                                                            **Page**

*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002)..................................................................................................10

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*,
   910 F.3d 106 (3d Cir. 2018) ......................................................................15

*Baird v. Bonta*,
   81 F.4th 1036 (9th Cir. 2023).....................................................................25

*Bevis v. City of Naperville*,
   85 F.4th 1175 (7th Cir. 2023) .........................................................20, 21, 23

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014)............................................................................24, 25

*Caetano v. Massachusetts*,
   577 U.S. 411 (2016) ............................................................................11, 12

*Counterman v. Colorado*,
   600 U.S. 66 (2023)..................................................................................10

*Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*,
   2024 WL 3406290 (3d Cir. July 15, 2024) ........................................25, 26, 27

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)............................................................................. *passim*

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................................24, 25

*FBME Bank Ltd. v. Lew*,
   125 F. Supp. 3d 109 (D.D.C. 2015) ..............................................................6

*Friedman v. City of Highland Park*,
   136 S. Ct. 447 (2015).................................................................................15

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015).......................................................................22

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013)....................................................................27

*Grace v. District of Columbia*,
   187 F. Supp. 3d 124 (D.D.C. 2016) ....................................................23, 24, 27

*Harrel v. Raoul*,
   144 S. Ct. 2491 (2024)...............................................................................21

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011)................................................................ *passim*

*Hobby Lobby Stores, Inc. v. Sebelius*,
   723 F.3d 1114 (10th Cir. 2013) ...................................................................24

*Maryland v. King,*
   567 U.S. 1301 (2012)...................................................................................25

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010)..............................................................................11, 24

*Mills v. District of Columbia,*
   571 F.3d 1304 (D.C. Cir. 2009).............................................................23, 25

*Morris v. District of Columbia,*
   38 F. Supp. 3d 57 (D.D.C. 2014) .................................................................27

*\*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
   597 U.S. 1 (2022).............................................................................. *passim*

*New York State Rifle and Pistol Ass'n, Inc. v. Cuomo,*
   804 F.3d 242 (2d Cir. 2015) ....................................................................15, 16

*Nken v. Holder,*
   556 U.S. 418 (2009)....................................................................................24

*Planned Parenthood of Columbia/Willamette v. Am. Coal. of Life Activists,*
   290 F.3d 1058 (9th Cir. 2002).....................................................................10

*Simms v. District of Columbia,*
   872 F. Supp. 2d 90 (D.D.C. 2012) ...............................................................27

*Singh v. Carter,*
   185 F. Supp. 3d 11 (D.D.C. 2016) .................................................................6

*Staples v. United States,*
   511 U.S. 600 (1994)........................................................................12, 20, 21

*Stenberg v. Carhart,*
   530 U.S. 914 (2000) ...................................................................................12

*United States v. Miller,*
   307 U.S. 174 (1939).....................................................................................8

*\*Wrenn v. District of Columbia,*
   864 F.3d 650 (D.C. Cir. 2017)...........................................................23, 27, 28

## Constitutional Provisions and Statutes

D.C. CODE
   § 7-2501.01(3A)(A) ...............................................................................3, 4, 28
   § 7-2501.01(3A)(A)(i)(I) ...............................................................................4
   § 7-2501.01(3A)(A)(i)(I)(aa) ........................................................................4
   § 7-2501.01(3A)(A)(i)(I)(ee) ........................................................................4
   § 7-2501.01(3A)(A)(i)(II) .............................................................................4
   § 7-2501.01(3A)(A)(i)(III) ............................................................................4
   § 7-2501.01(3A)(A)(ii) .................................................................................4
   § 7-2501.01(3A)(A)(iii) ................................................................................4
   § 7-2502.01(a) ........................................................................................3, 28
   § 7-2502.02(a)(6) ...................................................................................3, 28

§ 7-2502.09 ...............................................................................................3, 28
§ 7-2507.06(a) ..........................................................................................3, 28
§ 22-3571.01 ............................................................................................3, 28

U.S. CONST. amend. II. ...................................................................................6

### **Other Authorities**

11A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE
§ 2948.1 (3d ed. 2024) ........................................................................23, 24

Morton Denlow, *The Motion for a Preliminary Injunction: Time for a Uniform Federal Standard*,
22 REV. LITIG. 495 (2003) ........................................................................27

Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue:
Stenberg Principles, Assault Weapons, and the Attitudinalist Critique*,
60 HASTINGS L.J. 1285 (2009)..................................................................16

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L.
381 (1994)................................................................................................20

E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. ILL. U. L. J. 193 (2018) ...............13, 14, 15

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, TO CONSOLIDATE WITH THE MERITS, AND FOR SUMMARY JUDGMENT

### INTRODUCTION

The District of Columbia's ban on common semiautomatic firearms that it inaccurately and derisively labels "assault weapons" is flatly unconstitutional under a straightforward application of Supreme Court precedent. In *District of Columbia v. Heller*, 554 U.S. 570, 713 (2008), the Supreme Court invalidated a District of Columbia law that banned law-abiding citizens from possessing handguns in their homes. Under *Heller*'s reasoning, the District of Columbia's semiautomatic firearm ban must meet the same fate. First, *Heller* establishes that the Second Amendment, as a textual matter, presumptively protects "all firearms." 554 U.S. at 581–82. Second, *Heller* establishes that as a matter of history only firearms that are "dangerous and unusual weapons" may be banned. *Id*. at 627. It follows from this that firearms that are in "common use" by law-abiding citizens cannot be banned, as such firearms by definition are not dangerous and unusual. *See id.* Applying these principles, it is clear that the District's semiautomatic firearm ban is flatly unconstitutional. Indeed, the ban reaches rifles that the federal agency charged with implementing this Nation's gun laws recognizes as among "the most popular firearms in the United States." Definition of Frame or Receiver and Identification of Firearms, 87 FR 24652-01, 24653 (Apr. 26, 2022).

Despite *Heller*'s holding, the D.C. Circuit upheld the District's semiautomatic firearm ban (addressing only its application to rifles) in 2011. *See Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"). But following the Supreme Court's rejection of *Heller II*'s intermediate scrutiny approach in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the pertinent part of *Heller II* is not the abrogated panel majority opinion but rather the dissenting opinion of then-Judge Kavanaugh. In that opinion, applying *Heller*'s text-and-history

1

approach, Judge (now Justice) Kavanaugh reasoned that the District's ban was unconstitutional because "[s]emi-automatic rifles have not traditionally been banned and are in common use … by law-abiding citizens." *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting).

*Bruen* cements the case that the District's ban is unconstitutional. There, the Court not only rejected interest-balancing but also repeatedly reaffirmed that the Second Amendment does not permit the government to ban firearms that are in common use. For example, before turning to evaluate the text and history of the right to carry, the Court stated that there was no need to evaluate whether the arms in question were protected because they were "in common use today." 597 U.S. at 32. And the Court rejected the relevance of colonial laws that arguably banned carrying handguns because regardless of whether handguns "were considered dangerous and unusual weapons in the 1690s," handguns "are unquestionably in common use today." *Id*. at 47 (quotation marks omitted). *Bruen* thus vindicates then-Judge Kavanaugh's dissent in *Heller II*, and it follows that the District's ban is unconstitutional. Indeed, the case has gotten only stronger in the decade-plus since that decision. At that time, "about two million semi-automatic AR-15 rifles"—the most popular of the banned firearms—had "been manufactured," 670 F.3d at 1287, whereas today *nearly 30 million* AR-15 and similar rifles have been produced for the domestic market, *see* Ex. 1, *Over 28.1 Million Modern Sporting Rifles in Circulation*, NSSF (Jan. 11, 2024) https://bit.ly/3LEOO9b. The banned firearms were common in 2011; they are "ubiquitous" today. *See* Ex. 2, Thomas Gibbons-Neff, *An AR-15-style Rifle Was Recovered at the Scene of the Trump Rally Shooting*, N.Y. TIMES (July 14, 2024), https://nyti.ms/3WcFWwk.

Based on the foregoing, Plaintiffs are entitled to a preliminary injunction, as the District has no legitimate interest in enforcing its patently unconstitutional law. But the Court should not stop there. Based on the ban's plain unconstitutionality under *Heller*, the Court should enjoin it

permanently, either through summary judgment under Federal Rule of Civil Procedure 56 or advancing the trial on the merits under Rule 65(a)(2).

## BACKGROUND

### I.      The District of Columbia's Semiautomatic Firearm Ban

The District labels many commonly used semiautomatic firearms as "assault weapons" and criminalizes their possession. D.C. CODE §§ 7-2501.01(3A)(A); 7-2502.01(a); 7-2502.02(a)(6); 7-2502.09; 7-2507.06(a). Violators of the ban are punished by up to five years in prison and a fine between $2,500.00 and $12,500.00. *Id.* §§ 7-2507.06(a); 22-3571.01. While it exempts law enforcement, members of the military, and other narrow categories, the ban effectively functions as a flat ban making it unlawful for typical residents of the District to "receive, possess, control, transfer, offer for sale, sell, give, or deliver" any firearm the district labels as an "assault weapon." *Id.* § 7-2502.01(a).

The Semiautomatic Firearm Ban defines as "assault weapons" scores of common semiautomatic rifles, either by name or by feature. A semiautomatic rifle is banned if it has the capacity to accept a detachable magazine and has any one of the following features:

(aa) A pistol grip that protrudes conspicuously beneath the action of the weapon;
(bb) A thumbhole stock;
(cc) A folding or telescoping stock;
(dd) A grenade launcher or flare launcher;
(ee) A flash suppressor;
(ff) or A forward pistol grip;

*Id.* § 7-2501.01(3A)(A). Likewise, a semiautomatic pistol is banned if it has the capacity to accept a detachable magazine and has any one of the following features:

(aa) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer;
(bb) A second handgrip;
(cc) A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning his or her hand, except a slide that encloses the barrel; or

> (dd) The capacity to accept a detachable magazine at some location outside of the pistol grip;

*Id.* All semiautomatic shotguns with the ability to accept a detachable magazine are banned, as are semiautomatic shotguns that have one or more of the following:

> (aa) A folding or telescoping stock;
> (bb) A pistol grip that protrudes conspicuously beneath the action of the weapon;
> (cc) A thumbhole stock; or
> (dd) A vertical handgrip;

*Id.* Additionally, the Ban gives wide discretion so that "the Chief may designate as an assault weapon by rule, based on a determination that the firearm would reasonably pose the same or similar danger to the health, safety, and security of the residents of the District as those weapons enumerated in this paragraph." D.C. CODE § 7-2501.01(3A)(A)(iii). The Ban also applies to approximately 35 "specified" rifles, pistols, and shotguns, singled out by manufacturer name, make and model. *Id*. § 7-2501.01(3A)(A)(i)(I)–(III). Notably, the list includes the entirety of the extremely popular "Colt AR-15 series" and any variations with minor differences, regardless of manufacturer. *Id.* § 7-2501.01(3A)(A)(i)(I)(aa), (ee) & (3A)(A)(ii).

## II.     The Plaintiffs are harmed by the Semiautomatic Firearm Ban.

Plaintiffs in this case are two individuals and an organization who bring this action to vindicate their rights protected by the Second Amendment. Plaintiffs Adika Clemendor and David MacMillan are law-abiding District of Columbia residents and members of Plaintiff Firearms Policy Coalition, Inc ("FPC"). Plaintiffs' Statement of Undisputed Material Facts ¶¶ 1, 7, 20 (July 26, 2024) ("SOF"). Plaintiff Clemendor lives with his wife-to-be and elderly relatives. SOF ¶ 1. He intends to exercise his right to keep and bear so-called "assault weapons" for lawful purposes, especially home defense and target shooting. *Id.* If not for the Semiautomatic Firearm Ban, he would a possess a firearm which is currently banned, such as a Sig Sauer MCX-Spear, a Daniel Defense DDM4 V7, or a Palmetto State Armory PSA Gen3 PA-10, all of which are AR-style rifles

capable of accepting a detachable magazine, with a telescoping stock, pistol grip, and muzzle device. SOF ¶ 3. Plaintiff MacMillan is licensed to carry concealed pistols and owns multiple handguns and rifles, all of which he duly registered with the Metropolitan Police Department ("MPD"). SOF ¶¶ 7, 9. But for the Ban, he would purchase and equip his various firearms with accessories including a threaded barrel, pistol compensator, barrel shroud, butt pad, bolt carrier, and detachable magazines for lawful purposes including home defense, target shooting and shooting sports competitions. SOF ¶¶ 8, 9. He would also possess a rifle which is currently banned, the FN PS90. SOF ¶¶ 13, 14. Because Plaintiffs fear arrest, criminal charges, prosecution, fines, and incarceration by Defendants under the challenged laws, and because the bans have destroyed the legal market for such firearms and equipment in the District of Columbia, Plaintiffs cannot exercise their Second Amendment rights by purchasing and using these commonly possessed firearms. SOF ¶¶ 5, 16, 20, 21.

Plaintiff FPC is a nonprofit membership organization which seeks to defend the rights of its members, especially those protected by the Second Amendment. SOF ¶¶ 18, 19. It has members in the District of Columbia, including the named Plaintiffs, and brings this action to vindicate their rights. SOF ¶ 20. Because FPC's members fear arrest, prosecution, fines, and incarceration by Defendants under the challenged laws, and because the Ban has destroyed the legal market for such firearms in the District, its members cannot exercise their Second Amendment by purchasing, possessing, and using these commonly possessed firearms. SOF ¶ 20, 21.

Defendant District of Columbia is the municipal entity where the Ban is enforced. The named Defendants are District officials with authority to enforce the Ban against Plaintiffs. Defendant Pamela A. Smith is acting Chief of Police of the Metropolitan Police Department. Defendant Brian L. Schwalb is the Attorney General for the District of Columbia. Acting in their

official capacities, Defendants are presently charged with enforcing unconstitutional laws, customs, practices, and policies against Plaintiffs.

## ARGUMENT

A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.

*Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (citations omitted). When the government is the party opposing a preliminary injunction, the third and fourth of these factors merge. *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 127 (D.D.C. 2015). Plaintiffs meet this standard.

**I.      Plaintiffs are likely to succeed on the merits because the Semiautomatic Firearm Ban is unconstitutional under *Bruen*.**

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *Bruen*, the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. Applying that standard here is straightforward. Indeed, *Heller* already did the work of interpreting the Second Amendment's text and identifying the relevant tradition (or lack thereof) of regulation in cases like this one. The firearms banned by D.C. are "arms," which means that possessing them is conduct covered by the plain text of the Second Amendment. And the banned firearms are in common use for lawful purposes, which means that banning them is not consistent with the historical tradition of regulating dangerous and unusual firearms. The Semiautomatic Firearm Ban is therefore unconstitutional.

### A. The District of Columbia bans "Arms" within the plain text of the Second Amendment.

The initial analysis under *Bruen* is whether the "plain text" of the Second Amendment protects the conduct in which the Plaintiffs wish to engage but that is banned by the statute—here, owning certain semiautomatic firearms that the District labels "assault weapons." The question then, is whether so-called "assault weapons" are "arms" as that term was understood at the Founding. *Heller* makes clear that the answer is yes. "The 18th-century meaning is no different from the meaning today." *Heller*, 554 U.S. at 581. "The 1773 edition of Samuel Johnson's dictionary defined 'arms' as 'weapons of offence, or armour of defence.'" *Id.* (cleaned up). And "Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Id.* The Court also cited without quoting Webster's 1828 American Dictionary of the English Language, which gave as its first definition of arms "weapons of offense, or armor for defense and protection of the body," and said that "in law, arms are any thing which a man takes in his hand in anger, to strike or assault another." Ex. 3, N. WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), https://bit.ly/3TclVoq. Firearms plainly are encompassed within "arms." Indeed, while the Court noted one anomalous Founding-era source that "limited 'arms' (as opposed to 'weapons') to 'instruments of offence generally made use of in war," the Court emphasized that "even that source stated that all firearms constituted 'arms.'" *Heller*, 554 U.S. at 581. In sum, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Id*. at 582. And all firearms are arms. Because the D.C. laws challenged here ban firearms, the plain text is implicated, and the burden is on D.C. to justify its law.

**B. The Firearms Ban is inconsistent with this nation's history of firearm regulation.**

    **1. Arms "in common use" cannot be banned consistent with our country's history.**

Because the banned firearms are arms, the District of Columbia must prove that its regulation is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. Ordinarily, that would require the District to establish a relevant, Founding-era tradition of regulation, and then show that the Ban falls within that tradition. However, the Supreme Court has already made clear in both *Bruen* and *Heller* that the tradition of firearm regulation relevant to a case involving "the sorts of weapons protected" is the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627). By contrast, if a law prohibits "the possession and use of weapons that are 'in common use at the time,'" then by definition it *will not* fit into the tradition of prohibiting "dangerous and unusual weapons." *Id.* (quoting *Heller*, 554 U.S. at 627; *see also id.* at 625).

The Supreme Court first elucidated this rule in *Heller*. Like this case, *Heller* involved a ban on a type of firearm (there, handguns). *Heller* began by construing the plain text of the Second Amendment, from which the Court concluded that all firearms were "arms" and presumptively protected. 554 U.S. at 582. In Part III of *Heller*, the Court then turned to historical limitations on the textual scope of the right. *See Heller*, 554 U.S. at 626–28. Through examining history, the Court concluded that, despite its expansive textual scope, the Second Amendment "was not a right to keep and carry any weapon whatsoever." *Id.* at 626. Rather, the Supreme Court used historical analysis to affirm its holding in *United States v. Miller*, 307 U.S. 174, 179 (1939), that "the sorts of weapons protected were those 'in common use at the time.'" 554 U.S. at 627 (citation omitted). It found that this limitation was "fairly supported by the historical tradition of prohibiting the

carrying of 'dangerous and unusual weapons.'" *Id.* Thus, the Supreme Court *already analyzed history and tradition* to determine what sort of arms could be constitutionally restricted—and found that "dangerous and unusual weapons" was the answer. The corollary of this is that because arms which are in "common use" are not "dangerous and unusual," they are *per se* protected.

*Bruen* confirms the exception for "dangerous and unusual weapons" (and correlative protection for arms "in common use") is a rule derived from history. *See* Ex. 4, Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases-Again*, HARV. J.L. & PUB. POL'Y PER CURIAM (Sept. 27, 2023), https://bit.ly/49KhTKQ. When *Bruen* explained its framework, "common use" was the example it chose for how to use the "historical understanding of the Amendment to demark the limits on the exercise of th[e] right." 597 U.S. at 21. Once it was established that the arms at issue (handguns) were "in common use today for self-defense," there was no need for any further analysis of the type of arm at issue, textual or historical. *Id.* at 32 (quotation marks omitted). In distinguishing colonial laws that allegedly restricted the carrying of handguns, *Bruen* explained that regardless of what was true in colonial times, handguns are in common use today. That was significant because "colonial legislatures sometimes prohibited the carrying of dangerous and unusual weapons," and in *Heller*, "[d]rawing from this historical tradition, [the Court] explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id.* at 47. If there was any doubt that *Heller*'s statements about "common use" were derived from history, *Bruen* put them to rest. Thus, *Bruen* confirms that in the context of bans on bearable arms, *the Supreme Court has already done the historical spadework*—and the only restrictions of this kind that it has deemed consistent with the

historical understanding of the right to keep and bear arms are restrictions limited to *dangerous and unusual arms that are not in common use.*

### 2. The banned firearms are in common use.

This Court's task is straightforward: it must merely determine whether the banned firearms are "dangerous and unusual"—which they cannot be if they are "in common use." So, it is the District's burden to show the Firearm Ban "is consistent" with this historical tradition by demonstrating, among other things, that the firearms are not "in common use." *Bruen*, 597 U.S. at 47. Any doubt about the nature of this burden was removed by *Bruen*'s comparison of its analytic framework to First Amendment caselaw. To head off the complaint that it was unfair to put the government to its proof in defending a challenged law, the Court noted that this was precisely how things work in the First Amendment context where the government also generally bears the burden of "point[ing] to *historical* evidence about the reach of the First Amendment's protections." *Id*. at 24–25 (citing *United States v. Stevens*, 559 U.S. 460, 468–71 (2010)). In such a case, the government's work is not done merely because it establishes a certain type of speech is unprotected, it must *also* show that the speech covered by the challenged law (or at issue in the prosecution) is *of that type. Id.*; *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 246 (2002) ("[T]he Government must prove that the work, taken as a whole" is obscene.); *Counterman v. Colorado*, 600 U.S. 66, 69 (2023) (true threats); *Planned Parenthood of Columbia/Willamette v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1107–08 (9th Cir. 2002) (incitement). So too here. The District can only justify the Semiautomatic Firearm Ban by proving that the arms it has banned are appropriate targets for prohibition under the relevant historical framework.

Before assessing "common use" it is useful to establish a few principles. First, to determine whether a firearm is "in common use," the Supreme Court has made clear that the Second

Amendment focuses on the practices of the American people nationwide, not just in the District of Columbia. *See Bruen*, 597 U.S. at 26 ("It is this balance—struck by the traditions *of the American people*—that demands our unqualified deference." (emphasis added)); *Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by *American society*" for self-defense (emphasis added)); *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) ("stun guns are widely owned and accepted as a legitimate means of self-defense *across the country*" (emphasis added)). Thus, the Second Amendment protects those who live in states or localities with a less robust practice of protecting the right to keep and bear firearms, such as the District of Columbia, just as much as it protects those who live in jurisdictions that have hewn more closely to American traditions. *See, e.g.*, *Heller*, 554 U.S. at 570.

Second, courts may not analyze the utility, rather than the commonality, of arms possessed. "Common use" refers to possession by law-abiding citizens for lawful purposes. *Heller*, 554 U.S. at 625. Once this is established, courts may not second-guess the choices made by law-abiding citizens by questioning whether they really "need" the arms that they have chosen to possess. While *Heller* noted several "reasons that a citizen may prefer a handgun for home defense," the Court held that "[*w*]*hatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629 (emphasis added). As Justice Stevens explained, "[t]he Court struck down the District of Columbia's handgun ban not because of the *utility* of handguns for lawful self-defense, but rather because of their *popularity* for that purpose." *McDonald v. City of Chicago*, 561 U.S. 742, 890 n.33 (2010) (Stevens J., dissenting) (emphasis in original). And in *Bruen*, the Court reaffirmed that "the traditions of the American people"—which includes their choice of preferred firearms— "demand[ ] [the courts'] unqualified deference." 597 U.S. at 26. Thus, unless the State can show

that a certain type of firearm is "not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, the inquiry ends there.

Third, the Second Amendment inquiry focuses on the choices made by *contemporary* law-abiding citizens. *Heller* rejected as "bordering on the frivolous" "the argument . . . that only those arms in existence in the 18th century are protected," 554 U.S. at 582. And in *Caetano*, the Court reiterated this point, holding that "Arms" protected by the Second Amendment need not have been "in existence at the time of the Founding." 577 U.S. 411–12 (quoting *Heller*, 554 U.S. at 582). The *Caetano* Court flatly denied that a particular type of firearm's being "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id.* And *Bruen* cements the point. Responding to laws that allegedly restricted the carrying of handguns during the colonial period, the Court reasoned that "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 597 U.S. at 47.

With these principles in mind, it is indisputable that the banned firearms are "in common use." They are common, semiautomatic firearms that possess common features, and fire a single shot for each pull of the trigger. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). Labeling them as "assault weapons" does not change this fact. "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists . . ." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting). Anti-gun activists themselves have admitted that "assault weapon" is a political term designed to exploit "the public's confusion over fully automatic machine guns versus semi-automatic assault weapons." Ex. 5, JOSH SUGARMANN, ASSAULT WEAPONS AND ACCESSORIES IN AMERICA (1988), https://bit.ly/3m5OW5V.

In reality, the firearms the District labels as "assault weapons" are no different from any other semiautomatic firearms which are exceedingly common and fully protected by the Second Amendment.

To be sure, the District does not ban all semiautomatic firearms. But the features that the District focuses on do not somehow make a semiautomatic firearm dangerous and unusual. Indeed, to the extent they make a difference at all, they tend to make firearms *safer* by enhancing accuracy and usability. The straight-line design of rifles like the AR-15 in fact mandates a pistol grip (or a workaround like a thumbhole stock) to enable the rifle to be securely gripped. E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. ILL. U. L. J. 193, 229 (2018). This distinguishes an AR-15 style rifle from more traditional rifles that do not have a straight-line design. Unlike the latter, the stock of the AR-15 cannot comfortably be gripped by the trigger hand. *See Id.* ("The straight-line design [of an AR-15] requires a pistol grip separate from the buttstock because it is too awkward to pull the trigger while gripping the raised buttstock when firing … from the shoulder".). The straight-line design itself enhances accuracy by directing recoil energy straight back to the user's shoulder, thus reducing the muzzle rise that occurs with rifles without a straight-line design. *Id.*

Folding and telescoping stocks, broadly termed "[a]djustable stocks," are "ergonomic improvements over earlier fixed-stock rifle configurations" that are "designed to allow adjustments in the rifle's length of pull." *Id.* at 232. Because "[m]ost people cannot afford to have a rifle custom-stocked to fit their precise size and shape and certainly cannot afford to have custom stocks made for each member of their family," adjustable stocks serve a similar function as adjustable steering wheels and seats: they increase accessibility and comfort for users of different builds. Ex. 6, DENNIS P. CHAPMAN, THE AR-15 CONTROVERSY: SEMIAUTOMATIC RIFLES AND THE SECOND AMENDMENT 83–84 (2022).

A flash suppressor "reduces noise and potentially increases accuracy." Ex. 7, STEPHEN P. HALBROOK, AMERICA'S RIFLE: THE CASE FOR THE AR-15 332 (2022) (quoting *Murphy v. Guerrero*, No. 1:14-CV-00026, 2016 WL 5508998, at *19 (D.N. Mariana Islands Sept. 28, 2016)). It can be extremely useful in self-defense situations: when facing a home invader in the middle of the night, a homeowner would do well to not be blinded by the flash from his first shot.

> Civilian applications for flash hiders include hunting in low light or at night. Probably the greatest practical benefit of a flash hider for civilians is that it protects the crown of the barrel from dirt and other obstructions. There is no evidence that flash hiders have given terrorists or criminals any advantage in mass shootings or other crimes involving 'assault weapons.'

Wallace, *"Assault Weapon" Myths*, *supra* at 233–34.

Threaded barrels "can allow the firearm to be more easily disassembled for cleaning or maintenance . . . [and] offer greater precision and accuracy than non-threaded barrels." Ex. 8, *What Does a Threaded Gun Barrel Do?*, SPRINGHILL OUTFITTERS (July 13, 2022), https://bit.ly/3WdUa1t. A threaded barrel also can allow for the attachment of beneficial items such as flash suppressors.

Generally known as "handguards," a barrel shroud "is the metal or plastic enclosure that covers typically all but a few inches of the barrel" and, on an AR-15,

> has multiple functions: (1) it provides the shooter with a forward grip on the rifle using the non-trigger hand; (2) it protects the shooter's hand from a hot barrel; (3) it protects the barrel and gas tube or piston from damage; (4) it helps ventilate and cool the barrel; and (5) it provides a base for attaching accessories to the rifle such as sights, slings, flashlights, forward vertical grips, and bipods. None of these functions make the AR-15 exceptionally lethal, especially when compared to non-banned rifles.

Wallace, *"Assault Weapon" Myths*, *supra* at 231. Because burned hands pose "a critically important safety concern" for Americans who own these rifles, these handguards "exist to protect shooters from injury by contact with hot rifle barrels during ordinary, routine shooting activities." Ex. 6, Chapman, *supra* at 66–67.

"Civilian semiautomatic rifles and handguns are designed to use detachable magazines, as are most modern bolt-action rifles." *See* Wallace, *"Assault Weapons" Myths*, *supra* at 234. Detachable magazines have numerous advantages in the civilian context. If the magazine jams, it "can be easily removed from the firearm for reloading". Ex. 9, *Detachable vs. Fixed Magazines*, GUN CREED, https://bit.ly/4f4p1oC (last visited July 25, 2024). Additionally, "in self-defense situations where quick access to ammunition is crucial, having spare loaded magazines readily available allows for swift response without compromising safety." *Id.* Furthermore, the easy reloads "can be done by almost anyone with minimal training in how a firearm works," which increases accessibility and makes less seasoned firearm owners more effective during home defense situations. Ex. 10, *The AR-15 for Home Defense: Things to Consider*, PALMETTO STATE ARMORY, https://bit.ly/3VX4HNf (last visited July 25, 2024).

The bottom line is that none of the "assault" features identified by the District make a firearm "dangerous and unusual." Rather, they improve common firearms to make them safer and more accurate and reliable.

Even accepting the District's false framing that "assault weapons" are a coherent category, that does not change the fact that the arms are in common use for lawful purposes. The dispositive point under *Heller* and *Bruen* is that millions of law-abiding citizens choose to possess firearms in this category. *See Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting) (reasoning that "citizens . . . have a right under the Second Amendment to keep" "AR-style semiautomatic rifles" because "[r]oughly five million Americans own" them and "[t]he overwhelming majority . . . do so for lawful purposes[.]"); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) ("*ANJRPC*"), *abrogated by Bruen* (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *New*

*York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use[.]'").

As the D.C. Circuit previously found in *Heller II*, "it [is] clear enough in the record that semi-automatic rifles . . . are indeed in 'common use,' as the plaintiffs contend." 670 F.3d at 1261 (internal quotation marks omitted; alteration added). The court cited the popularity of one prototypical firearm that epitomizes the firearms the District bans: the AR-15. When *Heller II* was decided, the record showed that "approximately 1.6 million AR–15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market." *Id.* These numbers are far higher today, with *nearly 30 million* AR-15 and similar rifles produced for the domestic market, *see* Ex. 1, *Over 28.1 Million Modern Sporting Rifles in Circulation*, NSSF (Jan. 11, 2024), https://bit.ly/3LEOO9b. The AR-15 is "the best-selling rifle type in the United States." Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue: Stenberg Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285, 1296 (2009). Various sources demonstrate beyond doubt that the AR-15 and similar types of firearms are in common use for lawful purposes.

*Consumer surveys.* Several recent consumer surveys demonstrate the commonality of AR-15 and similar firearms. In 2022, Washington Post-Ipsos conducted a survey of 2,104 gun owners. Ex. 11, *Poll of current gun owners* at 1, WASH. POST-IPSOS (2022), https://bit.ly/46CqzRa ("WashPost Poll"). The survey asked whether individuals owned AR-15-style rifles. Twenty percent answered yes, *id.*, suggesting that "about 16 million Americans own an AR-15." Ex. 12,

Emily Guskin, et al., *Why do Americans own AR-15s*, WASH. POST (Mar. 27, 2023), https://wapo.st/3IDZG5I. The survey also asked *why* individuals owned AR-15s. Common answers included protection of self, family and property (91%, with 65% stating this was a major reason), target shooting (90%), in case law and order breaks down (74%), and hunting (48%). Ex. 12, WashPost Poll at 1–2. Sixty-two percent of AR-15 owners reported firing their AR-15 rifles at least a few times a year. *Id.* at 2.

In 2021, Georgetown Professor William English conducted a survey of 16,708 gun owners. Ex. 13, William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 18, 2022), https://bit.ly/3yPfoHw. The English survey asked whether gun owners had "ever owned an AR-15 or similarly styled rifle?" *Id.* at 33. "30.2% of gun owners, about 24.6 million people," answered that they had owned such a rifle. *Id.* The average owner of such rifles had owned 1.8 and the median 1. *Id.* The English survey also asked *why* individuals owned such rifles. Answers included target shooting (66%), home defense (61.9%), hunting (50.5%), and defense outside the home (34.6%). *Id.* at 33. English also asked about defensive use of firearms. The survey responses indicated that gun owners engage in 1.67 million defensive gun uses a year. *Id.* at 9. This is consistent with other survey data; "[a]lmost all national survey estimates indicate[d] that defensive gun uses by victims are at least as common as offensive uses by criminals, with estimates of annual uses ranging from about 500,000 to more than 3 million[.]" Ex. 14, Alan I. Leshner et al., *Priorities for Research to Reduce the Threat of Firearm-Related Violence*, at 15, NAT'L RSCH. COUNCIL (2013), https://bit.ly/48ZYjcm. English found that 13.1% of defensive gun users used a rifle, English at 14–15, which amounts to over 200,000 defensive uses of rifles a year.

Also in 2021, the National Shooting Sports Foundation (NSSF), the Firearm Industry Trade Association, conducted a survey of 2,185 owners of AR- and AK-platform rifles. Ex. 15, *Modern Sporting Rifle: Comprehensive Consumer Report* at 10, NSSF (July 14, 2022), https://bit.ly/3GLmErS. Owners were asked to rate on a scale of 1 to 10 (with 1 being not at all important and 10 very important) how important various reasons were for owning the rifles. Responses included recreational target shooting (8.7), home/self-defense (8.3), and varmint hunting (5.8). *Id.* at 18. Sixty-seven percent of respondents indicated that they had used their rifle at least five times in the previous twelve months. *Id.* at 41. Another NSSF survey estimated that over 21 million Americans had trained with these types of rifles in 2020. Ex. 16, *Sport Shooting Participation in the U.S. in 2020* at iii, NSSF (2021), https://bit.ly/3sPuEQl.

**Firearm Dealer Surveys.** In addition to surveying consumers, the NSSF also conducts surveys of firearm dealers. In one survey, retailers were asked what percentage of firearms they sold were of various types. *See* Ex. 17, *2021 Firearms Retailer: Survey Report*, NSSF (2021), https://bit.ly/3gWhI8E. In 2020, at the top was semiautomatic pistols, at 44.2%. *Id.* at 9. AR/modern sporting rifles were second, at 20.3%, followed by shotguns (12.4%), traditional rifles (11.3%), and revolvers (7.2%). *Id.* And 2020 was not an outlier. NSSF's 2019 retailer survey indicated that ARs and similar rifles constituted between 17.7% and 20.3% of firearm sales in every year from 2011 from 2018 (excepting 2017, when no results were reported). Ex. 18, *2019 Firearms Retailer: Survey Report* at 6, NSSF (2019), *available at Miller v. Becerra*, No. 3:19-cv-1537 (S.D. Cal.), Dkt. No. 22-13 at 107.

**Firearm Production Data.** NSSF has also analyzed firearm production data to determine how many AR- and AK-style rifles have been produced for the American market. Ex. 19, *Firearm Production in the United States With Firearm Import and Export Data* at 7, NSSF (2023),

https://bit.ly/42qYo7k. From 1990 to 2021, it estimates that number to be 28,144,000, with totals exceeding one million every year from 2012 to 2021, with an average of over two million per year over that time period. *See id.* at 7. Domestic production of AR-style and similar rifles accounted for approximately 20% of all domestic firearms produced for the American market for the decade of 2012 to 2021. *See id.* at 2–7.

In sum, AR-style rifles are unquestionably in common use for lawful purposes: millions of Americans own tens of millions of them; they account for approximately 20% of all firearm sales in the past decade; and leading reasons for owning them include self-defense, target shooting, and hunting. Indeed,

> [AR-style rifles are] popular with civilians . . . around the world because they're accurate, light, portable, and modular. . . .[The AR-style rifle is] also easy to shoot and has little recoil, making it popular with women. The AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves.

Ex. 20, FRANK MINITER, THE FUTURE OF THE GUN 46–47 (2014).

By contrast, use of such firearms for unlawful purposes is exceedingly rare. Evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'" Ex. 21, Gary Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL 112 (1997). Instead, the vast majority of murders are committed with ordinary handguns—the firearms unambiguously protected by *Heller*. 554 U.S. at 682 ("[T]he law concerns handguns, which are specially linked to urban gun deaths and injuries, and which are the overwhelmingly favorite weapon of armed criminals . . . .") (Breyer, J., dissenting). From 2015 through 2020, only 2.2% of murders were committed with any type of rifle. *See* Ex. 22, Crime Data Explorer, 2022, FBI, U.S. DEP'T OF JUST., *available at Lane v. James*, No. 7:22-cv-10989-KMK, Dkt. No. 94-62 (S.D.N.Y. July 15, 2024); Ex. 23, *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019, Crime in the United States, 2019*, FBI, U.S.

DEP'T OF JUST., https://bit.ly/31WmQ1V. Even in the counterfactual event that a different modern semiautomatic rifle had been involved in each rifle-related murder from 2015 to 2020, an infinitesimal percentage of the approximately 20 million modern sporting rifles in circulation during that time period—around .01 percent—would have been used for that unlawful purpose. Indeed, "[if] we are constrained to use D.C.'s rhetoric, we would have to say that handguns are the quintessential 'assault weapons' in today's society; they are used far more than any other kind of gun in violent crimes." *Heller II*, 670 F.3d at 1290 (Kavanaugh, J., dissenting). But such criminal misuse was entirely irrelevant to the Court, even when assessing whether handguns were "dangerous and unusual," because they were simultaneously widely popular among law-abiding citizens, as so-called "assault weapons" are. *See Heller*, 554 U.S. at 627, 629.

There is a long tradition in this country of lawful possession of semiautomatic firearms. The Supreme Court has held as much, concluding in *Staples* that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612. Semiautomatic rifles have been commercially available for over a century. *See Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 413 (1994). Yet apart from the now-expired ten-year federal "assault weapons" ban, the Federal Government has not banned them. And currently the vast majority of States do not ban semiautomatic firearms deemed "assault weapons." They are unequivocally in "common use," and the District's outlier ban should be held unconstitutional and enjoined.

## II.  The Seventh Circuit misapplied *Heller* and *Bruen* in its analysis of Illinois' semiautomatic firearm ban.

In analyzing these issues, the Court would do well to avoid following the example of the Seventh Circuit, which, in *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (7th Cir. 2023), *cert.*

*denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024), held that a similar Illinois ban should not be preliminarily enjoined. There the Seventh Circuit misapplied the Supreme Court's binding precedent to hold that the term "arms" includes an implicit limitation that the Second Amendment does not protect any "weapons that may be reserved for military use," by which the panel meant any firearm that is, in its judgment "more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense." *Bevis*, 85 F.4th at 1195.The panel explained this limitation was based on *Heller*'s singling out of "weapons that are most useful in military service—M16 rifles and the like" which "may be banned". *Id.* at 1193 (quoting *Heller*, 554 U.S. at 627). This is a misreading of *Heller*. As previously discussed, as a matter of plain text, the Second Amendment's protection extends to *all firearms* and permissible restrictions must then come from history. *Heller* explicitly states that: "[T]he Second Amendment extends, prima facie, to *all instruments that constitute bearable arms*[.]" 554 U.S. at 582 (emphasis added). While *Heller* did speak of M-16 rifles and weapons most useful in military service, it did so in the context of its "common use" analysis, which *Bevis* wrongly imported into its textual analysis of "arms." *Heller*, 554 U.S. at 627. And as previously explained, arms "in common use"—unlike M-16 rifles—are "protected" and therefore cannot be banned. *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627)*.*

The court in *Bevis* was also wrong in its factual analysis that the banned arms are "much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense (or so the legislature was entitled to conclude)." 85 F.4th at 1195. As the dissent pointed out, "no army in the world uses a service rifle that is only semiautomatic[,]" *id.* at 1222 (Brennan, J., dissenting), and modern AR-15s and similar semiautomatics indisputably are "civilian" firearms, *Staples*, 511 U.S. at 603, not military ones.

More fundamentally, however, the reasons why the Founders valued the militia render nonsensical any argument that an amendment meant to preserve that institution does not protect arms *because* they could be useful for military purposes. As *Heller* explains, the militia was "useful in repelling invasions and suppressing insurrections[,]" "render[ed] large standing armies unnecessary," and enabled the people to be "better able to resist tyranny." 554 U.S. at 597–98. Many arms may be useful for both civilian and military purposes, including ordinary handguns that are obviously "arms" under *Heller*. Pistols have always been standard-issue military firearms. An 1811 military guide, for example, describes the pistol as a standard weapon for an infantryman. *See* Ex. 24, E. Hoyt, Practical Instructions for Military Officers 111 (1811). The military continues to issue handguns today, such as the Beretta M9, a handgun with a counterpart available for purchase on Beretta's website. In fact, the M9 was designed and available to civilians a decade before the military selected it as the Beretta 92. *See* Ex. 25, *American Service Pistols & Civilian Counterparts*, Keystone Shooting Ctr. (2023), https://perma.cc/UG45-V46Q. Thus, the Seventh Circuit's attempt to cabin the meaning of "arms" is not only contradictory to the plain text of *Heller* but would in fact (nonsensically) remove the arms explicitly protected by *Heller* from the definition an of "arm."

The Seventh Circuit's analysis of history, though irrelevant in light of its textual finding, also rested upon errors imported into its analysis from its pre-*Bruen* caselaw. For instance, the panel specifically declined to rest its historical analysis on the question of whether the banned firearms are "in common use" because it "did not find this factor to be very helpful" for reasons that it had put forward in its pre-*Bruen* precedent, *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). In particular, the panel said that "common use" was a "slippery concept" which would have rendered the federal assault weapons ban "constitutional before 2004, but

unconstitutional thereafter" because while the panel granted that AR-15s are popular today, it suggested (without citation) that few civilians owned them before the federal ban was put in place. *Bevis*, 85 F.4th at 1198. This is wrong as a factual matter: *Staples* recognized in 1994, the year the federal ban went into effect, that an AR-15 was a firearm of a type traditionally accepted as a lawful possession and was already in common use for lawful purposes. *Heller II*, 670 F.3d at 1288 (Kavanaugh, J., dissenting). More fundamentally, it is wrong as a doctrinal matter: there is nothing inconsistent about the possibility that a firearm could go from being "dangerous and unusual" to being "in common use." The Court in *Bruen* explicitly recognized the possibility that the handgun may have at one point shifted from a "dangerous and unusual" weapon that could be permissibly banned, *Bruen*, 597 U.S. at 47, to today's "quintessential self-defense" weapon, *Heller*, 554 U.S. at 629. The principle being applied is the same, regardless of the underlying firearm at issue: whether it is in common use among law-abiding Americans for lawful purposes.

### III. The other preliminary injunction factors favor Plaintiffs.

When the District "acts to deprive [Plaintiffs] of the rights guaranteed to them by the Second Amendment, there is little need to belabor the irreparable injury prong." *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 149 (D.D.C. 2016), *vacated and remanded sub nom. Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017). *Grace*, like this case, involved a challenge to an unconstitutional firearm regulation. The D.C. Circuit in *Wren* not only affirmed the propriety of the preliminary injunction but went even further in vacating and remanding for the purpose of granting a permanent injunction as well. Thus, this Court's analysis in that case is directly analogous and controlling. Indeed, the D.C. "Circuit Court has itself made clear [that] the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (internal quotations omitted). *See Mills v. District of Columbia*, 571 F.3d 1304, 1312

(D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *see also* 11A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2024) ("When an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary."). This Court in *Grace* rejected as "poppycock" the argument that "[i]f no occasion arises where a handgun is needed for self-defense," the denial of the Second Amendment right to bear arms "cannot cause harm." 187 F. Supp. at 149. It did so because "defendants, sadly, miss[ed] the point" that the Second Amendment right "can be infringed upon whether or not plaintiffs are ever actually called to use their weapons to defend themselves." *Id.* at 150. The Court also cited *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011), which explained that like other constitutional rights, "[t]he Second Amendment protects . . . intangible and unquantifiable interests," which "cannot be compensated by damages." Moreover, as the Supreme Court has made it clear that the Second Amendment is not a "second-class right," *McDonald*, 561 U.S. at 780–81 (plurality), because "plaintiffs are likely to succeed in showing their Second Amendment rights are being infringed each and every day the District continues to enforce the [unconstitutional] requirement, they have more than adequately demonstrated irreparable injury." *Grace*, 187 F. Supp. 3d at 150.

The balance of the equities and public interest also weigh in favor of the Plaintiffs. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that these two factors "merge when the Government is the opposing party"). "[E]nforcement of an unconstitutional law is always contrary to the public interest." *Grace*, 187 F. Supp. 3d at 150 (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks omitted), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*,

573 U.S. 682 (2014). This is the case even though it is otherwise presumed that, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Thus, the remaining factors weigh heavily in favor of granting the injunction.

The recent Third Circuit opinion in *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 2024 WL 3406290 (3d Cir. July 15, 2024), which rejected a preliminary injunction request on a challenge to Delaware's ban on semiautomatic firearms, does not control and is not persuasive. That opinion, which held that plaintiffs failed to demonstrate irreparable harm and that the balance of equities and public interest did not favor a preliminary injunction, should not be followed here. First, that panel held that "[e]xcept in First Amendment cases, we do not presume constitutional harms irreparable[,]" *id.* at *6, in stark contrast to "our sister circuits [which] have presumed harm in various settings," including *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023), a Second Amendment case. 2024 WL 3406290 at *6. The D.C. Circuit is one of these "sister circuits", *see Mills*, 571 F.3d at 1312 (citation omitted), and this Court has in fact applied this principle in the context of the Second Amendment in *Grace*. Other Circuits have agreed. *See Baird*, 81 F.4th at 1046 ("[W]e presume that a constitutional violation causes a preliminary injunction movant irreparable harm and that preventing a constitutional violation is in the public interest"), *Ezell*, 651 F.3d at 699 (holding that when a law is facially challenged under the Second Amendment, "the form of the claim and the substance of the Second Amendment right" create a "harm [that] is properly regarded as irreparable and having no adequate remedy at law.").

Beyond the difference in circuit doctrine, the Third Circuit also erred in its doctrinal analysis of irreparable harm. That panel held that "[u]nique First Amendment doctrines warrant [the] exception" which treats First Amendment violations as presumptively involving irreparable

harm, because "First Amendment activity, like weekly worship and political speech, can be especially time-sensitive." *Delaware State Sportsmen's Ass'n*, 2024 WL 3406290, at \*7. But the Second Amendment is at least as time-sensitive as the First Amendment. From July 22, 2022–July 22, 2023, there were 225 homicides in the District of Columbia, 1,417 instances of assault with a dangerous weapon, 2,780 instances of robbery, and 1,053 instances of burglary. Ex. 26, D.C. CRIME DATA AND STATS, https://perma.cc/UM45-QBTU (last visited July 25, 2024). "The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence— and psychic comfort—that comes with knowing one could protect oneself if necessary," *Grace*, 187 F. Supp. 3d at 150, and any day where the right to bear arms is deprived is a day where citizens lose the ability to defend themselves. This is especially the case for the banned arms, as firearms like the "AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves." Ex. 20, FRANK MINITER, THE FUTURE OF THE GUN 46–47 (2014). This is apparent in this case, where Plaintiff MacMillan would, if permitted by law, attach accuracy enhancing features prohibited by the Ban to his existing firearms so that he could be better prepared to use them in self-defense if necessary. *See* MacMillan Decl. ¶¶ 2–3. Of course, the Supreme Court has expressly rejected the notion that the legality of one type of firearm can justify restriction access to another, *See Heller*, 554 U.S. at 1289, but the fact that Plaintiffs are forced by the Ban to use less apt tools for self-defense underscores the irreparable harm occasioned by permitting the unconstitutional restriction on their rights to continue for any length of time.

Finally, the Third Circuit panel said that "there is always a public interest in prompt execution of the laws" and "[w]ithout the clarity of a full trial on the merits, though, we must err on the side of respecting state sovereignty." *Delaware State Sportsmen's Ass'n*, 2024 WL 3406290, at \*8. While the Court in *Grace* acknowledged that state sovereignty is an interest, this was not enough

to overcome the fact that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). Thus, "[b]ecause plaintiffs are likely to prevail in showing that their Second Amendment rights are being violated, the public interest weighs heavily in favor of granting their requested injunction." *Grace*, 187 F. Supp. 3d at 150. The Third Circuit further accounted for the fact that "[Plaintiffs] delayed seeking a preliminary injunction" and that their "four-month delay suggests that it felt little need to move quickly." *Delaware State Sportsmen's Ass'n*, 2024 WL 3406290, at *8. There is no delay here. For all of these reasons, the remaining preliminary injunction factors favor Plaintiffs and it should be granted. Furthermore, the Court should waive the requirement for an injunction bond in light of the public interest Plaintiffs' seek to further in enjoining an unconstitutional law. *See Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (noting district courts have "broad discretion" to determine an appropriate bond, "including the discretion to require no bond at all").

## IV.    The Court should advance the trial on the merits and consolidate it with the preliminary injunction, or, in the alternative, grant summary judgment to Plaintiffs.

In this case, none of the material facts can be reasonably disputed. The firearms at issue are in common use and so the District's firearm ban is unconstitutional, full stop. Because the issues in this case are purely legal, there is no reason to delay, and final judgment should be entered in Plaintiffs' favor, whether under Rule 56 or Rule 65(a)(2). *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62–63 (D.D.C. 2014) (noting that "a district court has the power to consolidate a hearing for a preliminary injunction into one on the merits"); Morton Denlow, *The Motion for a Preliminary Injunction: Time for a Uniform Federal Standard*, 22 REV. LITIG. 495, 534 (2003) (noting that often, "it would be more efficient to consolidate the trial on the merits with the motion for a preliminary injunction under Rule 65(a)(2)."). Indeed, this case is on all fours with *Wrenn*, where on an appeal from orders on preliminary injunction motions, the D.C. Circuit ordered that

final judgment be entered for the plaintiffs because that outcome was "inevitable." 864 F.3d at 667. The same is true here. Under the standards established by the Supreme Court, the District's ban on common semiautomatic firearms is flatly unconstitutional. Accordingly, it "would be wasting judicial resources" to do anything other than enter final judgment in Plaintiffs' favor. *Id*.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to grant them a preliminary injunction enjoining each Defendant, each Defendant's respective employees, officers, agents, and representatives, and all those acting in concert or participation with him or her, from enforcing the District of Columbia's ban on semiautomatic firearms, consisting of D.C. CODE §§ 7-2501.01(3A)(A); 7-2502.01(a); 7-2502.02(a)(6); 7-2502.09; 7-2507.06(a); 22-3571.01, and all related regulations, policies, and/or customs designed to enforce or implement this scheme. In addition, Plaintiffs request judgment in their favor as sought in their Complaint and a permanent injunction on the same terms as the requested preliminary injunction.

Dated: July 26, 2024

Respectfully submitted,

/s/ *David S. Panzer*
David S. Panzer, Bar No. 470677
Nicolas J. Rotsko, (admitted *pro hac vice*)
FLUET
1751 Pinnacle Drive
Suite 1000
Tysons, VA 22102
(703) 590-1234
(703) 590-0366 (fax)
dpanzer@fluet.law
nrotsko@fluet.law
e-file@fluet.law

*Attorneys for Plaintiffs*

28

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 26, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that I have served the document on the following by causing it to be mailed via Federal Express and served via electronic mail:

Muriel Bowser
Mayor of the District of Columbia
1350 Pennsylvania Avenue, NW
Washington, DC 20004
chad.copeland@dc.gov
stephanie.litos@dc.gov
tonia.robinson@dc.gov

Pamela A. Smith
Chief of the Metropolitan Police Department
District of Columbia
300 Indiana Avenue, NW
Washington, DC 20001
pamela.smith1@dc.gov

Brian L. Schwalb
Attorney General for the District of Columbia
400 6th Street, NW
Washington, DC 20001
chad.copeland@dc.gov
stephanie.litos@dc.gov
tonia.robinson@dc.gov

<u>/s/ *David S. Panzer*</u>
David S. Panzer, Esq.

*Attorney for Plaintiffs*