# EXHIBIT 1

JANUARY 11, 2024

# NSSF RELEASES MOST RECENT FIREARM PRODUCTION FIGURES

*Over 28.1 Million Modern Sporting Rifles in Circulation*

WASHINGTON, D.C. — NSSF®, the Firearm Industry Trade Association, released the Firearm Production in the United States including the Firearm Import and Export Data 2023 Edition (reporting 2021 data) to its members. The report compiles the most up to date information based on data sourced from the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF's) Annual Firearms Manufacturing and Export Reports (AFMER). Key findings for public release showed:

- The estimated total number of firearms in civilian possession from 1990-2021 is 473.2 million, according to data in reports such as ATF Firearms Commerce in the United States, ATF Annual Firearms Manufacturing and Exportation Reports and Congressional Research Service and including the collective ATF Annual Firearms Manufacturing and Exportation Report (AFMER) reports up to the 2021 edition.
- Total domestic firearm production reported in the 2021 AFMER was 12,521,614 – an increase of 28.6 percent over 2020 reported figures.
- Data indicates that 28,144,000 Modern Sporting Rifles (MSRs) are in circulation since 1990.
- MSR production increased 32 percent from 2020 to 2021. This increased the estimated amount of MSRs produced (since 1990) by 15 percent from 24.4 million to 28.1 million.
- ...2021, 21,037,810 total firearms were made available for the U.S. market, which includes firearms that were domestically produced plus those imported, minus exported firearms. Of those, ...99,067 were handguns, 4,832,198 were rifles and 3,406,545 were shotguns.
- ...interim 2022 estimate showed a total of 11,217,388 total firearms were domestically produced. Of those 6,148,877 were pistols, 830,800 were revolvers, 3,575,322 were rifles and 662,389 ...shotguns. Those are interim reports and will be updated when complete reports are available from the ATF.
- Firearm and ammunition manufacturing accounted for over 12,400 employees producing over $5.6 billion in goods shipped in 2021.
- From 1990 to 2021, 254,753,372 firearms have been made available to the U.S. market.

"This report demonstrates the strength and durability of the U.S. firearm manufacturing sector and the U.S. firearm sales markets," said Joe Bartozzi, NSSF's President and CEO. "The data continues to show that the Modern Sporting Rifle is the most popular centerfire rifle sold in America today with over 28.1 million in circulation and being used for lawful purposes every day. The continued popularity of handguns demonstrates a strong interest by Americans to protect themselves and their homes, and to participate in the recreational shooting sports."

-30-

**About NSSF**

*NSSF is the trade association for the firearm industry. Its mission is to promote, protect and preserve hunting and the shooting sports. Formed in 1961, NSSF has a membership of thousands of manufacturers, distributors, firearm retailers, shooting ranges, sportsmen's organizations and publishers nationwide. For more information, visit* **nssf.org**.

———————————

NSSF Media contact:

**Mark Oliva**

202-220-1340

**Share This Article**

# EXHIBIT 2

# An AR-15-style Rifle Was Recovered at the Scene of the Trump Rally Shooting

The AR-15 rifle, billed as "America's rifle" by the National Rifle Association, has been commonly used by mass shooters and is one of the most ubiquitous weapons in the United States.

 **By Thomas Gibbons-Neff**

Published July 14, 2024   Updated July 15, 2024

An AR-15-style semiautomatic rifle was recovered by law enforcement at the scene of the attempted assassination of former President Donald J. Trump at his rally in Butler, Pa., on Saturday.

The AR-15 rifle, billed as "America's rifle" by the National Rifle Association, has been commonly used by mass shooters and is one of the most ubiquitous weapons in the United States.

AR-15-style rifles are frequently customized with easy-to-purchase scopes and other accessories that can make even an untrained shooter lethal.

The rifle can be built to fire heavier and lighter rounds, such as .22-caliber and .308-caliber, but most commonly fires a 5.56-millimeter round, and has an effective range of between 500 and 800 yards.

In the hands of a trained shooter, accuracy at that range is difficult but possible, especially if the rifle is supported by bipods or sandbags that can stabilize the sway of its barrel.

In 2004, the AR-15 re-entered the gun market with far more popularity after the end of the federal assault weapons ban. The rifle was marketed as accessible and easy to personalize.

Light, precise and with little recoil, the Colt Armalite Rifle-15 Sporter was the first civilian version of the military's M16 rifle when it first hit the market in the 1960s. It had a patented gas operating system that allowed for rapid fire and reloading. The weapon could easily handle a 20-round magazine, was easy to disassemble and was marketed, in one of Colt's early advertisements, to hunters, campers and collectors.

The sale of AR-15-type rifles, and other military-style semiautomatic weapons, is banned in nine states: Washington, California, New York, Connecticut, New Jersey, Massachusetts, Maryland, Illinois and Delaware.

***A correction was made on July 15, 2024****: Because of an editing error, an earlier version of this article referred imprecisely to the ban on AR-15 and other military-style semiautomatic weapons. While sales of such weapons are banned in nine states, not all of those states ban possession of weapons owned before the bans were put in place.*

———

When we learn of a mistake, we acknowledge it with a correction. If you spot an error, please let us know at nytnews@nytimes.com.  Learn more

**Thomas Gibbons-Neff** is a Ukraine correspondent and a former Marine infantryman. More about Thomas Gibbons-Neff

# EXHIBIT 3

# Arms

**'ARMS**, *noun plural* [Latin arma.]

**1.** Weapons of offense, or armor for defense and protection of the body.

**2.** War; hostility.

Arms and the man I sing.

To be in *arms* to be in a state of hostility, or in a military life.

To *arms* is a phrase which denotes a taking *arms* for war or hostility; particularly, a summoning to war.

To take *arms* is to arm for attack or defense.

Bred to *arms* denotes that a person has been educated to the profession of a soldier.

**3.** The ensigns armorial of a family; consisting of figures and colors borne in shields, banners, etc., as marks of dignity and distinction, and descending from father to son.

**4.** In law, *arms* are any thing which a man takes in his hand in anger, to strike or assault another.

**5.** In botany, one of the seven species of fulcra or props of plants, enumerated by Linne and others. The different species of *arms* or armor, are prickles, thorns, forks and stings, which seem intended to protect the plants from injury by animals.

Sire *arms* are such as may be charged with powder, as cannon, muskets, mortars, etc.

A stand of *arms* consists of a musket, bayonet, cartridge-box and belt, with a sword. But for common soldiers a sword is not necessary.

In falconry, *arms* are the legs of a hawk from the thigh to the foot.

# EXHIBIT 4

# What Part of "In Common Use" Don't You Understand?: How Courts Have Defied *Heller* in Arms-Ban Cases—Again

## Mark W. Smith[*]

### Introduction

In the year since *New York State Rifle & Pistol Association v. Bruen*[1] was decided, a line of argument has developed in the lower courts that effectively seeks to relitigate and nullify *District of Columbia v. Heller*.[2]

*Heller* established the constitutional test to determine what arms are protected by the Second Amendment. After examining the text of the Second Amendment, as illuminated by history, *Heller* determined that bearable arms that are "in common use" today are constitutionally protected and cannot be banned.[3]

To circumvent *Heller*, government litigants, their amici, and some lower courts have seized upon a single sentence in *Bruen* that states that "[w]hile the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating *unprecedented societal concerns* or *dramatic technological changes* may require a *more nuanced* approach."[4] Gun-control proponents claim that improvements in firearms technology, such as the development of semiautomatic weapons, are "dramatic technological changes" and that mass shootings are "unprecedented societal concerns" that did not exist at the Founding. According to some courts, these changes and concerns justify bans on so-called "assault weapons" and what are mislabeled "large capacity magazines."[5]

That contention is wrong because *Heller*'s "in common use" test governs in all arms-ban cases including "assault weapon" bans, "large capacity magazine" bans, and non-roster handgun bans. The language from *Bruen* regarding technological changes and societal concerns is not a legal *test* that governs decisions either in arms-ban cases or in non-arms-ban cases. It is part of a description of the *methodology* that *Bruen* lays out for lower courts in deciding "other cases" not governed by

---

[*] Mark W. Smith is a Visiting Fellow in Pharmaceutical Public Policy and Law in the Department of Pharmacology, Oxford University; Distinguished Scholar and Senior Fellow of Law and Public Policy, Ave Maria School of Law. He is a graduate of the NYU School of Law and hosts the popular The Four Boxes Diner YouTube Channel, which addresses Second Amendment scholarship, history, and legal issues.

[1] 142 S.Ct. 2111 (2022).

[2] 554 U.S. 570 (2008).

[3] *Id.* at 627.

[4] *Bruen*, 142 S.Ct. at 2132 (emphasis added).

[5] *See, e.g.*, Herrera v. Raoul, No. 1:23-cv-00532, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) (discussed below in detail).

*Heller*'s "in common use" test or by *Bruen*'s actual decision regarding restrictive, discretionary licensing systems regulating the public carry of arms.

Just as generations of Latin students learned that "All Gaul is divided into three parts,"[6] all Second Amendment cases after *Heller* and *Bruen* are divided into two categories: 1) laws that ban the possession or sale of particular arms (or the components required for them to function),[7] or 2) laws that otherwise regulate the sale or use of arms without banning particular weapons.[8] Cases in the first category are directly controlled by *Heller* and its test for arms bans. Cases in the second category are not.

In arms-ban cases, *Heller*'s "in common use" constitutional *test* controls, and there is nothing for the lower courts to do except apply that *test* to the facts at issue. In other, non-ban cases, the *methodology* described in *Bruen* must be followed to arrive at a *test* that provides the rule for deciding that case and similar cases.[9] It is only in the second, non-arms ban category of cases that "unprecedented societal concerns" and "dramatic technological changes" might have some application. But that language is not itself a *test*, and it is irrelevant in arms-ban cases.

The *Heller* test looks at what arms are "in common use" today, not in the past. If semiautomatic rifles and handguns that accept detachable magazines are in common use today, they are protected. Their ubiquity, and their being "in common use," confirms their protected status under the Second Amendment.

Such arms cannot be banned simply because they employ technology that some legislators or judges think is too dangerous. When *Heller* was before the Court, the parties and their amici presented arguments concerning the alleged exceptional "dangerousness" of modern firearms (in that case, handguns).[10] After considering these arguments, the Supreme Court adopted the "in common use" test without any exceptions for weapons that are allegedly too dangerous.

---

[6] JULIUS CAESAR, THE GALLIC WARS, Book 1, Ch. 1 (Trans W. A. McDevitte and W. S. Bohn).

[7] The Second Amendment's protection of the right to possess ("keep") arms logically and necessarily entails the right to *come into possession* of the protected arms, by sale or manufacture, since possession presupposes acquisition. It is for that reason that it would be absurd for a State to say after *Heller*, for example, that people can *keep* whatever handguns they have, but ban all sales, manufacture, and import of handguns. After all, constitutional rights "implicitly protect those closely related acts necessary to their exercise." Luis v. United States, 578 U.S. 5, 26 (2016) (Thomas, J., concurring). Similarly, the right to keep and bear arms also necessarily entails the right to keep and bear the components of protected arms that make them what they are—triggers, magazines, barrels, etc. *are all protected*. Furthermore, all these components are themselves "modern instruments that facilitate armed self-defense" that *Bruen* clarified are protected as a matter of text. *Bruen*, 142 S.Ct. at 2132.

[8] Such laws concern the age at which young people can acquire or possess arms, where and under what conditions arms can be carried, restrictions on gun ranges or training, and other issues that do not involve the question of whether an arm or class of arms is protected.

[9] For example, after a review of alleged historical analogues to New York's restrictive licensing regime for public carry, *Bruen* concluded that a licensing scheme that "prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms" is unconstitutional. *Bruen*, 142 S.Ct. at 2156. That articulates the rule applied in *Bruen* and that may be applied in other cases relating to the carrying of arms.

[10] *See generally* Brief for Petitioner, District of Columbia v. Heller, 554 U.S. 570 (2008) (No. 07-290); *see also* Brief for Violence Pol'y Ctr. et. al. as Amicus Curiae Supporting Petitioner at 2, District of Columbia v. Heller, 554 U.S. 570 (2008) (No. 07-290) ("The handgun ban is a reasonable restriction, because handguns constitute a unique class of firearm that have an unmatched ability to cause violence and kill human beings.").

Likewise, parties also presented arguments concerning "unprecedented societal concerns" to the *Heller* Court.[11] The Court adopted the "in common use" test without any limitation based on these allegedly unprecedented concerns.

Nevertheless, some post-*Bruen* courts have utterly disregarded the Supreme Court's binding precedent in *Heller* governing what arms are protected. Having lifted language about "unprecedented societal concerns" and "dramatic technological changes" from *Bruen*'s description of the *methodology* for non-arms-ban cases, some courts, as discussed below, have refused to apply *Heller*'s binding test. Instead, these courts conduct their own historical analyses to determine what arms are protected and formulate new tests that are contrary to *Heller*. Under such tests, lower courts have held that arms that are "exceptionally dangerous" or "particularly dangerous"—such as "assault weapons"—may be banned, even though they are unquestionably "in common use."[12] In doing so, these courts have not only refused to apply binding Supreme Court precedent but have also resurrected the discredited "interest balancing tests" rejected in *Heller* and expressly abrogated in *Bruen*.

I.   *HELLER'S* "IN COMMON USE" TEST WAS REAFFIRMED
IN *BRUEN* AND GOVERNS IN ARMS-BAN CASES.

*Heller* was an arms-ban case. The District of Columbia had imposed a ban on the possession of handguns, with only minor exceptions.[13] The *Heller* Court, therefore, had to decide whether handguns fell within the scope of the Second Amendment's protection of "arms," and thus could not be banned. To do that, the Court first had to decide the constitutional test for determining whether a class of arms is protected by the Second Amendment, and then determine whether that protection extended to the kind of arm at issue in the case.

The *Heller* Court applied the methodology later explicitly spelled out in *Bruen* to decide the appropriate constitutional test.[14] That methodology starts with evaluating the plain text of the Second Amendment. The plain text of the Second Amendment is clear—it protects the right to "keep and bear arms."[15] Because it is the right to keep *and bear* arms, that implies one limitation of the right—the arms it protects must be "bearable."[16] And what are arms? "Weapons of offence, or armour of defence"; in other words, "any thing that a man wears for his defence, or takes into his hands or useth in wrath to cast at or strike another."[17] The plain text of the Second Amendment thus has an expansive scope: "the Second Amendment extends, *prima facie*, to all instruments that

---

[11] *Id.*

[12] *See, e.g.*, Hartford v. Ferguson, No. 3:23-cv-05364-RJB, 2023 WL 3853011(W.D. Wa. June 6, 2023) (order denying motion for preliminary injunction).

[13] *Heller*, 554 U.S. at 574.

[14] *Bruen*, 142 S.Ct. at 2127–28.

[15] U.S. CONST. amend. II.

[16] *Heller*, 554 U.S. at 581.

[17] *See Heller, 554 U.S. at 581.* In *Heller*, the phrase "weapons of offense, or armour of defense" is from SAMUEL JOHNSON, 1 DICTIONARY OF THE ENGLISH LANGUAGE 107 (4th ed. 1773). The phrase "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another" is from TIMOTHY CUNNINGHAM, 1 A NEW AND COMPLETE LAW DICTIONARY (1771).

constitute bearable arms, even those that were not in existence at the time of the founding."[18] Moreover, the term "arms" includes "modern instruments that facilitate armed self-defense."[19]

*Heller* also indicated that the Second Amendment's protection, like that of other constitutional rights, is "not unlimited."[20] Although those in support of arms bans quote that language as a talisman, the statement is really an unremarkable observation about constitutional law. The Court read *United States v. Miller*[21] as recognizing that "the Second Amendment extends only to certain types of weapons."[22] When it came to consider "what types of weapons *Miller* permits," the Court noted that "*Miller* said … that the sorts of weapons protected were those 'in common use at the time.'"[23] The Court identified one and only one historical tradition that could fairly support a ban on possession of a type of arm: "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"[24] This limitation dovetailed with the historical practice of the militia bringing "the sorts of lawful weapons that they possessed at home to militia duty"; *i.e.*, weapons that were "in common use at the time."[25]

These passages, taken together, established a *constitutional test* for determining what kinds of arms are protected under the Second Amendment. In more formal language, *Heller* established the *rule of decision* for arms-ban cases: that is, the legal principle governing judicial decision-making in cases of a particular kind.[26] The general rule of decision embraced in *Heller* is that arms "in common use" are protected by the Second Amendment and cannot be banned. That is the legal test in a Second Amendment challenge to an arms ban. The Court then applied that constitutional test or rule of decision to the facts presented by *Heller* and held that because handguns are "in common use," handguns cannot be banned.

*Heller* remains good law and provides the binding rule of decision in arms-ban cases.[27] When the modern-day regulation seeks to ban a type of arm, the *Heller* test controls. Far from undermining or altering *Heller*, *Bruen* reinforced it, stating expressly that *Heller* found that "the Second Amendment protects the possession and use of weapons that are in common use."[28] And

---

[18] *Id.* at 582 (emphasis added).

[19] *Bruen*, 142 S.Ct. at 2132.

[20] *Heller*, 554 U.S at 594.

[21] United States v. Miller, 307 U.S. 174 (1939).

[22] *Heller*, 554 U.S. at 623.

[23] *Id.* at 627.

[24] *Id.*

[25] *Id.* (quoting *Miller*, 307 U.S. at 179).

[26] The words "test" and "rule of decision" are used interchangeably here. As Karl Llewellyn put it in his classic work, the "rule of the case" may be equated with "the *ratio decidendi*, the rule *the court tells you* is the rule of the case, the ground, as the phrase goes, upon which the court itself has rested its decision." K. LLEWELLYN, THE BRAMBLE BUSH: THE CLASSIC LECTURES ON THE LAW AND LAW SCHOOL 42 (Oxford University Press 2008) (reprint of THE BRAMBLE BUSH: ON OUR LAW AND ITS STUDY 1930) (emphasis in original). However expressed, the rule *applied* by a court in its deliberations, and set forth in an ultimate decision, is very different from a *description* of the methodology for analyzing historical evidence using an originalist approach.

[27] *Bruen* did not overrule *Heller*. When the Supreme Court overrules a precedent, it usually leaves no doubt as to the effect of its decision. *See, e.g.*, Dobbs v. Jackson Women's Health Organization, 142 S.Ct. 2228, 2284 (2022) ("The Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion. *Roe* and *Casey* arrogated that authority. We now overrule those decisions and return that authority to the people and their elected representatives."). *Bruen* cites *Heller* many times, generally favorably and never negatively.

[28] *Bruen*, 142 S.Ct. at 2128 (quotation marks omitted).

*Bruen* added that "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense."[29]

In its discussion of historical analogues, *Bruen* was merely describing, for the benefit of litigants and lower courts, the *methodology* that should be followed in future *non*-arms-ban cases, so that courts could perform the proper analysis in those cases. Only in non-arms-ban cases might the societal concerns and technological changes have some relevance. But such concerns and changes do not create an exception to *Heller*'s "in common use" test or allow that test to be cast aside. The *Heller* test is not an exception to the *Bruen* methodology, but rather the *result* of the Court's application of that same "text and historical tradition" methodology to the facts in *Heller*. *Bruen* merely described for lower courts how to apply that methodology in types of Second Amendment cases yet to be decided. Arms-ban cases are not such cases, for *Heller* already has decided that the "in common use" test governs.

Straightforward application of the "in common use" test should lead courts to strike down bans on "assault weapons" and on "large capacity magazines" because those arms and magazines are unquestionably in common use.

## II.   *Bruen* DESCRIBED THE METHODOLOGY TO BE FOLLOWED IN CASES IN WHICH *Heller* DOES NOT ESTABLISH THE RULE OF DECISION.

*Heller*'s "in common use" test is of little, if any, relevance in Second Amendment cases in which the question presented is not whether a particular arm is protected, but some other issue regarding the possession or use of arms.

Because the lower courts had largely misapplied *Heller* for fourteen years, the *Bruen* Court felt compelled to explain exactly how an originalist approach should proceed in non-arms-ban cases in the future. The Supreme Court used *Bruen* as a teaching tool for lower courts that failed to follow the clear originalist methodology demonstrated in *Heller*. But *Bruen* first had to clear away the underlying mistakes made by the lower courts. No, *Bruen* said, there is no two-step test, in which Second Amendment rights could be, and nearly always were, eliminated by intermediate scrutiny "interest balancing."[30] No, *Bruen* said, addressing the specific issue before the Court, Second Amendment rights are not a privilege that can be denied to almost everyone through a restrictive, discretionary licensing system that requires a showing of "proper cause" (that is, a special need) to obtain a license.[31]

Having done away with these past errors, *Bruen* then outlined how lower courts should conduct an originalist analysis in non-arms-ban cases. Courts should begin with an examination of the plain text of the Second Amendment as it bears on the question under consideration.

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important

---

[29] *Id.* at 2132.
[30] *Id.* at 2131.
[31] *Id.* at 2125.

> interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[32]

Note that this is not itself a test or a rule of decision. This is instead a *description* of a *methodology* that a court must employ to *arrive at* a *rule of decision* comparable to the "in common use" test that *Heller* ultimately arrived at for arms-ban cases. *Bruen* expressly tied this methodology to the approach the Court had followed in *Heller*; hence, *Bruen*'s phrase "in keeping with *Heller*." In explaining why the two-step approach previously employed by the lower courts must be rejected, the *Bruen* court "summarize[d] *Heller*'s methodological approach to the Second Amendment."[33] That summary showed that *Heller*'s methodological approach, even though not made so explicit, was the same as the methodology described in *Bruen*. Indeed, in explaining and exemplifying a methodology for Second Amendment cases to come, *Bruen* bolstered *Heller*'s approach and constitutional test. *Bruen* not only described the methodology to be applied, but also served as its own example of how the text-and-historical-tradition methodology is to be applied by the lower courts—i.e., *Bruen* showed by practice how to do what it and *Heller* preached.

Having explained the ways in which the lower courts had gone wrong under *Heller*, *Bruen* then went on to prescribe in detail how *Heller*'s methodology should be implemented in other cases by use of historical analogues. That methodology for the future included observations about three situations in which the presence or absence of analogues might suggest the unconstitutionality of a present-day law,[34] a discussion of reasoning by analogy and when two laws may be "relevantly similar,"[35] two important "metrics" for comparing analogues,[36] and related matters.

It is deep within this discussion of analogues that *Bruen* noted that, unlike the relatively straightforward analogues in *Heller* and in *Bruen* itself, there might be circumstances in "*other cases*" in which "*unprecedented societal concerns* or *dramatic technological changes* may require a *more nuanced* approach."[37] But this consideration comes into play only when a court is engaged in examining analogues in non-arms-ban cases for which *Heller* does not provide the binding rule of decision. *Bruen* acknowledges that in these "other," non-arms-ban cases some questions may require a "more nuanced" approach to the use of historical analogues than the relatively easy questions presented in *Heller* and *Bruen*. Because *Bruen*'s discussion of societal concerns and technological changes applies only in non-arms-ban cases, arguments about alleged societal concerns and technological changes are not relevant in arms-ban cases because *Heller* provides the relevant legal test.

---

[32] *Id*. at 2126.

[33] *Id*. at 2127.

[34] *Id*. at 2131.

[35] *Id*.

[36] *Id*. at 2133.

[37] *Id*. at 2132 (emphasis added).

III.   THE *HELLER* "IN COMMON USE" TEST ALREADY ACCOUNTS FOR TECHNOLOGICAL
CHANGES AND SOCIETAL CONCERNS ARISING FROM THOSE CHANGES BY PROVIDING
SECOND AMENDMENT PROTECTION TO ARMS "IN COMMON USE" TODAY.

A common argument raised in support of "assault weapon" bans is that due to alleged "dramatic technological changes" so-called "assault weapons" and "large capacity magazines" are more lethal than previous kinds of firearms, and lead to increased mortality in mass shootings. But that argument is misplaced for many reasons.

First, the Supreme Court has been aware of such contentions throughout the development of its Second Amendment jurisprudence. In the 2010 *McDonald* case, some respondents had urged that the "Second Amendment differs from all of the other provisions of the Bill of Rights because it concerns the right to possess a deadly implement and thus has implications for public safety."

But the Supreme Court dismissed this assertion by correctly noting that:

> The right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category.[38]

Second, briefing in *Heller* pointed out the alleged exceptionally dangerous nature of handguns, the rise of mass shootings, and similar concerns about violence and public safety. Ironically, when *Heller* was briefed in 2008, the District of Columbia and its amici argued that *handguns* were particularly dangerous and lethal, while there were few, if any, mentions of *rifles* such as "assault weapons" being "especially dangerous." In *Heller*, the District argued that its handgun ban "do[es] not disarm the District's citizens, who may still possess operational rifles and shotguns."[39] It further argued that "the [D.C.] Council . . . adopted a focused statute that continues to allow private home possession of shotguns and rifles, which some gun rights' proponents contend are actually the weapons of choice for home defense."[40] Today, gun ban advocates argue that so-called "assault rifles" are unusually dangerous and must be banned.

While the public policy arguments based on "dangerousness" that were briefed in *Heller* cannot be listed comprehensively here, the following are a few examples:

- "In the recent Virginia Tech shooting, a single student with two handguns discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more."[41]

- "When more rounds are fired and guns can be more quickly reloaded, the likelihood of inflicting wounds, and the severity of the resulting injuries, increases.

---

[38] McDonald v. City of Chicago, 561 U.S. 742, 782–83 (2010) (listing numerous examples, including the exclusionary rule sometimes setting the guilty free, speedy trial requirements resulting in dangerous criminals being released, and the requirement of *Miranda* warnings that may "return a killer, a rapist or other criminal to the streets ... to repeat his crime.").

[39] Brief for Petitioner at 11, District of Columbia v. Heller, 554 U.S. 570 (2008) (No. 07-290).

[40] *Id*. at 54.

[41] *Id*. at 53.

This unfortunate fact is illustrated all too often in mass shootings in America's schools, malls, places of worship, and other public arenas."[42]

- "Handguns also are used in an extraordinary percentage of this country's well-publicized shootings, including the large majority of mass shootings. A review of 50 high-profile shootings over the past four decades revealed that from 1980 onward the bulk of such incidents (39) were mass shootings. A handgun was used in 74 percent of these mass shootings as the only or primary weapon."[43]

- "The [D.C.] Council targeted handguns because they are disproportionately linked to violent and deadly crime…. [The Council found that] 'handguns are used in roughly 54% of all murders, 60% of robberies, 26% of all assaults and 87% of all murders of law enforcement officials.' Handguns were also particularly deadly in other contexts: 'A crime committed with a pistol is 7 times more likely to be lethal than a crime committed with any other weapon.'"[44]

- "The District considered evidence indicating that murders, robberies, and assaults were more likely to be committed with a handgun. Based on this evidence, the District concluded that handguns were *uniquely dangerous* and that it was necessary to prohibit the possession and use of such guns, while still permitting access to other weaponry if licensed and stored safely."[45]

- "Handguns for the civilian market now fire ammunition capable of piercing *body armor*—the last line of defense responsible for saving thousands of police officers' lives."[46]

Arguments that certain firearms must be banned because of alleged technological changes or social problems are not new. As illustrated above, those same arguments were made to the Supreme Court about handguns in *Heller*. Parties supporting the District of Columbia's handgun ban in *Heller* focused a great deal on societal problems such as the criminal misuse of the firearms, mass shootings, and the allegedly dramatic technological developments in firearms that supposedly created or exacerbated these problems. The only difference between those arguments in *Heller* and the arguments today is that those made in 2008 concerned the "uniquely" dangerous nature of modern handguns in relation to societal problems. Now, those very arguments are being advanced against modern rifles and magazines, *i.e.*, so-called "assault rifles" and "large capacity magazines," with no substantive difference. In short, arms-ban advocates switched their pre-*Heller* strategy of "rifles good, handguns bad" to a post-*Heller* strategy of "handguns good, rifles bad." If those arguments failed to persuade the Supreme Court in *Heller* to rule against handguns, they can't work against rifles—the criminal misuse of handguns is orders of magnitude higher than the criminal misuse of rifles.

---

[42] Brief of Violence Pol'y Ctr. et al. as Amicus Curiae Supporting Petitioner at 16–17, District of Columbia v. Heller, 554 U.S. 570 (2008) (No. 07-290) (citations omitted).

[43] *Id.* at 24.

[44] Brief for Petitioner at 4, District of Columbia v. Heller, 554 U.S. 570 (2008) (No. 07-290).

[45] Brief of D.C. Appleseed Ctr. et al. as Amicus Curiae Supporting Petitioner at 22, District of Columbia v. Heller, 554 U.S. 570 (2008) (No. 07-290) (emphasis added and citations omitted).

[46] Brief of Violence Pol'y Ctr. *et al.* as Amicus Curiae Supporting Petitioner at 18, District of Columbia v. Heller, 554 U.S. 570 (2008) (No. 07-290).

After *Heller*, these arguments against "assault weapons" and "large capacity magazines" were again advanced under the now-discredited two-step interest balancing test that was erroneously adopted by many courts post-*Heller*.[47] The *Heller* test does not involve weighing the dangers and benefits of weapons, but instead asks only whether they are "in common use" at the present time.[48]

Recent decisions by courts post-*Bruen* seek to get around *Heller*'s "in common use" test by ignoring *Heller* and then smuggling in dangerousness arguments under the guise of historical analogues. Arguments about "dramatic technological changes" cannot affect the "in common use" test mandated by *Heller*. That is because the "in common use" test looks at arms that are in common use by Americans *now,* and that necessarily includes any modern or new technology which those firearms use. Even though technology may have changed or improved over time, any form of modern firearm technology that is currently "in common use" is constitutionally protected.[49]

As the *Bruen* Court explained, even if a state could identify historical "laws [that] prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons'" at that time, that would "provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today."[50] With this language, *Bruen* reaffirmed the test *Heller* prescribes for identifying protected arms, which already and necessarily accounts for technological changes and societal concerns allegedly caused by those changes; it does this by ensuring that the Second Amendment's protection extends to all firearms that are in common use at the time a court conducts the "in common use" analysis—even if such firearms or such firearms technology were not in common use at some time in the past.

Because the "in common use" test looks at contemporary firearms and thus firearms technology in existence today,[51] there is no justification for trying to limit the technology[52] available to civilian possession of arms to some indefinite point in the past. *Heller* made this point explicitly, stating that "[s]ome have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment."[53] By classifying ordinary semiautomatic rifles as "assault weapons," legislatures in some states have

---

[47] *See Bruen*, 142 S.Ct. 2125–27.

[48] *Heller*, 554 U.S. at 634–35.

[49] Because the "in common use" test automatically protects today's existing firearms technology, it is unclear that *Bruen*'s "dramatic technological changes" language has any relevance to *firearms* technology at all. It might be relevant to other kinds of technological changes, such as airplanes and airports, which might be considered "sensitive places" today even though ships and coaches during the Founding period might have had no restrictions on the carrying of weapons.

[50] *Bruen*, 142 S.Ct. at 2143.

[51] *Id.* at 2134, 2143.

[52] There have been no dramatic technological changes to firearms in the past century. The big changes were in the 19th century, not recent decades. By the end of the 19th century and often well before, the elements that make up modern firearms were in place (guns that fire by percussion on a cap or primer; self-contained metallic cartridges that combine powder, bullet, and ignition source; repeating firearms including semiautomatics; smokeless powder). Bolt actions, lever actions, revolvers, and semiautomatic actions were all developed in the 19th century, and those are the main types in use today. Modern firearms today function in essentially the same way as at the turn of the 20th century with no breakthrough changes in technology.

[53] *Heller*, 554 U.S. at 582.

sought to limit Second Amendment protection only to firearms technology that existed at some point in the past. That, too, "borders on the frivolous."

Underlying the "in common use" test is the premise that the American people—not the government—get to choose their desired firearms technology. It is "the American people [who] have considered the handgun to be the quintessential self-defense weapon," and since "handguns are the most popular weapon chosen by Americans for self-defense in the home, ... a complete prohibition of their use is invalid."[54] Likewise, Americans choose modern-day rifles for any number of lawful purposes including for self-defense, and under *Heller*'s test the courts must defer to their choices.

IV.    LOWER COURTS HAVE IMPROPERLY DISREGARDED *HELLER*'S "IN COMMON USE" TEST IN ARMS-BAN CASES AND REPLACED IT WITH A "DANGEROUSNESS" TEST OF THEIR OWN.

Confusion on the part of courts between the *rule of decision* announced in *Heller* and the *methodology* described in *Bruen* has led to erroneous results in firearms-ban cases. For example, three consolidated lawsuits in Delaware challenged that state's newly enacted bans on so-called "assault weapons" and "large capacity magazines," and sought a preliminary injunction against their enforcement.[55] The plaintiffs, relying on *Heller* as providing the rule of decision, correctly argued that "once a weapon is found to be 'in common use' it cannot be regulated, and no historical analysis is necessary."[56] The district court responded:

> I disagree. As the Supreme Court made clear in *Bruen*, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."[57]

That would be true if a court was analyzing a non-arms-ban firearms law *ab initio*. But the Delaware court was not analyzing a Second Amendment question anew. The issue in that case was whether so-called "assault weapons" and "large capacity magazines" are protected arms under the Second Amendment. *Heller* had already done the historical analysis to determine what kinds of arms are protected by the Second Amendment and had determined that the test is whether they are "in common use" today. Lower courts are not permitted to do their own historical analysis and invent their own new test in cases where the Supreme Court has already done the work and provided the test that lower courts must apply. The only question presented in an arms-ban case is whether the arms in question meet the "in common use" test. The Delaware district court continued:

> If the standard were as Plaintiffs propose, then *Bruen* need not have proceeded beyond the first step of the analysis. Instead, however, after concluding that the Second Amendment's plain

---

[54] *Id.* at 629.

[55] Del. State Sportsmen's Ass'n v. Del. Dep't of Safety and Homeland Sec., No. 22-951-RGA, 2023 WL 2655150 (D. Del. Mar. 27, 2023) ("DSSA").

[56] *DSSA* at 17–18.

[57] *DSSA* at 18 (citation omitted and emphasis added).

text "presumptively guarantee[d]" the plaintiffs a right to bear arms in public for self-defense, the Supreme Court turned to the question of historical tradition. Thus, so do I.[58]

That is simply incorrect. The reason *Bruen* proceeded to examine the historical tradition is because the question in *Bruen did not involve an arms ban* and could not be resolved by applying *Heller*'s rule of decision. The question in *Bruen*, for which it performed a historical review, was whether New York's highly restrictive licensing system for the public carry of firearms was justified by historical analogues. That and related issues had never been addressed by the Supreme Court using historical methodology, whereas the question of what arms are protected had been addressed and settled in *Heller.*

As illustrated above, this passage from the Delaware district court's decision deeply confuses the *rule of decision* or *constitutional test* that *Heller* mandates in arms-ban cases, with the description of the *methodology* to be applied in non-ban cases that are not controlled by *Heller*, as described in *Bruen.* The district court did not understand that *Bruen* proceeded beyond the first step because *Bruen* was not an arms-ban case controlled by *Heller.* As a result, that court erroneously strayed off into its own historical analysis for bans on arms that are unquestionably in common use by Americans today.

That took the district court right back into the interest balancing rejected in *Bruen.* "Defendants argue that the instant regulations implicate 'unprecedented societal concerns' and 'dramatic technological changes.' I agree."[59] The court then adopted defendants' view of the history of semiautomatic technology, arguing that "assault long guns and LCMs represent recent advances in technology."[60] The opinion then goes on to address "unprecedented societal concerns," allegedly due to the rise in public mass shootings over the past four decades.[61]

The district court concluded that defendants had "sufficiently established that assault long guns and LCMs implicate dramatic technological change and unprecedented societal concerns for public safety."[62] The court found that defendants had demonstrated that "assault rifles and LCMs are exceptionally dangerous."[63]

These "societal" and "technological" arguments are precisely the same types of arguments advanced by the gun-ban advocates in *Heller* and pushed for years under intermediate scrutiny before *Bruen.* These are merely interest-balancing arguments dressed up as "dramatic technological change" and "unprecedented societal concerns." But those changes and concerns were never presented by *Bruen* as forming a separate test or rule of decision. They were merely an acknowledgment that in cases not involving arms bans the examination of analogues might need to be "more nuanced."[64] There is nothing in *Bruen* or in any other Supreme Court case that indicates that the rule of decision in arms-ban cases—the "in common use" test announced in *Heller*—has been overruled, replaced, or modified.

---

[58] *Id.*
[59] *Id.* at 20.
[60] *Id.* at 10.
[61] *Id.*
[62] *Id.* at 23.
[63] *Id.* at 21.
[64] *Bruen*, 142 S.Ct. at 2132.

Several other post-*Bruen* "assault weapon" ban cases and litigants have employed a similarly confused approach. First, they ignore *Heller* and the binding, applicable test concerning what arms are constitutionally protected. Then they perform an idiosyncratic historical analysis of what weapons are protected, generally finding that weapons that are particularly or exceptionally dangerous can be banned, regardless of whether they are "in common use."

 For example, a group of law professors purporting to be Second Amendment experts recently submitted an amicus brief in support of the United States in *United States v. Rahimi*, a case the Supreme Court will hear this term. *Rahimi* will consider the constitutionality of the federal ban on firearm possession by anyone subject to a domestic violence restraining order. In their brief, the professors (unnecessarily) expounded on the test applicable to arms-ban cases but twisted it, asserting that "[i]f a firearm is in 'common use' and can facilitate armed self-defense,' then it is relevantly similar to the arms protected by the Second Amendment at the time of its adoption and the right to bear that weapon warrants constitutional protection."[65]

Seeking to unnecessarily complicate the straightforward test prescribed by *Heller*, these professors attempt to create a conjunctive test requiring *not just* common use, but also that the arm be shown to "facilitate armed self-defense." As explained in detail above, this second requirement is *not* part of the rule of decision in arms ban cases, but in the wake of *Bruen* the professors have again sought to create a test that is "one step too many."[66] Rather, it acts as an open invitation to courts to assess whether individuals really need the banned firearms, or whether their features are, in the judgment of experts and the courts, well-suited to the self-defense needs of Americans. But *Heller* made clear that such questions are not for expert or even court decision. Rather, it is the judgment of the American people that matters and "whatever the reason" that they choose certain weapons, that they choose them is enough.[67]

In a federal district court case from Washington State,[68] the court performed a similar distortion of *Heller's* "in common use" test. There, plaintiffs properly relied on the "in common use" test to urge that the weapons at issue in that case could not be banned. The district court responded:

> The Plaintiffs misread *Heller* and *Bruen*. *Heller* noted that the right to keep and bear arms protected under the Second Amendment is limited to the sorts of weapons "in common use at the time." *Heller* at 627. It found that this limitation is "supported by the historical tradition of prohibiting 'dangerous and unusual weapons.'" *Id. Heller* does not hold that access to all weapons "in common use" are *automatically* entitled to Second Amendment protection *without limitation.*[69]

But, yes, *Heller* does so hold. Where did this "automatically" and "without limitation" language come from? *Heller* did not create any exceptions to the "in common use" test, and

---

[65] Brief for Second Amendment Law Scholars as Amicus Curiae Supporting Petitioner at 10, United States v. Rahimi (2023) (No. 22-915).

[66] *Bruen*, 142 S. Ct. at 2127.

[67] *Heller*, 554 U.S. at 629.

[68] Hartford v. Ferguson, No. 3:23-cv-05364-RJB, 2023 WL 3836230, at *3 (W.D. Wash. Jun. 6, 2023).

[69] *Id.* (emphasis added).

nothing in *Heller* or *Bruen* permits lower courts to create exceptions to that test. The court then continued:

> Further, under *Bruen*, if Plaintiffs demonstrate that their proposed conduct, that of buying and selling weapons regulated by HB1240, is covered by the Second Amendment, the "Constitution **presumptively** protects that conduct." *Bruen* at 2126, 2129-2130 (*emphasis added*). This presumption can be overcome. *Id*.[70]

But that language about presumptions is just the first part of *Bruen*'s methodology description. In short, the court shrugs off *Heller*, and then launches into its own historical analysis, *contra Heller*, of which arms are not protected by the Second Amendment. It concludes that "[t]hese weapons are exceptionally dangerous," and that there is a tradition of "exceptionally dangerous arms regulation."[71] But that is not the test. And this is yet another instance of improper interest balancing in another guise.

Another federal district court case that gets it wrong, albeit through more convoluted reasoning, is *Bevis v. City of Naperville*.[72] The district court there denied a preliminary injunction against the enforcement of city and state-wide "assault weapon" and "large capacity magazine" bans. In doing so, it erroneously considered the challenged regulations "on a *tabula rasa*," concluded that "*Bruen* is now the starting point," and substituted its own dangerousness test for *Heller*'s "in common use" test.[73] But "dangerousness" alone is not the test. To be banned, a weapon must be "unusual" (by definition, *not* "in common use") as well as dangerous.[74]

Another case from the Northern District of Illinois, *Herrera v. Raoul*,[75] applied the "dangerousness" test devised by the *Bevis* court. But it also leaned heavily on the "dramatic technological changes" and "unprecedented societal concerns" language from *Bruen*. According to the court, this language allows "local and state governments to respond to "'dramatic technological changes' and 'unprecedented societal concerns' of increasing mass shootings by regulating the sale of weapons and magazines used to perpetrate them."[76] Once again, the flagrant conflict between the "in common use" test and the *ad hoc* determination that any weapon that is "particularly dangerous" can be banned was not addressed.

A case from the District of Connecticut, *National Association for Gun Rights v. Lamont*,[77] misconceived *Heller* and *Bruen* on two fronts. There, the district court began by fabricating a "common use" test requiring Plaintiffs to show that "assault weapons" are commonly used specifically for self-defense.[78] But there is no such mandate in *Heller* or *Bruen*. After finding that Plaintiffs failed to meet their newly created burden, the district court doubled down, concluding

---

[70] Hartford v. Ferguson, No. 3:23-cv-05364-RJB, 2023 WL 3836230, at 5 (W.D. Wash. Jun. 6, 2023).

[71] *Id*.

[72] No. 22 C 4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023).

[73] *Id*. at 17.

[74] *See* Caetano v. Massachusetts, 577 U.S. 411, 417 (2016) (Alito, J., concurring) (stating that "As the per curiam opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual. Because the Court rejects the lower court's conclusion that stun guns are 'unusual,' it does not need to consider the lower court's conclusion that they are 'dangerous.'").

[75] No. 23 CV 532, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023).

[76] *Id*. at 15 (citations omitted).

[77] No. 22 CV 1118, WL 4975979 (D. Conn. Aug. 3, 2023).

[78] *Id*. at 29.

that *Bruen* permits bans on "new and dangerous weapon technology" that underpins "unprecedented societal concerns"—which, according to the district court, encompasses "assault weapons."[79] Again, this is plainly wrong. *Bruen*'s language concerns only non-arms-ban cases, and the whole point of the "common use" test is that it inherently accounts for changes in firearm technology.

Fortunately, the district court in *Barnett v. Raoul* got it right when it preliminarily enjoined enforcement of the Illinois "assault weapon" and "large capacity magazine" bans.[80] Regarding the probability of success on the merits of the preliminary injunction, he noted that "Plaintiffs rely on recent Supreme Court decisions that made it clear that the Second Amendment protects the possession and use of weapons that are in common use."[81] Plaintiffs contend there can be no question regarding the likelihood of success because the items banned under [the Illinois statute] are in common use today."[82] The court agreed.[83] And while the district court did consider Defendants' analogues, the court concluded that "the commonality of 'arms' banned under [the Illinois act] is *dispositive*."[84]

<div align="center">CONCLUSION</div>

Many lower courts have made fundamental legal errors in "assault weapon" and "large capacity magazine" ban cases. They have failed to recognize that *Heller*'s "in common use" test governs in arms-ban cases and have wrongly relied on a single sentence in *Bruen* describing the methodology to be applied in non-arms-ban cases. Those courts have treated the "dramatic technological changes" and "unprecedented societal concerns" language from *Bruen*'s methodological description as if it formed part of the governing test for determining which arms are protected by the Second Amendment, when that language has no role whatsoever in arms-ban cases. Because the "in common use" test looks to arms that are in common use today, that test automatically and necessarily protects existing technology, and addresses any contemporary societal concerns stemming from such modern technology. Lower courts are not free to disregard *Heller*'s "in common use" test and instead substitute a "dangerousness" test of their own devising. Doing so is merely "interest balancing" in a different guise, which is prohibited by both *Heller* and *Bruen* in Second Amendment challenges to gun-control laws.

---

[79] *Id.* at 63.

[80] Barnett v. Raoul, No. 3:23-cv-00209-SPM, 2023 WL 3160285, at *12 (S.D. Ill. Apr. 28, 2023), *appeal of preliminary injunction pending*, No. 23-1825 (7th Cir. 2023).

[81] *Id.* (quoting *Heller*, 554 U.S. at 627).

[82] *Id.*

[83] *Id.*

[84] *Id.* (emphasis added).

# EXHIBIT 5

# Assault Weapons and Accessories in America

## Conclusion

Assault weapons are increasingly being perceived by legislators, police organizations, handgun restriction advocates, and the press as a public health threat. As these weapons come to be associated with drug traffickers, paramilitary extremists, and survivalists, their television and movie glamour is losing its lustre to a violent reality.

Because of this fact, assault weapons are quickly becoming the leading topic of America's gun control debate and will most likely remain the leading gun control issue for the near future. Such a shift will not only damage America's gun lobby, but strengthen the handgun restriction lobby for the following reasons:

- *It will be a new topic in what has become to the press and public an old "old" debate.*

  Although handguns claim more than 20,000 lives a year, the issue of handgun restriction consistently remains a non-issue with the vast majority of legislators, the press, and public. The reasons for this vary: the power of the gun lobby; the tendency of both sides of the issue to resort to sloganeering and pre-packaged arguments when discussing the issue; the fact that until an individual is affected by handgun violence he or she is unlikely to work for handgun restrictions; the view that handgun violence is an "unsolvable" problem; the inability of the handgun restriction movement to organize itself into an effective electoral threat; and the fact that until someone famous is shot, or something truly horrible happens, handgun restriction is simply not viewed as a priority. Assault weapons—just like armor-piercing bullets, machine guns, and plastic firearms—are a *new* topic. The weapons' menacing looks, coupled with the public's confusion over fully automatic machine guns versus semi-automatic assault weapons—anything that looks like a machine gun is assumed to be a machine gun—can only increase the chance of public support for restrictions on these weapons. In addition, few people can envision a practical use for these weapons.

- *Efforts to stop restrictions on assault weapons will only further alienate the police from the gun lobby.*

  Until recently, police organizations viewed the gun lobby in general, and the NRA in particular, as a reliable friend. This stemmed in part from the role the NRA played in training officers and its reputation regarding gun safety and hunter training. Yet, throughout the 1980s, the NRA has found itself increasingly on the opposite side of police on the gun control issue. Its opposition to legislation banning armor-piercing ammunition, plastic handguns, and machine guns, and its drafting of and support for the McClure/Volkmer handgun decontrol bill, burned many of the bridges the NRA had built throughout the past hundred years. As the result of this, the Law Enforcement Steering Committee was formed. The Committee now favors such restriction measures as waiting periods with background check for handgun purchase and a ban on machine guns and plastic firearms. If police continue to call for assault weapons restrictions, and the NRA continues to fight such measures, the result can only be a further tarnishing of the NRA's image in the eyes of the public, the police, and NRA members. The organization will no longer be viewed as the defender of the sportsman, but as the defender of the drug dealer.

- *Efforts to restrict assault weapons are more likely to succeed than those to restrict handguns.*

  Although the majority of Americans favor stricter handgun controls, and a consistent 40 percent of Americans favor banning the private sale and possession of handguns, [129] many Americans do believe that handguns are effective weapons for home self-defense and the majority of Americans mistakenly believe that the Second Amendment of the Constitution guarantees the individual right to keep and bear arms.[130] Yet, many who support the individual's right to own a handgun have second thoughts when the issue comes down to assault weapons. Assault weapons are often viewed the same way as machine guns and "plastic" firearms—a weapon that poses such a grave risk that it's worth compromising a perceived constitutional right.

Although the opportunity to restrict assault weapons exists, a question remains for the handgun restriction movement: How? Defining an assault weapon—in legal terms—is not easy. It's not merely a matter of going after guns that are "black and wicked looking." Although those involved in the debate know the weapons being discussed, it's extremely difficult to develop a legal definition that restricts the availability of assault weapons without affecting legitimate semi-automatic guns. Most likely, any definition would focus on magazine capacity, weapon configuration, muzzle velocity, the initial purpose for which the weapon (or its full-auto progenitor) was developed, convertibility, and possible sporting applications. Any law based on this definition would, however, need to have a clause to excuse legitimate semi-automatic weapons that would inadvertently fall under it. And although legislation could be passed that would ban specific weapons, the world's arms manufacturers are expert at producing weapons that follow the letter, but not the intent, of the law. This often results in products that are virtually identical to the restricted weapon, yet different enough to remain on the market.

Yet, the framework for restricting assault weapons already exists. On the federal level, ATF currently excludes from import handguns recognized as Saturday Night Specials. This is done by application of criteria designed by the agency that takes into account such things as barrel length, caliber, quality of materials, safety devices, and other factors. Any gun that does not meet the importation threshold cannot be sold in the United States. Any manufacturer whose product is refused for import can challenge the decision in federal court. Criteria to identify and categorize assault weapons could be developed by ATF and applied toward restricting the availability of both foreign- and domestically-produced assault weapons.

The state of Maryland has taken a similar approach in banning the sale of Saturday Night Specials. The 1988 Maryland law established a nine-member board responsible for creating a roster of permitted handguns. The nine members of the board include: the superintendent of the state police; representatives of the Maryland States' Attorney's Association, Maryland Association of Chiefs of Police, Marylanders Against Handgun Abuse, the National Rifle Association, and a Maryland gun manufacturer; and three citizen board members to be determined by the governor. After January 1, 1990, the law requires that no person in Maryland may: manufacture a handgun not on the Handgun Roster or sell or offer to sell any handgun not on the Handgun Roster that was manufactured after January 1, 1985. In determining whether a handgun has a legitimate use and can therefore be placed on the roster, the board will consider: concealability; ballistic accuracy; weight; quality of materials; quality of manufacture; and reliability as to safety, caliber, and detectability by standard security devices used at airports and courthouses.[131] States could develop similar rosters to ban the sale of assault weapons.

Since passage of the Maryland law, the NRA has collected enough signatures of Maryland residents to bring the measure to referendum on the November 1988 ballot. The NRA's opposition to such a panel is not surprising. The organization fears giving the government, at any level, the power to restrict the availability of firearms—conjuring up images of a "gun czar." And although such proposals would solve the definitional problems posed by assault weapons, it would guarantee fierce opposition from the gun lobby.

The success of any proposed legislation to restrict assault weapons and their accessories depends not only on whether the American public pays attention to the topic, but agrees that these products are dangerous. Obviously, some aspects of America's fascination with assault weapons and their accessories are here to stay. Publications are clearly protected under the First Amendment of the Constitution. Yet the weapons themselves, and accessories such as laser sights and grenades requiring only the explosive charge, can be restricted and even banned at the local, state, or federal level. The fact that assault weapons are increasingly being equated with America's drug trade may play a major role in motivating the public to call for their restriction. Yet, recognizing the country's fascination for exotic weaponry and the popular images and myths associated with guns, it may require a crisis of a far greater proportion before any action is taken.

# EXHIBIT 6

# The AR-15 Controversy

## Semiautomatic Rifles and the Second Amendment

Dennis P. Chapman

# The AR-15 Controversy:
# Semiautomatic Rifles and the Second Amendment

Dennis P. Chapman

THIRD BRIGADE PRESS

Third Brigade Press, Springfield Virginia, USA

First Edition June 2021

(2nd Revision 01/22)

Copyright © 2021, 2022 by Dennis P. Chapman
All rights reserved.

ISBN-13 978-0-578-92803-6

To Charles Minot "Minnie" Dole, and those that volunteered, and those that never came home.



*Vires Montesque Vincimus*

you, meaning how comfortable the gun feels to you and how accurate you can shoot it. With the correct length of pull, you will have quick sight acquisition, better control, better accuracy, and feel more comfortable.[328]

And further,

> [m]ost rifles are designed for the average adult male, but many people, especially women, are not built like your average adult male. You will find that many rifles will not feel comfortable when you shoulder them. This is because the length of pull … is either too long or too short for you.[329]

Most people cannot afford to have a rifle custom-stocked to fit their precise size and shape and certainly cannot afford to have custom stocks made for each member of their family. Collapsible or adjustable stocks provide a standard, off-the-shelf solution that allows each shooter to adjust the rifle to their own body and thus optimize their shooting experience; adjustable buttstocks enable multiple members of a family to practice shooting with the same rifle, optimizing the shooting experience for each. In this respect, adjustable buttstocks reflect the American shooting tradition, wherein hunting, target shooting, and arms for self-defense have always been the province of ordinary working people of modest means, as opposed to the European tradition wherein the shooting sports were the domain of the wealthy and privileged classes who could afford to indulge in fine, handcrafted, and extremely expensive custom

---

[328] Suzanne Wiley. "What is Length of Pull and why does it Matter?" *The Shooter's Log*, July 10th, 2013. https://blog.cheaperthandirt.com/length-pull-matter/. Retrieved March 24th, 2019.

[329] "Purchasing a Women's Rifle and What to Consider." *Legacy Sports International*, May 10th, 2017. https://www.legacysports.com/purchasing-a-womens-rifle-and-what-to-consider/. Retrieved March 24th, 2019.

sporting arms. Adjustable buttstocks are more functional than even this, however:

> The requirements for perfection of length of pull will change if the rifle is to be used in more than one position. Perhaps this is what confounds the rifle shooter who is able to use different positions. Unlike a trap or skeet shooter, or maybe someone on Safari, the one 'perfect' fit may not exist.[330]

Folding buttstocks serve one principal function: to make the rifle easier to transport or stow, and there are perfectly straightforward, non-criminal reasons as to why a folding stock is useful and appropriate on a civilian firearm. Some people occupy small living quarters, where storage is at a premium. Some drive smaller vehicles with less cargo capacity. Some may wish to carry their rifle to the range in a smaller, possibly less expensive, rifle case. In fact, the military application of folding stocks shows that they do not exist for the nefarious purpose of secreting rifles into vulnerable places in which to unleash mass violence. The default firing position in military doctrine is from the shoulder. Well-trained soldiers do not run around the battlefield employing their rifles in some *faux* gangland style, firing them from the hip with the stocks collapsed. Folding stocks exist in military service to facilitate handling the rifle in cumbersome and awkward situations such as parachuting and boarding or disembarking vehicles. The ability to reduce the size of the rifle by folding or otherwise collapsing the stock is a simple matter of convenience, not of lethality or tactical surprise, and this convenience is of equal utility in civil as well as military life. Consider the ArmaLite AR-7 Explorer survival rifle: introduced in 1959, the AR-7 is a semiautomatic .22 caliber rifle with what might be the ultimate collapsible stock: the entire rifle disassembles and can be

---

[330] "Rifle Fit: Length of Pull." *Art of the Rifle*, February 27th, 2012. https://artoftherifle.com/rifle-fit-length-of-pull/2012/02/rifle-fit-length-of-pull.html. Retrieved March 24th, 2019.

pistol grips, the employment of handguards that encircle the barrel has nothing to do with spraying fire from the hip, for while the six-armed *Gegenees* might have been able to fire bolt action rifles from the hip at Jason and the Argonauts,[272] no mere two armed mortal could hope to carry out such a feat of arms.

It takes a rate of fire much lower than the extravagant rates that gun control advocates ascribe to the AR-15 to heat a rifle barrel sufficiently to cause injury. Just how much less was shown in a 1975 Rock Island Arsenal study of external barrel temperatures at various points along the barrel's length for various rates and modes of fire.[273] While the study was conducted under "a product improvement program to improve the accuracy of the M16A1 Rifle's barrel,"[274] its findings are of interest for our purposes as well, as they show that rifle barrels can reach dangerous temperatures at low rates fire. For example, the study found that after firing 140 rounds at the rate of one round every 6 seconds (10 rounds per minute), external temperatures ranged from 265 to 585 degrees Fahrenheit at various points along the barrel.[275] Further, the study results show that external barrel temperatures at some points along the barrel reached temperatures of 200 degrees Fahrenheit (93.33 degrees Celsius) and higher *after the first shot fired.*[276] This is a critically important safety concern, as one study has shown that partial skin thickness burns occur after one second of contact at less than 70 degrees Celsius, and full skin thickness burns occur after one second of contact at around

95 degrees Celsius.[277] Another study found that damage to porcine skin in contact with a surface heated to just over 61 degrees Celsius (143.6 degrees Fahrenheit) occurred at only one second of contact.[278] In sum, "barrel shroud" type handguards exist to protect shooters from injury by contact with hot rifle barrels during ordinary, routine shooting activities, not just during extreme circumstances like combat.

Relating an experience from his military service, a childhood friend of mine once showed me the importance of the wrap-around handguard or "barrel shroud" to operating a firearm safely. He served in the infantry with the 82nd Airborne Division. He related to me his unit's experience with the M249 Squad Automatic Weapon (SAW), a light machine gun employed by the US Armed Forces. When first fielded, this weapon was equipped, not with a handguard, but with only a polymer forearm similar to the wooden one found on the BAR.[279] The top of the barrel was left exposed to the air for its entire length, in the manner that would, in effect, be required by law under Senator Feinstein's proposed Assault Weapons Ban of 2013 (this defect was later corrected). The result was soldiers burning themselves on the barrel. These burns would not have been incurred while firing from the hip in the manner imagined by gun control advocates. While the weapon can be fired that way, that is not its primary mode of employment. These injuries would have been sustained while operating the weapon in its usual manner—firing, reloading, repositioning the gun while shooting in the prone position, and moving from one firing location to another.[280] More such injuries

---

[272] David Kravitz. *Who's Who in Greek and Roman Mythology* (Clarkson N. Potter, Inc., 1976), 105.
[273] Ronald E. Elbe. *External Barrel Temperature of the M16A1 Rifle* (GEN Thomas J. Rodman Laboratory, Rock Island Arsenal, distributed by the National Technical Information Service, US Department of Commerce) July 1975. https://apps.dtic.mil/dtic/tr/fulltext/u2/a019649.pdf. Retrieved March 17th, 2019.
[274] *Id.*, 1.
[275] *Id.*, Table II, page 10.
[276] *Id.*, Figures 4 – 10, pages 13 – 21.

[277] J.C. Lawrence, and Bull, J.P., "Thermal conditions which cause skin burns," Institution of Mechanical Engineers, *Engineering in Medicine*, Volume 5 Issue 3, July 1976, 61.
[278] A.R. Moritz and Henriquez, F.C., "Studies of thermal injury," *American Journal of Pathology*, 23(5), September 1947, 711.
[279] For an image of what the M249 SAW looked like in its original configuration, see *SH 21-25, The Infantryman's Handbook* (United States Army Infantry School, March 1985), 44.
[280] The Army ultimately corrected this, adding a handguard on top of the barrel and forearm, thus completely encircling the barrel. See *FM 23-14,*

# EXHIBIT 7

# AMERICA'S RIFLE



# THE CASE FOR THE AR-15

## STEPHEN P. HALBROOK

Author of *The Right to Bear Arms*

# AMERICA'S RIFLE:

## THE CASE FOR THE AR-15

### BY STEPHEN P. HALBROOK



BOMBARDIER
BOOKS

Case 1:24-cv-01955-DLF  Document 12-6  Filed 07/26/24  Page 35 of 410

Published by Bombardier Books
An Imprint of Post Hill Press
ISBN: 978-1-63758-680-8
ISBN (eBook): 978-1-63758-681-5

America's Rifle:
The Case for the AR-15
© 2022 by Stephen P. Halbrook
All Rights Reserved

Cover Design by Tiffani Shea

Interior Design by Yoni Limor

No part of this book may be reproduced, stored in a retrieval system, or transmitted by any means without the written permission of the author and publisher.

 

BOMBARDIER

Post Hill Press
New York • Nashville
posthillpress.com

Published in the United States of America
1  2  3  4  5  6  7  8  9  10

court asserted that "such weapons can fire through walls."[178] But that would depend on the caliber, it could be said about any firearm, and the act bans the described firearms "of any caliber."[179] This assertion is one among many that show how courts are often content to be ignorant of the facts upon which they are supposedly basing their decisions about laws that burden constitutional rights. The First Circuit upheld the Massachusetts ban without any discussion, meaningful or otherwise, of the specific features that cause a firearm to fall into the assault weapon category and therefore lose Second Amendment protection.

## How the District for the Northern Mariana Islands Got It Right

The issue of how the Second Amendment applies to assault weapon bans is far from settled. That is demonstrated by the dissents by then-Judge Kavanaugh in *Heller II*, Judge Manion and Justice Thomas (joined by Justice Scalia) in *Friedman*, and Judge Traxler in *Kolbe*. But it fell to the U.S. District Court for the Northern Mariana Islands—which sits in Saipan, the site of a hard-fought American victory against Japan in 1944—to get the law right in a binding decision.

The ban at issue listed the usual features seen in other assault weapon bans, such as a pistol grip, telescoping stock, and flash suppressor.[180] In a case styled *Murphy v. Guerrero*, Chief Judge Ramona V. Manglona found that the law failed intermediate scrutiny because "the banned attachments actually tend to make rifles easier to control and more accurate—making them safer to use."[181] There was expert evidence from an officer of the Department of Public Safety, who testified that a flash suppressor "reduces noise and potentially increases accuracy" and that "there is no law enforcement concern for pistol grips or thumbhole stocks, which simply assist a shooter in absorbing recoil."[182] Illustrations showed legal and banned rifles to be, aside from these features, essentially the same.

Regarding a telescoping stock, the expert confirmed that "there is essentially no difference between a short standard stock and a short-ened retractable stock, except that the former is legal and the latter is not.... Both would be legal under federal law, which requires that rifles

178 *Id.*
179 M.G.L. 140 § 121 ("Assault weapon").
180 *Murphy v. Guerrero*, No. 1:14-CV-00026, 2016 WL 5508998, *18 (D. N. Mariana Islands, Sept. 28, 2016).
181 *Id.*
182 *Id.* at *19.

# EXHIBIT 8

Home   Blog   What Does a Threaded Gun Barrel Do?



# WHAT DOES A THREADED GUN BARREL DO?

Jul 13th 2022

A threaded gun barrel is a barrel that has been machined with helical grooves that allow
to be screwed into the receiver of a firearm. This type of barrel is often used on rifles a
pistols that are designed for use with attachable muzzle devices.

**Shop All Threaded Barrels**

Threading a gun barrel can provide a number of benefits. First, it can allow the firearm
be more easily disassembled for cleaning or maintenance. Second, it can provide a tig
seal between the barrel and the suppressor, which can help to reduce noise signature.
Finally, threaded barrels can offer greater precision and accuracy than non-threaded
barrels.

## WHAT ATTACHMENTS CAN BE PUT ON A THREADED BARREL?

There are a number of muzzle devices that can be attached to a threaded gun barrel,
including:

- Suppressors
- Flash hiders
- Muzzle brakes
- Compensators

Suppressors are the most common type of attachment used on threaded barrels. Thes
devices work by trapping and redirecting the gases that are expelled when a bullet is fi
which helps to reduce the noise signature of the firearm. Flash hiders and muzzle brak
are also popular attachments, as they can help to reduce recoil and muzzle rise.



## HOW TO PROPERLY CLEAN A THREADED BARREL

Cleaning a threaded barrel is similar to cleaning any other type of barrel. However, there are a few things that you should keep in mind when cleaning a threaded barrel.

First, be sure to use a cleaning rod that is the correct size for the bore of the barrel.

Second, take care not to damage the threads on the barrel when cleaning it.

Finally, make sure that the muzzle device is properly attached before firing the firearm.

## WHAT GUNS COME WITH A THREADED BARREL?

Many different types of firearms come with a threaded barrel. This includes both pistols and rifles from a variety of manufacturers. Some examples of popular guns that are equipped with a threaded barrel include:

**Springfield Armory Hellcat Pro OSP**





Shop Threaded Barrel Springfield Hellcat

**Smith and Wesson MODEL M&P 15 SPORT**

Shop MODEL M&P 15 SPORT

**AMERICAN PREDATOR RIFLE 6.5 CREEDMOOR**



**Shop AMERICAN PREDATOR
RIFLE 6.5 CREEDMOOR**

## CAN YOU GET A BARREL THREADED?

Yes, it is possible to have a barrel threaded. This is often done by a gunsmith or another qualified individual. In most cases, the barrel will need to be removed from the firearm in order to be properly threaded.

If you are considering having a barrel threaded, it is important to make sure that the threads will be properly cut and that the barrel is the correct size for the firearm. Improperly threaded barrels can cause a number of problems, including:

- Increased wear on the barrel
- Reduced accuracy
- Increased noise signature
- Damage to the threads
- Malfunctions

## CAN A THREADED BARREL BE USED WITHOUT A MUZZLE DEVICE?

Yes, a threaded barrel can be used without a muzzle device. However, it is important to note that doing so can increase the noise signature of the firearm. Additionally, without a muzzle device, the threads on the barrel can be damaged by debris or other objects. For this reason, it is generally recommended that a muzzle device be used when shooting with a threaded barrel.



## DO ALL ATTACHMENTS FIT ALL THREADED BARRELS?

No, not all attachments will fit all threaded barrels. In most cases, for example, a suppressor must be specifically designed for the thread size and pitch of the barrel. Additionally, some suppressors are only compatible with certain types of firearms.

Before purchasing a muzzle device, it is important to make sure that it will fit the threads on your barrel. Most manufacturers will provide this information on their website or in the product description.

Case 1:24-cv-01955-DLF   Document 12-6   Filed 07/26/24   Page 41 of 410

## WHAT ARE THE DISADVANTAGES OF THREADING A BARREL?

While there are a number of advantages to threading a barrel, there are also a few disadvantages. First, threaded barrels can be more difficult to clean than non-threaded barrels. Second, if not properly maintained, the threads on a threaded barrel can become damaged or stripped. Finally, attaching a muzzle device to a threaded barrel can increase the overall length of the firearm, which can make it more difficult to carry or store.

## PURCHASE A HANDGUN FROM SPRINGHILL OUTFITTERS

If you're looking for a handgun with a threaded barrel, Springhill Outfitters has a great selection to choose from. We carry a variety of pistols from different manufacturers, so you're sure to find one that's perfect for you.

# EXHIBIT 9

# DETACHABLE VS. FIXED GUN MAGAZINES





GunCreed

Categories:   **Gun Magazines**

## Introduction To Detachable And Fixed Gun Magazines

When it comes to firearms, magazines play a critical role in determining the efficiency and effectiveness of a shooter. A magazine is a device that stores and feeds ammunition into the firearm, enabling rapid and continuous firing. Over the years, two primary types of gun magazines have emerged as popular choices among gun enthusiasts: detachable magazines and fixed magazines.

Detachable magazines, as the name suggests, can be easily removed from the firearm for reloading purposes. These magazines offer several advantages that make them highly sought after by shooters worldwide. Firstly, detachable magazines allow for quick reloads during combat or competitive shooting scenarios. This swift ammunition replacement ensures minimal downtime between shots, increasing overall shooting speed and enhancing user performance.

Another advantage of detachable magazines is their versatility. Shooters can carry multiple loaded magazines with them, allowing for extended shooting sessions without needing to manually load individual rounds into the firearm each time it runs out of ammunition. This flexibility also enables users to customize their loadouts according to specific requirements or preferences, such as using different types of ammunition or varying round capacities.

On the other hand, fixed gun magazines are permanently attached to the firearm and cannot be easily removed or replaced without significant effort. While this may seem like a disadvantage compared to detachable counterparts at first glance, fixed magazines offer distinct benefits in certain contexts. For instance, they provide enhanced reliability due to their simple design with fewer moving parts that can potentially malfunction or break under stressful conditions.

Moreover, fixed gun magazine systems adhere to specific legal requirements imposed in some jurisdictions where detachable magazine restrictions are imposed for safety reasons or as part of regulatory measures aiming at reducing crimes involving firearms.

In this comprehensive text about detachable vs. fixed gun magazines, we will explore these two types extensively – comparing their features, advantages, disadvantages – ultimately helping you make an informed decision based on your specific needs and circumstances. Whether you are an avid shooter, a law enforcement officer, or someone interested in firearms, understanding the differences between detachable and fixed gun magazines is crucial for maximizing your shooting experience.

## Advantages Of Detachable Gun Magazines

Detachable gun magazines have gained significant popularity in recent years and are widely used in various firearms, from handguns to rifles. These removable ammunition storage devices offer several distinct advantages over fixed gun magazines, making them a preferred choice for many shooters

and military personnel. In this section, we will explore the key benefits of detachable gun magazines. 1. Quick Reloads: One of the most significant advantages of detachable gun magazines is their ability to facilitate rapid reloads.

With a fixed magazine, reloading requires manually inserting rounds one by one, which can be time-consuming and cumbersome during critical situations. In contrast, detachable magazines allow shooters to quickly replace an empty magazine with a fully loaded one, reducing downtime and increasing overall efficiency. 2. Versatility: Detachable gun magazines enable shooters to carry multiple pre-loaded magazines simultaneously. This versatility provides the opportunity to carry different types of ammunition or varying round capacities depending on specific requirements or scenarios.

For instance, in self-defense situations where quick access to ammunition is crucial, having spare loaded magazines readily available allows for swift response without compromising safety. 3. Ease of Maintenance: Detachable gun magazines are generally easier to clean and maintain compared to fixed ones. After use, they can be easily removed from the firearm for thorough cleaning and inspection without requiring disassembly of the entire weapon system.

This advantage simplifies maintenance procedures and ensures that the magazine functions reliably during subsequent use. 4. Enhanced Safety: The ability to remove a magazine from a firearm instantly provides an added layer of safety by rendering the weapon temporarily inoperable while ensuring safe handling or storage practices are followed. By detaching the magazine when not in use or during transportation, accidental discharges can be prevented effectively.

5. Ammunition Management: Detachable gun magazines aid in effective ammunition management as they provide clear indicators regarding remaining rounds within the magazine at any given time. Shooters can readily assess their ammunition capacity and plan accordingly, preventing unexpected interruptions during critical moments. In conclusion, detachable gun magazines offer numerous advantages over fixed ones.

## Disadvantages Of Detachable Gun Magazines

While detachable gun magazines offer certain advantages such as ease of reloading and the ability to carry multiple magazines for quick ammunition changes, they also come with their fair share of disadvantages. These drawbacks, although not necessarily deal-breakers, are worth considering when evaluating the overall performance and reliability of firearms equipped with detachable magazines. 1. Reliability Concerns: One significant disadvantage associated with detachable gun magazines is the potential for reliability issues.

Compared to fixed magazines that are integrated into the firearm's design, detachable magazines can be more prone to malfunctions such as misfeeds or jams. Factors like poor magazine design or improper seating of the magazine within the firearm can lead to feeding problems and result in critical failures during crucial moments. 2. Limited Capacity: While detachable magazines offer flexibility in terms of reloading speed, they often have a limited capacity compared to fixed magazines.

Firearms equipped with fixed magazines can hold a greater number of rounds due to their design constraints being less influenced by ergonomics or cartridge shape considerations. This limitation may be a disadvantage in scenarios where high-capacity ammunition is required without frequent reloads. 3. Added Weight and Bulk: Detachable gun magazines add weight and bulkiness to firearms, especially when carrying multiple spare loaded magazines.

This additional weight can affect weapon handling characteristics and increase fatigue over extended periods of use—particularly relevant for military personnel or law enforcement officers who may carry firearms for prolonged periods. 4. Magazine Loss or Misplacement: Another drawback associated with detachable gun magazines is the increased risk of losing or misplacing them during intense activities or challenging environments. In situations where rapid movements, physical exertion, or harsh conditions are present—such as military operations or competitive shooting matches—detachable magazines may be inadvertently dropped or misplaced, resulting in an unexpected shortage of ammunition at critical moments.

5. Regulatory Restrictions: Detachable gun magazine regulations vary across jurisdictions. In some regions, legal restrictions may limit the capacity of detachable magazines or even ban them altogether.

## Advantages Of Fixed Gun Magazines

Fixed gun magazines, also known as integral magazines, are a type of firearm magazine that is permanently attached to the weapon and cannot be removed or replaced. While detachable magazines have gained popularity in recent years, fixed gun magazines still offer several advantages that make them a preferred choice for many firearm enthusiasts.

1. Enhanced Reliability: One significant advantage of fixed gun magazines is their inherent reliability. Since they are an integral part of the firearm, there is no risk of malfunction or misalignment during critical moments. Detachable magazines, on the other hand, can sometimes become loose or improperly seated, leading to feeding issues and potentially compromising the functionality of the weapon. By eliminating this potential point of failure, fixed gun magazines provide a more reliable shooting experience.

2. Improved Durability: Fixed gun magazines tend to be more durable than their detachable counterparts due to their permanent attachment to the firearm. Detachable magazines can become damaged or worn out over time with repeated insertion and removal from the weapon. In contrast, fixed gun magazines eliminate this wear and tear since they remain securely attached at all times.

3. Streamlined Ergonomics: By designating a specific magazine for a particular firearm model and permanently attaching it, manufacturers can optimize ergonomics for improved handling and balance. The seamless integration between the magazine well and the firearm itself allows for better control and maneuverability during shooting sessions.

4. Legal Compliance: In certain jurisdictions where firearms regulations are stricter, fixed gun magazines may be required by law or preferred due to legal restrictions on detachable magazine capacities or features like high-capacity ammunition feeding devices.

While detachable gun magazines have undeniable advantages in terms of quick reloading capabilities and easy interchangeability between firearms, it's crucial not to overlook the benefits offered by fixed gun magazine systems such as enhanced reliability, improved durability, streamlined ergonomics tailored for specific models, and adherence to legal requirements in certain regions. Ultimately, the choice between fixed and detachable magazines depends on individual preferences, shooting requirements, and applicable laws.

## Disadvantages Of Fixed Gun Magazines

Fixed gun magazines, also known as integral magazines, have been a longstanding feature in firearms design. However, they come with several notable disadvantages that have led to the rise in popularity of detachable gun magazines in recent years. While fixed magazines offer certain

advantages such as improved weapon balance and reliability, their limitations cannot be ignored.

One significant drawback of fixed gun magazines is their limited ammunition capacity. Unlike detachable magazines that can be easily swapped out for fully loaded ones, fixed magazines are typically built into the firearm's frame or receiver. This means that once the ammunition is expended, reloading becomes a time-consuming process. In high-pressure situations or combat scenarios where rapid reloading is crucial, this limitation can prove to be a severe disadvantage.

Additionally, fixed gun magazines hinder tactical flexibility. Detachable magazines enable shooters to carry multiple pre-loaded magazines and swiftly switch between them as needed. This allows for quick adaptation to different combat scenarios or shooting ranges without the need for manual reloading. In contrast, fixed magazine users are confined to the ammunition capacity built into their firearm and must rely on external tools or assistance to reload effectively.

Another drawback of fixed gun magazines lies in their maintenance and cleaning requirements. Detachable magazine systems allow for easy disassembly and cleaning of individual components without interfering with the firearm's overall functionality. However, with fixed magazine designs, accessing internal components for maintenance or cleaning purposes can be significantly more challenging and time-consuming.

Lastly, due to their permanent integration into the firearm's structure, fixed gun magazines limit customization options for users who wish to modify their firearms according to specific needs or preferences. Detachable magazine systems provide greater flexibility in terms of aftermarket accessories such as extended capacity magazines or ergonomic grips that cater to individual preferences.

While there are certain advantages associated with fixed gun magazines concerning weapon balance and reliability under certain conditions, it is clear that these advantages come at the cost of reduced ammunition capacity, limited tactical flexibility, challenging maintenance, and customization restrictions. As firearm technology continues to evolve, detachable magazines have emerged as a preferred choice for many shooters seeking greater versatility and adaptability in their firearms.

## Comparison Of Reloading Speed Between Detachable And Fixed Gun Magazines

Reloading speed is a crucial factor for shooters, whether in military operations, law enforcement, or competitive shooting. The choice between detachable and fixed gun magazines can significantly impact how quickly a shooter can reload their firearm. Both types have their advantages and disadvantages when it comes to reloading speed.

Detachable gun magazines, as the name suggests, can be easily removed from the firearm by pressing a release button or pulling a lever. This allows shooters to quickly replace an empty magazine with a loaded one. The process of reloading with detachable magazines is relatively straightforward and can be accomplished swiftly with practice. Shooters trained in tactical reloads can efficiently swap magazines within seconds, minimizing downtime during engagements.

On the other hand, fixed gun magazines are integrated into the firearm's design and cannot be detached without disassembling the weapon. Reloading with fixed magazines requires manually feeding rounds into the magazine or utilizing devices such as stripper clips or loading tools. This process tends to be slower compared to using detachable magazines since it involves more manual steps.

However, it is essential to note that skilled shooters who are proficient in using fixed gun magazines can achieve impressive reloading speeds through efficient techniques like speed loading or thumbing rounds into the magazine without having to use additional tools. These techniques require extensive training but can rival the reloading speed of those using detachable magazines.

While detachable gun magazines generally provide faster reload times due to their ease of removal and replacement, they also have limitations. In high-stress situations where fine motor skills may deteriorate under pressure or adverse conditions like low visibility or extreme weather conditions, inserting a new magazine into its well accurately may become challenging.

In conclusion, while detachable gun magazines offer faster reload times overall due to their simplicity and ease of use, skilled shooters utilizing fixed gun magazines can achieve comparable reloading speeds through specialized techniques honed through extensive training. Ultimately, the choice between detachable and fixed gun magazines should be based on individual preferences, training, and specific operational requirements.

## Discussion On Magazine Capacity In Detachable Vs. Fixed Gun Magazines

When it comes to firearm magazines, one important consideration is their capacity. Magazine capacity refers to the number of rounds that can be loaded into a magazine before it needs to be reloaded. In the context of detachable and fixed gun magazines, there are several factors that influence magazine capacity and subsequently impact the usability and effectiveness of the firearm.

Detachable gun magazines offer the advantage of being easily replaceable, allowing for quick reloading during intense situations. The ability to carry multiple pre-loaded magazines provides an immediate increase in firepower without needing to manually reload individual rounds. This convenience often translates into higher magazine capacities for detachable magazines compared to their fixed counterparts.

In contrast, fixed gun magazines are permanently attached to the firearm and cannot be easily swapped out like detachable ones. As a result, their capacity is typically limited due to space constraints within the weapon's design or legal restrictions imposed by certain jurisdictions. Manufacturers must strike a balance between optimizing magazine size for functionality while adhering to regulations.

The debate over magazine capacity has been at the forefront of discussions around firearms legislation and public safety concerns. Proponents argue that higher-capacity detachable magazines offer increased self-defense capabilities for law-abiding citizens, providing them with more ammunition during life-threatening encounters where every round counts.

On the other hand, critics argue that high-capacity detachable magazines can facilitate mass shootings or criminal activities by enabling shooters to fire numerous rounds without pausing for reloading. They contend that limiting magazine capacities could potentially reduce casualties during such incidents by forcing attackers to reload more frequently, creating opportunities for intervention or escape.

Ultimately, finding a balance between personal defense needs and public safety interests remains a challenge when discussing magazine capacities in both detachable and fixed gun magazines. Striking this balance often involves evaluating various factors such as potential threats faced by individuals versus community safety concerns while considering societal norms and legal frameworks surrounding firearms ownership and usage.

# Analysis Of Reliability And Durability In Detachable Vs. Fixed Gun Magazines

Reliability and durability are critical factors to consider when evaluating the performance of detachable and fixed gun magazines. Both types have their unique advantages and limitations, which can impact the overall functionality and effectiveness of a firearm. This analysis aims to compare the reliability and durability of these magazine types in order to provide a comprehensive understanding of their strengths and weaknesses.

Detachable gun magazines offer the advantage of quick reloading, allowing shooters to swiftly replace an empty magazine with a loaded one during intense situations. However, this convenience comes with potential drawbacks regarding reliability. Detachable magazines rely on mechanical components such as springs, followers, and release mechanisms that may be prone to failure or malfunction under certain circumstances. For instance, dust or debris entering the magazine well can impede proper feeding, causing jams or misfires.

Moreover, detachable magazines often possess more intricate designs compared to their fixed counterparts, making them more susceptible to wear over time.

On the other hand, fixed gun magazines are typically built directly into the firearm's frame or receiver without any removable parts. This design eliminates potential issues associated with detachable magazines' mechanical components since there are fewer moving parts that could fail or become damaged. As a result, fixed magazines are generally considered more reliable than detachable ones since they offer fewer opportunities for malfunctions to occur.

Furthermore, due to their simplicity in design and construction, fixed gun magazines tend to exhibit greater durability over extended periods of use compared to detachable variants. The absence of removable components reduces the likelihood of parts breaking or becoming loose during rigorous activities like tactical training or combat scenarios.

In conclusion, while detachable gun magazines provide rapid reloading capabilities for improved efficiency in certain situations, they also introduce potential reliability concerns due to their complex mechanisms. In contrast, fixed gun magazines offer enhanced dependability by eliminating many points of failure seen in detachable designs while providing greater long-term durability. Ultimately, the choice between detachable and fixed gun magazines depends on the specific needs and preferences of the shooter, considering factors such as intended use, reliability requirements, and environmental conditions.

# Conclusion: Choosing The Right Magazine Type For Your Firearm

When it comes to firearms, selecting the appropriate magazine type is crucial for optimal performance and functionality. The choice between detachable and fixed gun magazines depends on various factors, including personal preference, intended use, and legal considerations.

Detachable magazines offer several advantages that make them popular among firearm enthusiasts. Their ability to be easily loaded and unloaded allows for quick reloading during intense situations such as self-defense or competitive shooting. Additionally, detachable magazines enable shooters to carry multiple pre-loaded magazines, ensuring a continuous supply of ammunition without the need for manual reloading in critical moments.

Furthermore, detachable magazines provide firearm users with the flexibility to switch between different calibers or capacities based on their specific needs. This versatility allows shooters to adapt their firearms for various scenarios such as hunting different game species or complying with specific regulations in certain jurisdictions.

On the other hand, fixed gun magazines have their own set of advantages that should not be overlooked. These magazines are permanently attached to the firearm and are generally more secure since they cannot be accidentally dropped or lost during high-stress situations. For individuals looking for a reliable magazine option without concerns about detachment or misplacement, fixed gun magazines provide peace of mind.

Moreover, fixed gun magazines often have a lower profile compared to detachable ones due to their integrated design with the firearm's frame. This compactness can be advantageous in scenarios where discreetness is essential, such as concealed carry or military operations.

Ultimately, when choosing between detachable and fixed gun magazines, it is vital to consider your specific requirements and preferences alongside legal restrictions that may apply in your jurisdiction. Evaluate factors such as ease of use, reloading speed requirements, magazine capacity needs, potential caliber interchangeability options, reliability concerns under stress conditions, and discretion requirements before making an informed decision.

Remember that proper training and adherence to safety protocols are paramount regardless of the magazine type chosen—ensuring safe handling, storage, and usage of firearms should always be a priority.

# EXHIBIT 10

# THE AR-15 FOR HOME DEFENSE: THINGS TO CONSIDER

Posted in: Rifles Tactical

**26 comments** Share:



Home defense is becoming a more significant point of conversation with current and new gun owners alike. Political polarization and the media fixating on an apparent growth of violence has caused more people to take their protection into their own hands. According to the FBI, from January through the end of September in 2020 was a record-breaking year with 28.8 million NICS background checks. While these numbers do not necessarily reflect the actual number of guns sold, it does show that millions are focusing more now than ever on their protection. However, the question of what should be used to defend one's home and family is always a top consideration. Is a shotgun better than a pistol? Is an AR-15 better than either? That question can only really be answered by the individual. However, buying an AR-15 rifle for home defense advantages over a shotgun and a pistol. Let's look at those advantages and the differences between an AR-15 rifle and pistol, should a light source be mounted and optics versus iron sights.

# HOME DEFENSE ADVANTAGES OF AN AR-15

Arguably, the AR-15 is the most popular firearm sold in the United States today. Currently, the National Shooting Sports Foundation (NSSF) estimates there to be between 5-10 million AR-15s in circulation, with that number growing daily. With the influx of veterans returning home from Iraq and Afghanistan to the end of the Assault Weapons Ban (AWB), it is not hard to see why the numbers increase every year.

The first significant advantage of the AR-15 comes in its ease of use. Eugene Stoner took pride in the fact that the AR-15 was engineered to ensure anyone could efficiently utilize the controls and operate the firearm. Controls, such as magazine release and safety lever, are conveniently placed to allow the operator to use the index finger and thumb to manipulate both, respectively. Other controls, like the charging handle and bolt catch, are placed so that people with different body types can operate without too much issue. The detachable box magazine also makes for easy reloads and can be done by almost anyone with minimal training in how a firearm works. The AR-15 has also continued to be updated to keep pace with the consumer's needs like the adoption of ambidextrous controls, free-floating barrels and handguards, and swapping iron sights for optics.

# BEST CALIBER FOR HOME DEFENSE



One advantage of the modular nature of the AR is the ease of caliber changes. ARs can be chambered in something as small as a .22lr or even larger calibers such as .458 SOCOM, 6.5 Grendel, or .50 Beowulf. The user-friendliness and selection of barrels and ammo make the AR-15 a better option than most shotguns. Due to its light recoil, nearly any family member can use it to defend a home, which can level the playing field if a weaker victim confronts a burglar. It also provides a more stable platform to protect yourself with than a handgun. An AR-15 allows four points of contact (left hand, right hand, cheek, and shoulder) to stabilize the weapon rather than the two points of contact (left hand & right hand) you will use with a handgun.

The most popular and standard chambering of the AR-15 is the 5.56x45mm NATO or .223 Remington cartridge. It is a high-velocity round with little felt recoil used by militaries worldwide due to its ability to perform. The bullet of the 5.56mm/.223REM cartridge can be found in several different grain weights that can either decrease the recoil even more or allow for specific home defense ammunition.

.300 Blackout ammo is the next most popular round used in an AR-15. It was initially developed for Special Forces to bridge the gap between the 5.56mm and 7.62 NATO rounds optimized for use with a silencer. One of the most significant advantages for this caliber is that it can come in various weights enabling it to be tuned for your specific barrel length and suppressor set up. Its versatility makes it the second most popular for home defense because you can quickly suppress it, and it has the potential knockdown power of lighter .30 caliber rounds.

# BEST HOME DEFENSE AMMO

Regardless of what caliber you choose for your AR-15, it is imperative to research the best home defense ammunition available to your weapon's chambering and what is legal for your jurisdiction. There are various offerings from some of the biggest names in munitions manufacturing. However, not all rounds are created equal. Here are a few recommendations.

For AR-15s chambered in 5.56mm, the most available ammunition will always be what the military uses. The XM-193 is a 55 grain projectile that is extensively used by NATO and the XM-855, which will have the 62 grain bullet. These are great rounds since they can be used for plinking at the range, training, or home defense with consistent results. Unfortunately, these rounds can be susceptible to over-penetration and may not be the best for home defense.

Two of the best rounds specifically designed for home defense will be Hornady's Critical Defense and Speer Gold Dot 55gr munitions. Hornady's Critical Defense is topped off with the FTX bullet that is identical to the technology they're renowned for in their pistol ammo. The Speer Gold Dot has a 55 grain soft point bullet that was designed specifically for law enforcement. These rounds will mushroom upon impact, which dumps most of its energy and prevents over-penetration while still maintaining accuracy.

# RIFLE VS. CARBINE VS. PISTOL LENGTH ARS



The rabbit hole of online forums and YouTube videos discussing the different lengths of an AR will also find a heated debate about which AR length is best. Defining the differences of each will give you a better grasp as to their capabilities and limitations. This will also help you determine which will be right for you based on your needs and desires for an AR-15.

# DOES SIZE MATTER?

As far as the AR-15 is concerned, the standard rifle-length will mirror the military version of the M-16 rifle. This rifle will have a barrel length of 20", a rifle length gas system and front sight gas block combination, and a fixed butt-stock. Not all rifle length AR-15s will be set up this way; however, that is its traditional configuration. This rifle's significant advantage is that the longer barrel will maximize the pressure and gun powder burn to extract the most velocity of the 5.56mm/.223REM cartridge. The longer gas system allows for a softer recoil as pressures diminish over the gas tube's length and an overall flatter shooting set up. This can be especially ideal for young, new, or inexperienced shooters.

The major disadvantage is the overall length of the rifle. The standard 20" barreled version will have an overall length of 39.5", which will be the longest version of the three we will discuss. The extended length may cause issues navigating around doorways and corners as you defend your home. Thus, most people will not consider this a good home defense weapon and relegate it to varmint or small game hunting. However, with some training and adapting its use, it still can be a practical rifle for home defense. The Marines use the M-16A4 as its primary weapon while deployed to Iraq and Afghanistan,

Case 1:24-cv-01955-DLF   Document 12-6   Filed 07/26/24   Page 51 of 410

where close quarter battles (CQB) were common. Yet, most would argue that it would not be their first choice.

# GOLDILOCKS OF THE AR WORLD

The carbine length AR-15 will most closely resemble the M-4 pattern rifle of the U.S. military. The characteristics of a majority of carbines will have a 16" barrel and a six-position telescoping butt-stock. Its primary advantage is that it is a more compact rifle that will be a bit of a "do all" set up. The 16" barrel length will reduce the rifle's length while still providing excellent velocities for the 55 grain and 62 grain bullets. Also, the telescoping butt-stock will reduce the overall size to approximately 32.5," which allows it to be more maneuverable in CQB environments. The major disadvantage is still the overall length of the rifle. While it has a shorter overall length, some may still find it challenging to move around their home. However, this compromise is an excellent option for the person who wants an AR-15 to be used for home defense, hunting, or training. Truly a jack of all trades.

# SHORTER IS BETTER?

The ATF defines an AR pistol as a firearm with an overall length of less than 26". Initially, the AR-15 pistol was heavily influenced by the famed MK-18 used extensively by Special Operations starting in the late 1990s and is still used today. Most AR pistols will have a barrel shorter than 14.5" and a stabilizing brace from manufacturers like SB Tactical. This is the AR pistol's most significant advantage. You will have the ability to customize an AR pistol to precisely what you need and get the overall length right where you want it. The versatility provides you with the ability to set up your gun to maneuver around your home without the concern of banging into door frames or corners. Most of the popular barrel lengths will be 10.5", 11.5", and 12.5"; however, some people have built shorter or longer pistols. Yet, this is also the pistol's major disadvantage. The shorter barrel length can cause the gun to have a fiercer recoil, a shorter maximum effective range due to the round's lower velocity, and more flash as the unspent powder is ignited after it leaves the muzzle; the fireball effect. These concerns can be fixed through product selection, such as flash hiders and braces, and training. That is why most people will choose the AR pistol as the best option for home defense.

**Optics vs. Iron Sights**



Regardless of which length of AR you choose, the following determination for your AR is whether you will use an optic such as a red dot sight or iron sights. Both can be employed with sound effects, but how do you decide which is right for you? Let's look at the differences of each to help you decide.

# OPTICS WIN BATTLES

It has been said that optics win battles, and that could very well be true! The advent of the red dot, holographic, and even low power variable optics has made the AR-15 a force multiplier without a doubt.

Optics, especially red dot and holographic sights, has dramatically increased a shooter's ability to quickly find a target, place the dot or aiming reticle on the target, and place accurate rounds where they want them to go compared to iron sights. Having the ability to place a reticle on a target, compared to lining up two physical sights, has made shooting easier and more enjoyable for most. Besides, for high-stress situations, such as home defense, having a simple aiming point could be crucial in saving lives.

# OPTICS AND MURPHY'S LAW

The most significant disadvantage of an optic is that most will run on batteries, and batteries will die. Murphy's Law states that the thing you need will fail when you need it the most. Truthfully, technology for many red dots on today's market will have a battery life of up to 50,000 hours. That is years of usage; however, you must remember to change the battery on time or be stuck without a point of aim. Albeit a rare occurrence, red dots and holographic sights also can lose their zero if mistreated. Losing their zero will be more prevalent in budget options, but again, Murphy's Law can and will come into play should your optic get bumped hard enough.

# IRON SIGHTS ARE FOREVER

Once zeroed, the standard AR-15 rifle sights will rarely lose zero, which is its main advantage over optics since iron sights are basically "set it and forget it." Therefore, the military will always start teaching recruits Basic Rifle Marksmanship with iron sights before introducing any optic type. If the shooter does their part, iron sights are as consistent and accurate as the shooter can make it. Iron sights can also be bumped or knocked around with little to no impact on the rifle's zero. With training, a person can become just as proficient with irons as they can be with an optic.

# IRONS FAIL TOO

Iron sights will always be the most consistent sighting option available to the AR-15; however, they are not perfect. Having to align a rear and front sight can be challenging, and when stress is added, it can be nearly impossible. Training can vastly help one's ability to shoot quickly and accurately with iron sights, but you still have to align two objects with your eye. Low light scenarios also hinder your ability to find and align the iron sights, significantly impacting your accuracy and speed.

Therefore, for home defense, a red dot style optic would be the preferred setup. Yet, and it cannot be reiterated enough, you have to maintain your optic. It is good practice to verify your AR-15's zero at least every quarter if not monthly. And while most red dots have extended battery life, it is also good to change batteries annually. Most will set a calendar reminder to swap out their red dot batteries on New Year's Day along with their smoke detectors.

# LET THERE BE LIGHT, TACTICAL LIGHTS



One of the best accessories to add to your AR-15 will be a light source such as a [tactical light](#). Most of the lights available today will be lightweight, compact, and extremely bright. Many tactical lights will also be able to mount to MLOK or Picatinny sections making for easy installation. Also, it can be attached to either side of the AR-15, depending on your preference. Attaching lights to your AR is encouraged to help you identify a target before shooting, especially in low light situations such as home defense. However, many do not consider that a significant disadvantage is using a weapon-mounted light to search your home. Anything the light points at will also have the muzzle of the AR pointing at it as well. This will violate one of the four firearm safety rules as you may inadvertently point your firearm at a family member that is up late one night. Make sure to train and plan to mitigate this concern.

# FINAL RECOMMENDATIONS

[The AR pistol is the best home defense option](#) because of its compact design and ease of use when maneuvering around corners and doors. Optics and lights attached to your firearm are also better options when setting up an AR-15 to defend your home. However, that does not mean that this is right for you! Specifically, defining what you need out of your AR will better help you decide what length of AR and attachments will work best. Once you have determined that, test it in your home to verify the results.

Finally, no matter what you decide to select as your home defense set up, get training. Good, quality training will help you better hone your home defense weapon; moreover, it will also give you the skills, plans, implementation of those plans and teach you what to do after you have successfully defended your home. Once you have the training and a plan set, rehearse, rehearse, rehearse. There is no doubt that a well thought out plan that has been practiced will defeat any situation. Stay safe, train hard!

*Mark Grimsley* is a former U.S. Army Officer that started his career as an enlisted Abrams crewman. He has served in 3 overseas tours that include Korea in 2002, Iraq in 2003 as a tank gunner and Afghanistan in 2010-11 as a logistics officer. He completed numerous military schools to include Air Assault and Airborne as well as over civilian firearms training. Mark enjoys spending time with his children, running a YouTube channel and working out.

# EXHIBIT 11

This Washington Post-Ipsos poll was conducted Sept. 30-Oct. 11, 2022, among a random national sample of 2,104 gun owners, including 399 AR-15-style rifle owners. The sample was drawn through Ipsos KnowledgePanel, an ongoing survey panel recruited through random sampling of U.S. households. Results among gun owners overall have a margin of sampling error of plus or minus 2.5 percentage points; the error margin is 5.5 points for the sample of AR-15-style rifle owners. Sampling, field work and data processing were conducted by Ipsos of Washington, D.C.

(Full methodological details appended at the end.)

*= less than 0.5 percent

1. (AMONG GUN OWNERS) What types of firearms do you own? *Please select all that apply.*

|  | Handguns, such as pistols or revolvers | Hunting rifles or shotguns | AR-15-style rifles, including any semi-automatic weapon built on a common AR-15 platform | Antique firearms | Other |
|---|---|---|---|---|---|
| 10/11/22 | 80 | 62 | 20 | 16 | 2 |
| AR-15 owners | 95 | 79 | 100 | 33 | 2 |

2. (AMONG AR-15 OWNERS) In a few words, what are the main reasons you own an AR-15-style rifle?

|  | 10/11/22 |
|---|---|
| Self defense/Protect home/self/family | 33 |
| Fun/Recreation/Sport or hobby shooting | 15 |
| Target shooting/Take to range/Competition | 15 |
| Second Amendment/It's my right/Because I can | 12 |
| Hunting | 12 |
| Like the way it looks/Like it/Because I want to | 9 |
| Easy to use/Simple/Accurate | 6 |
| Used one in the military/ as a police officer/Use for work | 4 |
| Customizable/Platform/Versatile | 4 |
| In case of chaos/Government tyranny | 3 |
| Was a gift/Inherited it | 2 |
| Collection/Collector | 2 |
| Angers liberals/Because people want to ban them/ Because they make other people afraid | 2 |
| Other | 5 |
| No answer | 2 |

3. (AMONG AR-15 OWNERS) Is each of the following a major reason, minor reason or not a reason why you own an AR-15-style rifle?

10/11/22 - Summary table among AR-15-style rifle owners

|  | Major reason | Minor reason | Not a reason | No opinion |
|---|---|---|---|---|
| a. Target shooting | 60 | 30 | 10 | 0 |
| b. Hunting | 18 | 30 | 52 | 0 |
| c. Ease of customizing or modifying the rifle | 25 | 30 | 45 | 0 |
| d. Protect self, family and property | 65 | 26 | 8 | * |
| e. Potential for new laws restricting AR-15 sales | 22 | 28 | 49 | 0 |
| f. In case law and order |  |  |  |  |

```
        breaks down              42      32      26       0
g. It is fun to shoot            63      27      10       *
h. It is important to who
   I am as an American           36      24      40       *
```

4. (AMONG AR-15 OWNERS) How often do you fire your AR-15-style rifle(s)?

| | Less than once a year | Once or twice a year | A few times a year | About once a month | More than once a month | No op. |
|---|---|---|---|---|---|---|
| 10/11/22 | 22 | 16 | 42 | 10 | 10 | 0 |

5. (AMONG GUN OWNERS) As far as you know, how many of your friends, if any, own an AR-15-style rifle?

| | All or most | Some | Only a few | None | No opinion |
|---|---|---|---|---|---|
| 10/11/22 | 9 | 26 | 27 | 37 | 1 |
| AR-15 owners | 30 | 45 | 20 | 5 | * |

6. (AMONG AR-15 OWNERS) In a few words, what do you think are the biggest misunderstandings about AR-15-style rifles in the general public or media?

RESULTS FORTHCOMING WHEN CODING IS COMPLETE

7. (AMONG GUN OWNERS) Have you ever served in the U.S. Armed Forces, Reserves or National Guard?

| | | | ------------- Served in military --------------- | | | |
|---|---|---|---|---|---|---|
| | Never served in military | NET | On active duty for training in Reserves or National Guard | Now on active duty | Active duty in the past but not now | No op. |
| 10/11/22 | 80 | 20 | 1 | * | 17 | * |
| AR-15 owners | 72 | 28 | 5 | 0 | 23 | 0 |

8. (AMONG PEOPLE WHO WERE ACTIVE DUTY MILITARY NOW OR IN THE PAST) In military training or combat, did you ever fire an M4 or M16?

| | Yes | No | No opinion |
|---|---|---|---|
| 10/11/22 | 81 | 19 | * |
| AR-15 owners | 89 | 11 | 0 |

NET 7/8 among AR-15 owners

| | | --------- Served in military ---------- | | | |
|---|---|---|---|---|---|
| | NET | Fired M4 or M16 | Didn't fire M4 or M16 | No opinion | Never served in military | No opinion |
| 10/11/22 | 28 | 25 | 3 | 0 | 72 | 0 |

9. (AMONG AR-15 OWNERS WHO USED M4 OR M16 IN MILITARY TRAINING OR COMBAT) Did familiarity with the M4 or M16 increase your interest in owning an AR-15-style rifle?

| | Yes | No | No opinion |
|---|---|---|---|
| 10/11/22 | 55 | 45 | 0 |

NET 7/9 among AR-15 owners

```
          --- Fired M4 or M16 in military ----
              Increased     Didn't
```

| | NET | interest in AR-15 | increase interest | No opinion | Didn't fire M4 or M16 | Never served in military | No opinion |
|---|---|---|---|---|---|---|---|
| 10/11/22 | 25 | 14 | 11 | 0 | 3 | 72 | 0 |

*** END ***

METHODOLOGICAL DETAILS

This poll was jointly sponsored and funded by The Washington Post and Ipsos. It was conducted among a random sample of 2,104 U.S. adults 18 and older who reported they own a gun, of which 399 own an AR-15-style rifle. Interviews were conducted in English and Spanish. A sample of adults aged 18 years and older were screened for gun ownership and gun owners were asked if they own an AR-15.

The questionnaire was administered with the exact questions in the exact order as they appear in this document. Demographic questions are not shown. If a question was asked of a reduced base of the sample, a parenthetical preceding the question identifies the group asked.

Ipsos conducted sampling, interviewing and tabulation for the survey using the KnowledgePanel, a representative panel of adults aged 18 years and over living in the United States. The survey was conducted online among a sample from the KnowledgePanel, an ongoing survey panel recruited through random sampling of U.S. households through address-based sampling. Panel members who do not have internet access are provided with a tablet and internet service.

This survey uses statistical weighting procedures to account for deviations in the survey sample from known population characteristics, which helps correct for differential survey participation and random variation in samples. The general population adult sample was weighted to match the makeup of the population geodemographics to the sources below. The gun owner weight was then scaled to the number of respondents.

| Source | Benchmarks |
|---|---|
| U.S. Census Bureau's 2019 American Community Survey (ACS) | Sex, region, metropolitan status, age, education, household income |
| U.S. Census Bureau's March 2022 Current Population Survey supplement (CPS) | Metropolitan status |
| Washington Post-ABC News telephone polls | Political party affiliation |

The margin of sampling error for the sample of AR-15-style rifle owners, including the design effect is plus or minus 5.5 percentage points. Note that sampling error is only one of many potential sources of error in this or any other public opinion poll.

All error margins have been adjusted to account for the survey's design effect, which is 1.2. The design effect is a factor representing the survey's deviation from a simple random sample and takes into account decreases in precision due to sample design and weighting procedures. Surveys that do not incorporate a design effect overstate their precision.

The Washington Post is a charter member of AAPOR's Transparency Initiative, which recognizes organizations that disclose key methodological details on the research they produce.

Contact polls@washpost.com for further information about how The Washington Post conducts polls.



# EXHIBIT 12

**AMERICAN ICON**

# Why do Americans own AR-15s?

The Washington Post and Ipsos asked nearly 400 AR-15 owners why they own the rifle

*FUN TO SHOOT*

By Emily Guskin, Aadit Tambe and Jon Gerberg

March 27 at 6:12 a.m.

Share

Comment   Save



**AMERICAN ICON**

A series examining the AR-15, a weapon with a singular hold on a divided nation

**More stories**

←   →

The AR-15's destructive force: A rare look at the weapon's impact

Why are we showing graphic AR-15 content? A letter from the executive editor.

What does to a huma visual exar the deadly

**About the terminology** ⌄

The AR-15 is the best-selling rifle in the United States, industry figures indicate. Almost every major gunmaker now produces its own version of the weapon, which dominates gun dealers' walls and websites.

Critics claim that the military-style gun has no legitimate civilian use — yet about 1 in 20 Americans own one. So who chooses to buy an AR-15, and why?

The Washington Post and Ipsos asked nearly 400 AR-15 owners to explain their reasons for having the weapon, what they use it for and how often they fire it.

The survey found that AR-15 owners come from red, blue and purple states. Compared with Americans as a whole, AR-15 owners are significantly more likely to be White, male and between the ages 40 and 65. They're also more likely to have higher incomes, to have served in the military and to be Republican. And AR-15 owners are more likely to live in states former president Donald Trump won in 2020 than adults overall.

Self-defense was the most popular reason for owning an AR-15. Other popular answers included recreation, target shooting and hunting, while some pointed to owning an AR-15 as their Second Amendment right.

**Why people own AR-15-style rifles**

Q: In a few words, what are the main reasons you own an AR-15-style rifle? (Open-ended responses coded into categories.)



Total does not equal 100 because up to two answers
were accepted.
Source: Sept. 30-Oct. 11, 2022, Washington Post-Ipsos
poll of 399 AR-15-style rifle owners with an error margin
of +/- 5.5 percentage points.

| Inherited it 2% | No answer 2% | Collection/ Collector 2% |

The Post-Ipsos poll is one of the most detailed nationally representative surveys to date focused on the opinions of AR-15 owners.

The gun industry estimates there are about 20 million AR-15s in circulation. There is no way to independently confirm that number, but polling can estimate how many Americans own them.

## Demographics of AR-15 owners

### GENDER



### GEOGRAPHY



### LOCATION



### RACE

| | White | Hispanic | Black | Other |
| --- | --- | --- | --- | --- |
| AR-15 owners | 74% | 11% | 9% | 5% |
| Other gun owners | 75 | 9 | 10 | 7 |
| U.S. adults overall | | | | |



|  |  | 62 | 17 | 12 | 9 |

## INCOME

| | Under $50K | $50K-$99K | $100K+ |
|---|---|---|---|

**AR-15 owners**

| 15% | 29% | 56% |

**Other gun owners**

| 27 | 34 | 39 |

**U.S. adults overall**

| 29 | 29 | 43 |

## AGE

| | Age 18-39 | Age 40-64 | Age 65+ |
|---|---|---|---|

**AR-15 owners**

| 28% | 56% | 15% |

**Other gun owners**

| 25 | 49 | 26 |

**U.S. adults overall**

| 37 | 41 | 22 |

## EDUCATION

| | No college degree | College degree |
|---|---|---|

**AR-15 owners**

| 67% | 33% |

**Other gun owners**

| 72 | 28 |

**U.S. adults overall**

| 65 | 35 |

## POLITICAL PARTY

| | Republican | Democratic | Independent | Other/None |
|---|---|---|---|---|

**AR-15 owners**

| 41% | 10% | 46% | |

**Other gun owners**

| 36 | 21 | 40 | |

**U.S. adults overall**

| 27 | 27 | 39 | 7 |

## MILITARY SERVICE

| | Served in military | Did not serve in military |
|---|---|---|

**AR-15 owners**

| 28% | 72% |

**Other gun owners**

| 18 | 82 |

**U.S. adults overall**

| 8 | 92 |
|---|----|

Note: Totals may not equal 100 because of rounding.

Source: Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of 2,104 gun owners including 399 AR-15-style rifle owners with an overall error margin of +/- 2.5 percentage points and 5.5 points among AR-15 owners. Most U.S. adult demographics based on Census Bureau's 2022 Annual Social and Economic Supplement; Urban/Suburban/Rural from Ipsos KnowledgePanel estimate; party identification from November 2022 Washington Post-ABC News poll.

National surveys by Ipsos in 2022 found that 31 percent of adults own guns. The Post-Ipsos survey of AR-15 owners estimates that 20 percent of gun owners own an AR-15-style rifle. Taken together, the polls find that 6 percent of Americans own an AR-15, about 1 in 20.

The data suggests that with a U.S. population of 260.8 million adults, about 16 million Americans own an AR-15.

## AR-15 owners explain why they have the weapon

▶ Watch All

Videos by Jon Gerberg

**Is each of the following a reason why you own an AR-15?**



| | Major reason | Minor reason | Not a reason |
|---|---|---|---|

**Protect self, family and property**

| 65% | | 26% | 8% |
|---|---|---|---|

**It is fun to shoot**

| 63 | | 27 | 10 |
|---|---|---|---|

**Target shooting**

| 60 | | 30 | 10 |
|---|---|---|---|

**In case law and order breaks down**



| | | | |
|---|---|---|---|
| 42 | 32 | 26 | |

**It is important to who I am as an American**

| | | |
|---|---|---|
| 36 | 24 | 40 |

**Ease of customizing or modifying the rifle**

| | | |
|---|---|---|
| 25 | 30 | 45 |

**Potential for new laws restricting AR-15 sales**

| | | |
|---|---|---|
| 22 | 28 | 49 |

**Hunting**

| | | |
|---|---|---|
| 18 | 30 | 52 |

Note: "No opinion" indicated in gray. Totals may not equal 100 because of rounding.

Source: Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of 399 AR-15-style rifle owners with an error margin of +/- 5.5 percentage points.

> "To ensure I would not be outgunned if I had to defend my family and property with the rate that society is going."

**A 52-year-old man**

**AR-15 owners are not firing their weapons frequently**

Q: How often do you fire your AR-15(s)?



Less than once a year — 22%

Once or twice a year — 16

A few times a year — 42

About once a month — 10

More than once a month — 10

Source: Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of 399 AR-15-style rifle owners with an error margin of +/- 5.5 percentage points.

## "I own it to protect my family members."

**A 52-year-old woman**

**Military training and AR-15 usage**

Q: In military training or combat, did you ever fire an M4 or M16?



Fired M4 or M16
25%

Did not fire M4 or M16
3

28% served in the military

Never served in military
72

Source: Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of 399 AR-15-style rifle owners with an error margin of +/- 5.5 percentage points.

### About this story

This Washington Post-Ipsos poll was conducted Sept. 30-Oct. 11, 2022, among 2,104 gun owners, including 399 AR-15-style rifle owners. The sample was drawn through the Ipsos KnowledgePanel, an ongoing panel recruited through random sampling of U.S. households. Results among AR-15 owners have a margin of error of plus or minus 5.5 percentage points. The estimate that 31 percent of U.S. adults own any gun is from an Ipsos KnowledgePanel survey of more than 31,000 adults in November and December 2022.

Reporting by Emily Guskin. Videos by Jon Gerberg. Graphics and design by Aadit Tambe. Motion graphics by Osman Malik.

Illustration by Anna Lefkowitz; iStock. Design and development by Anna Lefkowitz, Aadit Tambe and Rekha Tenjarla. Design editing by Madison Walls. Video editing by Angela M. Hill. Graphics editing by Chiqui Esteban.

Editing by Scott Clement, Peter Wallsten and Wendy Galietta. Additional editing by Jordan Melendrez, Kim Chapman and Tom Justice.

Additional support from Sarah Murray, Courtney Beesch, Angel Mendoza, Kyley Schultz, Brandon Carter, Ashleigh Wilson, Jai-Leen James and Bryan Flaherty.

**MORE FROM THE SERIES**           **HAND-CURATED**

Magazine restrictions could reduce mass killings by AR-15s, but courts must decide

March 27, 2023



# EXHIBIT 13

# 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned

William English, PhD

Georgetown University

Expanded Report: May 13, 2022

## Abstract

This report summarizes the findings of a national survey of firearms ownership and use conducted between February 17th and March 23rd, 2021 by the professional survey firm Centiment. This survey, which is part of a larger book project, aims to provide the most comprehensive assessment of firearms ownership and use patterns in America to date. This online survey was administered to a representative sample of approximately fifty-four thousand U.S. residents aged 18 and over, and it identified 16,708 gun owners who were, in turn, asked in-depth questions about their ownership and their use of firearms, including defensive uses of firearms.

Consistent with other recent survey research, the survey finds an overall rate of adult firearm ownership of 31.9%, suggesting that in excess of 81.4 million Americans aged 18 and over own firearms. The survey further finds that approximately a third of gun owners (31.1%) have used a firearm to defend themselves or their property, often on more than one occasion, and it estimates that guns are used defensively by firearms owners in approximately 1.67 million incidents per year. Handguns are the most common firearm employed for self-defense (used in 65.9% of defensive incidents), and in most defensive incidents (81.9%) no shot was fired. Approximately a quarter (25.2%) of defensive incidents occurred within the gun owner's home, and approximately half (53.9%) occurred outside their home, but on their property. About one out of ten (9.1%) defensive gun uses occurred in public, and about one out of thirty (3.2%) occurred at work.

A majority of gun owners (56.2%) indicate that they carry a handgun for self-defense in at least some circumstances, and about 35% of gun owners report carrying a handgun with some frequency. We estimate that approximately 20.7 million gun owners (26.3%) carry a handgun in public under a "concealed carry" regime; and 34.9% of gun owners report that there have been instances in which they had wanted to carry a handgun for self-defense, but local rules did not allow them to carry.

The average gun owner owns about 5 firearms, and handguns are the most common type of firearm owned. 48.0% of gun owners – about 39 million individuals – have

Electronic copy available at: https://ssrn.com/abstract=4109567

owned magazines that hold over 10 rounds (up to 542 million such magazines in total), and 30.2% of gun owners – about 24.6 million individuals – have owned an AR-15 or similarly styled rifle (up to 44 million such rifles in total). Demographically, gun owners are diverse. 42.2% are female and 57.8% are male. Approximately 25.4% of Blacks own firearms, 28.3% of Hispanics own firearms, 19.4% of Asians own firearms, and 34.3% of Whites own firearms. In total, Americans own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

# 1   Introduction

This report summarizes the main findings of a national survey of firearms ownership and use conducted between February 17th and March 23rd, 2021 by the professional survey firm Centiment. This survey, which is part of a larger book project, aims to provide the most comprehensive assessment of firearms ownership and use patterns in America to date.

Before this survey, the most authoritative resource for estimating details of gun ownership in the U.S. has been the "Comprehensive National Survey on Firearms Ownership and Use" conducted by Cook and Ludwig in 1994 (Cook and Ludwig, 1996), and the most authoritative resource for estimating defensive gun use in the U.S. has been the "National Self-Defense Survey" conducted by Kleck and Gertz in 1993 (Kleck and Gertz, 1995, 1998). While valuable resources, they are both now a quarter century old, and no surveys of similar scope and depth have documented firearms ownership and use in more recent years.

Hepburn et al. (2007) conducted a more limited survey to ascertain the "gun stock" in 2004, a version of which was repeated in 2015 (Azrael et al., 2017). However, as they explain in introducing their latter survey, data sources on firearms ownership and use remain scarce:

> Although the National Opinion Research Center's General Social Survey and other surveys have asked respondents whether they personally own a firearm or live in a home with firearms, few have asked about the number of guns respondents own, let alone more detailed information about these firearms and the people who own them, such as reasons for firearm ownership, where firearms were acquired, how much firearms cost, whether they are carried in public, and how they are stored at home (Smith and Son 2015; Gallup 2016; Morin 2014). Because of this, the best and most widely cited estimates of the number of firearms

Electronic copy available at: https://ssrn.com/abstract=4206007

in civilian hands are derived from two national surveys dedicated to producing detailed, disaggregated, estimates of the U.S. gun stock, one conducted in 1994, the other in 2004 (Cook and Ludwig 1997, 1996; Hepburn et al. 2007).

Miller, Zhang, and Azrael conducted an expanded survey in 2021 of 5,932 gun owners with a focus on characterizing the demographics of those who acquired firearms for the first time during the COVID-19 Pandemic, based on a sub-sample of 447 individuals who fit this criterion (Miller et al., 2022). This team also described their survey as a "2021 National Firearms Survey," and it is helpful to clarify that their survey was distinct from the survey reported here.

Richer survey data on firearms ownership and use has been collected by industry associations such as the National Shooting Sports Foundation (NSSF).[1] However, these surveys generally aim at assessing industry trends and market segmentation and are not necessarily designed to be nationally representative. In 2017, the Pew Research Center conducted one of the most recent and detailed surveys of the demographics of gun ownership (Brown, 2017).[2] Although it did not ask detailed questions concerning defensive use of firearms and the types of firearms owned, this recent Pew survey serves as a helpful benchmark for corroborating the general ownership estimates of the present survey.

Advances in survey research technologies make it possible to reach large, representative respondent populations today at a much lower cost than a quarter century ago. One of the limitations of the Cook and Ludwig survey, which sought to be nationally representative, was that the survey sample was relatively small, with about 2,500 respondents of whom only about 600, or (24.6%), owned a firearm when the survey was administered. As the investigators noted in their report, some sub-questions were not sufficiently well powered to make confident inferences, particularly concerning the defensive use of firearms. Similarly, Kleck and Gertz's survey was limited to 4,977 respondents, and the more recent surveys by Pew, Hepburn, and Azrael are all based on less than 4,000 respondents.

---

[1]See https://www.nssf.org/research/

[2]See Pew Research Center, June 2017, "America's Complex Relationship With Guns" https://www.pewresearch.org/social-trends/wp-content/uploads/sites/3/2017/06/Guns-Report-FOR-WEBSITE-PDF-6-21.pdf

Electronic copy available at: https://ssrn.com/abstract=4209697

Today, professional survey firms like Centiment[3] cultivate large pools of survey respondents, enabling representative sampling, and have techniques that encourage high response and completion rates while also ensuring the integrity of responses.[4]  The online survey summarized here was presented to a nationally representative sample (excluding residents of Vermont who had already responded to a pilot version of this survey) of 54,244 individuals aged 18 or over who completed an initial questionnaire that included an indirect question indicating whether they owned a firearm (respondents were presented with a list of items commonly owned for outdoor recreational purposes, including firearms, and were asked to select all items that they own).

This question identified 16,708 individuals as gun owners, who were then transferred to the main survey, which then asked detailed questions about their ownership and use of firearms.  Given the length and detail of the survey, there was a slight amount of attrition, as 7.5%, or 1,258 individuals, did not make it through all questions to the end of the survey. However, 92.5% of the responding firearms owners (15,450) did proceed through all of the survey questions.

This survey thus contains what we believe is the largest sample of firearms owners ever queried about their firearms ownership and firearms use in a scientific survey in the United States.  This survey was approved by Georgetown University's Institutional Review Board. Of note, this survey was conducted just after a period of widespread social unrest across the U.S. and a contentious presidential election, which background check data suggests led to record gun sales (approximately 39.7 million in 2020, up 40% from the prior year).[5]  It is thus a comprehensive and timely assessment of the state of firearms ownership and use in the United States.  Finally, the extraordinarily large size of this sample enables us to make well-powered, statistically informative inferences within individual states, which considerably extends the value of this data.

The initial sample of respondents achieved excellent demographic representation across

---

[3]See https://www.centiment.co/

[4]See https://help.centiment.co/how-we-safeguard-your-data

[5]See McIntyre, Douglas A. "Guns in America: Nearly 40 million guns were purchased legally in 2020 and another 4.1 million bought in January" https://www.usatoday.com/story/money/2021/02/10/this-is-how-many-guns-were-sold-in-all-50-states/43371461/

Electronic copy available at: https://ssrn.com/abstract=4209697

all 49 states and DC, excluding Vermont (see Appendix A and B). For the purpose of estimating firearms ownership rates for the general U.S. population we employed raked weighting on gender, income, age, race, and state of residence. Note that there was a brief period in the first two days after the soft launch of the survey that comprehensive demographic data was not collected from those respondents who did not indicate firearms ownership, and thus did not proceed to the main survey (approximately 300 respondents). Although the survey company, Centiment, maintained demographic data on these panel respondents, it was determined that this data was not as comprehensive as the data collected by the survey, at which point the demographic questions were moved to the front of the survey, and asked of all respondents, including those who did not indicate firearms ownership. For the purpose of calculating statistics on national firearms ownership rates, we exclude the entire sample of both firearms owners and non-firearms owners from these first two days (410 respondents), leaving us with 53,834 respondents after this date for whom we have comprehensive demographic data. Firearms-owning respondents from the first two days are included in subsequent analysis of firearms owners, and we do possess comprehensive demographic information for these individuals.

Appendix B contains tables reporting the demographic sampling rates and the Census demographics used for raked weighting of the national survey. Note that the overall effect of weights is minimal given the high representativeness of the initial sample. For the purposes of analyzing responses within the sub-sample of firearms owners, we do not employ weighting schemes, in part because the "true" demographics of gun ownership are not knowable from an authoritative source analogous to the U.S. Census Bureau. However, as a robustness exercise, using weights based on estimates derived from the larger survey response rates yields results that are substantially identical for the analysis of responses from firearms owners.

One of the challenges in asking questions about firearms is eliciting truthful responses from firearms owners who may be hesitant to reveal information about practices that are associated with public controversy. The "tendency to respond to questions in a socially acceptable direction" when answering surveys is often referred to as "social desirability bias" (Spector, 2004), and there is evidence that it can influence survey responses to questions regarding firearms. For example, when Rafferty et al. (1995) conducted a telephone survey

Electronic copy available at: https://ssrn.com/abstract=4209687

of Michigan residents who had purchased a hunting license or registered a handgun, only 87.3 percent of the handgun registrants and 89.7 percent of hunting license holders reported having a gun in their household. Similarly, Ludwig et al. (1998) have documented a large gender gap in reporting of firearms ownership, finding that "in telephone surveys, the rate of household gun ownership reported by husbands exceeded wives' reports by an average of 12 percentage points." Asking questions via an anonymous survey instrument on the internet is likely to cause less concern or worry than traditional phone-based questionnaires with a live person on the other end or during face-to-face interviews, which is how the General Social Survey – one of the most prominent national surveys that regularly asks about firearm ownership – is conducted.[6] Even when presented in the more impersonal setting of a computer interface, however, a survey must be worded thoughtfully so as to assure anonymity, and not give respondents reason to worry about answering truthfully.

This survey employs five common devices to encourage more truthful responses. First, it uses an indirect "teaser" question to pre-screen respondents in order to select those who own firearms. The initial question prompt presents the survey as concerned with "recreational opportunities and related public policies" and asks respondents if they own any of the following items, presented in a random order: Bicycle, Canoe or Kayak, Firearm, Rock Climbing Equipment, None of the Above. Only those who select "Firearm" are then presented the full survey. We also ask demographic questions at the outset, which allows us to assess the representativeness of the sample, including those who do not indicate firearms ownership. Second, the survey was carefully phrased so as to not suggest animus towards gun owners or ignorance of firearms-related terminology. Third, the survey assures respondents of anonymity. Fourth, in order to ensure that respondents are reading the survey questions carefully, and then responding with considered answers thereto, a "disqualifying" question (sometimes referred to as a "screening" question) was embedded a little over half of the way through the survey instructing respondents to select a particular answer for that question, which only those who read the question in its entirety would understand. Anyone registering an incorrect answer to this question was disqualified from the survey and their responses to

---

[6]For a description of the methods of the General Social Survey see: `https://www.nsf.gov/pubs/2007/nsf0748/nsf0748_3.pdf`

Electronic copy available at: https://ssrn.com/abstract=4209697

any of the survey questions were neither considered nor tallied.

Finally, while responses were required for basic demographic questions, if questions of a sensitive nature were left blank, the software would first call attention to the blank response and prompt the respondent to enter a response. However, if a respondent persisted in not responding and again tried to progress, rather than kick them out of the survey, they would be allowed to progress to the next section in the interest of obtaining the maximum amount of information that they were willing to share. Respondents were not made aware of this possibility in advance, and in practice such "opting out" of a particular question was seldom done (less than 1% of responses for the average question). This is the reason that small variations are sometimes observed in the total number of respondents for certain questions.

A pilot version of this survey was first fielded in Vermont as part of a research project aimed at documenting firearms ownership and firearms use rates in that specific state. The Vermont survey served as a proof of concept for the national version, demonstrating that this survey is a viable instrument for eliciting responses from firearms owners with both high response rates and low disqualification rates. The results of the Vermont survey are presented separately in Appendix A of this report and closely mirror national results.

This report focuses on providing descriptive statistics of answers to the major questions asked in the survey. Future research will examine responses, and relationships between them, in more detail. The report proceeds as follows: the next (second) section summarizes national firearms ownership estimates and demographics; the third section examines defensive uses of firearms; the fourth section examines question regarding carrying for self-defense; the fifth section summarizes ownership statistics, and the sixth section concludes.

## 2    Gun Ownership Demographics

- About a third of adults in the U.S. report owning a firearm, totaling about 81.4 million adult gun owners.

- 57.8% of gun owners are male, 42.2% are female.

- 25.4% of Blacks own firearms.

Electronic copy available at: https://ssrn.com/abstract=4209697

- 28.3% of Hispanics own firearms.

- 19.4% of Asians own firearms.

- 34.3% of Whites own firearms.

With raked weighting employed for gender, state, income, race, and age we find that 32.5% of US adults age 21 and over own a firearm (95% Confidence Interval, 32.1 - 32.9%). Expanding the sample population to include those age 18-20, who are restricted in some states from purchasing firearms, 31.9% of US adults age 18 and over own firearms (95% Confidence Interval, 31.5% - 32.3%). This is slightly above, but consistent with, the most recent in-depth survey of firearms ownership conducted by Pew in 2017 before the Covid-19 pandemic, which found that 30% of adults in America own a firearm (Brown, 2017). It is also consistent with recent Gallup polling in 2020 and 2021, which found that 32% and 31% of adults personally own a firearm (Gallup, 2021).

As a benchmark to assess the accuracy of the teaser question used to ascertain firearm ownership, we can also compare ownership rates of other items reported by respondents for this question. We find 52% of respondents indicating owning a bicycle, which closely matches Pew's finding that 53% of Americans own a bicycle, according to a poll conducted in 2014.[7]

The distribution of gun owners surveyed by state is illustrated in Figure 1, and ranges from 1,287 in California and 1,264 in Texas to 26 in Washington, DC and 24 in North Dakota.

Table 1 shows the proportion of the population in each state estimated to own a firearm. Massachusetts, Hawaii, Rhode Island, and New Jersey have the lowest rates of ownership with less than 20% of the adult population owning firearms, while Kentucky, Montana, West Virginia, and Idaho have the highest rates of ownership with more than 45% of the adult population owning firearms.

With regard to the demographics of gun ownership, we find that 57.8% of gun owners are male and 42.2% are female, the average age of gun owners is 46-50 years old, and the average annual household income is $80,000-$90,000. Approximately 18% of gun owners do not identify as White (alone). Overall, approximately 10.6% of gun owners identify as Black,

---

[7]See   https://www.pewresearch.org/fact-tank/2015/04/16/car-bike-or-motorcycle-depends-on-where-you-live/

Electronic copy available at: https://ssrn.com/abstract=4209697



Figure 1: Distribution of Firearms Owners Surveyed

3.6% identify as Asian, 1.6% identify as American Indian, .2% identify as Pacific Islander, 82.0% identify as White, and 2.0% identify as Other. When analyzed within racial groups, we find that 25.4% of Blacks own firearms, 28.3% of Hispanics own firearms, 19.4% of Asians own firearms, and 34.3% of Whites own firearms.

According to the latest (2019) census estimates, there are approximately 255,200,373 individuals age 18 and over in the U.S., which implies that there are about 81.4 million adult gun owners.[8] Note that this figure does not include those under the age of 18 who may use or possess firearms for purposes such as hunting or shooting sports.

In sum, firearms ownership is widespread, and firearms owners are diverse.

# 3   Defensive Use of Firearms

- 31.1% of gun owners, or approximately 25.3 million adult Americans, have used a gun in self-defense.

- In most cases (81.9%) the gun is not fired.

- Gun owners engage in approximately 1.67 million defensive uses of firearms per year.

- The majority of defensive gun uses take place outside of the home (74.8%).

---

[8]Census date is available at `https://www2.census.gov/programs-surveys/popest/tables/2010-2019/national/asrh/nc-est2019-syasexn.xlsx`

9

Electronic copy available at: https://ssrn.com/abstract=4209697

| State | Proportion of adult population estimated to own firearms | 95% Confidence Interval |
|---|---|---|
| Alabama | 39.6% | 35.2% − 44.1% |
| Alaska | 33.4% | 25.7% − 42.1% |
| Arizona | 32.0% | 28.8% − 35.4% |
| Arkansas | 36.6% | 31.1% − 42.5% |
| California | 25.5% | 24.0% − 27.0% |
| Colorado | 33.6% | 29.8% − 37.7% |
| Connecticut | 20.2% | 16.8% − 24.1% |
| Delaware | 24.7% | 18.9% − 31.6% |
| District of Columbia | 23.9% | 15.6% − 34.9% |
| Florida | 30.3% | 28.5% − 32.2% |
| Georgia | 37.1% | 34.5% − 39.9% |
| Hawaii | 16.4% | 10.6% − 24.5% |
| Idaho | 54.5% | 45.5% − 63.1% |
| Illinois | 26.5% | 24.3% − 28.9% |
| Indiana | 40.3% | 36.6% − 44.1% |
| Iowa | 33.2% | 28.1% − 38.8% |
| Kansas | 42.8% | 37.4% − 48.3% |
| Kentucky | 46.7% | 42.6% − 50.8% |
| Louisiana | 32.8% | 28.0% − 38.0% |
| Maine | 35.9% | 29.7% − 42.6% |
| Maryland | 21.7% | 18.5% − 25.2% |
| Massachusetts | 15.8% | 13.4% − 18.6% |
| Michigan | 34.7% | 32.0% − 37.5% |
| Minnesota | 32.5% | 28.4% − 36.8% |
| Mississippi | 39.5% | 33.5% − 45.8% |
| Missouri | 39.7% | 36.2% − 43.4% |
| Montana | 48.4% | 38.7% − 58.3% |
| Nebraska | 37.2% | 29.8% − 45.2% |
| Nevada | 38.0% | 32.8% − 43.4% |
| New Hampshire | 24.1% | 18.4% − 30.9% |
| New Jersey | 19.3% | 16.9% − 22.0% |
| New Mexico | 33.8% | 25.9% − 42.7% |
| New York | 22.7% | 21.3% − 24.2% |
| North Carolina | 37.3% | 34.5% − 40.2% |
| North Dakota | 42.6% | 29.9% − 56.4% |
| Ohio | 33.7% | 31.1% − 36.4% |
| Oklahoma | 40.5% | 36.2% − 45.0% |
| Oregon | 38.3% | 32.7% − 44.2% |
| Pennsylvania | 30.3% | 28.1% − 32.6% |
| Rhode Island | 16.9% | 11.4% − 24.2% |
| South Carolina | 40.7% | 36.5% − 45.1% |
| South Dakota | 39.2% | 32.4% − 46.4% |
| Tennessee | 43.0% | 39.5% − 46.6% |
| Texas | 36.0% | 34.1% − 38.0% |
| Utah | 42.8% | 36.1% − 49.8% |
| Virginia | 30.6% | 27.6% − 33.7% |
| Washington | 32.8% | 29.3% − 36.4% |
| West Virginia | 53.0% | 45.6% − 60.2% |
| Wisconsin | 33.3% | 29.9% − 36.9% |
| Wyoming | 42.7% | 34.5% − 51.2% |

Table 1: Proportion of the population estimated to own a firearm in each state.

- About half of defensive gun uses involve more than one assailant (51.2%).

- Handguns are the firearm most commonly used in defensive incidents (65.9%), followed

Electronic copy available at: https://ssrn.com/abstract=4209697

by shotguns (21.0%) and rifles (13.1%).

Defensive use of firearms was assessed through a series of questions that asked for increasingly detailed information from those who indicated that they had used a firearm in self-defense.

First, all gun owners were asked, "Have you ever defended yourself or your property with a firearm, even if it was not fired or displayed? Please do not include military service, police work, or work as a security guard." About a third (31.1%) answered in the affirmative, and they were then asked how many times they defended themselves with a firearm (from "once" to "five or more times"). As Figure 2 shows, a majority of gun owners who have used a firearm to defend themselves have done so on more than one occasion.



Figure 2: Defensive Gun Use: 31.1% of firearms owners have defended themselves of their property with a gun, and a majority have done so more than once.

Both men and women report having used firearms in self-defense at high rates, with 33.8% of male gun owners indicating they have defensively used a gun, and 27.3% of female gun owners indicating they have defensively used a gun. Table 2 further breaks down reports of

Electronic copy available at: https://ssrn.com/abstract=4209697

defensive use of firearms by categories of race and ethnic ancestry, illustrating that defensive gun use rates are higher in some minority groups.

| Demographic Group | Proportion of Gun Owners Who Used Gun Defensively | 95% Confidence Interval |
|---|---|---|
| White | 29.7% | 29.0% − 30.5% |
| Black | 44.3% | 41.2% − 47.5% |
| Asian | 26.0% | 21.7% − 30.9% |
| Native American | 47.7% | 42.7% − 52.7% |
| Pacific Islander | 37.1% | 26.0% − 49.7% |
| Other Ethnic Ancestry | 36.2% | 30.3% − 42.7% |
| Hispanic (any ancestry) | 39.3% | 36.0% − 42.8% |
| Male | 33.8% | 32.8% − 34.8% |
| Female | 27.3% | 26.2% − 28.4% |

Table 2: Demographics of defensive gun use.

Given that 31.1% of firearms owners have used a firearm in self-defense, this implies that approximately 25.3 million adult Americans have defended themselves with a firearm. Answers to the frequency question suggest that these gun owners have been involved in a total of approximately 50 million defensive incidents. Assuming that defensive uses of firearms are distributed roughly equally across years, this suggests at least 1.67 million defensive uses of firearms per year in which firearms owners have defended themselves or their property through the discharge, display, or mention of a firearm (excluding military service, police work, or work as a security guard).[9]

---

[9]This is calculated by taking the total number of defensive incidents represented by the survey responses (50 million) and dividing by the number of adult years of the average respondent, which is 30. According to U.S. Census data, the average age of U.S. adults (i.e. the average age of those in the set of everyone 18 years or older) is 48, which also matches our survey data. Thus, the average respondent of the survey has 30 years of adult experience (48 years - 18 years = 30 adult years), over which the defensive incidents captured in this survey are reported.

Note that this estimate is inherently conservative for two reasons. First, it assumes that gun owners possessed firearms, or had access to firearms, from the age of 18. In so far as firearms were only first ac-

Electronic copy available at: https://ssrn.com/abstract=4205097



Figure 3: How Guns are Employed in Self-defense: In most defensive incidents no shots are fired.

Gun owner respondents were asked to answer detailed questions regarding each defensive

quired/accessed by some respondents in later years, this would reduce the number of adult firearms owning years represented by the survey responses and result in a higher estimate of the number of defensive incidents per year. Second, this figure only captures defensive gun uses by those currently indicating firearms ownership. According to Kleck and Gertz (1995), only 59.5% of respondents who reported a defensive gun use personally owed a gun (p.187). This would suggest that the true number of defensive gun uses, if those who do not personally own firearms are included in the estimate, could be substantially higher - perhaps as high as 2.8 million per year.

This approach is also robust to critiques that have been made by Hemenway (1996) and others who argue that defensive gun use estimates from surveys can be exaggerated due to recollection bias when respondents are asked to recount incidents within a limited time period. The intuition behind these critiques is that if respondents are asked, for example, if they used a gun defensively within the last year, there is a possibility that people will respond affirmatively if they used a gun in self-defense in recent memory, even if that incident wasn't strictly within the last 12 months. This could lead to inflated "per year" estimates of defensive gun uses, which would only be further magnified when extrapolated out to total defensive gun uses over many years. However, the approach of this survey is not vulnerable to this critique because the survey asks about defensive gun use at any time, not simply those within the last year or some other short time horizon. We thus do not engage in the exercise of extrapolating out estimates from potentially biased measures of comparatively rare events in a restricted window of time. Rather our approach asks questions about defensive gun use in the manner that is most methodologically sound for eliciting unbiased estimates.

Finally, note that our overall approach assumes that children are not employing firearms for self-defense

Electronic copy available at: https://ssrn.com/abstract=4209697

incident that they reported. As Figure 3 shows, in the vast majority of defensive gun uses (81.9%), the gun was not fired. Rather, displaying a firearm or threatening to use a firearm (through, for example, a verbal threat) was sufficient. This suggests that firearms have a powerful deterrent effect on crime, which, in most cases, does not depend on a gun actually being fired or an aggressor being injured.

Figure 4 shows where defensive gun uses occurred. Approximately a quarter (25.2%) of defensive incidents took place within the gun owner's home, and approximately half (53.9%) occurred outside their home but on their property. About one out of ten (9.1%) of defensive gun uses occurred in public, and about one out of thirty (3.2%) occurred at work.



Figure 4: The Location of Defensive Incidents: Most take place outside the home.

For each incident, respondents were asked to indicate what sort of firearm was used. Figure 5 show the distribution of types of firearms employed in defensive incidents. Handguns were the most commonly used firearm for self-defense, used in nearly two-thirds (65.9%) of defensive incidents, followed by shotguns (21.0%) and rifles (13.1%).

Respondents were also asked to indicate how many assailants were involved in each de-

---

with any meaningful frequency. However, for the purpose of sensitivity analysis, if we lower the age used for calculating defensive incident frequency to assume that children as young as 12 years old are commonly possessing and using firearms for self-defense (and no non-firearms owning adults used firearms for self-defense), this would still imply 1.39 million defensive uses of firearms per year (48 years - 12 years = 36 years over which 50 million defensive incidents took place).

Electronic copy available at: https://ssrn.com/abstract=4109494



What sort of firearm did you use during this incident? (%)

Figure 5: Type of Gun Used for Defense: Handguns are the most common type of firearm used in defensive encounters, followed by shotguns and rifles.

fensive incident. As Figure 6 illustrates, about half of defensive encounters (51.2%) involved more than one assailant. Presumably, part of the value of using a firearm in self-defense is that it serves as a force multiplier against more powerful or more numerous assailants. Survey responses confirm that encountering multiple assailants is not an infrequent occurrence in defensive incidents. 30.8% of defensive incidents involved two assailants, and 20.4% involved three or more, while slightly less than half (48.8%) involved a single assailant.

Finally, after respondents answered these detailed questions about each defensive incident, which all flowed from their initial affirmative answer to the question, "Have you ever defended yourself or your property with a firearm, even if it was not fired or displayed?", all gun owners were asked, "Separate from any incident in which you directly used a gun to defend yourself, has the presence of a gun ever deterred any criminal conduct against you, your family, or your property?" This question was meant to capture incidents that did not involve active self-defense, but for which individuals believed that the presence of a firearm helped deter predatory behavior. For example, a situation in which a combative customer calmed down after noticing that shop owner had a handgun on his or her hip, or a situation in which a trespasser cooperatively left a property when questioned by a landowner who had a rifle slung over his or her shoulder, or a situation in which a friend showed up with a firearm

15

Electronic copy available at: https://ssrn.com/abstract=4109597



Figure 6: Distribution of the Number of Assailants Involved in a Defensive Incident: Multiple assailants are common.

to help diffuse a dangerous situation, could fall into this category. Respondents answering in the affirmative could indicate how many times such deterrence occurred, from once to five or more occasions. As Figure 7 illustrates, separate from the self-defense incidents summarized earlier, 31.8% of gun owners reported that the mere presence of a gun has deterred criminal conduct, and 40.2% of these individuals indicated that this has happened on more than one occasion. Extrapolated to the population at large, this suggests that approximately 25.9 million gun owners have been involved in an incident in which the presence of a firearm deterred crime on some 44.9 million occasions. This translates to a rate of approximately 1.5 million incidents per year for which the presence of a firearm deterred crime.

# 4    Carry Outside of the Home

- A majority of gun owners (56.2%) indicate that there are some circumstances for which they carry a handgun for self-defense.

- Approximately 26.3% of gun owners, or 20.7 million individuals, carry handguns for defensive purposes under a "concealed carry" regime.

- About a third of gun owners (34.9%) have wanted to carry a handgun for self-defense

16

Electronic copy available at: https://ssrn.com/abstract=4109567



Figure 7: Frequency with which Firearms Deter Crime: 31.8% of firearms owners report that the presence of a firearm has deterred criminal conduct against them, often on more than one occasion.


in a particular situation but local rules prohibited them from doing so.

As Figure 8 illustrates, a majority of gun owners (56.2%), or about 45.8 million, indicate that there are some circumstances in which they carry a handgun for self-defense (which can include situations in which no permit is required to carry, such as on their own property); and about 35% of gun owners report carrying a handgun with some frequency (indicating that they carry "Sometimes," "Often," or "Always or almost always."). Moreover, as Figure 9 summarizes, 34.9% of gun owners report that there have been instances in which they wanted to carry a handgun for self-defense, but local rules did not allow them to carry.

Assessing the number of people who carry a concealed handgun in public is complicated due, in part, to the proliferation of so-called "constitutional carry" or "permitless carry" states in recent years. These states - about 18 at the time this survey was conducted - generally allow adults in good legal standing (often restricted to those age 21 and older) to

17

Electronic copy available at: https://ssrn.com/abstract=4209687



Figure 8: Frequency of Defensive Carry: Carrying a handgun for self-defense is common.



Figure 9: Prohibition of Carry: About a third of gun owners have wanted to carry a handgun for self-defense in a particular situation but local rules prohibited them from doing so.

carry a concealed weapon without a permit. Most of these states previously had a permitting process for concealed carry and required permits to be renewed at regular intervals in order to remain valid. Under constitutional carry, law abiding adults in these states are permitted to carry concealed without an official "permit." However, most of these states continue to issue permits to residents who desire them because such permits can be useful for reciprocal carry benefits in other states. For example, a person acquiring a Utah carry permit would be entitled to carry a handgun in a number of other states such as neighboring Colorado and

18

Electronic copy available at: https://ssrn.com/abstract=4209697

Nevada.[10] Thus, while basically all gun owners age 21 and over are "permitted" to carry a handgun for self-defense in constitutional carry states, many individuals may also possess a "permit," even though it is redundant for in-state carry.

Unsurprisingly, when asked "Do you have a concealed carry permit?" gun owning residents of many constitutional carry states respond in the affirmative at high rates. Also complicating this question about concealed carry permits is the fact that many states refer to such permits by different names, the fact that the right to carry a handgun can be conferred in certain circumstances by hunting or fishing licenses in some states,[11] and the existence of other related permits, some of which do not license concealed carry (e.g. standard pistol permits in North Carolina or New York, eligibility certificates in Connecticut) and some of which do (most License To Carry permits required for handgun ownership in Massachusetts, state pistol permits in Connecticut, and LEOSA permits available to current and retired law enforcement officers nationwide). Finally, it is also possible for individuals to obtain concealed carry permits in states other than the one in which they reside.

In order to provide a robust but conservative estimate of those who actually carry in public, we code as "public carriers" those individuals who indicated both that they have a concealed carry permit and that they carry a handgun for self-defense at least "sometimes." We also restrict analysis and population estimates to those age 21 and over given that most states restrict those under 21 from carrying concealed in public.

Using this simple definition, we find that 26.3% of gun owners are "public carriers," which translates to approximately 20.7 million individuals who carry handguns in public under a concealed carry regime. Note that this could include current and former law enforcement officers who may be represented in the survey. However, the number of active law enforcement officers in the U.S. is well under a million (approximately 700,000 in 2019).[12]

---

[10]See https://bci.utah.gov/concealed-firearm/reciprocity-with-other-states/

[11]For example, a number of states such as California, Georgia, and Oregon allow those with a hunting or fishing license to carry concealed while engaged in hunting or fishing or while going to or returning from an expedition. See: https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/pdf/cfl2016.pdf, https://law.justia.com/codes/georgia/2010/title-16/chapter-11/article-4/part-3/16-11-126/, https://codes.findlaw.com/or/title-16-crimes-and-punishments/or-rev-st-sect-166-260.html

[12]See https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-74

Electronic copy available at: https://ssrn.com/abstract=4209687

# 5    Types of Firearms and Magazines Owned

- 82.7% of gun owners report owning a handgun, 68.8% report owning a rifle, and 58.4% report owning a shotgun.

- The average gun owner owns about 5 firearms. The median gun owner owns 3.

- 29.0% of gun owners own only one firearm.

- 30.2% of gun owners, about 24.6 million people, have owned an AR-15 or similarly styled rifle, and up to 44 million such rifles have been owned.

- 48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to 542 million such magazines have been owned.

- Overall, Americans own in excess of 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

## 5.1    Rifles, Shotguns, and Handguns

Respondents were asked to indicate the number of rifles, shotguns, and handguns that they owned. 82.7% of gun owners report owning a handgun (95% CI 82.0% - 83.3%), 68.8% reported owning a rifle (95% CI 68.1% - 69.6%), and 58.4% report owning a shotgun (95% CI 57.6% - 59.2%). Note that using survey weights based on in-survey demographics of firearms ownership has no substantive effect on these estimates: Handgun, 83.7% (82.9% - 84.4%), Rifle, 68.6% (67.7% - 69.6%), Shotgun 58.6% (57.6% - 59.6%).

Approximately 99.8% of respondents indicated owning fewer than 100 firearms of each type, and approximately 97.2% indicated owning fewer than 10 firearms of each type. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we exclude the 0.2% of responses that indicated owning over 100 firearms in any category in the analysis that examines average numbers of guns owned. Also, 1.5% of respondents entered zero for each category of firearms ownership. While ostensibly inconsistent with having earlier indicated ownership of a firearm, there are a number of plausible explanations for this discrepancy including a reluctance to

Electronic copy available at: https://ssrn.com/abstract=4209697



Percentage of gun owners reporting ownership of at least one firearm in the indicated category.

Figure 10: Percent of gun owners who own each type of firearm.

provide this level of detailed information, having use of a firearm in one's household which one does not personally own, or owning a firearm that technically does not fall into one of these three categories. We exclude these response in analyzing ownership rates below. However, including them has no significant effect on estimates.

On average, gun owners owned 5.1 firearms, consisting of 1.8 rifles, 1.2 shotguns, and 2.1 handguns. Figure 11 plots histograms of the number of firearms owned by respondents. Unsurprisingly, these are skewed right, indicating that most gun owners own a small number of guns, while a smaller portion of gun owners own a large number of guns. The median gun owner owned 3 firearms. 29.0% of firearms owners owned only one firearm.[13] Among those who only own one firearm, handguns are the most commonly owned type of gun (64.7%), followed by rifles (22.5%) and shotguns (13.3%).

Overall, these estimates imply that Americans own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

---

[13]An earlier draft had estimated that 21.9% of gun owners owned only one firearm, but the denominator for that calculation mistakenly included respondents who did not provide an answer to this question. The estimate of 29.0% properly incorporates all information provided by respondents.

Electronic copy available at: https://ssrn.com/abstract=4209697



(a) Histogram of number of rifles owned

(b) Histogram of number of shotguns owned

(c) Histogram of number of handguns owned

(d) Histogram of total number of guns owned

Figure 11: Histograms showing the distributions of gun ownership.

## 5.2   Magazine Ownership

The survey asked respondents whether they have ever owned a magazine that holds more than 10 rounds. Those who answered in the affirmative were then asked to indicate the purposes for which they owned such magazines and to estimate how many magazines of different types they owned.

48.0% of gun owners (95% CI 47.2%-48.7%) responded yes to the question, "Have you ever owned a handgun or rifle magazine that holds more than 10 rounds? (You can count magazines that you may keep in another state if there are local restrictions against ownership.)" indicating that they had owned such magazines. Note that, again, using survey

22

Electronic copy available at: https://ssrn.com/abstract=4209697

weights based on in-survey demographics of firearms ownership has no substantive effect on this estimate (47.4%, CI 46.5%-48.4%). This suggests that approximately 39 million adults in the U.S. have owned magazines that hold more than 10 rounds.



Percentage indicating each factor was a reason for ownership.

Figure 12: Purposes indicated for owning 11+ capacity magazines.

Figure 12 shows the percentage of respondents who indicated that they owned magazines that can hold more than 10 rounds for the following purposes: defense outside the home (41.7%), home defense (62.4%), competitive shooting sports (27.2%), recreational target shooting (64.3%), hunting (47.0%), and other (3.9%). Note that respondents could choose multiple purposes for which they owned such magazines. Home defense and recreational target shooting were the two most common reasons indicated for owning these magazines, with approximately two-thirds of respondents identifying each of these as a rationale for ownership.

Respondents who indicated that they had owned magazines that can hold more than 10 rounds were also asked to estimate the number of pistol and rifle magazines they owned of particular sizes. Numerical responses were unbounded. Approximately 99.8% of respondents indicated owning fewer than 100 magazines of each type, and approximately 96.5% indicated owning fewer than 10 magazines of each type. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we exclude the 0.2% of responses that indicated owning over 100 magazines

23

Electronic copy available at: https://ssrn.com/abstract=4203697

in a category.



Average number of handgun magazines owned by capacity.

Figure 13: About how many handgun magazines of each type would you estimate you have owned?

Figure 13 shows the average number of handgun magazines of each type reported by respondents in this section: 10 rounds or less (3.1 magazines), 11-15 rounds (2.5 magazines), more than 15 rounds (4.4 magazines). In sum, the average respondent (who indicated that they have owned a magazine that holds more than 10 rounds), owns about 10 handgun magazines, and more than two-thirds of these magazines hold more than 10 rounds. Note that the question asked whether respondents have ever owned such magazines and how many such magazines they have owned, so these estimates should be interpreted as an upper bound on current ownership given that some magazines may have been resold. Building on earlier estimates, this suggests that U.S. gun owners have owned up to 269 million handgun magazines that hold over 10 rounds.

Figure 14 shows the average number of rifle magazines of each type reported by respondents in this section: 10 rounds or less (2.4 magazines), 11-15 rounds (1.8 magazines), over 15 rounds (5.4 magazines). In sum, the average respondent (who indicated that they have owned a magazine that holds more than 10 rounds), owns about 9.6 rifle magazines, and about three-quarters of these magazines hold more than 10 rounds. Building on earlier estimates, this suggests that U.S. gun owners have owned up to 273 million rifle magazines that

Electronic copy available at: https://ssrn.com/abstract=4209697

hold over 10 rounds.



Average number of rifle magazines owned by capacity.

Figure 14: About how many rifle magazines of each type would you estimate you have owned?

These estimates suggest that Americans have owned some 542 million rifle and handgun magazines that hold over 10 rounds. Finally, note that these questions about the types of magazines owned were only asked of those who indicated that they had owned a magazine that holds more than 10 rounds, and thus we do not know how many magazines up to 10 rounds are owned by the 52.0% of gun owners who are not in this category.

Table 3 shows the breakdown of ownership of magazines that hold over 10 rounds across different demographic segments.

Table 4 shows the percentage of gun owners in each state who indicated that they have owned magazines that hold more than 10 rounds. Note that this question explicitly instructed respondents that "You can count magazines that you may keep in another state if there are local restrictions against ownership." This presumably explains the relatively high rates of ownership in states that restrict the purchase or ownership of such magazines. It's also possible that those answering in the affirmative possess magazines that were grandfathered in because they were acquired before such bans or that some respondents have gotten rid of magazines that they owned in the past.

Another dynamic that likely contributes to such differences in ownership rates derives

Electronic copy available at: https://ssrn.com/abstract=4209697

| Demographic Group | Proportion Owned 11+ Mags | 95% Confidence Interval |
|---|---|---|
| White | 47.0% | 46.1% – 47.8% |
| Black | 55.2% | 52.2% – 58.2% |
| Asian | 50.0% | 44.8 – 55.2% |
| Native American | 52.6% | 47.7% – 57.4% |
| Pacific Islander | 59.1% | 47.4% – 69.9% |
| Other Ethnic Ancestry | 59.6% | 53.3% – 65.6% |
| Hispanic (any ancestry) | 61.6% | 58.3% – 64.7% |
| Male | 57.7% | 56.7% – 58.7% |
| Female | 34.1% | 33.0% – 35.3% |

Table 3: Demographics of ownership of magazines that hold more than 10 rounds.

from the fact that in states with low rates of firearms ownership, such as DC and Hawaii, those few individuals who do own guns are presumably more likely to be gun enthusiasts. Indeed, analysis of the survey data reveals that states with higher rates of firearms ownership are associated with slightly lower rates of ownership of magazines that own over 10 rounds, and this difference is statistically significant (coef = -0.36, p=.03).

Given that such a large percentage of gun owners indicated that they owned magazines that hold over ten rounds for defensive purposes, we further analyze the potential value of these magazines for defense. Recall that a majority of defensive incidents involved multiple assailants (51.2%). Presumably, it would be advantageous to have a firearm with a larger capacity magazine if one needed to engage more than one assailant, which these responses suggest is indeed common. Although in most defensive gun uses the gun was not fired (81.9%), we can further analyze the subset of incidents in which a gun was fired. In 67.8% of these cases in which a gun was fired in self defense, multiple rounds were fired.

As part of the self-defense section of the survey, respondents were invited to answer an open response question that asked: "Have you ever been in a situation (including any referenced in earlier responses) in which it would have been useful for defensive purposes

26

Electronic copy available at: https://ssrn.com/abstract=4209607

| State | Owned 11+ cap. mags | 95% Confidence Interval |
|---|---|---|
| Alabama | 48.1% | 42.7% − 53.6% |
| Alaska | 52.7% | 39.6% − 65.4% |
| Arizona | 47.5% | 42.3% − 52.8% |
| Arkansas | 50.7% | 44.1% − 57.3% |
| California | 53.8% | 51.0% − 56.5% |
| Colorado | 51.4% | 45.3% − 57.4% |
| Connecticut | 42.6% | 34.4% − 51.3% |
| Delaware | 50.6% | 39.8% − 61.5% |
| District of Columbia | 69.2% | 49.5% − 83.8% |
| Florida | 46.9% | 43.9% − 49.8% |
| Georgia | 52.4% | 48.7% − 56.2% |
| Hawaii | 59.3% | 40.3% − 75.8% |
| Idaho | 45.4% | 36.7% − 54.4% |
| Illinois | 51.5% | 47.3% − 55.6% |
| Indiana | 46.5% | 41.8% − 51.2% |
| Iowa | 35.4% | 28.0% − 43.6% |
| Kansas | 42.2% | 35.4% − 49.4% |
| Kentucky | 43.7% | 38.5% − 49.0% |
| Louisiana | 47.4% | 41.1% − 53.8% |
| Maine | 37.9% | 28.7% − 48.0% |
| Maryland | 50.8% | 43.7% − 57.8% |
| Massachusetts | 53.3% | 45.7% − 60.8% |
| Michigan | 37.1% | 33.2% − 41.1% |
| Minnesota | 39.8% | 34.0% − 46.0% |
| Mississippi | 44.6% | 37.3% − 52.2% |
| Missouri | 50.6% | 45.8% − 55.5% |
| Montana | 52.6% | 39.8% − 65.1% |
| Nebraska | 45.5% | 35.9% − 55.3% |
| Nevada | 61.0% | 52.8% − 68.5% |
| New Hampshire | 43.9% | 31.6% − 56.9% |
| New Jersey | 52.2% | 46.5% − 57.8% |
| New Mexico | 49.2% | 36.9% − 61.5% |
| New York | 54.9% | 51.8% − 58.0% |
| North Carolina | 43.9% | 39.9% − 47.9% |
| North Dakota | 44.4% | 24.0% − 67.0% |
| Ohio | 42.0% | 38.4% − 45.7% |
| Oklahoma | 47.5% | 41.7% − 53.4% |
| Oregon | 49.8% | 42.9% − 56.6% |
| Pennsylvania | 39.6% | 36.0% − 43.2% |
| Rhode Island | 55.3% | 39.5% − 70.1% |
| South Carolina | 42.8% | 37.7% − 48.0% |
| South Dakota | 50.0% | 40.2% − 59.8% |
| Tennessee | 44.1% | 39.5% − 48.7% |
| Texas | 54.1% | 51.3% − 56.8% |
| Utah | 46.8% | 38.2% − 55.6% |
| Virginia | 47.5% | 42.7% − 52.4% |
| Washington | 53.1% | 47.8% − 58.4% |
| West Virginia | 44.8% | 37.7% − 52.1% |
| Wisconsin | 33.6% | 28.5% − 39.0% |
| Wyoming | 63.0% | 51.4% − 73.3% |

Table 4: Percent of gun owners who have indicated that they have ever owned magazines that hold over 10 rounds by state. Note that this includes magazines that an owner holds in other states if there are local ownership restrictions.

Electronic copy available at: https://ssrn.com/abstract=4209687

to have a firearm with a magazine capacity in excess of 10 rounds?  If so, please briefly describe that situation."  Approximately 550 respondents gave a affirmative response with most sketching out details of the encounter.  Examples of these responses (reported verbatim) include:

- I got jumped by multiple people in a carjacking in front of our apartments with my wife and children.

- Yes. I was robbed on a street 1 time by a group of about 6 people that at least 1 was armed and I wasn't. It took about 6 hours of emergency surgery to gat my bones in face jaws and skull back in place form being beaten in the head face kicked all over. Damn near killed me.

- Yes, a man broke into our apartment, high. He was approx 6'4, 300 pounds & threw a friend of ours around the living room like a rag doll. Beat her repeatedly.

- Yes. The first incident I mentioned. Three men attempted to rob me outside my home, with the intention of entering my home thereafter. My wife and child were inside the home at the time. That was in California with a magazine that only held 7 shots. I am a great shot, prior military and other firearms training, but I hate to only have 7 shots with three people. In such a situation, very well trained people, pumped up with adrenalin can and do miss their target. Thank you.

- Yes, absolutely. I am mobility challenged and was walking my dog one day. Three men ambushed me from behind, but luckily my dog chased them away. My dog actually bit one of the men.

- On the farm, we have had mountain lions killing our calves so a larger animal could require more rounds

- When two people attacked my company's warehouse

- Yes, I was alone with my son and 3 large men were trying to break in, I was unable to reload, thank goodness they realized and left.

28

Electronic copy available at: https://ssrn.com/abstract=4209697

- I was charged by a bear. It was very scary in the moment I panicked and rattled over multiple shots. Most missed but some hit home and eventually stopped him.

- Yes. I went in but into a store and 4 thugs approached me telling me to give them money. I produced my handgun at my side and they left. If this had been a shooting with multiple bad guys with guns a 15 round magazine is best.

- When I was a teenager 4 guys did a home invasion at our house. I could easily see needing a 20 to 30 round clip would be necessary.. we didnt have weapons and my mom and dad were hurt pretty bad. Dad was stabbed 4 times and they had a gun too. Thats when I decided when I was on my own that I would have protection.

- About 20 coyotes attacked some of my livestock. It took two 30 round magazines to repel the animals and then only after killing 10 of them.

- Yes. I was surrounded by would-be assailants in a perking lot. I was able to escape unharmed, but if they had rushed me, I would most certainly had to lay down a rapid field of fire, alternately in various directions. In that scenario, I probably would have missed the targets and needed multiple, rapid follow-up shots to hit or at least dissuade the attackers from pressing forward. Only a firearm with 10 or more round magazine would offer that kind of defensive capability.

- Had several people trespass on my property doing something illegal and when I called the police said it would be a while before they could come out so when I asked the people to leave they threatened to kill me but after they seen that I was open carry the left if the situation went a different way I dont know if I would have been about to protect myself with as many of them as there was

- The time when there were 4 people in my home and I was fearful of being hurt and my concern was do I have enough rounds to protect myself what if I missed if I had to fire the weapon .

- Yes. Been stalked by a pack of coyotes while hiking with my children

29

Electronic copy available at: https://ssrn.com/abstract=4209697

- Yes when I had more than one person trying to break into my car. I live out in the country so I do not have time to wait for police to get to me I have to act fast and protect myself and my family.

- Yes, I ran into a situation where there were numerous criminals breaking the law and rioting at a public venue during an annual festival event. They were blocking my self and my friends, two of which were females, from leaving the area as well as preventing the police from reaching us. I was very glad that I had multiple magazines that had more then a 10 round capacity.

- 2 men broke into my home while I was sleeping. I woke up and heard them breaking stuff downstairs. I grabbed my gun and ran down stairs and confronted them. I pointed my gun at them and told them to get out. They ran off.

- I was stopped at a red light. Car in front of me backed up and the car behind me pulled up to my bumper. Both drivers got out and approached both sides of my car. Light turned green. I gassed it pushing the car in front of me out of the way. They had bats to break my windows. Would've robbed me I think. Was under a overpass.

- Twice it was people attempting to break into my home I was alone age 64 and 4 burly men thought no one was home as I had been napping. They learned quickly this old lady was not without protection. They saw the gun and quickly left. I called 911 and they were apprended they had been robbing homes for 6 weeks in the area. Those home who had guns they left and went elsewhere. Another time people a group wanted a big party came to the wrong road half were drunk or stoned. I had small children. There was finally someone sober enough to see I had a gun and that I meant business it was the middle of the night and they wanted to party but had the wrong road. The sane person got them to all leave and they never came back. We had no phone at that time. The third time was a cougar attacking my livestock. It ran off but had killed 4 goats. We called the game warden they had a special hunt and killed it as we had been the 4th place hit it had killed livestock. We have had cougar on our property in our yard 3 times since once my son shot one stalking him and his dog the other time

30

Electronic copy available at: https://ssrn.com/abstract=4209697

it ran off before he could get his gun ready.

- yes, but not at home, we were camping in prescott arizona and several men came up and wanted to harass and steal from our family. We all felt very threatened and if another couple of people had not shown up with their guns the people would have over ran us and my family would have been hurt.

- It could have helped during a robbery at my residence where 4 intruders entered my home

- I was a small business owner before I became disabled. I would often carry large amounts of cash. On more than 1 occasion I was faced with pulling my weapon or lose my cash

- I was walking a long distance through Philadelphia to get to a restaurant and was approached by 3 men who demanded to know why I thought I could go through their neighborhood. I told them I did not want any trouble and tried to continue walking but one stood in my way and asked if I actually thought I was going to leave without answering them. I began to wonder if I was going to be robbed or assaulted when they first approached and at this point it seemed like they would prevent me from leaving. I lifted my shirt and placed my hand on a pistol I was legally able to conceal carry and said yes I would be leaving. They backed away from me but continued to yell things at me as I left the area. I never pulled the gun out, but them knowing I had it and may use it to stop them was enough to escape unharmed. Having less than 10 rounds against 3 attackers, especially if they were also armed, would have put me at a disadvantage if I was unable to accurately hit my targets initially and they continued to Pursue me.

- Yes, I was in Illinois, which does not honor Indiana concealed carry. I had to leave my firearm at home. This was truly the only time in my life I felt I needed to actually use a firearm, but almost was killed. 4 men (3 with guns displayed and 1 with a knife in his hand) were walking up to me fast in a parking lot screaming stop and give me everything you have. The parking lot was near empty, and dark outside. I was able

31

Electronic copy available at: https://ssrn.com/abstract=4209697

to unlock my car while running, start the car and speed off. Just as I got in the car, I had just enough time to lock the door before the 3 men pointed there guns at the car and the other was stabbing the window with a knife. They intended to rob and kill me. I couple rounds were fired as I sped off. I would have needed minimally 10 rounds if I had discharged given their distancing. I almost died because of Illinois law and my street smarts and luck was the only thing that saved me

- Yes An incident occurred when a man was drunk and crashed his car in front of me while I was carrying my 2 small children. A large group of his friends tried to get the drunk away before the police arrived. A fight started with them punching my elderly dad and threatened my elderly mother with violence.

- I was confronted then attacked by a group of about 12 teens when I was a teenager. They kicked me and caused a sever head injury and fractured ribs. I was defenseless. Being able to brandish a weapon with the capacity to take on a group of that size would have deterred their next step of physically assaulting me

- The two large males that attempted to break into my home. Much larger than myself. A 9mm would take several shots to slow down either and/or both.

- Yes. I am a 5'2" disabled female. I was stalked by a homeless drug addict. He was detained 4-5 times due to red behavior because he was high on methamphetamine. This person could have potentially done great harm to me. Meth addicts don't always go down easy. Sometimes it takes numerous rounds to get them down.

- My brother and I were robbed at gun point when ione of the men got in the car with me after my brother got out of the car. The man had already told my brother that he wanted his money and that there were other people watching across the parking lot in case he had any problems with us. So when my brother got out, that man got in with a gun and stuck it right into my right side. He told me not to look at him and to give him all my money. With the other men standing in different positions in the parking lot my brother could have tried to shoot them (or at them) to try and scare them off

Electronic copy available at: https://ssrn.com/abstract=4209697

and if he could have had a larger capacity magazine he could have been able to fire more rounds at them to keep them away while we tried to get help from someone.

Finally, it is worth noting that, although a majority of these scenarios involve the prospect of defending against criminal aggression, a number involve defending against animals. The pilot survey in Vermont similarly documented a number of incidents involving animals (see Appendix A). This is a phenomenon that has been largely neglected in the scholarly literature examining the value of firearms for self-defense, and it would be helpful for future research to evaluate the frequency with which firearms are employed in defense against animal threats.

## 5.3   Ownership of AR-15 and similarly styled rifles

All gun owners were asked, "Have you ever owned an AR-15 or similarly styled rifle? You can include any rifles of this style that have been modified or moved to be compliant with local law." 30.2% of gun owners, about 24.6 million people, indicated that they have owned an AR-15 or similarly styled rifle. Using survey weights based on in-survey demographics of firearms ownership has no effect on this estimate. Respondents were then asked to indicate how many of such rifles they have owned. Approximately 99.7% indicated owning under 100 and 98.4% under 10. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we disregard the 0.3% that indicate owning over 100 in calculating average ownership numbers. Among those who indicate having owned AR-15 and similarly styled rifles, they indicate having owned an average of 1.8, with the median owner having owned 1. This suggest that up to 44 million AR-15 styled rifles have been owned by U.S. gun owners. Note, again, that this estimate is based on a question that asks whether someone has ever owned such a rifle, so this estimate should be interpreted as an upper bound on current ownership given that some rifles may have been resold.

Figure 15 shows the percentage of respondents who indicated that they owned AR-15 styled rifles for the following purposes: defense outside the home (34.6%), home defense (61.9%), competitive shooting sports (32.1%), recreational target shooting (66.0%), hunting (50.5%), and other (5.1%). Note that respondents could choose multiple purposes for which

Electronic copy available at: https://ssrn.com/abstract=4290697



Percentage indicating each factor was a reason for ownership.

Figure 15: Purposes indicated for owning AR-15 styled rifles.

they owned such firearms. Home defense and recreational target shooting were the two most common reasons indicated for owning these magazines, with approximately two-thirds of respondents identifying each of these as a rationale for ownership.

| Demographic Group | Proportion Owned AR-15 Styled Rifle | 95% Confidence Interval |
|---|---|---|
| White | 29.6% | 28.9% − 30.4% |
| Black | 34.0% | 31.0% − 37.1% |
| Asian | 29.2% | 24.6% − 34.2% |
| Native American | 35.4% | 30.8% − 40.3% |
| Pacific Islander | 48.4% | 36.3% − 60.7% |
| Other Ethnic Ancestry | 34.6% | 28.8% − 41.1% |
| Hispanic (any ancestry) | 38.3% | 35.0% − 41.8% |
| Male | 36.4% | 35.5% − 37.4% |
| Female | 21.3% | 20.3% − 22.3% |

Table 5: Demographics of ownership of AR-15 styled rifles.

Table 5 shows the breakdown of ownership of AR-15 styled rifles across different demographic segments. As this table demonstrates, AR-15 styled rifles are commonly owned at

Electronic copy available at: https://ssrn.com/abstract=4209697

high rates across many different demographic groups.

Table 6 shows the percentage of gun owners in each state who indicated that they have owned AR-15 styled rifles. Note that this question explicitly instructed respondents that "You can include any rifles of this style that have been modified or moved to be compliant with local law." Thus, as with magazines, these answers can include firearms that are kept in other states, as well as firearms that were grandfathered in or modified to be compliant with local law, or respondents who have since sold or disposed of such guns. This presumably explains the relatively high rates of ownership in states that restrict the purchase or ownership of such firearms.

# 6   Conclusion

This report summarizes the main findings of the most comprehensive survey of firearms ownership and use conducted in the United States to date. While many of its estimates corroborate prior survey research in this area, it also provides unique insights that are relevant to timely public policy debates, particularly regarding the defensive use of firearms and the ownership and use of AR-15 styled rifles and magazines that hold over 10 rounds.

This survey finds firearms ownership rates slightly above those documented before the Covid-19 pandemic, which is consistent with other recent scholarly research finding a large surge in firearms purchases during the pandemic, particularly among first time buyers (Crifasi et al., 2021; Miller et al., 2022).

In sum, about 31.9% of U.S. adults, or 81.4 million Americans, own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns. About 24.6 million individuals have owned a up to 44 million AR-15 and similarly styled rifles, and 39 million individuals have owned up to 542 million magazines that hold over 10 rounds. Approximately a third of gun owners (31.1%) have used a firearm to defend themselves or their property, often on more than one occasion, and guns are used defensively by firearms owners in approximately 1.67 million incidents per year. A majority of gun owners (56.2%) indicate that they carry a handgun for self- defense in at least some circumstances, and about 35% of gun owners report carrying a handgun with some frequency.

Electronic copy available at: https://ssrn.com/abstract=4206973

| State | Owned AR-15 Style Rifle | 95% Confidence Interval |
|---|---|---|
| Alabama | 28.9% | 24.1% − 34.3% |
| Alaska | 37.0% | 24.4% − 51.6% |
| Arizona | 28.8% | 24.2% − 34.0% |
| Arkansas | 35.0% | 28.7% − 41.8% |
| California | 37.5% | 34.8% − 40.2% |
| Colorado | 33.3% | 27.7% − 39.5% |
| Connecticut | 21.8% | 15.3% − 30.2% |
| Delaware | 20.3% | 12.6% − 30.9% |
| District of Columbia | 30.0% | 14.1% − 52.7% |
| Florida | 28.1% | 25.5% − 30.9% |
| Georgia | 31.4% | 27.9% − 35.1% |
| Hawaii | 34.6% | 19.1% − 54.3% |
| Idaho | 31.0% | 23.3% − 40.0% |
| Illinois | 32.6% | 28.7% − 36.7% |
| Indiana | 30.8% | 26.5% − 35.5% |
| Iowa | 27.1% | 20.4% − 35.1% |
| Kansas | 28.4% | 22.4% − 35.4% |
| Kentucky | 29.9% | 25.2% − 35.1% |
| Louisiana | 27.5% | 22.0% − 33.7% |
| Maine | 22.0% | 14.6% − 31.6% |
| Maryland | 29.9% | 23.7% − 36.9% |
| Massachusetts | 33.8% | 26.9% − 41.4% |
| Michigan | 24.9% | 21.5% − 28.6% |
| Minnesota | 20.7% | 16.1% − 26.3% |
| Mississippi | 30.4% | 23.8% − 38.0% |
| Missouri | 28.0% | 23.8% − 32.7% |
| Montana | 26.8% | 16.8% − 39.8% |
| Nebraska | 22.4% | 15.3% − 31.8% |
| Nevada | 42.4% | 34.6% − 50.6% |
| New Hampshire | 23.2% | 14.0% − 36.0% |
| New Jersey | 30.7% | 25.7% − 36.2% |
| New Mexico | 29.5% | 19.4% − 42.1% |
| New York | 37.8% | 34.8% − 41.0% |
| North Carolina | 25.6% | 22.2% − 29.4% |
| North Dakota | 44.4% | 24.0% − 67.0% |
| Ohio | 25.9% | 22.7% − 29.4% |
| Oklahoma | 29.3% | 24.1% − 35.0% |
| Oregon | 25.6% | 20.0% − 32.2% |
| Pennsylvania | 24.4% | 21.3% − 27.8% |
| Rhode Island | 29.7% | 17.3% − 46.1% |
| South Carolina | 25.3% | 21.0% − 30.2% |
| South Dakota | 35.8% | 26.8% − 45.9% |
| Tennessee | 28.9% | 24.8% − 33.3% |
| Texas | 36.0% | 33.3% − 38.7% |
| Utah | 24.8% | 17.9% − 33.2% |
| Virginia | 26.0% | 21.9% − 30.6% |
| Washington | 35.3% | 30.3% − 40.6% |
| West Virginia | 27.4% | 21.3% − 34.5% |
| Wisconsin | 19.7% | 15.6% − 24.6% |
| Wyoming | 36.1% | 25.9% − 47.8% |

Table 6: Percent of gun owners who have indicated that they have ever owned an AR-15 styled rifle by state. Note that this includes rifles that an owner holds in other locations if there are local ownership restrictions and rifles modified to be compliant with local laws.

Electronic copy available at: https://ssrn.com/abstract=4209697

Finally, the demographics of firearms ownership and defensive use are diverse, with different demographic groups commonly owning and using firearms at substantial rates.

Electronic copy available at: https://ssrn.com/abstract=4209697

# References

Deborah Azrael, Lisa Hepburn, David Hemenway, and Matthew Miller. The stock and flow of us firearms: results from the 2015 national firearms survey. *RSF: The Russell Sage Foundation Journal of the Social Sciences*, 3(5):38–57, 2017.

Anna Brown. *America's Complex Relationship With Guns: An In-depth Look at the Attitudes and Experiences of US Adults.* Pew Research Center, 2017.

Philip J Cook and Jens Ludwig. *Guns in America: results of a comprehensive national survey on firearms ownership and use.* Police Foundation Washington, DC, 1996.

Cassandra K Crifasi, Julie A Ward, Emma E McGinty, Daniel W Webster, and Colleen L Barry. Gun purchasing behaviours during the initial phase of the covid-19 pandemic, march to mid-july 2020. *International review of psychiatry*, 33(7):593–597, 2021.

Gallup. *In Depth: Topics, Guns.* https://news.gallup.com/poll/1645/guns.aspx , https://news.gallup.com/poll/264932/percentage-americans-own-guns.aspx, 2021.

David Hemenway. Survey research and self-defense gun use: an explanation of extreme overestimates. *J. Crim. L. & Criminology*, 87:1430, 1996.

Lisa Hepburn, Matthew Miller, Deborah Azrael, and David Hemenway. The us gun stock: results from the 2004 national firearms survey. *Injury prevention*, 13(1):15–19, 2007.

Gary Kleck and Marc Gertz. Armed resistance to crime: the prevalence and nature of self-defense with a gun. *J. Crim. L. & Criminology*, 86:150, 1995.

Gary Kleck and Marc Gertz. Carrying guns for protection: results from the national self-defense survey. *Journal of Research in Crime and Delinquency*, 35(2):193–224, 1998.

Jens Ludwig, Philip J Cook, and Tom W Smith. The gender gap in reporting household gun ownership. *American Journal of Public Health*, 88(11):1715–1718, 1998.

Matthew Miller, Wilson Zhang, and Deborah Azrael. Firearm purchasing during the covid-19 pandemic: results from the 2021 national firearms survey. *Annals of internal medicine*, 175(2):219–225, 2022.

Electronic copy available at: https://ssrn.com/abstract=4209687

Ann P Rafferty, John C Thrush, Patricia K Smith, and Harry B McGee. Validity of a household gun question in a telephone survey. *Public Health Reports*, 110(3):282, 1995.

Paul Spector. Social desirability bias. *The SAGE encyclopedia of social science research methods*, 2004.

Electronic copy available at: https://ssrn.com/abstract=4209697

# Appendix A: Vermont Pilot Survey

An initial version of this survey was fielded in Vermont. We report below the top line results from the Vermont survey, which closely mirror the results of the national survey.

In sum, 572 Vermont residents were surveyed, of which 163 indicated owning firearms. The survey sample represented the demographics of Vermont well on all dimensions except gender, as women were over represented and comprised 65.2% of respondents. Thus, weights were employed for gender.

With weighting employed, we find that 30% of Vermont residents own a firearm. Given that the adult population of Vermont is approximately 486,000, this suggest that there are over 145,600 firearms owners in Vermont. 42.1% of Vermont firearms owners are estimated to be female and 57.9% male.

As Figure 16 illustrates, almost a third of gun owners (29.3%) reported having used a firearm to defend themselves or their property (not counting incidents that were due to military service, police work, or work as a security guard). In nearly half of these defensive gun uses (45.9%), respondents reported facing multiple assailants. 85.8% of all incidents were resolved without the firearm owner having to fire a shot (e.g. by simply showing a firearm or verbally threatening to use it).



Figure 16: Proportion of gun owners in Vermont who have use a firearm in self-defense and number of assailants involved.

Electronic copy available at: https://ssrn.com/abstract=4209697

Sample of Vermont responses to open ended question prompt of "Have you ever been in a situation (including any referenced in earlier responses) in which it would have been useful for defensive purposes to have a firearm with a magazine capacity in excess of 10 rounds?":

- in the first incident it was five to one. I was outnumbered. three rounds per person if needed

- The time I was assaulted by 10 individuals.

- Yes. We have bear that frequently come to our home. They've attempted to get into my truck, they have come onto our porch thru the dog door (XL size) they have been in our chicken coops and in our garage. They have damaged many items, destroyed gas grills and threatened my dogs and children. Sometimes a warning shot isn't enough. And if, God forbid, the bear turned and started to attack us multiple bullets would be needed to stop him.

- About 6 individuals broke into my house one night. I locked myself in my room and they tried to break my door down. I threatened them with use of deadly force, but they kept trying. One of them was outside and broke my bedroom window and I aimed my shotgun at him and he ran off. I threatened again with the sound of charging my shotgun that they knew I wasn't bluffing and they all fled. Had they entered with the intent to kill my family and I, then we would have been out numbered. If there was an exchange of gun fire, I wouldn't want to have the restriction of reloading within the time I needed to protect my family and myself. Outgun the enemy or the enemy will surely outgun you. Limiting everyone's right to weapons is not the answer, and clearly this attempt to ban high capacity magazines is just the catalyst to a government gun grab for easier totalitarian control of the population.

- Yes, i had two run ins with a mountain lion.

- We had a home invasion two times in a month

- Yes. We live in VT. Every time I fired my gun in defense of my property it was to deter bears from damaging my property. It takes more than 1 shot to scare a bear. If

Electronic copy available at: https://ssrn.com/abstract=4209697

it charges you or your family it'll definitely take a bunch of shots to stop the bear.

- Yes. Just because there are 10 rounds in a magazine does not mean all will be on target during a self defense incident. In 2012 while I was in college in Connecticut, I got jumped by 4 people in Hartford ct. I had nothing on me to defend myself. The men all threatened me with knives and handguns. I wish I was able to carry a firearm at that point.

Electronic copy available at: https://ssrn.com/abstract=4209697

# Appendix B: Sampling Proportions With and Without Weights for National Survey

| Gender | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| Male | 49.32% | 49.23% |
| Female | 50.68% | 50.77% |

| Age Range | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| 18-20 | 7.89% | 5.04% |
| 21-25 | 8.11% | 8.58% |
| 26-30 | 7.30% | 9.24% |
| 31-35 | 11.67% | 8.67% |
| 36-40 | 12.66% | 8.44% |
| 41-45 | 8.49% | 7.70% |
| 46-50 | 6.46% | 8.09% |
| 51-55 | 6.37% | 8.13% |
| 56-60 | 7.39% | 8.52% |
| 61-65 | 7.67% | 7.87% |
| 66-70 | 8.03% | 6.59% |
| 71-75 | 5.07% | 5.13% |
| 76-80 | 1.94% | 3.50% |
| Over 80 | 0.93% | 4.49% |

43

Electronic copy available at: https://ssrn.com/abstract=4209697

| Annual Household Income | Initial Sample Proportions | Census Based Weighted Proportions |
| --- | --- | --- |
| Less than $10,000 | 8.87% | 3.40% |
| $10,000-20,000 | 8.95% | 4.89% |
| $20,000-30,000 | 9.69% | 6.26% |
| $30,000-40,000 | 8.78% | 7.06% |
| $40,000-50,000 | 7.44% | 7.21% |
| $50,000-60,000 | 7.72% | 6.96% |
| $60,000-70,000 | 6.00% | 6.96% |
| $70,000-80,000 | 6.37% | 6.37% |
| $80,000-90,000 | 4.51% | 5.76% |
| $90,000-100,000 | 5.89% | 5.76% |
| $100,000-150,000 | 17.67% | 19.11% |
| Over $150,000 | 8.12% | 20.23% |

Electronic copy available at: https://ssrn.com/abstract=4209697

| State of Residence | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| Alabama | 1.83% | 1.52% |
| Alaska | 0.39% | 0.22% |
| Arizona | 2.10% | 2.16% |
| Arkansas | 1.10% | 0.91% |
| California | 9.75% | 11.95% |
| Colorado | 1.59% | 1.75% |
| Connecticut | 1.23% | 1.09% |
| Delaware | 0.56% | 0.30% |
| District of Columbia | 0.27% | 0.21% |
| Florida | 7.29% | 6.51% |
| Georgia | 3.67% | 3.24% |
| Hawaii | 0.36% | 0.44% |
| Idaho | 0.44% | 0.56% |
| Illinois | 4.14% | 3.87% |
| Indiana | 2.13% | 2.05% |
| Iowa | 0.91% | 0.96% |
| Kansas | 0.92% | 0.89% |
| Kentucky | 1.61% | 1.36% |
| Louisiana | 1.23% | 1.41% |
| Maine | 0.51% | 0.41% |
| Maryland | 1.67% | 1.87% |
| Massachusetts | 1.88% | 2.13% |
| Michigan | 3.21% | 3.05% |
| Minnesota | 1.36% | 1.73% |
| Mississippi | 0.83% | 0.90% |
| Missouri | 1.93% | 1.86% |
| Montana | 0.25% | 0.33% |
| Nebraska | 0.53% | 0.59% |
| Nevada | 0.90% | 0.94% |
| New Hampshire | 0.40% | 0.42% |
| New Jersey | 2.97% | 2.81% |
| New Mexico | 0.36% | 0.64% |
| New York | 8.09% | 6.11% |
| North Carolina | 3.18% | 3.16% |
| North Dakota | 0.13% | 0.24% |
| Ohio | 4.13% | 3.57% |
| Oklahoma | 1.32% | 1.20% |
| Oregon | 1.05% | 1.28% |
| Pennsylvania | 4.30% | 3.93% |
| Rhode Island | 0.33% | 0.33% |
| South Carolina | 1.68% | 1.55% |
| South Dakota | 0.48% | 0.27% |
| Tennessee | 2.18% | 2.09% |
| Texas | 6.91% | 8.81% |
| Utah | 0.56% | 0.99% |
| Virginia | 2.43% | 2.61% |
| Washington | 2.03% | 2.33% |
| West Virginia | 0.71% | 0.54% |
| Wisconsin | 1.83% | 1.78% |
| Wyoming | 0.32% | 0.17% |

Electronic copy available at: https://ssrn.com/abstract=4209697

| Race | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| White | 81.26% | 76.30% |
| Black | 9.85% | 13.40% |
| Asian | 3.98% | 5.90% |
| Native American | 2.19% | 1.30% |
| Pacific Islander | 0.49% | 0.20% |
| Other | 2.22% | 2.90% |

Electronic copy available at: https://ssrn.com/abstract=4209697

# EXHIBIT 14

PRIORITIES FOR RESEARCH TO REDUCE THE THREAT OF

# FIREARM-RELATED
# VIOLENCE

Committee on Priorities for a Public Health Research Agenda to Reduce
the Threat of Firearm-Related Violence

Executive Office
Institute of Medicine

Committee on Law and Justice
Division of Behavioral and Social Sciences and Education

Alan I. Leshner, Bruce M. Altevogt, Arlene F. Lee, Margaret A. McCoy,
and Patrick W. Kelley, *Editors*

INSTITUTE OF MEDICINE *AND*
NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

Copyright National Academy of Sciences. All rights reserved.

**THE NATIONAL ACADEMIES PRESS • 500 Fifth Street, NW • Washington, DC 20001**

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine.

This project was supported by awards between the National Academy of Sciences and both the Centers for Disease Control and Prevention (CDC) (#200-2011-38807) and the CDC Foundation with the Foundation's support originating from The Annie E. Casey Foundation, The California Endowment, The California Wellness Foundation, The Joyce Foundation, Kaiser Permanente, the Robert Wood Johnson Foundation, and one anonymous donor. The views presented in this publication are those of the editors and attributing authors and do not necessarily reflect the view of the organizations or agencies that provided support for this project.

International Standard Book Number-13: 978-0-309-28438-7
International Standard Book Number-10: 0-309-28438-4

Additional copies of this report are available for sale from the National Academies Press, 500 Fifth Street, NW, Keck 360, Washington, DC 20001; (800) 624-6242 or (202) 334-3313; http://www.nap.edu.

For more information about the Institute of Medicine, visit the IOM home page at: **www.iom.edu.**

Copyright 2013 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

Suggested citation: IOM (Institute of Medicine) and NRC (National Research Council). 2013. *Priorities for research to reduce the threat of firearm-related violence.* Washington, DC: The National Academies Press.

Copyright National Academy of Sciences. All rights reserved.

# THE NATIONAL ACADEMIES

### Advisers to the Nation on Science, Engineering, and Medicine

The **National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Ralph J. Cicerone is president of the National Academy of Sciences.

The **National Academy of Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. C. D. Mote, Jr., is president of the National Academy of Engineering.

The **Institute of Medicine** was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Harvey V. Fineberg is president of the Institute of Medicine.

The **National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Ralph J. Cicerone and Dr. C. D. Mote, Jr., are chair and vice chair, respectively, of the National Research Council.

**www.national-academies.org**

Copyright National Academy of Sciences. All rights reserved.

## Scope of the Public Health Problem

*Injuries and Fatalities*

Unintentional injury is the leading cause of death in Americans aged 1 to 44 (NCHS, 2012). Firearm-related injury, in particular, is a serious threat to the health of the nation, with direct costs to the victims of violence as well as societal costs to families, friends, and communities. In 2010, there were twice as many nonfatal firearm-related injuries (73,505) as deaths.[4,5]

Between the years 2000 and 2010, firearm-related suicides significantly outnumbered homicides for all age groups, annually accounting for 61 percent of the more than 335,600 people who died from firearm-related violence in the United States.[6,7] The number of public mass shootings of the type that occurred at Sandy Hook Elementary School accounted for a very small fraction of all firearm-related deaths. Specifically, since 1983 there have been 78 events in which 4 or more individuals were killed by a single perpetrator in 1 day in the United States, resulting in 547 victims and 476 injured persons (Bjelopera et al., 2013).

Although overall crime rates have declined in the past decade and violent crimes, including homicides specifically, have declined in the past 5 years (FBI, 2011a), crime-related deaths involving firearms remain a serious threat. According to the Federal Bureau of Investigation's (FBI's) Uniform Crime Reporting Program, 68,720 people were murdered in firearm-related violence between 2007 and 2011. During that same time frame, firearms accounted for more than twice as many murders as all other weapons combined (FBI, 2011b). More than two-thirds of victims murdered by a spouse or ex-spouse died as a result of a gunshot wound (Cooper and Smith, 2011). More than 600,000 victims of

---

[4]NCIPC. 2013. *WISQARS nonfatal injury reports: Overall firearm gunshot nonfatal injuries and rates per 100,000—2010, United States, all races, both sexes, all ages* (accessed May 1, 2013).

[5]NCIPC. 2013. *WISQARS injury mortality reports: Overall firearm gunshot nonfatal injuries and rates per 100,000—2010, United States, all races, both sexes, all ages* (accessed May 1, 2013).

[6]NCIPC. 2013. *WISQARS injury mortality reports: Suicide firearm deaths and rates per 100,000—2000-2010, United States, all races, both sexes, all ages* (accessed May 1, 2013).

[7]NCIPC. 2013. *WISQARS injury mortality reports: Firearm deaths and rates per 100,000—2000-2010, United States, all races, both sexes, all ages* (accessed May 1, 2013).

Copyright National Academy of Sciences. All rights reserved.

robbery and other crimes reported that they faced an assailant armed with a gun (Truman and Rand, 2010).

*Demographic Characteristics of Victims in the United States*

There are major disparities among subpopulations of people in the United States in terms of mortality rates from firearm violence. The patterns for homicide and suicide are vastly different depending on economic conditions and geography, with homicides occurring more frequently among youth in high-poverty urban environments and suicides occurring more frequently among middle-aged males in rural areas. Inclusive of homicide, suicide, and unintentional death, African American males have the highest overall rate of firearm-related mortality: 32 per 100,000,[8] twice that of white, non-Hispanic males (at 16.6 per 100,000),[9] and three times that of Hispanic and American Indian males (at 10.4[10] and 11.8[11] per 100,000, respectively). The rate of mortality by firearm for Asian/Pacific Islander males is 4.2 per 100,000.[12] The rates of mortality for females are much lower, ranging from a low of 0.6 per 100,000 for Asian/Pacific Islander females[13] to 3.3 per 100,000 for African American and 3.0 for white, non-Hispanic females.[14] As will be discussed in further

---

[8]NCIPC. 2013. *WISQARS injury mortality reports: Overall firearm gunshot fatal injuries and rates per 100,000—2010, United States, black, males, all ages* (accessed May 15, 2013).

[9]NCIPC. 2013. *WISQARS injury mortality reports: Overall firearm gunshot fatal injuries and rates per 100,000—2010, United States, white, non-Hispanic, males, all ages* (accessed May 15, 2013).

[10]NCIPC. 2013. *WISQARS injury mortality reports: Overall firearm gunshot fatal injuries and rates per 100,000—2010, United States, Hispanic, males, all ages* (accessed April 30, 2013).

[11]NCIPC. 2013. *WISQARS injury mortality reports: Overall firearm gunshot fatal injuries and rates per 100,000—2010, United States, American Indian/Alaskan Native, males, all ages* (accessed May 15, 2013).

[12]NCIPC. 2013. *WISQARS injury mortality reports: Overall firearm gunshot fatal injuries and rates per 100,000—2010, United States, Asian/Pacific Islander, males, all ages* (accessed April 30, 2013).

[13]NCIPC. 2013. *WISQARS injury mortality reports: Overall firearm gunshot fatal injuries and rates per 100,000—2010, United States, Asian/Pacific Islander, females, all ages* (accessed April 30, 2013).

[14]NCIPC. 2013. *WISQARS injury mortality reports: Overall firearm gunshot fatal injuries and rates per 100,000—2010, United States, black, females, all ages* (accessed April 30, 2013); NCIPC. 2013. *WISQARS injury mortality reports: Overall firearm gunshot fatal injuries and rates per 100,000—2010, United States, white, non-Hispanic, females, all ages* (accessed May 15, 2013).

Copyright National Academy of Sciences. All rights reserved.

Priorities for Research to Reduce the Threat of Firearm-Related Violence

detail later in the report, the reasons for these differences may include a variety of factors such as socioeconomic status, urban/rural factors, and crime and policing in neighborhoods. Individual factors that may influence these differences include age; substance use; engagement or association with risky, delinquent, violent, or unlawful behaviors; propensity for suicide; and whether the perpetrator of a homicide is a family member, acquaintance, or stranger. Many of these factors are confounding, and careful analysis is required to understand the independent and interactive effects, supporting the need for rigorous research.

## Availability of Firearms

Guns are widely used for recreation, self-protection, and work in the United States. However, it is difficult to determine the exact number and distribution of guns currently in homes and communities due to lack of data. Between 1986 and 2010, the domestic production of firearms increased by 79 percent, firearm exports increased by 11 percent, and firearm imports increased by 305 percent (ATF, 2012). A December 2012 poll found that 43 percent of those surveyed reported having a gun in the home (Gallup, 2013).

## Defensive Use of Guns

Defensive use of guns by crime victims is a common occurrence, although the exact number remains disputed (Cook and Ludwig, 1996; Kleck, 2001a). Almost all national survey estimates indicate that defensive gun uses by victims are at least as common as offensive uses by criminals, with estimates of annual uses ranging from about 500,000 to more than 3 million (Kleck, 2001a), in the context of about 300,000 violent crimes involving firearms in 2008 (BJS, 2010). On the other hand, some scholars point to a radically lower estimate of only 108,000 annual defensive uses based on the National Crime Victimization Survey (Cook et al., 1997). The variation in these numbers remains a controversy in the field. The estimate of 3 million defensive uses per year is based on an extrapolation from a small number of responses taken from more than 19 national surveys. The former estimate of 108,000 is difficult to interpret because respondents were not asked specifically about defensive gun use.

A different issue is whether defensive uses of guns, however numerous or rare they may be, are effective in preventing injury to the gun-wielding crime victim. Studies that directly assessed the effect of actual

Copyright National Academy of Sciences. All rights reserved.

Priorities for Research to Reduce the Threat of Firearm-Related Violence

defensive uses of guns (i.e., incidents in which a gun was "used" by the crime victim in the sense of attacking or threatening an offender) have found consistently lower injury rates among gun-using crime victims compared with victims who used other self-protective strategies (Kleck, 1988; Kleck and DeLone, 1993; Southwick, 2000; Tark and Kleck, 2004). Effectiveness of defensive tactics, however, is likely to vary across types of victims, types of offenders, and circumstances of the crime, so further research is needed both to explore these contingencies and to confirm or discount earlier findings.

Even when defensive use of guns is effective in averting death or injury for the gun user in cases of crime, it is still possible that keeping a gun in the home or carrying a gun in public—concealed or open carry— may have a different net effect on the rate of injury. For example, if gun ownership raises the risk of suicide, homicide, or the use of weapons by those who invade the homes of gun owners, this could cancel or outweigh the beneficial effects of defensive gun use (Kellermann et al., 1992, 1993, 1995). Although some early studies were published that relate to this issue, they were not conclusive, and this is a sufficiently important question that it merits additional, careful exploration.

## Firearm-Related Violence as a Public Health Issue

The public health field focuses on problems that are associated with significant levels of morbidity and mortality. The complexity and frequency of firearm-related violence combined with its impact on the health and safety of the nation's residents make it a topic of considerable public health importance and suggest that a public health approach should be incorporated into the strategies used to prevent future harm and injuries. Violence, including firearm-related violence, has been shown to be contagious. Recognizing this, the academic community has suggested that research examine violence much like is done for contagious diseases (IOM, 2013).

In the past, responses to firearm violence typically have been based in the criminal justice system, which is crucial to public safety, but a more comprehensive and multidisciplinary approach is necessary to reduce the burden of firearm-related violence on individuals, families, communities, and general society (Kellermann et al., 1991). Public health approaches focus efforts on the prevention of violence by characterizing the scope or magnitude of the problem, evaluating potential risk

Copyright National Academy of Sciences. All rights reserved.

# EXHIBIT 15



*NSSF® Report*

# MODERN SPORTING RIFLE
## COMPREHENSIVE CONSUMER REPORT

**Ownership, Usage and Attitudes Toward
AR- and AK-Platform Modern Sporting Rifles**

**NSSF®**
The Firearm Industry
Trade Association

**Copyright:** ©2022 National Shooting Sports Foundation
For all client unique research, copyright is assigned to said client. All report findings contained within are the property of the client (NSSF), who is free to use this information as desired. However, it is recommended that the client contact *Sports Marketing Surveys*, prior to reproduction or transmission for clarification of findings, analysis, or recommendations.


**Disclaimer:**
While proper due care and diligence has been taken in the preparation of this document, *Sports Marketing Surveys* cannot guarantee the accuracy of the information contained and does not  accept any liability for any loss or damage caused as a result of using information or recommendations contained within this document.

Sports Marketing Surveys USA
6650 West Indiantown Road, Suite 220,
Jupiter,
Florida 33458, USA

www.sportsmarketingsurveys.com

+1 561 427 0647
c. 772 341 6711

Case 1:24-cv-01955-DLF   Document 12-6   Filed 07/26/24   Page 125 of 410

# Table of Contents

Executive Summary…………………………………………………………………………………   3

Methodology…………………………………………………………………………   9

1. Experience with MSRs……………………………………………………….   10

2. Most Recently Acquired MSR……………………………………………….   18

3. MSR Usage and Activities……………………………………………………   39

4. MSR User Profiles……………………………………………………….   51

5. Clusters/Segmentation……………………………………………………….   61

6. Sample Profile…………………………………………………………….   71

# Executive Summary

## EXPERIENCE WITH MSRs

- <u>Ownership & Platform</u>: The median MSR user owns nearly 4 MSRs, with 97% of owners saying they own an AR–platform MSR. 38% own another MSR platform and 27% own an AK platform MSR.

- <u>When MSR was first owned</u>: Over 40% obtained their first MSR since 2009, with 11% obtaining their first MSR within the last 2 years.  while 20% of MSR owners obtained their first MSR prior to 1999.

- <u>Other Firearms Owned First</u>: 99% of MSR owners used or obtained another firearm before an MSR; the most popular firearm owned is a handgun, which 88% of MSR owners held before obtaining a MSR.

- <u>Introduction to MSRs</u>: One-third of MSR owners became interested through their own personal accord. About 21% first gained interest through military or their job, and another 20% through family & friends.

- <u>Range membership</u>: 52% of MSR owners are current members of a shooting range. 28% have never been a member, with the final 20% being former members.

- <u>Reasons for ownership</u>: Recreational target shooting was rated as the most important reasons for owning an MSR.  Big game hunting and professional/job–related use were rated as least important.

## MOST RECENTLY ACQUIRED MSR

- <u>When Acquired:</u> 48% of MSR owners said they obtained their most recently acquired MSR within the last two years (2021 or 2021), with 31% saying they obtained a MSR in 2021.

- <u>Platform:</u> Nearly 9 out of 10 MSR owners said the most recent MSR they acquired was an AR platform.

# Executive Summary

## MOST RECENTLY ACQUIRED MSR (cont.)

- <u>New/Used MSR</u>: 83% of MSR owners said they bought their most recent MSR by purchasing it new.

- <u>Place of purchase</u>: 30% of owners bought their most recent MSR from a independent (mom & pop) retail store. 22% assembled their MSR using purchases of different parts, and 19% used the internet/website.  The most popular retailers & online sites used were Palmetto State Armory, Gunbroker.com, Cabela's, and Sportsman's Warehouse.

- <u>Price</u>: The average price for a new MSR paid by owners was $1,071; half of MSR owners paid between $500 and $1000 for their most recently acquired MSR.

- <u>Brand:</u> Survey data indicates the MSR market is highly fragmented.  11% of MSR owners said Palmetto was the brand of their most recently acquired MSR.

- <u>Caliber</u> – 60% of respondents said the caliber of their most recently acquired MSR is .223 / 5.56 mm.

- <u>Reasons for buying</u>– MSR owners said reliability, accuracy, and fun were the most important reasons for purchasing their most recently acquired MSR. The least important reasons were recommendations from a retailer and MSRs owned by family/friends.

- <u>Accessories:</u> 86% of MSR owners have their most recently acquired MSR customized to some extent, with 70% having 1–3 accessories. 75% of those with accessories added them to their MSR within 12 months after purchase. The average spent for accessories by owners on their most recently acquired MSR is $618.

- <u>Optics used</u>: 61% of MSR owners have a scope equipped as a primary optics, while 55% utilize a red dot.

NSSF MSR Consumer Study – Report of Findings

# Executive Summary

## MOST RECENTLY ACQUIRED MSR (cont.)

- <u>Scope</u>: the most common scopes used by MSR owners are the 3–9x power scope and the 1–4x power scope.

- <u>Magazine capacity</u>: Over half (52%) of MSR owners stated the magazine capacity of their MSR is 30 rounds. When asked why they chose their respective capacity, most frequent responses were related to popularity/standard and being readily available.

- <u>Stock</u>: Approximately two-thirds of MSR owners have a collapsible/folding stock on their MSR.

- <u>Receiver</u>: 81% of owners have a flat top upper receiver.

- <u>Handguard</u>: The most common type of handguard is a free floating with rails handguard, used by 43% of respondents on their most recently acquired MSR.

- <u>Finish color</u>: 3 out of 4 owners have a black finish color on their MSR.

- <u>Barrel</u>: 67% have a threaded barrel on their MSR.

- <u>Barrel accessories</u>: Most used barrel accessories are flash hider (39% of MSR owners) and muzzle brake/compensator (37%).

- <u>Barrel length</u>: 75% have a MSR with a barrel length of 16" to 20".

- <u>Operating system</u>: The most recently acquired MSR for 59% of owners operates by direct gas impingement.

# Executive Summary

## MOST RECENTLY ACQUIRED MSR (cont.)

- <u>Storage</u>: 67% store their MSR unloaded and secured in a safe, lock box, or with a trigger lock. An additional 19% store their MSR <u>loaded</u> and secured in a safe, lock box, or with a trigger lock.

- <u>Likelihood to buy</u>: On a scale from 1 to 10, where 1 is "not at all likely" and 10 is "very likely", the average likelihood rating given by MSR owners that they'll buy a MSR in the next 12 months is 6.2, slightly more to the 'likely' end of the scale.

- <u>Accessories owned</u>: The most common accessories currently owned by MSR owners are gun cleaning kits, extra magazines, targets, and a soft carrying case. The accessory MSR owners most frequently said they planned to buy in the next 12 months is a suppressor/silencer. About 70% of MSR owners do not own and do not plan on buying a laser designator or night vision/thermal scope in the next 12 months.

## USAGE AND ACTIVITIES

- <u>Use:</u> 88% of MSR owners used/shot their MSR(s) in the last 12 months. The average number of times used was 14, just over once a month. Compared to the 12 months before that, 41% said their MSR use was "about the same" while 38% said it was less.

- <u>Desired usage</u>: 75% of MSR owners said they did not use their MSR as much as they would like over the past 12 months. The most important factors preventing owners from using their MSR more are related to ammunition: lack of availability and cost.

- <u>Activities</u>: The most popular activity by MSR owners is target shooting — 54% said they did target shooting at a private range, while 49% said they did target shooting at a public range.

- <u>Ammo used</u>: Roughly 70% of MSR owners used budget factory and premium factory loads in the last 12 months. The ammo breakdown for an average MSR user is made up of 42% budget factory loads, 32% premium factory loads, 17% handloads/reloads, and 9% import ammo. The average number of rounds used by MSR owners in the last 12 months is 907 rounds. In the next 12 months, MSR owners project they'll fire 984 rounds.

# Executive Summary

## USAGE AND ACTIVITIES (cont.)

- <u>Ammo purchases</u>: The average number of ammo rounds typically purchased by MSR owners is 637.

- <u>Ammo on hand</u>: Nearly half (45%) of MSR owners own/keep more than 1,000 rounds on hand.

- <u>Ammo reloads</u>: 6 out of 10 MSR owners do not reload their own ammunition. Of the 40% who do, the average percentage of ammunition they reload is 53%.

- <u>Activities – Distance</u>: The most frequent distance that MSR owners hunt/target shoot is at 100–300 yards.

- <u>Target shooting alone vs with others</u>: 43% of MSR owners who go target shooting typically go with 1 other person. 27% go alone.

- <u>Favorite part about owning MSR</u>: MSR owners said their favorite part about owning a MSR was: fun/enjoyment of shooting, exercising freedom/2A rights, ease of use, and reliability.

## RESPONDENT PROFILE

- Organizations: 61% of MSR owners are members of or recently donated to the NRA, the most frequently chosen organization. 21% of MSR owners are not members of or recently donated to any firearm organizations. 12% are members or recently donated to the NSSF.

- Military/Law-Enforcement: 38% of MSR owners are active/retired member of law enforcement or the military.

- Age/Gender/Race: 96% of MSR owners are Male. The average age of MSR owners is 55 years old. 88% are White/Caucasian.

- Marital status: 74% of MSR owners are married. Of these MSR owners, over half say their spouse accompanies them for target shooting. 24% say their spouse has no interest in target shooting or firearms.

# Executive Summary

**RESPONDENT PROFILE (cont.)**

- Education: 45% of MSR owners have attained at least a bachelors degree. One-quarter have attended some college, but did not graduate.

- Income: The average yearly household income for MSR owners is $110,934. More than half are in households with an annual income of greater than $85,000.

- <u>Children in Household</u>: 62% of MSR owners do not have any children living with them.

- State: The states with the most respondents were Texas (9%), California (5%), and Florida (5%).

# Methodology

In 2020, the National Shooting Sports Foundation (NSSF) contracted Sports Marketing Surveys for an online consumer survey on modern sporting rifles (MSRs) that was last carried out in 2013. Due to the COVID pandemic and personnel changes at NSSF, this survey was not able to be administered until December 2021. The aim is to provide the NSSF and manufacturers insights on current consumer needs and uses of MSRs as well as educate those influencing public policy in the effort to preserve our constitutional rights.

The online survey covered various aspects of MSR ownership, behavior, and attitudes. The NSSF promoted the survey via a partner email distribution list.  A random drawing to win one of four $250 Mastercard prepaid gift cards was included to incentivize participation. The term "Modern Sporting Rifle" was clearly defined as AR- or AK-platform rifles such as AR-15, AR-10, AK-47, AK-74 and did not include non-rifle firearms such as AR pistols, etc. Photographs of both AR- and AK-platform MSRs were shown on the survey landing page. All responses from those under 18 years old or said they did not own at least 1 MSR were removed from the analysis.

The survey was live from December 9, 2021 to January 2, 2022.
*   **Completed Surveys: 2,421**
*   **Usable responses for analysis: 2,185**

Case 1:24-cv-01955-DLF   Document 12-5   Filed 07/26/24   Page 133 of 410



Section 1: Experience with Modern Sporting Rifles

# Modern Sporting Rifle Ownership: Platforms



**MSR Platforms Owned**

Average number of MSRs owned: 3.8
- AR – 2.6
- Other – 0.8
- AK – 0.4

Median of all MSRs owned: 3

(may own zero of one or more platform, but must at least own one MSR)



**Number of MSRs owned**

| Platform | Average Number of MSRs owned (must own at least one of specified platform) |
|---|---|
| AR platform | 2.7 |
| Other platform | 2.3 |
| AK platform | 1.5 |

**Trend – Average Number of MSRs owned**
2010: 2.6
2013: 3.1
2021: 3.8

NSSF MSR Consumer Study – Report of Findings

# Modern Sporting Rifle Ownership: Experience



**When did you obtain your FIRST MSR?**

| Year | Percentage |
|------|-----------|
| 2021 | 5% |
| 2020 | 6% |
| 2019 | 6% |
| 2018 | 5% |
| 2017 | 5% |
| 2016 | 6% |
| 2015 | 6% |
| 2014 | 5% |
| 2013 | 4% |
| 2012 | 5% |
| 2011 | 3% |
| 2010 | 5% |
| 2005 – 2009 | 14% |
| 2000 – 2004 | 7% |
| Prior to 1999 | 20% |

| | By Number of MSRs Owned | | | | |
|---|---|---|---|---|---|
| | 1 MSR | 2 | 3 | 4 | 5+ |
| 2021 | 14% | 3% | 3% | 1% | 1% |
| 2020 | 13% | 7% | 3% | 1% | 2% |
| 2019 | 9% | 7% | 5% | 4% | 2% |
| 2018 | 9% | 7% | 5% | 5% | 2% |
| 2017 | 8% | 5% | 5% | 4% | 3% |
| 2016 | 7% | 8% | 8% | 6% | 3% |
| 2015 | 7% | 8% | 6% | 3% | 5% |
| 2014 | 5% | 7% | 3% | 4% | 3% |
| 2013 | 3% | 5% | 6% | 4% | 4% |
| 2012 | 4% | 4% | 4% | 7% | 5% |
| 2011 | 2% | 4% | 4% | 4% | 4% |
| 2010 | 2% | 4% | 7% | 4% | 6% |
| 2005 – 2009 | 8% | 13% | 15% | 15% | 19% |
| 2000 – 2004 | 3% | 4% | 7% | 9% | 11% |
| Prior to 1999 | 7% | 13% | 20% | 28% | 30% |

- **20% of MSR owners obtained their first MSR before 1999. Over 40% have owned theirs since 2009.**

- **11% obtained their first MSR within the last two years.**

- **26% of those who own 1 MSR obtained it in 2020 or 2021.**

**NSSF MSR Consumer Study – Report of Findings**

# Modern Sporting Rifle Ownership: Experience

**Firearms Used/Owned BEFORE obtaining a MSR**



- Handguns are the most popular firearm used/owned before obtaining an MSR, with 88% of MSR owners selecting.

- Traditional rifles were also first used/owned by 82% of MSR owners.

- Younger MSR owners show less ownership of other firearm types before a MSR compared to other age groups.

**Firearms Used Before MSR - by Age**



# Modern Sporting Rifle Ownership: Experience

**Introduction to MSRs: where did you first gain interest?**



**Introduction to MSRs (Grouped)**



- One-third of MSR owners became interested through their own personal accord.

- About 21% first gained interest through the military or their job, and another 20% through family/friends.

NSSF MSR Consumer Study – Report of Findings

# Modern Sporting Rifle Ownership: Experience

**Introduction to MSRs: where did you first gain interest?**



| | |
|---|---|
| My own personal interest | 34% |
| Military | 18% |
| Friend | 11% |
| Family member | 9% |
| Shooting Range | 9% |
| Books/Magazines | 5% |
| Other | 5% |
| Job | 3% |
| Internet | 2% |
| Movies/TV | 2% |
| Video games | 2% |
| Influencer on social media | 1% |

**Introduction to MSRs (Grouped)**



- One-third of MSR owners became interested through their own personal accord.

- About 21% first gained interest through the military or their job, and another 20% through family/friends.

NSSF MSR Consumer Study – Report of Findings

# Modern Sporting Rifle Ownership: Shooting Ranges

**Do you currently have a membership at a shooting range?**



- About half of MSR owners are current members of a shooting range.

- 28% have never been a member of a shooting range.

# Modern Sporting Rifle Ownership: Reasons for Ownership

Respondents were asked to rate how important each of the following reasons are to owning an MSR. They rated each reason on a scale from 1 to 10, where 1 is "not at all important" and 10 is "very important."



**Rating: How important are these reasons to owning an MSR?**

| Reason | Rating |
|---|---|
| Recreational target shooting | 8.7 |
| Home/self-defense | 8.3 |
| Collecting | 6.3 |
| Varmint Hunting | 5.8 |
| Competition shooting (i.e. 3. Gun) | 5.6 |
| Big Game Hunting | 4.9 |
| Professional use / Job-related | 3.4 |

*Scale:*
*1=Not at all important, 10= very important*

- Recreational target shooting was rated as the most important reason for owning an MSR.

- Big game hunting and professional/job-related use were given the lowest importance ratings.

|  | MSR Owned | | | | | Age | | | Usage Frequency | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5+ | Under 45 | 45 to 54 | 55+ | 3 times or less | 4 to 11 times | 12 to 23 times | 24+ times |
| Recreational target shooting | 8.4 | 8.7 | 8.8 | 8.6 | 9 | 8.4 | 8.8 | 8.9 | 8.5 | 8.8 | 9 | 9.1 |
| Home/self-defense | 7.9 | 8.2 | 8.2 | 8.3 | 8.7 | 8.4 | 8.3 | 8.2 | 8 | 8.3 | 8.5 | 8.7 |
| Collecting | 5.2 | 5.8 | 6.6 | 6.7 | 7.1 | 6.9 | 6.5 | 5.8 | 5.9 | 6.2 | 6.4 | 7 |
| Varmint Hunting | 5.2 | 5.5 | 5.8 | 5.9 | 6.3 | 5.7 | 5.8 | 5.8 | 5.2 | 5.7 | 6.2 | 7 |
| Competition shooting (i.e. 3. Gun) | 4.6 | 5.3 | 5.6 | 6 | 6.4 | 6 | 5.8 | 5.2 | 4.9 | 5.4 | 6.3 | 7 |
| Big Game Hunting | 4.3 | 4.4 | 4.9 | 5.4 | 5.5 | 5.2 | 4.9 | 4.7 | 4.4 | 4.9 | 5.2 | 6 |
| Professional use / Job-related | 2.8 | 3 | 3.7 | 3.5 | 3.9 | 4 | 3.4 | 3 | 3 | 3.2 | 3.6 | 4.5 |

NSSF MSR Consumer Study – Report of Findings



Section 2: Most Recently Acquired Modern Sporting Rifle

Case 1:24-cv-01955-CLE- Document 13-5 - Filed 07/26/24 - Page 142 of 410

# Most Recently Acquired MSR: Platform, When Acquired

**Platform - Most Recent MSR Obtained**



Other
5%

AK Platform
8%

AR Platform
87%

**Year of Most Recently Acquired MSR**



| | |
|---|---|
| 31% | 2021 |
| 17% | 2020 |
| 12% | 2019 |
| 9% | 2018 |
| 6% | 2017 |
| 5% | 2016 |
| 5% | 2015 |
| 3% | 2014 |
| 2% | 2013 |
| 2% | 2012 |
| 1% | 2011 |
| 1% | 2010 |
| 3% | 2005 – 2009 |
| 1% | 2000 – 2004 |
| 2% | Prior to 1999 |

- Nearly 9 out of 10 MSR owners said the most recent MSR they acquired was an AR platform.

- Nearly one–third of MSR owners said they acquired their most recent one in 2021, nearly 50% within the last two years (2021 or 2020).

# Most Recently Acquired MSR: How? Where?



**How did you obtain your most recently acquired MSR?**

- I purchased it NEW — 83%
- I purchased it USED — 11%
- I received it NEW as a gift — 3%
- I received it USED as a gift — 2%
- I inherited it — 1%



**Place of Purchase**

- Independent (Mom & Pop) Retail Store — 30%
- Purchases of different parts — 22%
- Internet/Website — 19%
- Other — 10%
- Chain or Big Box Retail Store — 9%
- Purchased as a kit — 6%
- Gun Show — 4%

- • 83% of MSR owners acquired their most recent MSR by purchasing it new.

- • For those purchasing a new or used MSR, the most common place of purchase was an independent retail store.

- • Popular retailers & online sites used: Palmetto State Armory, Gunbroker.com, Cabela's, Sportsman's Warehouse,

Case 1:24-cv-01955-DLF   Document 17-5   Filed 07/26/24   Page 144 of 410

# Most Recently Acquired MSR: Place of Purchase

| | Total | Number of MSRs Owned | | | | | Age | | | Range Membership | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5+ | Under 45 | 45 to 54 | 55+ | Member | Non-member |
| Independent (Mom & Pop) Retail Store | 30.3% | 31.9% | 30.5% | 31.1% | 29.8% | 28.9% | 26.6% | 35.1% | 30.1% | 33.9% | 26.5% |
| Purchases of different parts | 22.2% | 12.0% | 18.8% | 24.8% | 29.3% | 28.6% | 25.4% | 25.8% | 19.0% | 21.3% | 23.2% |
| Internet/Website | 19.3% | 18.6% | 21.1% | 16.2% | 19.1% | 20.2% | 24.3% | 14.1% | 19.1% | 18.1% | 20.7% |
| Other | 9.5% | 11.4% | 11.2% | 9.6% | 8.0% | 7.3% | 6.1% | 7.8% | 11.9% | 8.9% | 10.1% |
| Chain or Big Box Retail Store | 9.2% | 16.2% | 10.1% | 7.6% | 5.3% | 5.2% | 7.9% | 8.8% | 9.9% | 7.9% | 10.5% |
| Purchased as a kit | 5.8% | 5.6% | 4.6% | 6.3% | 5.8% | 6.4% | 7.0% | 4.6% | 5.6% | 5.9% | 5.6% |
| Gun Show | 3.7% | 4.2% | 3.7% | 4.3% | 2.7% | 3.5% | 2.7% | 3.8% | 4.2% | 4.0% | 3.4% |

**NSSF MSR Consumer Study – Report of Findings**

# Most Recently Acquired MSR: Price

**Price of most recently acquired NEW MSR**

**Price of most recently acquired USED MSR**





- Half of MSR owners paid between $500 and $1000 for their most recently purchased MSR, both those who bought a new MSR and those who bought a used MSR.

- Average price for last MSR: $1,071.

|  | 2010 | 2013 | 2021 |
|---|---|---|---|
| **Overall average** | **$1,083** | **$1,058** | **$1,071** |
| AR–platform (new) |  | $1,112 | $1,057 |
| AR platform (used) |  |  | $992 |
| AK platform (new) |  | $711 | $1,086 |
| AK platform (used) |  |  | $1,218 |

**NSSF MSR Consumer Study – Report of Findings**

# Most Recently Acquired MSR: Brand

**Brand of Most Recently Acquired AR**



- Survey data indicates the MSR market is highly fragmented. 11% of MSR owners said Palmetto was the brand of their most recently acquired MSR —— the highest among the options available.

Commonly mentioned brands included in "Other":
- ATI
- Battle Arms Development
- MBX
- Sharp Bros
- Tavor
- WBP

*50+ other brands were selected by less than 1% of respondents; full list available upon request*

NSSF MSR Consumer Study – Report of Findings

# Most Recently Acquired MSR: Caliber



**Caliber of Most Recently Acquired MSR**

- **60% of respondents said the caliber of their most recently acquired MSR is .223 / 5.56 mm**

- **Of the 5% selecting "other," the most frequently mentioned calibers included:**
  - **6.5 Grendel**
  - **.458 SOCOM**
  - **.224 Valkyrie**

*7 other calibers were selected by less than 1 % of respondents*

**NSSF MSR Consumer Study – Report of Findings**

# Most Recently Acquired MSR: Reasons for Buying

For the 94% of respondents that purchased their MSR new or used, they were asked to rate how important each of the following reasons are for selecting their most recently acquired MSR on a scale from 1 to 10, where 1 is "not at all important" and 10 is "very important."



**Rating: Most Important Reasons for Buying Most Recently Purchased MSR**

| Reason | Rating |
| --- | --- |
| Reliable | 9.0 |
| Accuracy | 8.8 |
| Fun | 8.7 |
| Easy to shoot | 8.4 |
| Good ergonomics, easy access to safety, fits my body | 8.1 |
| Reputation of manufacturer | 8.1 |
| Availability of ammunition in this caliber | 8.1 |
| Availability of parts | 8.1 |
| Ability to accessorize | 7.5 |
| For home/self-defense | 7.4 |
| Aesthetically pleasing | 7.0 |
| Potential to avoid any potential future ownership ban | 7.0 |
| Low cost of ammunition | 6.8 |
| Price | 6.6 |
| Light weight | 6.6 |
| Low recoil | 6.5 |
| Ability to shoot competitively | 5.2 |
| To hunt | 5.1 |
| Taught to use a similar firearm in military / law enforcement | 3.7 |
| Recommended by retailer | 3.3 |
| My friends / family had one | 3.2 |

*Scale:*
*1=Not at all important,   10= very important*

- MSR owners rated reliability, accuracy, and fun as the most important reasons for purchasing their most recently acquired MSR.

- The least important reasons as rated by MSR owners include recommendations from a retailer and MSRs owned by family/friends.

NSSF MSR Consumer Study – Report of Findings

# Most Recently Acquired MSR: Accessories

**MSR – Use of Accessories**



**When have you added accessories to your MSR?**



- 86% of have their most recently acquired MSR customized to some extent, 70% having 1–3 accessories.

- For those with accessories on their most recently acquired MSR, 75% added accessories within 12 months after purchase. Nearly a quarter added accessories at the time of purchase.

**NSSF MSR Consumer Study – Report of Findings**

# Most Recently Acquired MSR: Accessories - Spend

**Spend on After-Market Customization to Most Recently Acquired MSR**



| | 2010 | 2013 | 2021 |
|---|---|---|---|
| **Average spent** | **$436** | **$381** | **$618** |

- Of the MSR owners who have added accessories to their most recently acquired MSR, nearly half, or 48%, have spent between $201 and $600 on after–market customization.

- The average spent for accessories by owners on their most recently acquired MSR by owners is $618.

# Most Recently Acquired MSR: Optics



**Optics Used on Most Recently Acquired MSR**

- • 61% of MSR owners have a scope equipped as a primary optic on their most recently acquired MSR.

- • Iron sights are the most common secondary aiming device, equipped on two-thirds of respondents' MSRs.

Case 1:24-cv-01955-CLE Document 17-5 Filed 07/26/24 Page 152 of 410

# Most Recently Acquired MSR: Scope

**Type of Scope on MSR**



- The most common scopes used by MSR owners are the 3–9x power scope (21%) and the 1–4x power scope (20%).

- Of the 10% who selected "Other," the most frequently mentioned scopes were:
  - 1-8x variable power scope
  - 1-10x variable power scope

Case 1:24-cv-01055-DLF Document 12-5 Filed 07/26/24 Page 153 of 410

# Most Recently Acquired MSR: Magazine Capacity



**Magazine Capacity on MSR**

- 30 round capacity: 52%
- 20 round capacity: 17%
- 10 round capacity: 17%
- 5 round capacity: 5%
- 15 round capacity: 3%
- 25 round capacity: 2%
- 40 round capacity: 2%
- Other: 1%

- Half (52%) of MSR owners stated the magazine capacity of their most recently acquired MSR is 30 rounds.

- When asked why they chose their respective magazine capacity, the most frequent responses were:
  - Common/standard
  - Readily available

**NSSF MSR Consumer Study – Report of Findings**

# Most Recently Acquired MSR: Type of Stock

**Type of Stock on MSR**



- **65%, or approximately two-thirds, of MSR owners have a collapsible/folding stock on their most recently purchased MSR.**

# Most Recently Acquired MSR: Type of Upper Receiver

**Type of Upper Receiver on MSR**



- 81% have a flat top upper receiver on their most recently acquired MSR.

# Most Recently Acquired MSR: Type of Handguard

**Type of Handguard on MSR**



- The most common type of handguard is a free floating with rails handguard, used by 43% of respondents on their most recently acquired MSR.

**NSSF MSR Consumer Study – Report of Findings**

# Most Recently Acquired MSR: Finish Color



**Finish Color on MSR**

- 3 out of 4 MSR owners have a black finish color.

# Most Recently Acquired MSR: Barrels – Type, Accessories, Length

### Type of Barrel on MSR



### Barrel Length on MSR



### Barrel Accessories on MSR



- Two-thirds of MSR owners have a threaded barrel.

- Most common accessories: flash hider (39%), muzzle brake/compensator (37%)

- 75% have a barrel length of 16–20%

**NSSF MSR Consumer Study – Report of Findings**

# Most Recently Acquired MSR: Operating System, Storage



**Operating System on MSR**

| | |
|---|---|
| Direct gas impingement | 59% |
| Gas piston | 21% |
| Recoil / Blow-back operated | 11% |
| I don't know | 6% |
| Delayed toggle bolt recoil | 1% |
| Other | 1% |

- 59% of MSR owners indicated their most recently acquired MSR is operated by direct gas impingement.

- 67%, or two-thirds, of MSR owners store their MSR secured and unloaded.

**MSR Storage**

| | |
|---|---|
| Secured (e.g., in a safe, lock box, trigger lock) – unloaded | 67% |
| Secured (e.g., in a safe, lock box, trigger lock) - loaded | 19% |
| Unsecured – unloaded | 8% |
| Unsecured - loaded | 5% |

# Most Recently Acquired MSR: Likelihood to Buy a MSR in Next 12 Months



**Likelihood to Buy a MSR in Next 12 Months**

Avg: **6.2**

Scale: 1= Very Unlikely 10=Very Likely

- Average likelihood to buy an MSR in the next 12 months is a 6.2 out of 10, slightly more to the "likely" end of the scale.

- 25%, or one-fourth of respondents, said they are "very likely" to buy an MSR in the next 12 months.

NSSF MSR Consumer Study – Report of Findings

# Most Recently Acquired MSR: Accessories Owned

| | Owned | Plan to buy in next 12 months | Don't own, don't plan to buy |
|---|---|---|---|
| Gun Cleaning Kit | 94% | 9% | 3% |
| Extra Magazines | 87% | 23% | 6% |
| Targets | 84% | 26% | 5% |
| Soft Carrying Case | 84% | 9% | 12% |
| Rifle Sling | 81% | 21% | 8% |
| Gun Safe | 78% | 14% | 13% |
| Rifle Scope | 76% | 23% | 14% |
| Hard Carrying Case | 69% | 12% | 25% |
| Gun Lock | 64% | 4% | 32% |
| Backup sights | 55% | 20% | 31% |
| Bipod | 55% | 21% | 34% |
| Railed Handguard | 54% | 13% | 36% |
| Spotting Scope | 52% | 19% | 31% |
| Mounted Flashlight | 46% | 27% | 36% |
| Trigger Upgrade | 45% | 26% | 39% |
| Range Finder | 43% | 25% | 37% |
| Vertical Fore-grip | 41% | 14% | 49% |
| Stock Upgrade | 37% | 17% | 49% |
| Suppressor/silencer | 19% | 37% | 53% |
| Laser Designator | 17% | 12% | 72% |
| Night Vision/Thermal | 13% | 26% | 67% |
| Other | 6% | 4% | 43% |

- The most common accessories currently owned by MSR owners are gun cleaning kits, extra magazines, targets, and soft carrying case.

- The accessory that MSR owners most frequently said they planned to buy in the next 12 months is a suppressor/silencer.

- Roughly 70% of MSR owners do not own and do not plan to buy a laser designator or night vision/thermal scope in the next 12 months.

NSSF MSR Consumer Study – Report of Findings



Section 3: Modern Sporting Rifle Usage & Activities

**NSSF MSR Consumer Study – Report of Findings**

## MSR Usage and Activities

**Used Your MSR(s) in the last 12 months?**



**MSR Use in Last 12 Months Compared to Previous 12 Months**



**MSR Usage: Number of Times in Last 12 Months**



Avg: **14 occasions**

- 88% of MSR owners used/shot their MSR(s) in the last 12 months. Compared to the 12 months before that, 41% said their MSR use was "about the same." 38% said it was less.

- Of those who used their MSR, the average number of times respondents used it in the last 12 months is 14.

# MSR Usage and Activities: Factors Preventing Usage

**Used MSR As Much As You Would Like in Last 12 Months?**



Yes 25%

No 75%

**Rating: How important are the following in preventing you from using your MSR as much as you'd like?**



| | |
|---|---|
| Lack of ammunition availability | 8.0 |
| Cost of ammunition | 7.8 |
| Not enough free time | 6.2 |
| Distance I must travel for a suitable place to shoot | 4.5 |
| Cost of range fees | 3.4 |
| No one to go with | 3.2 |
| Other | 3.0 |

- 3 out of 4 MSR owners said they did not use their MSR as much as they would like over the past 12 months.

- The most important factors preventing owners from using their MSR more are related to ammunition: lack of availability and cost.

*Scale:*
*1=Not at all important,  10= very important*

**NSSF MSR Consumer Study – Report of Findings**

## MSR Usage and Activities



**MSR Activities in Last 12 Months**

| Activity | % |
|---|---|
| Target shoot at a private range | 54% |
| Target shoot at a public range | 49% |
| Target shoot on my/family land | 32% |
| Target shoot on friends land | 25% |
| While hunting on private land | 24% |
| Competition Shooting (i.e. 3 Gun) | 15% |
| While hunting on public land | 11% |
| At paid course/training academy | 10% |
| While at work (i.e. Law Enforcement, Private Security) | 5% |
| Other | 4% |

- **The most popular activity by MSR owners is target shooting; 54% said they did at a private range, while 49% said they did at a public range.**

# MSR Usage and Activities: Ammunition Used - Type

**Ammo Used (% of MSR Owners Using)**



**Ammo Profile - Average % Breakdown Per MSR Owner**



- Across all MSR owners, roughly 70% of used budget factory loads and premium factory loads in the last 12 months.

- The ammo breakdown per MSR owner shows that 42% of ammo they used in the past 12 months are factory loads/bulk packs.

# MSR Usage and Activities: Ammunition Used - Amount

**Rounds of Ammo Fired Through MSR In Last 12 Months**



**Rounds of Ammo Fired (Grouped)**



- The average number of rounds used by MSR owners in the last 12 months is 907.

- Approximately half of MSR owners fired between 1 and 400 shots in the last 12 months, the other half shooting more than 400 rounds.

# MSR Usage and Activities: Ammunition Used – Projected Amount

**Projected Rounds of Ammo Fired Through MSR In Next 12 Months**



**Projected Rounds of Ammo Fired (Grouped)**



- The average number of rounds that MSR owners project they will fire in the next 12 months is 984.

- Over one-third of MSR owners anticipate firing more than 800 rounds of ammunition in the next 12 months.

# MSR Usage and Activities: Ammunition Quantity Purchased, Kept On Hand

**Quantity of MSR Ammo Typically Purchased**



**Number of MSR Rounds Owned/Kept on Hand**



- When purchasing ammunition, the average number of ammo rounds typically purchased by MSR owners is 637.

- 36% of MSR owners typically purchase between 500–1,999 rounds.

- Nearly half of MSR owners own/keep more than 1,000 rounds on hand.

**NSSF MSR Consumer Study – Report of Findings**

# MSR Usage and Activities: Ammunition Reloads

**Do you reload your own ammunition?**



**Percentage of Ammo Reloaded**



- 6 out of 10 MSR owners do not reload their own ammunition.

- Of the 40% who do, the average percentage of their ammunition they reload is 53%.

NSSF MSR Consumer Study – Report of Findings

# MSR Usage and Activities: Firearms Used



**Firearms Used - Activities**

- **95% of respondents used their MSR to rifle target shoot.**

**NSSF MSR Consumer Study – Report of Findings**

# MSR Usage and Activities: Target Shooting/Hunting

**Typical Distance When Using MSR for Hunting/Target Shooting**



**Target Shooting - Do you generally go alone or with others?**



- The most frequent distance that MSR owners hunt/target shoot at is 100–300 yards.

- 43% generally go target shooting with one other person. 27% go alone.

# Respondent Profile: Favorite Part About Owning MSR

Respondents were asked in an open-ended question to explain their favorite part of owning an MSR. Common themes in answers include:

**FUN/ENJOYMENT OF SHOOTING**
- General enjoyment of shooting; relaxing
- Challenge of target shooting, hunting; improving
- Camaraderie with others, quality time with loved ones
- Ability to customize/building from parts

**EXERCISING FREEDOM/2A RIGHTS**
- Represents freedom and America
- Tradition and history

**EASE OF USE**
- Lightweight
- Low-recoil
- Accurate, versatile
- Instills confidence

**RELIABLE**
- Craftsmanship and engineering
- Peace of mind — excellent for home defense

NSSF MSR Consumer Study – Report of Findings



Section 4: MSR Owner Profiles

**NSSF MSR Consumer Study – Report of Findings**

# Profile: Single MSR Owners vs Multi-MSR Owners



Multiple–MSR owners are relatively more likely to be:

- Ages 55+

- Non–range members

- Those who used MSR 11 or less times in the last 12 months

- Not from a military/law enforcement background

- Those with an income under $65k, though there is fairly even distribution across ranges

- Users of MSR for target shooting

- Those with no kids at home

- Owners of a MSR(s) for home defense purposes

- Those who plan to buy MSR accessories in the next 12 months

# Profile: Range vs Non-Range Member



MSR owners who are shooting range members are relatively more likely to be:

- Owners of multiple MSRs

- Ages 55+

- Occasional users of MSRs – 4 to 11 times times in the last 12 months

- Not from a military/law enforcement background

- Those with an income over $110k

- Users of MSR for target shooting

- Those with no kids at home

- Owners of a MSR(s) for home defense, hunting, competition shooting

- Those who plan to buy MSR accessories in the next 12 months

# Profile: Infrequent vs Avid MSR Users



Avid MSR owners are relatively more likely to be:

- Owners of multiple MSRs

- Ages 55+

- A member of a shooting range

- Not from a military/law enforcement background

- Those with an income over $110k

- Users of MSR for target shooting and hunting

- Those with no kids at home

- Owners of a MSR(s) for home defense, hunting, competition shooting

- Those who recently bought a MSR in 2020 or 2021, plan to buy accessories or a new MSR in the next 12 months

NSSF MSR Consumer Study – Report of Findings

# Profile: Target Shooters vs Hunters



Target shooters and hunters have similar profiles. Hunters are slightly more likely to be:

- Owners of multiple MSRs

- Under 45 years old

- A frequent or avid user of MSRs

- Those without a bachelors degree

- Users of MSR for target shooting and hunting

- Those with kids at home

- Owners of a MSR(s) for home defense, hunting, competition shooting

- Those who are likely to buy a new MSR in the next 12 months

**NSSF MSR Consumer Study – Report of Findings**

# Profile: Owners Who Haven't Used MSR In Last 12 Months



Non–MSR users are relatively more likely to be:

- Owners of multiple MSRs

- Ages 55 & older

- Not a member of a shooting range

- Those with a household income of less than $110k

- Those with no kids at home

- Owners of a MSR(s) for home defense, some hunting

- Those who plan to buy accessories for their MSR in the next 12 months

**NSSF MSR Consumer Study – Report of Findings**

# Profile: Premium Buyers (>$1500 spent on MSR) vs Non-Premium Buyers



Premium MSR buyers are relatively more likely to be:

- Owners of multiple MSRs

- Ages 55 & older

- A member of a shooting range

- Regular users of MSRs, using 4 to 11 times a year

- Those with a household income greater than $110k

- With a bachelors degree or more

- Using MSR for target shooting, competition shooting, and hunting.

- Owners of a MSR(s) for home defense, competition shooting, hunting

- Recent buyers (purchased MSR in 2021 or 2020), high–spenders on accessories ($600+) and very likely to buy new MSR in the next 12 months.

# Profile: Heavily Accessorized (4+ accessories) MSR Owners



Owners of heavily accessorized MSRs are relatively more likely to be:

- Owners of multiple MSRs

- Under 45 years old

- A member of a shooting range

- Frequent/avid users of MSRs

- Those with a household income greater than $110k

- With a bachelors degree or more

- Using MSR for target shooting, competition shooting, and hunting.

- Owners of a MSR(s) for home defense, competition shooting, hunting

- Premium MSR buyers (>$1500 spent on last MSR), high-spenders on accessories ($600+) and very likely to buy new MSR in the next 12 months.

# Profile: Likely MSR buyers



Likely MSR buyers are relatively more likely to be:

- Owners of multiple MSRs

- Under 45 years old

- Frequent/avid users of MSRs

- Those with a household income greater than $110k

- With a bachelors degree or more

- Using MSR for target shooting, competition shooting, and hunting.

- Owners of a MSR(s) for home defense, competition shooting, hunting

- Premium MSR buyers (>$1500 spent on last MSR), high-spenders on accessories ($600+) and very likely to buy new MSR in the next 12 months.

# Profile: Military/Law Enforcement vs Non-Military/Law Enforcement



MSR owners with a military/law-enforcement background are relatively more likely to be:

- Owners of multiple MSRs

- 55 years old or older

- Frequent/avid users of MSRs

- Those with a household income of $65–$110k

- Those without a bachelors degree or more

- Using MSR for competition shooting or work

- Owners of a MSR(s) for home defense or professional/job-related purpose



Section 5: Clusters/Segmentation

# Clusters Analysis/Market Segmentation Explained

A Cluster Analysis is method used in market segmentation to help marketers identify specific consumer groups based on a specific set and sub-set of demographic and specific product usage patterns. Market segmentation means dividing the market into distinct groups of individual segments or clusters with similar wants or needs and behaviors.

A market segment or cluster is a sub-set of a people, in this case, MSR owners with one or more characteristics that cause them to demand similar product and/or services based on qualities of those products — such as usage activity and demographics. A true market segment meets all of the following criteria: it is distinct from other segments (different segments have different needs), it is homogeneous within the segment (exhibits common needs), and responds similarly to market stimulus and media.

In the MSR Study, we used the following variables to establish clusters:
- Age
- Reasons for owning an MSR
- Annual Household Income
- Number of MSRs Owned
- Military/Law-Enforcement Affiliation

NSSF MSR Consumer Study – Report of Findings

# MSR Clusters Summary

| | 1. Law Enforcement & Competition | 2. Casual Hunter | 3. Affluent Gun Enthusiast | 4. Low-Use Home Defense | 5. Hunting Aficionado |
|---|---|---|---|---|---|
| % of owners | 18% | 17% | 23% | 21% | 21% |
| % of MSRs | 24% | 13% | 27% | 11% | 25% |
| Number of MSRs Owned | 3+ | 1 | 3+ | 1 | 3+ |
| Age | Under 45 | Under 45 | 45 to 54 | 55+ | 55+ |
| Reasons for Owning a MSR | Professional use/job-related, competition | Hunting | Competition shooting | Home defense | Hunting |
| Annual Household Income | $65 to $110k | <$65k | >$110k | <$65k | >$110k |
| Military/Law-Enforcement Affiliation | Military/L.E. | Non-Military/L.E. | Non-Military/L.E. | Slightly more Military/L.E. | Slightly more non-Military/L.E. |
| MSR usage frequency (last 12 months) | More than 24 times | 3 times or less | 12 to 23 times | 3 times or less | 4 to 11 times |
| Range Member | Slightly more likely to be a range member | Non-member | Range Member | Non-member | Non-member |
| Education | Slightly more likely to not have a bachelors | No bachelors | Bachelors+ | Both bachelors+/no bachelors | Bachelors+ |
| Introduction to MSRs | Military/job, Other | Family/friends, personal interest | Shooting Range | Media/internet, military/job | Family/friends, personal interest |
| MSR Activities In Last Year | Use MSR for work, competition | Hunting, long-range shooting | Competition shooting | Not Used MSR | Hunting |
| MSR Purchase Behavior | Very likely to buy MSR in next year, premium MSR buyer (>$1500 for MSR), High-spend accessories, heavily accessorized, recent buyer | Very likely to buy MSR in next 12 months, plans on buying accessories | Premium MSR buyer (>$1500), heavily accessorized MSR, high-spend on accessories, recent buyer | Slightly less likely to plan to buy accessories in next year | Recent buyer (obtained MSR in 2020 or 2021) |
| Place of Purchase | Mom & Pop Retail Store | Gun Show | Gun show, custom built | Chain/Big-Box Retail | Bought as kit/custom-built |

**NSSF MSR Consumer Study – Report of Findings**

# MSR Clusters Summary

## Clusters: Makeup of MSR Owners & Total MSRs Owned



|  | % of owners | % of MSRs |
|---|---|---|
| Law Enforcement & Competition | 18% | 24% |
| Younger Casual Hunter | 17% | 13% |
| Affluent Gun Enthusiast | 23% | 27% |
| Low-Use | 21% | 11% |
| Hunting Aficionado | 21% | 25% |

NSSF MSR Consumer Study – Report of Findings

## How to Read Cluster Graphs

In the cluster graphs, the overall MSR sample profile is represented by a value of 0. The index is calculated by dividing the profile of the cluster (percentage of that cluster for a category) by the profile of the total MSR population. An index of 20 means the cluster is 20% more likely to exhibit that behavior or be a part of that group. For examples, MSR owners in Cluster 1 (Law Enforcement & Competition) have an index of 37 for ages under 45 —this means a MSR owner in this cluster is 37% relatively more likely to be under 45 years old compared to the overall MSR user population.

We describe this as a relative measure since it does not account for the percentage of the MSR owner population. Using our previous example, MSR owners in Cluster 1 (Law Enforcement & Competition) have an index of 37 for ages under 45; this does not mean MSR owners under 45 form the majority of Cluster 1, only that they're over–represented compared to the overall MSR owner population.

**NSSF MSR Consumer Study – Report of Findings**

# Cluster 1: Law Enforcement & Competition

*Index (All MSR Owners = 0)*



The **Law Enforcement & Competition** Cluster accounts for 18% of MSR owners. They tend to be:

- Owners of 3+ MSRs

- Under 45 years old

- Avid users of MSR

- From a military/law enforcement background

- Those with income of $65k to $110k

- Users of MSR for work/law, competition shooting

- Those with kids at home

- Very likely to buy new MSR in next 12 months, a premium buyer of MSRS (spending more than $1500 most recently acquired MSR), high–spenders on accessories

NSSF MSR Consumer Study – Report of Findings

# Cluster 2: Casual Hunter

*Index (All MSR Owners = 0)*



The **Casual Hunter** Cluster accounts for 17% of MSR owners. They tend to be:

- Owners of 1 MSR

- Under 45 years old

- Not members of a shooting range

- Casual users, using their MSR 3 times or less in the past 12 months

- Not from a military or law enforcement background

- Those with income less than $65k

- Those without a bachelors degree

- Users of MSRs for hunting and long-range shooting

- Those without kids at home

- Very likely to buy new MSR in next 12 months and plan to buy accessories.

- Owners of MSRs for hunting and self-defense

# Cluster 3: Affluent Gun Enthusiast

*Index (All MSR Owners = 0)*



The **Affluent Gun Enthusiast** Cluster accounts for 23% of MSR owners. They tend to be:

- Owners of 3+ MSR

- 45 to 54 years old

- Members of a shooting range

- Frequent users, using their MSR 12 to 23 times in the last 12 months

- Not from a military or law enforcement background

- Those with income greater than $110k

- Those with a bachelors degree

- Users of MSRs for competition shooting

- Premium MSR Buyers (>$1500 on most recent MSR, heavily accessorized and high spender on accessories

- Owners of MSRs for competition shooting

# Cluster 4: Low-Use Self Defense

*Index (All MSR Owners = 0)*





The **Low-Use Self Defense** Cluster accounts for 21% of MSR owners. They tend to be:

- Owners of 1 MSR

- 55 years old or older

- Not members of a shooting range

- Infrequent users, using their MSR 3 times or less in the last 12 months

- Slightly more likely to be from a military or law enforcement background

- Those with income less than $65k

- Those who did not use their MSR in the last 12 months

- Those with no kids at home

- Less likely to buy new MSR or be a premium buyer

- Owners of MSRs for home defense

# Cluster 5: Hunting Aficionado

*Index (All MSR Owners = 0)*



The **Hunting Aficionado** Cluster accounts for 21% of MSR owners. They tend to be:

- Owners of 3+ MSRs

- 55 years old or older

- Not members of a shooting range

- Occasional MSR users, using their MSR 4 to 11 times in the last 12 months

- Slightly more likely to not be from a military or law enforcement background

- Those with income of greater than $110k

- Those with a bachelors degree

- Those used their MSR for hunting in the last 12 months

- Recent buyers of a MSR (in 2020 or 2021)

- Less likely to buy new MSR or be a premium buyer

- Owners of MSRs for hunting



Section 6: Sample Profile

**NSSF MSR Consumer Study – Report of Findings**

# Respondent Profile: Organizations

**Current Membership or Recent Donation to Organizations**



- When asked what organizations they are a member of or recently donated to, the most-selected organization was the NRA (61%), chosen more than twice as much as any other organization.

- 21% of MSR owners are not members of or recently donated to any organizations listed.

- 12% are members or recently donated to the NSSF.

- Of the 19% who selected "Other" organizations, the most common mentions were:
  - Firearms Policy Coalition
  - Liberal Gun Club/Liberal Gun Owners
  - Second Amendment Foundation
  - National Skeet Shooting Foundation
  - National Sporting Clays Association

Case 1:24-cv-01565-PLF Document 12-5 Filed 07/26/24 Page 196 of 410

# Respondent Profile: Military/Law-Enforcement

**Active or Veteran/Retired Member of Law Enforcement/Military**



**Military/Law Enforcement Affiliation**



| Military/law–enforcement (grouped) | % of those |
|---|---|
| Veteran military | 82% |
| Veteran law enforcement | 26% |
| Active law enforcement | 11% |
| Active military | 9% |

Army (veteran) 34%
Air Force (veteran) 19%
Local Law Enforcement (veteran) 17%
Navy (veteran) 17%
Marines (veteran) 13%
National Guard (veteran) 11%
Reserves (veteran) 9%
Local Law Enforcement (active) 7%
Other Law Enforcement (veteran) 6%
State Law Enforcement (veteran) 6%
Federal Law Enforcement (veteran) 5%
Army (active) 5%
State Law Enforcement (active) 3%
Federal Law Enforcement (active) 3%
National Guard (active) 3%
Other Law Enforcement (active) 2%
Air Force (active) 2%
Coast Guard (veteran) 2%
Reserves (active) 2%
Navy (active) 2%
Marines (active) 2%
Coast Guard (active) 2%
Space Force (active) 2%
Space Force (veteran) 1%

**NSSF MSR Consumer Study – Report of Findings**

# Respondent Profile: Age, Gender

### Gender



Female 2%

Prefer not to answer 2%

Male 96%

### Age



Avg: **55 years**

| Age | % |
|-----|---|
| 18 to 24 | 2% |
| 25 to 34 | 9% |
| 35 to 44 | 17% |
| 45 to 54 | 22% |
| 55 to 64 | 27% |
| 65+ | 24% |

### Race/Ethnicity



| | |
|---|---|
| 88% | White / Caucasian |
| 3% | Multi-racial |
| 3% | Hispanic / Latino |
| 2% | Other |
| 2% | Asian / Pacific Islander |
| 2% | Black / African-American |
| 1% | American Indian / Alaska Native |

- 96% of respondents are Male.

- The average age of respondents is 55 years old. Only 27% are under the age of 45.

- 88% of respondents are White/Caucasian.

# Respondent Profile: Martial Status, Shooting Activities with Spouse



- **74% of respondents are married.**

- **Of these MSR owners, over half (57%) say their spouse accompanies them for target shooting. Nearly a quarter, 24%, say their spouse has no interest in target shooting or firearms.**

**NSSF MSR Consumer Study – Report of Findings**

# Respondent Profile: Education



**Highest Level of Education Completed**

- **45% of respondents have attained at least a bachelors degree (29% have bachelors, 16% post-graduate).**

- **One-quarter of MSR owners have attended some college but did not graduate.**

**NSSF MSR Consumer Study – Report of Findings**

# Respondent Profile: Income



**Estimated Yearly Household Income**

| Income | % |
|---|---|
| Under $25,000 | 3% |
| $25,000 – $35,000 | 3% |
| $35,001 – $45,000 | 5% |
| $45,001 – $55,000 | 6% |
| $55,001 – $65,000 | 6% |
| $65,001 – $75,000 | 7% |
| $75,001 – $85,000 | 7% |
| $85,001 – $95,000 | 6% |
| $95,001 – $110,000 | 11% |
| $110,001 – $150,000 | 15% |
| $150,001 – $200,000 | 10% |
| $200,001 – $250,000 | 5% |
| More than $250,000 | 5% |
| Prefer not to say | 11% |

Avg: **$110,934**

$85k or less: 37%
More than $85k: 52%

- The average yearly household income for respondents is $110,934.

- More than half of MSR owners are in households with an annual income of greater than $85,000.

**NSSF MSR Consumer Study – Report of Findings**

# Respondent Profile: State, Household Children

**Do you have any children living with you?**



Prefer not to answer
3%

Yes
35%

No
62%

- Nearly two–thirds of respondents do not have any children living with them.

- The states with the most respondents are Texas (9%), California (5%), and Florida (5%).

**State**



| | |
|---|---|
| 9% | Texas |
| 5% | California |
| 5% | Florida |
| 4% | Pennsylvania |
| 4% | Michigan |
| 4% | Ohio |
| 4% | Virginia |
| 3% | North Carolina |
| 3% | Washington |
| 3% | Tennessee |
| 3% | Georgia |
| 3% | Arizona |
| 3% | Colorado |
| 3% | Illinois |
| 3% | Indiana |
| 3% | Missouri |
| 2% | Minnesota |
| 2% | New York |
| 2% | Oregon |
| 2% | Wisconsin |
| 2% | South Carolina |
| 2% | Arkansas |
| 2% | Nevada |
| 2% | Kentucky |
| 2% | Oklahoma |
| 2% | Utah |
| 1% | New Jersey |
| 1% | Alabama |
| 1% | Iowa |
| 1% | Kansas |
| 1% | Maryland |
| 1% | Massachusetts |
| 1% | Connecticut |
| 1% | Idaho |
| 1% | Nebraska |

# Respondent Profile: State, Household Children





© 2022 National Shooting Sports Foundation, Inc. All Rights Reserved

# EXHIBIT 16

# NSSF® REPORT 2021 EDITION

# SPORT SHOOTING PARTICIPATION

## IN THE U.S. IN 2020



RESPONSIVE MANAGEMENT

Conducted for the
National Shooting Sports Foundation®
by Responsive Management

NSSF®
The Firearm Industry
Trade Association

# SPORT SHOOTING PARTICIPATION IN THE UNITED STATES IN 2020

**2021**

**Responsive Management National Office**
Mark Damian Duda, Executive Director
Martin Jones, Senior Research Associate
Tom Beppler, Senior Research Associate
Steven J. Bissell, Ph.D., Qualitative Research Associate
Amanda Center, Research Associate
Andrea Criscione, Senior Research Associate
Patrick Doherty, Research Associate
Gregory L. Hughes, P.E., Research Associate
Caroline Gerken, Survey Center Manager
Alison Lanier, Business Manager


130 Franklin Street
Harrisonburg, VA 22801
540-432-1888
Email: mark@responsivemanagement.com
www.responsivemanagement.com

# Sport Shooting Participation in the United States 2009 to 2020: Overview

## Survey Topics

- **Participation in Target and Sport Shooting**
- **Trends in Participation in Target and Sport Shooting**
- **Days of Participation in Target and Sport Shooting**
- **Motivations for Target and Sport Shooting**
- **Demographic Characteristics of Shooters**
- **Characteristics of New Shooters**
- **Traditional and Nontraditional Pathways To Sport Shooting**
- **Initiation Into Target/Sport Shooting**
- **Growing Up With Firearms and Its Effect on Shooting Participation**
- **Nontraditional Shooters**
- **Overlap of Participation in Target Shooting and Hunting**
- **Types of Firearms Used in Target/Sport Shooting and Hunting**
- **Likelihood To Go Target or Sport Shooting in the Future**
- **Reasons for Not Participating in Target or Sport Shooting and Non- Shooters' Demographic Characteristics**
- **Reasons for Not Participating in Hunting**

This study of sport shooting participation in 2020, from a survey completed in March 2021, continues a series of studies that Responsive Management has conducted for the National Shooting Sports Foundation about this topic. Since 2009, these studies have been released every 2 years, allowing an examination of trends in participation in the past decade.

The studies show a fairly steady increase, with one blip in 2016, in the number of shooters in the United States during the course of the surveys, from 34 million in 2009 to 56 million in 2020. Participation in various types of shooting have been tracked, all showing an increase over the course of the studies, with one exception: the 2020 rate of shooting at an *indoor* range fell, a statistically significant difference ($p \leq 0.05$). This is not surprising because of the effects of the COVID-19 pandemic in 2020. (The studies also track participation in the clay shooting games, all of which had small statistically significant increases in participation at the $p \leq 0.05$ level, and long-range shooting, shown in the full report. The 2009 survey did not include questions about shooting at a range.)



**Percent of adult Americans who participated in the following shooting activities.**

\* Statistically significant difference between 2018 and 2020

The studies also found that the pool of hunters and shooters considered as a whole had been increasingly made up of shooters from 2012 to 2018, but then hunters made a slight gain in 2020, albeit hunters who also went target *and* sport shooting—a statistically significant difference ($p \leq 0.05$).



**Percent of all hunters and shooters who participated in target shooting only, hunting only, or both.**

\* Statistically significant difference between 2018 and 2020

# Overview Continued

♦ The 2020 rate of target/sport shooting participation among adults in the United States was 24.1%, which extrapolates to an estimated 56.4 million adults participating in any type of target or sport shooting in 2020. Note that this rate represents just slightly more than half of the people who have a firearm in their household—both Gallup and the Pew Research Center estimate that more than 40% of U.S. households have a firearm.

♦ The rate of participation in nearly every shooting activity is higher in 2020 than in any other year (the exception being target shooting at an *indoor range*, which is slightly down from 2018, a likely result of COVID-19).

♦ Target shooting with a handgun (18.6% participated), target shooting with a rifle (16.8%), target shooting at an *outdoor* range (12.0%), and target shooting with a modern sporting rifle (9.1%) had the highest participation rates. Note that sport shooters could have participated in multiple types of shooting, and they generally did so.

♦ While COVID-19 likely had an effect on established sport shooters and hunters (this study did not directly ask established shooters about it), the study showed a definite effect on shooters who first shot in 2020—more than a fifth of them started shooting at least in part because of COVID-19.

♦ The study explored the demographic characteristics of shooters compared to non-shooters. Shooters were more likely to be male, particularly young and male, and they were much more rural, relative to non-shooters. While the South has the most shooters of any region, there are no marked differences regionally between shooters and non-shooters.



♦ As with previous studies, this year's survey report examined new shooters—those who started within the past 5 years. The percentage of all shooters (those who shot in 2020) who are identified as *new* shooters is 12%, a rate that is lower than previous years. One reason for the lower rate is that the surges of new shooters in the Presidential election years of 2012 and 2016 are moving through time, and those new shooters in 2012 are no longer new shooters.

♦ New shooters are continuing to be attracted to the sport in nontraditional ways (traditional being a young male being introduced to shooting by family, usually his father, in a rural setting). New shooters, compared to established shooters, are much less likely to go target shooting with a rifle—perhaps the most "traditional" shooting. New shooters are much more likely than established shooters to go to an indoor range. Established shooters are much more likely than new shooters to have grown up around firearms,



as 84% of established shooters grew up in a firearm family, while only 56% of new shooters did. This makes new shooters somewhat different than more "traditional" sport shooters who were introduced to shooting in a family setting.

♦ Further evidence of nontraditional entry into shooting is found in the trend on the importance of self defense as a motivation for shooting—it has continued to rise over the years among new shooters, as shown at left.

♦ Other topics that were explored include the likelihood to go shooting in the next 2 years. Among those who shot in 2020, 19% do not expect to shoot in 2021—which is a substantial challenge for retention programs. Fortunately, 61% are very likely to go in the next 2 years, and another 19% are somewhat likely.

## Acknowledgments

Responsive Management would like to thank Dianne Vrablic and John McNamara of the National Shooting Sports Foundation for their input, support, and guidance on this project.

Although the NSSF partnered with Responsive Management for this report, any errors in the report are the sole responsibility of Responsive Management.

# EXECUTIVE SUMMARY

This 2021 shooting participation report (about participation in 2020) is the latest in a series of studies conducted for the National Shooting Sports Foundation (NSSF) by Responsive Management. The first study was conducted about shooting in calendar year 2009, and then subsequent studies were conducted every two years starting with a look at calendar year 2012. These studies determined regional and national participation rates in target and sport shooting. This study entailed a telephone survey of U.S. residents ages 18 years old and older, using a probability-based random sample that is fully reflective of the U.S. population as a whole.

## METHODOLOGY

Telephones were selected as the preferred sampling mode for several reasons. Past research on surveys by Responsive Management on shooting sports or other outdoor recreation has shown that respondents who do not actively participate in outdoor recreation are more likely to respond to a telephone survey than a mail or online survey, as there is more effort involved in responding via mail or online. Respondents who did not participate in outdoor recreation will readily tell an interviewer verbally that they did not do so, but they are much less motivated to answer even a single survey question on paper and mail it in or go to a web address and respond online. For this reason, surveys that are performed via mail or online have an inherent risk of overestimating participation due to the decreased response from those who did not actively participate.

Furthermore, telephone surveys allow respondents who cannot or will not respond to a mail or online survey to participate. Mail and online surveys systematically exclude those who have difficulty reading. In addition, those with poor or limited internet service or who are intimidated by technology may be reticent to complete a survey online. Finally, telephone surveys also have fewer negative effects on the environment than do mail surveys because of the reduced use of paper, reduced energy consumption for delivering and returning the questionnaires, and reduced quantity of material to be disposed of after the survey.

The NSSF and Responsive Management developed the survey questionnaire cooperatively, based in part on the previous surveys. The telephone survey was computer coded for Responsive Management's computer-assisted telephone interviewing (CATI) process. An important aspect of this process is that the computer controls which questions are asked and allows for immediate data entry. Each telephone survey, however, is administered by a live interviewer. Responsive Management conducted pre-tests of the questionnaire to ensure proper wording, flow, and logic in the survey.

The probability-based random sample was fully reflective of the U.S. population as a whole, and each U.S. resident had an approximately equal chance of being in the sample. The methodology used a dual-frame sample, which consisted of a random sample of landline telephones and a random sample of cell phone numbers, which ensured that all telephone users had an approximately equal chance of being called.

Telephone surveying times were Monday through Friday from 10:00 a.m. to 9:00 p.m., Saturday from noon to 8:00 p.m., and Sunday from 2:00 p.m. to 9:00 p.m., local time. A five-callback design was used to maintain the representativeness of the sample, to avoid bias toward people easy to reach by telephone, and to provide an equal opportunity for all to participate. When a respondent could not be reached on the first call, subsequent calls were placed on different days of the week and at different times of the day. The survey was conducted in February and March

2021 (but note that it asked about participation in 2020). Responsive Management obtained 3,016 completed interviews.

The analysis of data was performed using IBM SPSS Statistics as well as proprietary software developed by Responsive Management. For the entire survey sample, the sampling error is at most plus or minus 1.78 percentage points, at the 95% confidence interval. For some trends, statistical significance is indicated by the notation, $p \leq 0.05$, meaning it is statistically significant at a 95% confidence interval between 2018 and 2020.

## PARTICIPATION IN TARGET AND SPORT SHOOTING

The 2020 rate of target/sport shooting participation among adults in the United States was 24.1%, which extrapolates to an estimated 56.4 million adults participating in any type of target or sport shooting in 2020. The graph below shows that the most popular types were target shooting with a handgun (18.6% participated), target shooting with a rifle (16.8%), and target shooting at an outdoor range (12.0%). The actual numbers of participants are tabulated following the graph.



Target shooting with a modern sporting rifle is separate from target shooting with a rifle (the former is not a subset of the latter).

To put the participation rate of shooting in perspective, that overall participation rate of 24% is well below the percentage of households with firearms, estimated by both Gallup and the Pew Research Center* to be more than 40%. Comparatively, Responsive Management has also found that approximately 42% of Americans either own a firearm or live in a household with a firearm. While the percentage of households and the percentage of people are not the same—because all households are not the same size—the Gallup, Pew, and Responsive Management estimates are close to each other at approximately 40%. Therefore, it is reasonable to assume that well more than 24% of people are in a household with access to a firearm. Removing the approximately 60% of households that do not have a firearm, the participation rate means that a little more than

half of people with access to a firearm went shooting in 2020. (*See the body of the report for full references of these studies.)

**National Participation in Target and Sport Shooting in 2020**

| Activity | Estimated Total Participants (ages 18 years and older) | 95% Confidence Interval | |
|---|---|---|---|
| | | Lower Limit | Upper Limit |
| **National** | | | |
| Any target shooting or sport shooting | 56,449,334 | 53,036,385 | 59,862,282 |
| Target shooting with a rifle | 39,370,514 | 35,750,187 | 42,990,841 |
| Target shooting with a modern sporting rifle | 21,313,424 | 18,392,021 | 24,234,827 |
| Target shooting with a handgun | 43,552,855 | 40,840,286 | 46,265,424 |
| Trap shooting | 13,047,994 | 10,412,883 | 15,683,105 |
| Skeet shooting | 15,469,568 | 13,893,692 | 17,045,444 |
| Sporting clays | 16,870,119 | 14,887,464 | 18,852,775 |
| Any clay | 23,200,498 | 21,694,090 | 24,706,905 |
| Target shooting at an outdoor range | 28,165,580 | 26,567,510 | 29,763,649 |
| Target shooting at an indoor range | 14,664,740 | 13,066,670 | 16,262,810 |
| 3-gun shooting | 5,187,494 | 3,119,612 | 7,255,377 |
| Long-range shooting | 10,870,784 | 9,135,842 | 12,605,727 |

Target shooting with a modern sporting rifle is separate from target shooting with a rifle (the former is not a subset of the latter).

## TRENDS IN PARTICIPATION IN TARGET AND SPORT SHOOTING

The 2020 adult participation rate in target/sport shooting overall was 24.1%, an increase over the 15.1% rate among adult Americans in 2009 and slightly higher than the 2018 rate of 22.2% (the difference between 2018 and 2020 is not statistically significant). The rate of participation in nearly every shooting activity is higher in 2020 than in any other year, as shown in the next two graphs. The exception is *target shooting at an indoor range*, which is significantly down from 2018 ($p \le 0.05$). On the graphs, statistical significance between 2018 and 2020 is indicated by asterisks; six of the nine differences are statistically significant ($p \le 0.05$).



*Statistically significant difference between 2018 and 2020.
Target shooting with a modern sporting rifle is separate from target shooting with a rifle (the former is not a subset of the latter).



**Percent of adult Americans who participated in the following shooting activities. (Part 2)**

No data on shooting in an indoor or outdoor range and on long-range shooting were gathered in 2009.
*Statistically significant difference between 2018 and 2020.

There were higher numbers in 2020 compared to 2018 for every shooting activity.

| Activity | Estimated Total Participants (ages 18 years old and older) | | | | | | % Change Compared to 2018 |
|---|---|---|---|---|---|---|---|
| **National** | **in 2009** | **in 2012** | **in 2014** | **in 2016** | **in 2018** | **In 2020** | |
| Any target shooting or sport shooting | 34,382,566 | 40,779,651 | 51,226,765 | 49,361,637 | 52,073,224 | 56,449,334 | +8.4 |
| Target shooting with a rifle | 24,045,795 | 26,822,425 | 31,764,116 | 27,949,753 | 32,169,412 | 39,370,514 | + 22.4 |
| Target shooting with a modern sporting rifle | 8,868,085 | 11,976,702 | 16,267,924 | 13,986,528 | 18,327,314 | 21,313,424 | +16.3 |
| Target shooting with a handgun | 22,169,700 | 28,209,283 | 34,221,107 | 33,276,976 | 38,182,610 | 43,552,855 | +14.1 |
| Skeet shooting | 6,979,680 | 12,090,346 | 12,596,361 | 8,626,450 | 11,563,358 | 15,469,568 | +33.8 |
| Trap shooting | 7,582,479 | 10,116,684 | 11,227,278 | 7,855,875 | 10,227,286 | 13,047,994 | +27.6 |
| Sporting clays | 8,399,989 | 8,789,340 | 13,033,633 | 10,545,394 | 13,174,752 | 16,870,119 | +28.0 |
| Any clay shooting | 11,597,841 | 17,758,371 | 18,396,758 | 15,792,273 | 18,765,126 | 23,200,498 | +23.6 |
| Long-range shooting | na | 9,972,991 | 10,434,630 | 8,881,155 | 9,272,382 | 10,870,784 | +17.2 |
| 3-gun shooting | na | 4,127,049 | 3,837,132 | 3,902,990 | 4,020,531 | 5,187,494 | +29.0 |

Target shooting with a modern sporting rifle is separate from target shooting with a rifle (the former is not a subset of the latter).

## DAYS OF PARTICIPATION IN TARGET AND SPORT SHOOTING

The tabulation at the right shows the mean and median days spent in the various shooting activities, among those who participated in each activity. Nationally, the highest mean days of participation is in target shooting with a handgun, followed closely by target shooting with a modern sporting rifle, long-range shooting, and target shooting with a traditional rifle.

| Activity | Mean Days Spent on Activity in 2020 | Median Days Spent on Activity in 2020 |
|---|---|---|
| **National** | | |
| Target shooting with a traditional rifle | 11.90 | 5 |
| Target shooting with a modern sporting rifle | 12.69 | 5 |
| Target shooting with a handgun | 13.58 | 5 |
| Trap shooting | 9.92 | 5 |
| Skeet shooting | 7.42 | 4 |
| Sporting clays | 7.74 | 4 |
| 3-gun shooting | 8.71 | 4 |
| Long-range shooting | 11.98 | 5 |
| Shooting at a range | 9.64 | 4 |

## MOTIVATIONS FOR TARGET AND SPORT SHOOTING



Social/recreational reasons top the list of motivations. However, they are closely followed in the ranking by utilitarian reasons: for self defense and to prepare for hunting. (The graph is ranked by the percentage saying *very* important.)

## DEMOGRAPHIC CHARACTERISTICS OF SHOOTERS

Shooters were much more likely to be male than were non-shooters: 71% of 2020 shooters were male, whereas only 41% of non-shooters were male. This means that slightly more than a quarter of shooters were female (28%). Shooters in 2020 tended to be younger than non-shooters. Sport shooters were much less urban and much more rural than were non-shooters in 2020. Finally, the Northeast Region was just slightly less associated with target/sport shooting participation: the Northeast made up only 16% of shooters, but it made up 19% of non-shooters.

## CHARACTERISTICS OF NEW SHOOTERS

New shooters were defined as those who started shooting within the past 5 years. For calendar year 2020, new shooters made up 12% of sport shooters, having been initiated into the shooting sports within the previous 5 years. This is the lowest percentage since 2012 when the surveys started tracking this. One reason for this is that the surge in shooting participation of a decade ago—when many new shooters were attracted to the sport—is moving through time, and those new shooters in 2012 are no longer new shooters. If they stuck with it, they are now established shooters. Note that the definition of new shooter uses a 5-year timeframe *from the date of each survey*.

Once they were thus defined, new shooters were compared to established shooters to see how they differ. New shooters tend to be less "traditional" than established shooters—meaning that they are less of the traditional type (the traditional type being white, male, rural, and initiated into shooting in a family setting).

Regarding the types of firearms used by the two groups, established shooters have a markedly higher percentage using each type of equipment, although the two groups are closest together in handgun use. In particular, established shooters have a much higher rate of use of a traditional rifle, shotgun, and modern sporting rifle, compared to new shooters. New shooters are much less likely than established shooters to have grown up around firearms. Only 56% of new shooters grew up in a firearm family, while 84% of established shooters did.

Several other demographic characteristics point toward nontraditional participation among new shooters, who are more likely to be female than are established shooters. New shooters are more likely to be non-white than are established shooters, and they are more likely to be urban/suburban than are established shooters.

Motivations for sport shooting were also examined in this comparison of new and established sport shooters. For each reason with two exceptions, established shooters have a higher percentage saying that it is a *very* important reason for shooting, particularly shooting for sport and recreation, to prepare for hunting, and to mentor a new shooter. The exceptions are self defense and as part of a job, both of which are nearly equal between the two groups.

The trends suggest that shooting for self defense remains high among new shooters (it went up markedly in 2018). On the other hand, shooting to be with family and friends is down in importance among new shooters, relative to previous years.

Finally, this section's final analysis has multiple demographic characteristics on a single graph, which shows those characteristics that are associated with being a new shooter. Black/African-American and Hispanic/Latino shooters are correlated with being a new shooter. Other groups

associated with being new to shooting are young shooters, non-hunting shooters, Northeast Region shooters, and female shooters.



## OVERLAP OF PARTICIPATION IN TARGET SHOOTING AND HUNTING

The pie graph below shows the proportions of hunting/shooting participants who went target shooting, hunting with firearms, or both in 2020. The entire pie consists of those who *either* hunted with firearms or went target/sport shooting. Just under half of this pool went target/sport shooting but did not hunt.



The trends analysis found that hunting took a bigger share of the participation breakdown, with *hunting and target shooting* as well as *hunting, but not target shooting* being higher in 2020 than they were in 2018, the former being statistically significant ($p \leq 0.05$). In looking at the entire time period, however, target shooting still has a bigger share now than it did in 2012, at the expense of hunting. Asterisks indicate statistical significance between 2018 and 2020.



*Statistically significant difference between 2018 and 2020.

## TYPES OF FIREARMS USED IN TARGET OR SPORT SHOOTING

The following graph shows the percentages of target or sport shooters using various types of firearms (in total, 24.1% of all adult U.S. residents went target or sport shooting). At the top of the list are handguns and traditional rifles—both used by two thirds or more of sport shooters. This is followed by shotguns, being used by just more than half, and modern sporting rifles, used by a bit less than half.



## NONTRADITIONAL SHOOTERS

There are seven characteristics that were used to identify nontraditional shooters, as presented in the table below. Each variable was made to be dichotomous, meaning each had two sides: a variable had either a traditional or nontraditional side. Most of these characteristics were based on a single survey question, but two characteristics were based on the results of multiple questions. The characteristics and the question responses on which they are based are shown in the tabulation that follows.

| Nontraditional Characteristic | Question Used as Basis |
|---|---|
| Not growing up in a household with a firearm that was actively used at least two times per year | When you were growing up, did your family own any firearms? |
| | (IF YES) When you were growing up, about how many times per year did someone in your family use the firearm for target shooting? |
| Did not shoot until an adult | How old were you when you first went target shooting? |
| First experienced shooting with a handgun or a modern sporting rifle | Which of the following firearms did you use when you first learned how to target shoot? |
| Not mentored by a father or other close male relative | Did you have a person or group who taught you how to shoot? |
| | (IF YES) Who or which group taught you? |
| Ethnically non-white | What races or ethnic backgrounds do you consider yourself? Please mention all that apply. |
| Female | Respondent's gender. |
| Urban/suburban | Do you consider your place of residence to be a large city or urban area, a suburban area, a small city or town, a rural area on a farm or ranch, or a rural area not on a farm or ranch? |

For the purposes of this analysis, a respondent was nontraditional if four of the seven characteristics were nontraditional—in other words, if more than half of the characteristics were in the nontraditional side of the dichotomy. In the sample of shooters, 28% had at least four of the seven variables in the nontraditional side; 72% of shooters were considered traditional. These two groups (traditional and nontraditional shooters) were then crosstabulated by region, by their reasons for shooting, by what shooting activities they did, by the types of firearms they shot, and by the number of days that they did various shooting activities.

The findings suggest that the Northeast and South Regions have the highest percentages of shooters who are nontraditional shooters.

Nontraditional shooters are less concerned about being with family and friends when they shoot, compared to traditional shooters. They also put less importance on shooting for sport and recreation, to prepare for hunting, and to mentor a new shooter. They are about the same in the importance of training for self defense.

Nontraditional shooters are target shooting with handguns at a slightly higher rate than traditional shooters. Also, they are shooting in indoor ranges at a much higher rate than traditional shooters.

Nontraditional shooters tend to shoot fewer days than traditional shooters. They have a lower mean number of days for each type of shooting.

## LIKELIHOOD TO GO TARGET OR SPORT SHOOTING IN THE FUTURE

Among adult Americans overall, those who shot as well as those who did not shoot, 23% say that it is *very* likely that they will go shooting in the next 2 years. In looking at the percentages among those who shot and those who did not, 61% of those who shot in 2020 are *very* likely, while only 12% of those who did not shoot in 2020 are *very* likely to go shooting in the next 2 years.

Demographic analyses compared those who say that they are *very* likely to those who are *not at all* likely, thereby giving some insight into these people. (Those who are *somewhat* likely were dropped out of this analysis.) These crosstabulations on likelihood were then run on those who did not shoot in 2020 and then those who shot in 2020.

The first analysis is among those who did *not* go shooting in 2020, comparing those who say that they are *very* likely to go shooting versus those who say that they are *not at all likely* to go shooting in the next 2 years. Among those who did not go shooting in 2020, men show a little more interest in target/sport shooting than women.

Among those who did *not* go shooting in 2020, men show a little more interest in target/sport shooting. Men make up 58% of those *very* likely to shoot but only 37% of those *not at all* likely to shoot in the next 2 years (note that this is among non-shooters in 2020). Middle-aged people have a greater propensity to say that they are *very* likely to go target/sport shooting in the next 2 years, compared to either the youngest category or the oldest category.

Among non-shooters, rural and small city/town residency is positively correlated with being *very* likely to go shooting in the next 2 years. Regionally, the West shows a slightly greater percentage in the *very*-likely-to-shoot category.

Note that the above looked at those who had *not* participated in target or sport shooting in 2020. Those who *had* participated in 2020 were also analyzed. Of 2020 shooting participants, 61% are *very* likely to go shooting in the next 2 years. The same demographic analyses were run comparing those who are *very* likely to those who are *not at all* likely (again ignoring the *somewhat* likely).

The gender crosstabulation found that women appear to be more likely to drop out of target/sport shooting: females make up only 24% of those who had shot in 2020 and are *very* likely to continue (i.e., shoot in the next 2 years), while they make up 37% of those who had shot in 2020 but are likely to quit (i.e., not at all likely to shoot in the next 2 years). The age crosstabulation does not show consistent differences in one direction or the other; however, when combining age and gender, older females have a disproportionate share of the group that plans to quit.

The place-of-residence crosstabulation found that rural areas and small cities/towns have a higher representation of 2020 shooters who are *not at all* likely to go shooting, compared to those shooters who plan to continue shooting in the next 2 years. The regional crosstabulation does not show large differences.

## REASONS FOR NOT PARTICIPATING IN TARGET OR SPORT SHOOTING

Those who did not participate in target/sport shooting were asked about their reasons for not doing so (75.9% of U.S. residents did *not* go target or sport shooting in 2020). Other than lack of interest, important reasons include lack of equipment, COVID-19 (which closed some indoor ranges), lack of time, and age/health.

# TABLE OF CONTENTS

Introduction and Methodology ...................................................................................................1
    Use of Telephones for the Survey .........................................................................................1
    Questionnaire Design ............................................................................................................1
    Survey Sample.......................................................................................................................2
    Telephone Interviewing Facilities .........................................................................................2
    Interviewing Dates and Times...............................................................................................2
    Telephone Survey Data Collection and Quality Control.........................................................3
    Data Analysis.........................................................................................................................3
    Sampling Error .......................................................................................................................4
    Additional Information About the Presentation of Results in the Report ...............................5
Survey Results ..........................................................................................................................6
    Participation in Target and Sport Shooting .............................................................................6
    Trends in Participation in Target and Sport Shooting ...........................................................11
    Effect of COVID-19 on Initiation Into Sport Shooting Participation ...................................13
    Days of Participation in Target and Sport Shooting..............................................................14
    Motivations for Target and Sport Shooting..........................................................................25
    Demographic Characteristics of Shooters ...........................................................................29
    Characteristics of New Shooters ..........................................................................................37
    Traditional and Nontraditional Pathways To Sport Shooting ...............................................56
        Initiation Into Target/Sport Shooting ..............................................................................56
        Growing Up With Firearms and Its Effect on Shooting Participation.........................62
        Nontraditional Shooters ...................................................................................................72
    Overlap of Participation in Target Shooting and Hunting......................................................84
    Types of Firearms Used in Target/Sport Shooting................................................................86
    Likelihood To Go Target or Sport Shooting in the Future.....................................................89
    Reasons for Not Participating in Target or Sport Shooting in 2020 and Non-Shooters'
        Demographic Characteristics........................................................................................100
    Reasons for Not Participating in Hunting in 2020 ..............................................................107
About Responsive Management ..............................................................................................108

# INTRODUCTION AND METHODOLOGY

This 2021 shooting participation report (about participation in 2020) is the latest in a series of studies conducted for the National Shooting Sports Foundation (NSSF) by Responsive Management. The first study was conducted about shooting in calendar year 2009, and then subsequent studies were conducted every two years starting with a look at calendar year 2012. These studies determined regional and national participation rates in target and sport shooting. Following the methodology of previous studies, this study entailed a telephone survey of U.S. residents ages 18 years old and older, using a probability-based random sample that is fully reflective of the U.S. population as a whole. Specific aspects of the research methodology are discussed below.

## USE OF TELEPHONES FOR THE SURVEY

Telephones were selected as the preferred sampling mode for several reasons. Past research on surveys by Responsive Management on shooting sports or other outdoor recreation has shown that respondents who do not actively participate in outdoor recreation are more likely to respond to a telephone survey than a mail or online survey, as there is more effort involved in responding via mail or online. Respondents who did not participate in outdoor recreation will readily tell an interviewer verbally that they did not do so, but they are much less motivated to answer even a single survey question on paper and mail it in or go to a web address and respond online. For this reason, surveys performed via mail or online have an inherent risk of overestimating participation due to the decreased response from those who did not actively participate.

Furthermore, telephone surveys allow respondents who cannot or will not respond to a mail or online survey to participate. Mail and online surveys systematically exclude those who have difficulty reading. In 2016, the U.S. Department of Education's National Institute of Literacy estimated that up to 43% of the general population of the United States cannot read beyond a "basic level," suggesting that many might be reticent to complete a mail or online survey they must read to themselves. In addition, those with poor or limited internet service or who are intimidated by technology may be reticent to complete a survey online. In a telephone survey, however, a live interviewer reads the survey questions, clarifies them if necessary, and assists the respondent with completing the survey, which reduces bias and increases response to the survey.

Finally, telephone surveys also have fewer negative effects on the environment than do mail surveys because of the reduced use of paper, reduced energy consumption for delivering and returning the questionnaires, and reduced quantity of material to be disposed of after the survey.

## QUESTIONNAIRE DESIGN

The NSSF and Responsive Management developed the survey questionnaire cooperatively, based in part on the previous surveys. As in those previous surveys on sport shooting participation, the survey used a ruse line of questioning at the beginning of the survey. This was done because the main objective of the survey was to determine national and regional participation rates in the shooting sports, and the survey was worded to avoid bias that would arise from the tendency for those who do *not* shoot to refuse to participate in a survey about shooting. Therefore, the survey starts by asking about some general activities, mixing shooting and hunting participation in with participation in other non-shooting activities.

The telephone survey was computer coded for Responsive Management's computer-assisted telephone interviewing (CATI) process. An important aspect of this process is that the computer

controls which questions are asked and allows for immediate data entry. Each telephone survey, however, is administered by a live interviewer. Responsive Management conducted pre-tests of the questionnaire to ensure proper wording, flow, and logic in the survey.

## SURVEY SAMPLE

The probability-based random sample was fully reflective of the U.S. population as a whole, and each U.S. resident had an approximately equal chance of being in the sample. The methodology used a dual-frame sample, which consisted of a random sample of landline telephones and a random sample of cell phone numbers, which ensured that all telephone users had an approximately equal chance of being called. The scientific sampling plan entailed obtaining a target number of interviews in each state, from both landlines and cell phones, so that the number of respondents in each state in the sample would be proportional to the state's population and, by extension, within the United States population as a whole.

The probability-based sample was obtained from Marketing Systems Group, a company that specializes in providing scientifically valid telephone survey samples. The overall sample with landlines and cell phones was representative of all Americans 18 years old and older.

## TELEPHONE INTERVIEWING FACILITIES

For this survey, a combination of in-house and home-based calling was conducted. Responsive Management has a central surveying site that allows for rigorous quality control over the interviews and data collection staffed by interviewers with experience conducting computer-assisted surveys. Survey Center Managers monitor these in-house calls. Typically, all calling is done from Responsive Management's in-house telephone interviewing facilities. However, due to coronavirus distancing, some interviewers conducted the surveys from their home locations, as well. Nonetheless, Survey Center Managers were able to remotely monitor these home-based interviews in real time and provide rigorous quality control over the interviews and data collection.

To further ensure the integrity of the telephone survey data, Responsive Management has interviewers who have been trained according to the standards established by the Council of American Survey Research Organizations. Methods of instruction included lecture and role-playing. The Survey Center Managers and other professional staff conducted a conference call briefing with the interviewers prior to the administration of this survey. Interviewers were instructed on type of study, study goals and objectives, handling of survey questions, interview length, termination points and qualifiers for participation, interviewer instructions within the survey questionnaire, reading of the survey questions, skip patterns, and probing and clarifying techniques necessary for specific questions on the survey questionnaire.

## INTERVIEWING DATES AND TIMES

Telephone surveying times were Monday through Friday from 10:00 a.m. to 9:00 p.m., Saturday from noon to 8:00 p.m., and Sunday from 2:00 p.m. to 9:00 p.m., local time. A five-callback design was used to maintain the representativeness of the sample, to avoid bias toward people easy to reach by telephone, and to provide an equal opportunity for all to participate. When a respondent could not be reached on the first call, subsequent calls were placed on different days of the week and at different times of the day. The survey was conducted in February and March 2021; note that the report shows participation in 2020. Responsive Management obtained 3,016 completed interviews.

## TELEPHONE SURVEY DATA COLLECTION AND QUALITY CONTROL

As previously mentioned, CATI software was used for data collection. The survey data were entered into the computer as each interview was being conducted, eliminating manual data entry after the completion of the survey and the concomitant data entry errors that may occur with manual data entry. The survey questionnaire was programmed so that CATI branched, coded, and substituted phrases in the survey based on previous responses to ensure the integrity and consistency of the data collection. As indicated previously, each telephone survey was administered by a live interviewer; the CATI software only directs the interviewer to the proper questions, depending on previous responses given in the survey, but the interviewer reads the questions to the respondent.

The Survey Center Managers and statisticians monitored the data collection, including monitoring of the actual telephone interviews without the interviewers' knowledge to evaluate the performance of each interviewer and ensure the integrity of the data. The survey questionnaire itself contained error checkers and computation statements to ensure quality and consistent data. After the surveys were obtained by the interviewers, the Survey Center Managers and/or statisticians checked each completed survey to ensure clarity and completeness.

## DATA ANALYSIS

The analysis of data was performed using IBM SPSS Statistics as well as proprietary software developed by Responsive Management. There were set goals for the numbers of interviews in each state. In the raw data, the demographic breakdown of the resulting sample was very close to the reported demographic breakdown of the population as a whole in each state, according to U.S. Census data. However, the results were slightly weighted by age, gender, and race/ethnicity to be exactly proportional to the total population of each region (U.S. Census Bureau regions, which are those also used by the U.S. Fish and Wildlife Service) and of the United States as a whole.

On open-ended questions, after the data were obtained, analysts reviewed each written response to assign it to the appropriate response category. Overall, analysts assigned approximately 1,000 written comments into response categories to be quantified on "Multiple Responses Allowed" graphs. (The different types of questions are defined on page 5.)

In the analysis, each state was sampled proportionately to preserve proper distribution within each region and in the U.S. as a whole. The analysis was conducted on a regional basis and on the U.S. as a whole, but not at the state level. The number of completed interviews from each state is shown in the tabulation that follows.

As mentioned, the states were grouped into regions to aid in comparison and analysis. The four main U.S. Census Bureau regions were used, as shown on the map on the following page from the U.S. Census Bureau website.

**Completed Interviews by State, 2021 Survey**

| State of Residence | Completed Interviews | State of Residence | Completed Interviews | State of Residence | Completed Interviews |
|---|---|---|---|---|---|
| Alabama | 50 | Louisiana | 45 | Ohio | 97 |
| Alaska | 36 | Maine | 27 | Oklahoma | 36 |
| Arizona | 64 | Maryland | 57 | Oregon | 54 |
| Arkansas | 66 | Massachusetts | 69 | Pennsylvania | 133 |
| California | 159 | Michigan | 99 | Rhode Island | 11 |
| Colorado | 52 | Minnesota | 52 | South Carolina | 48 |
| Connecticut | 38 | Mississippi | 51 | South Dakota | 44 |
| Delaware | 11 | Missouri | 58 | Tennessee | 65 |
| Florida | 160 | Montana | 50 | Texas | 120 |
| Georgia | 96 | Nebraska | 18 | Utah | 47 |
| Hawaii | 15 | Nevada | 34 | Vermont | 24 |
| Idaho | 36 | New Hampshire | 30 | Virginia | 99 |
| Illinois | 113 | New Jersey | 87 | Washington | 81 |
| Indiana | 63 | New Mexico | 20 | West Virginia | 33 |
| Iowa | 30 | New York | 138 | Wisconsin | 57 |
| Kansas | 30 | North Carolina | 95 | Wyoming | 39 |
| Kentucky | 42 | North Dakota | 30 | Washington D.C. | 7 |
| | | | | TOTAL | 3,016 |



On questions that asked respondents to provide a number (e.g., number of days target shooting), graphs or tables may show ranges of numbers rather than the precise numbers. Nonetheless, in the survey each respondent provided a precise number, and the dataset includes this precise number, even if the graph shows only ranges of numbers. Note that the calculation of means and medians used the precise numbers that the respondents provided.

## SAMPLING ERROR

Throughout this report, findings of the telephone survey are reported at a 95% confidence interval. For the entire sample, the sampling error is at most plus or minus 1.78 percentage points. This means that if the survey were conducted 100 times on different samples that were selected in the same way, the findings of 95 out of the 100 surveys would fall within plus or minus 1.78 percentage points of each other. Sampling error was calculated using the formula

described below, with a sample size of 3,016 and a population size of 255,200,373 United States residents 18 years old and older (population data obtained from the U.S. Census Bureau).

**Sampling Error Equation**

$$B = \left( \sqrt{\dfrac{\dfrac{N_p(.25)}{N_s} - .25}{N_p - 1}} \right)(1.96)$$

Where:    B = maximum sampling error (as decimal)
          $N_P$ = population size (i.e., total number who could be surveyed)
          $N_S$ = sample size (i.e., total number of respondents surveyed)

Derived from formula: p. 206 in Dillman, D. A. 2000. *Mail and Internet Surveys*. John Wiley & Sons, NY.

**Note**: This is a simplified version of the formula that calculates the <u>maximum</u> sampling error using a 50:50 split (the most conservative calculation because a 50:50 split would give maximum variation).

## ADDITIONAL INFORMATION ABOUT THE PRESENTATION OF RESULTS IN THE REPORT

In examining the results, it is important to be aware that the questionnaire included several types of questions:

- Single response questions: Some questions allow only a single response.
- Multiple response questions: Other questions allow respondents to give more than one response or choose all that apply. Those that allow more than a single response are indicated on the graphs with the label, "Multiple Responses Allowed."
- Closed-ended questions have an answer set from which to choose.
- Open-ended questions are those in which no answer set is presented to the respondents; rather, they can respond with anything that comes to mind from the question.
- Scaled questions: Many closed-ended questions (but not all) are in a scale, such as one that ranges from very important to not at all important.
- Series questions: Many questions are part of a series, and the results are primarily intended to be examined relative to the other questions in that series (although results of the questions individually can also be valuable). Typically, results of all questions in a series are shown together.

Results are shown for nationwide results, followed by regional crosstabulations. Several other crosstabulations are presented as well; for example, additional crosstabulations have been run to further evaluate the characteristics of new shooters.

In addition, trends graphs are included to show 2020 results alongside results from 2009, 2012, 2014, 2016, and 2018 for comparison. For some trends, statistical significance is indicated by the notation, $p \leq 0.05$, meaning it is statistically significant at a 95% confidence interval between 2018 and 2020.

# SURVEY RESULTS

## PARTICIPATION IN TARGET AND SPORT SHOOTING

The 2020 rate of target/sport shooting participation among adults in the United States was 24.1%, which extrapolates to an estimated 56.4 million adults participating in any type of target or sport shooting in 2020. The graph below shows that the most popular types were target shooting with a handgun (18.6% participated), target shooting with a rifle (16.8%), and target shooting at an outdoor range (12.0%). Respondents could have done multiple shooting activities. The actual numbers of participants are presented in a tabulation following the regional graphs.



Target shooting with a modern sporting rifle is separate from target shooting with a rifle (the former is not a subset of the latter).

To put the participation rate of shooting in perspective, that overall participation rate of 24% is well below the percentage of households with firearms, estimated by both Gallup and the Pew Research Center[1] to be more than 40%. Comparatively, Responsive Management has also found that approximately 42% of Americans either own a firearm or live in a household with a firearm. While the percentage of households and the percentage of people are not the same—because all households are not the same size—the Gallup, Pew, and Responsive Management estimates are close to each other at approximately 40%. Therefore, it is reasonable to assume that well more than 24% of people are in a household with access to a firearm. Removing the approximately 60% of households that do not have a firearm, the participation rate means that a little more than half of people with access to a firearm went shooting in 2020.

---

[1] The Gallup poll was one of its series called, *Gallup Poll Social Series* (one of a dozen polls that encompass this series). The results were downloaded from the Gallup website. The Pew Research Center *Factank* page on its website contains this finding in an article titled "7 facts about guns in the U.S." by J. Gramlich and K. Schaeffer.

Case 1:24-cv-01955-DLF Document 12-6 Filed 07/26/24 Page 228 of 410

The regional graph is presented below, followed by an individual graph for each region with the activities ranked from highest to lowest participation in each region.

Target shooting with a modern sporting rifle is separate from target shooting with a rifle (the former is not a subset of the latter).



Percentage of adult U.S. residents participating in the following sport shooting activities in 2020.
Multiple Responses Allowed
Target shooting with a handgun 14.7
Target shooting with a rifle 14.5
Target shooting at an outdoor range 12.7
Target shooting with a modern sporting rifle 7.1
Skeet shooting 6.1
Sporting clays 6.0
Trap shooting 4.7
Target shooting at an indoor range 4.4
Long-range shooting 3.8
3-gun shooting 1.3
Northeast Region (n=557)
0 20 40 60 80 100
Percent

Percentage of adult U.S. residents participating in the following sport shooting activities in 2020.
Multiple Responses Allowed
Target shooting with a handgun 21.7
Target shooting with a rifle 17.7
Target shooting at an outdoor range 12.7
Target shooting with a modern sporting rifle 9.7
Target shooting at an indoor range 7.3
Sporting clays 6.7
Skeet shooting 6.0
Trap shooting 4.9
Long-range shooting 4.9
3-gun shooting 2.7
South Region (n=1081)
0 20 40 60 80 100
Percent

Percentage of adult U.S. residents participating in the following sport shooting activities in 2020.
Multiple Responses Allowed
Target shooting with a rifle 17.7
Target shooting with a handgun 16.5
Sporting clays 10.6
Target shooting at an outdoor range 10.5
Target shooting with a modern sporting rifle 8.9
Skeet shooting 8.4
Trap shooting 7.7
Long-range shooting 5.1
Target shooting at an indoor range 4.7
3-gun shooting 2.1
Midwest Region (n=691)
0 20 40 60 80 100
Percent

Percentage of adult U.S. residents participating in the following sport shooting activities in 2020.
Multiple Responses Allowed
Target shooting with a handgun 18.4
Target shooting with a rifle 16.3
Target shooting at an outdoor range 11.7
Target shooting with a modern sporting rifle 9.7
Target shooting at an indoor range 7.3
Skeet shooting 6.2
Sporting clays 5.8
Trap shooting 5.3
Long-range shooting 4.3
3-gun shooting 2.2
West Region (n=687)
0 20 40 60 80 100
Percent

The tabulation below and continued on the next page shows estimates of numbers of participants nationally and by region.

**Sport and Target Shooting Participation in 2020**

| Activity | Estimated Total Participants (ages 18 years and older) | 95% Confidence Interval | |
|---|---|---|---|
| | | Lower Limit | Upper Limit |
| **National** | | | |
| Any target shooting or sport shooting | 56,449,334 | 53,036,385 | 59,862,282 |
| Target shooting with a rifle | 39,370,514 | 35,750,187 | 42,990,841 |
| Target shooting with a modern sporting rifle | 21,313,424 | 18,392,021 | 24,234,827 |
| Target shooting with a handgun | 43,552,855 | 40,840,286 | 46,265,424 |
| Trap shooting | 13,047,994 | 10,412,883 | 15,683,105 |
| Skeet shooting | 15,469,568 | 13,893,692 | 17,045,444 |
| Sporting clays | 16,870,119 | 14,887,464 | 18,852,775 |
| Any clay | 23,200,498 | 21,694,090 | 24,706,905 |
| Target shooting at an outdoor range | 28,165,580 | 26,567,510 | 29,763,649 |
| Target shooting at an indoor range | 14,664,740 | 13,066,670 | 16,262,810 |
| 3-gun shooting | 5,187,494 | 3,119,612 | 7,255,377 |
| Long-range shooting | 10,870,784 | 9,135,842 | 12,605,727 |
| **Northeast Region** | | | |
| Any target shooting or sport shooting | 9,097,190 | 7,741,330 | 10,453,050 |
| Target shooting with a rifle | 6,240,817 | 5,134,599 | 7,347,036 |
| Target shooting with a modern sporting rifle | 3,058,183 | 1,964,470 | 4,151,896 |
| Target shooting with a handgun | 6,327,829 | 5,311,196 | 7,344,463 |
| Trap shooting | 2,038,576 | 1,458,666 | 2,618,486 |
| Skeet shooting | 2,624,426 | 1,951,780 | 3,297,073 |
| Sporting clays | 2,577,176 | 1,999,215 | 3,155,138 |
| Any clay | 3,543,820 | 2,900,855 | 4,186,785 |
| Target shooting at an outdoor range | 5,471,671 | 4,702,305 | 6,241,038 |
| Target shooting at an indoor range | 1,879,418 | 1,110,051 | 2,648,784 |
| 3-gun shooting | 570,826 | -62,998 | 1,204,650 |
| Long-range shooting | 1,641,769 | 1,320,464 | 1,963,073 |
| **South Region** | | | |
| Any target shooting or sport shooting | 22,312,988 | 20,203,738 | 24,422,237 |
| Target shooting with a rifle | 15,315,607 | 13,448,246 | 17,182,967 |
| Target shooting with a modern sporting rifle | 8,440,521 | 6,808,043 | 10,072,999 |
| Target shooting with a handgun | 18,792,191 | 17,155,937 | 20,428,445 |
| Trap shooting | 4,291,699 | 3,177,560 | 5,405,837 |
| Skeet shooting | 5,244,559 | 4,012,122 | 6,476,996 |
| Sporting clays | 5,837,622 | 4,929,657 | 6,745,588 |
| Any clay | 7,870,720 | 6,904,016 | 8,837,425 |
| Target shooting at an outdoor range | 10,983,904 | 9,705,219 | 12,262,589 |
| Target shooting at an indoor range | 6,355,506 | 5,076,820 | 7,634,191 |
| 3-gun shooting | 2,321,729 | 1,207,112 | 3,436,345 |
| Long-range shooting | 4,290,187 | 3,556,944 | 5,023,430 |

Target shooting with a modern sporting rifle is separate from target shooting with a rifle (the former is not a subset of the latter).

**Sport and Target Shooting Participation in 2020 (continued)**

| Activity | Estimated Total Participants (ages 18 years and older) | 95% Confidence Interval | |
|---|---|---|---|
| | | Lower Limit | Upper Limit |
| **Midwest Region** | | | |
| Any target shooting or sport shooting | 12,079,399 | 10,469,587 | 13,689,210 |
| Target shooting with a rifle | 8,972,381 | 7,623,916 | 10,320,845 |
| Target shooting with a modern sporting rifle | 4,530,966 | 3,273,715 | 5,788,217 |
| Target shooting with a handgun | 8,395,933 | 7,141,633 | 9,650,233 |
| Trap shooting | 3,888,574 | 3,176,066 | 4,601,082 |
| Skeet shooting | 4,270,088 | 3,357,379 | 5,182,798 |
| Sporting clays | 5,372,741 | 4,605,361 | 6,140,121 |
| Any clay | 6,987,896 | 6,416,403 | 7,559,389 |
| Target shooting at an outdoor range | 5,349,964 | 4,420,449 | 6,279,479 |
| Target shooting at an indoor range | 2,405,192 | 1,475,677 | 3,334,707 |
| 3-gun shooting | 1,080,111 | 305,182 | 1,855,039 |
| Long-range shooting | 2,611,000 | 2,071,328 | 3,150,673 |
| **West Region** | | | |
| Any target shooting or sport shooting | 12,909,761 | 11,257,308 | 14,562,213 |
| Target shooting with a rifle | 8,825,030 | 7,427,155 | 10,222,905 |
| Target shooting with a modern sporting rifle | 5,247,719 | 3,870,919 | 6,624,518 |
| Target shooting with a handgun | 9,938,448 | 8,657,346 | 11,219,550 |
| Trap shooting | 2,857,710 | 2,239,779 | 3,475,640 |
| Skeet shooting | 3,359,131 | 2,312,796 | 4,405,466 |
| Sporting clays | 3,134,134 | 2,410,599 | 3,857,670 |
| Any clay | 4,850,254 | 3,929,973 | 5,770,535 |
| Target shooting at an outdoor range | 6,343,711 | 5,267,103 | 7,420,318 |
| Target shooting at an indoor range | 3,962,391 | 2,885,784 | 5,038,998 |
| 3-gun shooting | 1,199,436 | 334,577 | 2,064,294 |
| Long-range shooting | 2,326,071 | 1,867,828 | 2,784,314 |

Target shooting with a modern sporting rifle is separate from target shooting with a rifle (the former is not a subset of the latter).

**TRENDS IN PARTICIPATION IN TARGET AND SPORT SHOOTING**

The 2020 adult participation rate in target/sport shooting overall was 24.1%, an increase over the 15.1% rate among adult Americans in 2009 and slightly higher than the 2018 rate of 22.2% (the difference between 2018 and 2020 is not statistically significant). As shown below, the rate of participation in nearly every shooting activity is higher in 2020 than in any other year. The exception is *target shooting at an indoor range*, which is significantly down from 2018 ($p \leq 0.05$). On the graphs, statistical significance between 2018 and 2020 is indicated by asterisks; six of the nine differences are statistically significant ($p \leq 0.05$).



No data on shooting in an indoor or outdoor range and on long-range shooting were gathered in 2009.
*Statistically significant difference between 2018 and 2020.
Target shooting with a modern sporting rifle is separate from target shooting with a rifle (the former is not a subset of the latter).

The tabulation below shows the number of shooters in the various activities (as opposed to the rate; note that a rate can stay the same but the number of participants can rise, if the total population rises, which it did in the United States throughout the time period). There were higher numbers in 2020 compared to 2018 for every shooting activity.

| Activity | Estimated Total Participants (ages 18 years old and older) | | | | | | % Change Compared to 2018 |
|---|---|---|---|---|---|---|---|
| **National** | **in 2009** | **in 2012** | **in 2014** | **in 2016** | **in 2018** | **In 2020** | |
| Any target shooting or sport shooting | 34,382,566 | 40,779,651 | 51,226,765 | 49,361,637 | 52,073,224 | 56,449,334 | +8.4 |
| Target shooting with a rifle | 24,045,795 | 26,822,425 | 31,764,116 | 27,949,753 | 32,169,412 | 39,370,514 | + 22.4 |
| Target shooting with a modern sporting rifle | 8,868,085 | 11,976,702 | 16,267,924 | 13,986,528 | 18,327,314 | 21,313,424 | +16.3 |
| Target shooting with a handgun | 22,169,700 | 28,209,283 | 34,221,107 | 33,276,976 | 38,182,610 | 43,552,855 | +14.1 |
| Skeet shooting | 6,979,680 | 12,090,346 | 12,596,361 | 8,626,450 | 11,563,358 | 15,469,568 | +33.8 |
| Trap shooting | 7,582,479 | 10,116,684 | 11,227,278 | 7,855,875 | 10,227,286 | 13,047,994 | +27.6 |
| Sporting clays | 8,399,989 | 8,789,340 | 13,033,633 | 10,545,394 | 13,174,752 | 16,870,119 | +28.0 |
| Any clay shooting | 11,597,841 | 17,758,371 | 18,396,758 | 15,792,273 | 18,765,126 | 23,200,498 | +23.6 |
| Long-range shooting | na | 9,972,991 | 10,434,630 | 8,881,155 | 9,272,382 | 10,870,784 | +17.2 |
| 3-gun shooting | na | 4,127,049 | 3,837,132 | 3,902,990 | 4,020,531 | 5,187,494 | +29.0 |

Target shooting with a modern sporting rifle is separate from target shooting with a rifle (the former is not a subset of the latter).

## EFFECT OF COVID-19 ON INITIATION INTO SPORT SHOOTING PARTICIPATION

Among first-time sport shooters in 2020, approximately a quarter (22%) said that the COVID-19 pandemic played a role in their decision to start sport shooting. (There were no first-time sport shooters in the West in the survey sample.)

**You indicated that you target shot for the first time in 2020. Did the COVID-19 pandemic have any effect on your decision to target shoot? (Asked of those who target shot for the first time in 2020.)**

**You indicated that you target shot for the first time in 2020. Did the COVID-19 pandemic have any effect on your decision to target shoot? (Asked of those who target shot for the first time in 2020.)**



## DAYS OF PARTICIPATION IN TARGET AND SPORT SHOOTING

For each type of target or sport shooting, a graph shows the number of days of participation among those who participated. Regional graphs are also included for each activity. Following the graphs is a tabulation showing the mean and median number of days spent participating in the activities.













How many days did you target shoot with a modern sporting rifle in 2020? (Asked of those who went target shooting with a modern sporting rifle in 2020.)
More than 30 days 10
21-30 days 4
11-20 days 12
6-10 days 18
5 days 8
4 days 10
3 days 4
2 days 13
1 day 15
Don't know 6
Mean = 12.69
Median = 5
0 20 40 60 80 100
Percent (n=252)

How many days did you target shoot with a modern sporting rifle in 2020? (Asked of those who went target shooting with a modern sporting rifle in 2020.)
More than 30 days 15 6 24 3
21-30 days 3 5 9 1
11-20 days 9 9 14 14
6-10 days 16 15 12 28
5 days 8 5 11 11
4 days 3 15 1 14
3 days 4 4 3 3
2 days 19 12 11 11
1 day 16 18 10 13
Don't know 8 10 4 1
Mean Median
Northeast: 12.64 5
South: 9.85 4
Midwest: 22.24 10
West: 9.23 5
Northeast Region (n=43)
South Region (n=93)
Midwest Region (n=55)
West Region (n=61)
0 20 40 60 80 100
Percent

How many days did you target shoot with a handgun in 2020? (Asked of those who went target shooting with a handgun in 2020.)
More than 30 days 6
21-30 days 6
11-20 days 15
6-10 days 15
5 days 8
4 days 8
3 days 12
2 days 10
1 day 14
Don't know 5
Mean = 13.58
Median = 5
0 20 40 60 80 100
Percent (n=590)

How many days did you target shoot with a handgun in 2020? (Asked of those who went target shooting with a handgun in 2020.)
More than 30 days 4 5 14 3
21-30 days 5 8 9 3
11-20 days 8 16 17 15
6-10 days 16 13 12 22
5 days 5 8 10 10
4 days 6 9 9 8
3 days 17 15 7 6
2 days 14 9 6 11
1 day 18 11 11 19
Don't know 7 7 4 3
Mean Median
Northeast: 8.55 3
South: 11.34 5
Midwest: 27.98 6
West: 9.07 5
Northeast Region (n=90)
South Region (n=240)
Midwest Region (n=125)
West Region (n=135)
0 20 40 60 80 100
Percent

How many days did you trap shoot in 2020? (Asked of those who went trap shooting in 2020.)
More than 30 days
21-30 days
11-20 days
6-10 days
5 days
4 days
3 days
2 days
1 day
Don't know
6
2
14
17
10
4
9
15
18
5
Mean = 9.92
Median = 5
0
20
40
60
80
100
Percent (n=175)

How many days did you trap shoot in 2020? (Asked of those who went trap shooting in 2020.)
More than 30 days
21-30 days
11-20 days
6-10 days
5 days
4 days
3 days
2 days
1 day
Don't know
Mean Median
Northeast: 10.48 5
South: 7.89 4
Midwest: 11.59 5
West: 9.92 5
Northeast Region (n=31)
South Region (n=59)
Midwest Region (n=51)
West Region (n=34)
11 4 9 2
3 2 4 1
0 6 18 31
35 20 10 10
2 14 9 10
6 5 7 0
3 7 12 13
24 16 15 6
16 21 10 23
0 6 7 3
0
20
40
60
80
100
Percent

How many days did you skeet shoot in 2020? (Asked of those who went skeet shooting in 2020.)
More than 30 days
3
21-30 days
1
11-20 days
15
6-10 days
13
5 days
9
4 days
8
3 days
10
2 days
15
1 day
19
Don't know
7
Mean = 7.42
Median = 4
0
20
40
60
80
100
Percent (n=188)

How many days did you skeet shoot in 2020? (Asked of those who went skeet shooting in 2020.)
More than 30 days
9
5
0
0
21-30 days
2
1
1
1
11-20 days
4
7
17
34
6-10 days
22
11
15
7
5 days
2
15
7
6
4 days
5
7
11
9
3 days
12
7
6
16
2 days
17
14
23
5
1 day
25
21
10
21
Don't know
2
12
10
0
Mean Median
Northeast: 9.09 3
South: 7.25 4
Midwest: 6.76 4
West: 7.13 4
Northeast Region (n=35)
South Region (n=72)
Midwest Region (n=51)
West Region (n=30)
0
20
40
60
80
100
Percent

**How many days did you shoot sporting clays in 2020? (Asked of those who shot sporting clays in 2020.)**

Mean = 7.74
Median = 4

(n=197)

**How many days did you shoot sporting clays in 2020? (Asked of those who shot sporting clays in 2020.)**

|  | Mean | Median |
|---|---|---|
| Northeast: | 9.30 | 3 |
| South: | 4.39 | 3 |
| Midwest: | 9.72 | 5 |
| West: | 9.48 | 6 |

Northeast Region (n=32)
South Region (n=71)
Midwest Region (n=60)
West Region (n=34)





How many days did you go 3-gun shooting in 2020? (Asked of those who participated in 3-gun shooting in 2020.)
More than 30 days
3
11-20 days
21
6-10 days
13
5 days
4
4 days
5
3 days
16
2 days
9
1 day
19
Don't know
10
Mean = 8.71
Median = 4
0
20
40
60
80
100
Percent (n=66)

How many days did you go 3-gun shooting in 2020? (Asked of those who participated in 3-gun shooting in 2020.)
Mean Median
Northeast: 2.68 2
South: 6.24 3
Midwest: 6.55 5
West: 17.45 10
More than 30 days
0
0
0
11
11-20 days
5
21
14
36
6-10 days
3
7
34
11
5 days
0
6
7
0
4 days
0
2
9
8
3 days
33
16
6
17
2 days
28
2
27
0
1 day
30
27
0
12
Don't know
0
19
3
4
Northeast Region (n=8)
South Region (n=28)
Midwest Region (n=14)
West Region (n=16)
0
20
40
60
80
100
Percent

**How many days did you go long-range target shooting in 2020? (Asked of those who went long-range target shooting in 2020.)**

Percent (n=143)

Mean = 11.98
Median = 5

| | More than 30 days | 8 |
| | 21-30 days | 8 |
| | 11-20 days | 13 |
| | 6-10 days | 11 |
| | 5 days | 9 |
| | 4 days | 2 |
| | 3 days | 12 |
| | 2 days | 20 |
| | 1 day | 14 |
| | Don't know | 3 |

**How many days did you go long-range target shooting in 2020? (Asked of those who went long-range target shooting in 2020.)**

Percent

|  | Mean | Median |
|---|---|---|
| **Northeast:** | 12.42 | 2 |
| **South:** | 7.70 | 3 |
| **Midwest:** | 16.55 | 12 |
| **West:** | 14.23 | 8 |

Northeast Region (n=22)
South Region (n=57)
Midwest Region (n=28)
West Region (n=36)



**Approximately how many times did you go target shooting at a range in 2020? (Asked of those who shot at a range in 2020.)**

| | Mean | Median |
|---|---|---|
| Northeast: | 8.97 | 4 |
| South: | 10.03 | 3 |
| Midwest: | 13.42 | 4 |
| West: | 6.74 | 3 |

Mean = 9.64
Median = 4

Northeast Region (n=86)
South Region (n=178)
Midwest Region (n=89)
West Region (n=107)

Percent (n=460)

Percent

The tabulations below show the mean and median days spent in the various shooting activities, among those who participated in each activity. Nationally, target shooting with a handgun has the highest mean days of participation; the next nearest activities are target shooting with a modern sporting rifle, long-range shooting, and target shooting with a traditional rifle—all with means of more than 10 days. For the national results and each region, the top-ranked activity in mean days is dark green; any activity within 2.0 mean days of the top activity is light green.

| Activity | Mean Days Spent on Activity, 2020 | Median Days Spent on Activity, 2020 |
|---|---|---|
| **National** | | |
| Target shooting with a traditional rifle | 11.90 | 5 |
| Target shooting with a modern sporting rifle | 12.69 | 5 |
| Target shooting with a handgun | 13.58 | 5 |
| Trap shooting | 9.92 | 5 |
| Skeet shooting | 7.42 | 4 |
| Sporting clays | 7.74 | 4 |
| 3-gun shooting | 8.71 | 4 |
| Long-range shooting | 11.98 | 5 |
| Shooting at a range | 9.64 | 4 |
| **Northeast Region** | | |
| Target shooting with a traditional rifle | 8.91 | 5 |
| Target shooting with a modern sporting rifle | 12.64 | 5 |
| Target shooting with a handgun | 8.55 | 3 |
| Trap shooting | 10.48 | 5 |
| Skeet shooting | 9.09 | 3 |
| Sporting clays | 9.30 | 3 |
| 3-gun shooting | 2.68 | 2 |
| Long-range shooting | 12.42 | 2 |
| Shooting at a range | 8.97 | 4 |
| **South Region** | | |
| Target shooting with a traditional rifle | 11.89 | 5 |
| Target shooting with a modern sporting rifle | 9.85 | 4 |
| Target shooting with a handgun | 11.34 | 5 |
| Trap shooting | 7.89 | 4 |
| Skeet shooting | 7.25 | 4 |
| Sporting clays | 4.39 | 3 |
| 3-gun shooting | 6.24 | 3 |
| Long-range shooting | 7.70 | 3 |
| Shooting at a range | 10.03 | 3 |
| **Midwest Region** | | |
| Target shooting with a traditional rifle | 18.41 | 5 |
| Target shooting with a modern sporting rifle | 22.24 | 10 |
| Target shooting with a handgun | 27.98 | 6 |
| Trap shooting | 11.59 | 5 |
| Skeet shooting | 6.76 | 4 |
| Sporting clays | 9.72 | 5 |
| 3-gun shooting | 6.55 | 5 |
| Long-range shooting | 16.55 | 12 |
| Shooting at a range | 13.42 | 4 |
| **West Region** | | |
| Target shooting with a traditional rifle | 7.99 | 5 |
| Target shooting with a modern sporting rifle | 9.23 | 5 |
| Target shooting with a handgun | 9.07 | 5 |
| Trap shooting | 9.92 | 5 |
| Skeet shooting | 7.13 | 4 |
| Sporting clays | 9.48 | 6 |
| 3-gun shooting | 17.45 | 10 |
| Long-range shooting | 14.23 | 8 |
| Shooting at a range | 6.74 | 3 |

Mean days of participation in the various activities for all survey years (except as noted) are shown in the two graphs below. Mean days in 3-gun shooting and the various clay games all went down in 2020 compared to 2018. The activities are sorted left to right from the largest number of mean days in 2020 to the smallest number of mean days.



## MOTIVATIONS FOR TARGET AND SPORT SHOOTING

The survey examined motivations for target/sport shooting, and social/recreational reasons top the list. However, they are closely followed in the ranking by utilitarian reasons: for self defense and to prepare for hunting. (The graph is ranked by the percentage saying *very* important.) Regional results follow the overall results below. (Although not shown here, a comparison of this graph with the same graph from the previous report found less importance to shooting to be with family or friends—perhaps a response to social distancing because of COVID-19.)









Percent of target shooters who indicated each of the following was very important to them as a reason to go target shooting:
Northeast Region (n=89)
South Region (292≤n≤293)
Midwest Region (174≤n≤175)
West Region (173≤n≤175)
To be with family or friends
57
67
68
56
For sport and recreation
63
62
70
57
For self defense
59
66
48
53
To practice or prepare for hunting
49
55
58
53
To mentor a new target shooter
47
44
46
46
As part of your job
8
11
14
10
Self defense is markedly more important in the South than in other regions. For the sport/recreation is more important in the Midwest than in other regions.
0
20
40
60
80
100
Percent

## DEMOGRAPHIC CHARACTERISTICS OF SHOOTERS

A breakdown of target/sport shooters by demographic factors is presented in the graphs that follow.

Shooters were much more likely to be male than were non-shooters: 71% of 2020 sport shooters were male, whereas only 41% of non-shooters were male. This means that slightly more than a quarter of shooters were female (28%). Shooters in 2020 tended to be younger than non-shooters.



In the combination of age and gender, women were not well represented among active target/sport shooters in 2020, regardless of age.



Sport shooters were much less urban and much more rural than were non-shooters.



Finally, the Northeast Region was just slightly less associated with target/sport shooting participation: the Northeast made up only 16% of shooters, but it made up 19% of non-shooters. (These are the regions used by the U.S. Fish and Wildlife Service.)



The following four pages present demographic trends data of shooters in each of the survey years from 2009 through 2020.







Younger sport shooters made up a smaller share of the pie in 2020, compared to any other year. Sport shooters who are 55 years old and older have the largest share that they have ever had since the surveys started in 2009.







In 2020, well more than a third of sport shooters were from a rural area—the highest share since the surveys began in 2009. Those from a large city or urban area made up the smallest share since these surveys began.

**Residence breakdown of sport shooting participants 2009.**

**Residence breakdown of sport shooting participants 2012.**

**Residence breakdown of sport shooting participants 2014.**

**Residence breakdown of sport shooting participants 2016.**

**Residence breakdown of sport shooting participants 2018.**

**Residence breakdown of sport shooting participants 2020.**













In the regional breakdown, the South continues to account for the largest portion of the pie, and its share in 2020 was the highest it has been, just barely higher than the proportion in 2016.







## CHARACTERISTICS OF NEW SHOOTERS

New shooters were defined as those who started shooting within the past 5 years. For calendar year 2020, new shooters made up 12% of sport shooters, having been initiated into the shooting sports within the previous 5 years. This is the lowest percentage since 2012 when the surveys started tracking this. One reason for this is that the surge in shooting participation of a decade ago—when many new shooters were attracted to the sport—is moving through time, and those new shooters in 2012 are no longer new shooters. If they stuck with it, they are now established shooters. Note that the definition of new shooter uses a 5-year timeframe *from the date of each survey*.

The analysis looked at the group of all target/sport shooters and then separated out new shooters and compared them to established shooters. In general, new shooters are less like the "traditional" shooter (the traditional being a rural, white male who grew up around firearms).



There are marked differences in the types of shooting done by new shooters versus established shooters. New shooters, compared to established shooters, are much *less* likely to go target shooting with a rifle—perhaps the most "traditional" shooting. They are also a little less likely to target shoot with a handgun and with a modern sporting rifle. New shooters are much more likely than established shooters to go to an indoor range.

Regarding the types of firearms used by the two groups, established shooters have a markedly higher percentage using each type of equipment, although the two groups are closest together in handgun use. In particular, established shooters have a much higher rate of use of a traditional rifle, shotgun, and modern sporting rifle, compared to new shooters.

Established shooters are much more likely than new shooters to have grown up around firearms. While 84% of established shooters grew up in a firearm family, only 56% of new shooters did. This makes new shooters somewhat different than more "traditional" sport shooters who were introduced to shooting in a family setting.







Types of shooting activities among new shooters.
(New shooters are those who shot for the first time in the past 5 years.) (Part 1)
2012
2014
2016
2018
2020
Percent
100
80
60
40
20
0
58
65
71
72
69
46
41
49
40
48
35
39
34
45
42
50
46
43
49
36
21
24
23
24
29
Target shooting with a handgun
Target shooting at an outdoor range
Target shooting at an indoor range
Target shooting with a rifle
Target shooting with a modern sporting rifle

Types of shooting activities among new shooters.
(New shooters are those who shot for the first time in the past 5 years.) (Part 2)
2012
2014
2016
2018
2020
Percent
100
80
60
40
20
0
13
13
17
8
22
13
14
12
7
22
5
8
9
5
18
16
17
23
8
10
4
4
2
3
9
Sporting clays
Skeet shooting
Trap shooting
Long-range shooting
3-gun shooting

Which of the following firearms or equipment did you use when target shooting in 2020? (Asked of those who went target or sport shooting in 2020.)
Multiple Responses Allowed
Handgun
67
76
Traditional rifle
32
71
Shotgun
41
58
Modern sporting rifle
31
44
Air rifle
14
23
Black powder firearm or muzzleloader
5
21
New shooter (n=65)
Established shooter (n=694)
0 20 40 60 80 100
Percent

When you were growing up, did your family own any firearms?
Yes
56
84
No
43
13
Don't know
1
2
New shooter (n=65)
Established shooter (n=694)
0 20 40 60 80 100
Percent

Several demographic characteristics also point toward nontraditional participation. New shooters are more likely to be female than are established shooters. New shooters are a little younger than established shooters, which is intuitive. New shooters are more likely to be non-white than are established shooters, and they are more likely to be urban/suburban than are established shooters.











May I ask your age?
65 years old or older
55-64 years old
45-54 years old
35-44 years old
25-34 years old
18-24 years old
9
13
8
19
24
18
10
20
16
18
33
9
Mean Median
New: 38.71 39
Established: 45.94 45
New shooter (n=65)
Established shooter (n=694)
Note that the survey was limited to those 18 and older.
0 20 40 60 80 100
Percent

Age breakdown of new shooters.
(New shooters are those who shot for the first time in the past 5 years.)
2012 2014 2016 2018 2020
Percent
100 80 60 40 20 0
45 41 34 28 33
25 27 29 31 16
11 13 13 21 10
11 9 14 10 24
4 8 10 6 8
3 2 1 2 9
18-24 years old
25-34 years old
35-44 years old
45-54 years old
55-64 years old
65 years old or older

**Do you consider your place of residence to be a large city or urban area, a suburban area, a small city or town, a rural area on a farm or ranch, or a rural area not on a farm or ranch?**



**Types of residential areas among new shooters. (New shooters are those who shot for the first time in the past 5 years.)**

Motivations for sport shooting were also examined in this comparison of new and established sport shooters. For each reason with two exceptions, established shooters have a higher percentage saying that it is a very important reason for shooting, particularly shooting for sport and recreation, to prepare for hunting, and to mentor a new shooter. The exceptions are self defense and as part of a job, both of which are nearly equal between the two groups.

The trends suggest that shooting for self defense remains high among new shooters (it went up markedly in 2018). On the other hand, shooting to be with family and friends is down in importance among new shooters, relative to previous years.









How important is self defense as a reason to go target shooting? (Among new shooters) (New shooters are those who shot for the first time in the past 5 years.)
2012
2014
2016
2018
2020
Percent
100
80
60
40
20
0
49
51
42
58
60
18
27
29
19
20
33
21
29
23
20
Very important
Somewhat important
Not at all important

How important is being with family or friends as a reason to go target shooting? (Among new shooters) (New shooters are those who shot for the first time in the past 5 years.)
2012
2014
2016
2018
2020
Percent
100
80
60
40
20
0
55
57
65
61
50
28
26
29
23
26
16
17
7
16
24
Very important
Somewhat important
Not at all important

How important is sport and recreation as a reason to go target shooting? (Among new shooters) (New shooters are those who shot for the first time in the past 5 years.)
2012
2014
2016
2018
2020
Percent
100
80
60
40
20
0
46
39
47
32
39
42
37
40
46
42
11
24
12
21
20
Very important
Somewhat important
Not at all important

**How important is to practice or prepare for hunting as a reason to go target shooting? (Among new shooters) (New shooters are those who shot for the first time in the past 5 years.)**

**How important is mentoring a new shooter as a reason to go target shooting? (Among new shooters) (New shooters are those who shot for the first time in the past 5 years.)**

**How important is your job as a reason to go target shooting? (Among new shooters) (New shooters are those who shot for the first time in the past 5 years.)**

This section's next analysis examines multiple demographic characteristics on a single graph, which shows those characteristics that are associated with being a new shooter. Black/African-American and Hispanic/Latino shooters are correlated with being a new shooter. Other groups associated with being new to shooting are young shooters, non-hunting shooters, Northeast Region shooters, and female shooters.



A final analysis of new shooters looks at a subset of them: new shooters whose first year was 2020—the newest of the new shooters. The tables that follow show the results of this analysis. Because the sample size was so low, however, the tables show frequencies of respondents, and they show unweighted data. The main purpose of these tables is simply to give an idea of the newest of the new shooters, but caution should be taken when interpreting the results because of the low number of respondents who qualified as the newest of the new shooters.

**Participation**

| Did you do any of the following in 2020?<br>(Multiple responses allowed)<br>(Among those who first went sport shooting in 2020.) | |
| --- | --- |
| | **Number of respondents** |
| Target shooting with a handgun | 12 |
| Target shooting with a rifle | 3 |
| Target shooting at an outdoor range | 7 |
| Target shooting with a modern sporting rifle | 0 |
| Sporting clays | 1 |
| Skeet shooting | 1 |
| Trap shooting | 0 |
| Target shooting at an indoor range | 8 |
| Long-range shooting | 0 |
| 3-gun shooting | 0 |
| None of these | 3 |

| Which of the following firearms or equipment did you use when target shooting in 2020?<br>(Multiple responses allowed)<br>(Among those who first went sport shooting in 2020.) | |
| --- | --- |
| | **Number of respondents** |
| Traditional rifle | 1 |
| Handgun | 12 |
| Modern sporting rifle | 2 |
| Shotgun | 3 |
| Black powder firearm or muzzleloader | 0 |
| Air rifle | 3 |
| None of these | 1 |
| Don't know | 1 |

**Effect of COVID-19 on Participation**

| Did the COVID-19 pandemic have any effect on your decision to target shoot?<br>(Asked of those who first went sport shooting in 2020.) | |
| --- | --- |
| | **Number of respondents** |
| Yes | 4 |
| No | 15 |

## Days of Participation in Target and Sport Shooting

| How many days did you target shoot with a traditional rifle in 2020? (Asked of those who went target shooting with a traditional rifle in 2020.) (Among those who first went sport shooting in 2020.) | Number of respondents |
|---|---|
| 1 day | 3 |
| Did not get question | 16 |

| How many days did you go target shooting with a handgun in 2020? (Asked of those who went target shooting with a handgun in 2020.) (Among those who first went sport shooting in 2020.) | Number of respondents |
|---|---|
| 21-30 days | 1 |
| 11-20 days | 0 |
| 6-10 days | 1 |
| 5 days | 0 |
| 4 days | 0 |
| 3 days | 3 |
| 2 days | 2 |
| 1 day | 5 |
| Did not get question | 7 |

| How many days did you skeet shoot in 2020? (Asked of those who went skeet shooting in 2020.) (Among those who first went sport shooting in 2020.) | Number of respondents |
|---|---|
| 1 day | 1 |
| Did not get question | 18 |

| How many days did you shoot sporting clays in 2020? (Asked of those who shot sporting clays in 2020.) (Among those who first went sport shooting in 2020.) | Number of respondents |
|---|---|
| 1 day | 1 |
| Did not get question | 18 |

| Approximately how many times did you go target shooting at a range in 2020? (Asked of those who shot at a range in 2020.) (Among those who first went sport shooting in 2020.) | Number of respondents |
|---|---|
| 21-30 days | 1 |
| 11-20 days | 0 |
| 6-10 days | 1 |
| 5 days | 0 |
| 4 days | 0 |
| 3 days | 2 |
| 2 days | 2 |
| 1 day | 5 |
| Did not get question | 8 |

## Motivations for Target and Sport Shooting

| To be with family or friends. (Is this very important, somewhat important, or not at all important as a reason you go target shooting?) (Among those who first went sport shooting in 2020.) | Number of respondents |
|---|---|
| Very important | 8 |
| Somewhat important | 4 |
| Not at all important | 7 |

| For sport and recreation. (Is this very important, somewhat important, or not at all important as a reason you go target shooting?) (Among those who first went sport shooting in 2020.) | Number of respondents |
|---|---|
| Very important | 4 |
| Somewhat important | 8 |
| Not at all important | 7 |

| To practice or prepare for hunting. (Is this very important, somewhat important, or not at all important as a reason you go target shooting?) (Among those who first went sport shooting in 2020.) | Number of respondents |
|---|---|
| Very important | 2 |
| Somewhat important | 1 |
| Not at all important | 16 |

| **For self defense.**<br>**(Is this very important, somewhat important, or not at all important as a reason you go target shooting?)**<br>**(Among those who first went sport shooting in 2020.)** | |
|---|---|
| | **Number of respondents** |
| Very important | 9 |
| Somewhat important | 3 |
| Not at all important | 6 |
| Don't know | 1 |

| **To mentor a new target shooter.**<br>**(Is this very important, somewhat important, or not at all important as a reason you go target shooting?)**<br>**(Among those who first went sport shooting in 2020.)** | |
|---|---|
| | **Number of respondents** |
| Very important | 0 |
| Somewhat important | 4 |
| Not at all important | 15 |

| **As part of your job.**<br>**(Is this very important, somewhat important, or not at all important as a reason you go target shooting?)**<br>**(Among those who first went sport shooting in 2020.)** | |
|---|---|
| | **Number of respondents** |
| Very important | 2 |
| Somewhat important | 0 |
| Not at all important | 17 |

## Likelihood To Go Target or Sport Shooting in the Future

| **What is the likelihood that you will participate in any type of sport shooting in the next 2 years?**<br>**(Among those who first went sport shooting in 2020.)** | |
|---|---|
| | **Number of respondents** |
| Very likely | 5 |
| Somewhat likely | 4 |
| Not at all likely | 9 |
| Don't know | 1 |

| Which of those activities do you plan to do in the coming year? (Asked of those very or somewhat likely to go sport shooting in the next 2 years.) (Multiple responses allowed) (Among those who first went sport shooting in 2020.) | Number of respondents |
|---|---|
| Target shooting with a handgun | 7 |
| Target shooting with a rifle | 2 |
| Target shooting at an outdoor range | 5 |
| Target shooting with a modern sporting rifle | 1 |
| Sporting clays | 3 |
| Skeet shooting | 1 |
| Trap shooting | 1 |
| Target shooting at an indoor range | 4 |
| Long-range shooting | 1 |
| 3-gun shooting | 1 |
| None of these | 2 |

## Initiation Into Sport Shooting

| Did you have a person or group who taught you how to shoot? (Among those who first went sport shooting in 2020.) | Number of respondents |
|---|---|
| Yes | 15 |
| No | 4 |

| When you were growing up, did your family own any firearms? (Among those who first went sport shooting in 2020.) | Number of respondents |
|---|---|
| Yes | 12 |
| No | 7 |

| Do you own one firearm, more than one firearm, or do you not own any firearms? (Among those who first went sport shooting in 2020.) | Number of respondents |
|---|---|
| One firearm | 5 |
| More than one firearm | 8 |
| Do not own any firearms | 4 |
| Don't know / refused | 2 |

## Demographic Information

| May I ask your age? (Among those who first went sport shooting in 2020.) | Number of respondents |
|---|---|
| 65 years old or older | 5 |
| 55-64 years old | 5 |
| 45-54 years old | 4 |
| 35-44 years old | 2 |
| 25-34 years old | 2 |
| 18-24 years old | 0 |
| Don't know / refused | 1 |
| Mean = 55.61; median = 59 | |

| Demographic characteristics of those who first went sport shooting in 2020. | Number of respondents |
|---|---|
| *Gender* | |
| Male | 8 |
| Female | 11 |
| *Region of Residence* | |
| Northeast | 7 |
| South | 6 |
| Midwest | 6 |
| West | 0 |
| *Race or Ethnicity* | |
| White or Caucasian | 16 |
| Black or African-American | 0 |
| Hispanic or Latino | 1 |
| Refused | 2 |
| *Type of Residential Area* | |
| Large city or suburb | 9 |
| Small city or town | 5 |
| Rural area | 4 |
| Refused | 1 |
| *Participation in Hunting* | |
| Hunted in 2020 | 0 |
| Did not hunt in 2020 | 19 |
| *Political Affiliation* | |
| Democrat | 2 |
| Republican | 4 |
| Independent | 6 |
| Refused | 7 |
| *Age* | |
| 55 years old or older | 10 |
| 35 to 54 years old | 6 |
| 18 to 34 years old | 2 |
| Refused | 1 |

## TRADITIONAL AND NONTRADITIONAL PATHWAYS TO SPORT SHOOTING

In this section, the nontraditional path is examined in several ways. The first is a look at initiation into the sport and then how growing up with a firearm affects shooting participation. Nontraditional shooters are examined in the final part of this section through several variables to define them.

### Initiation Into Target/Sport Shooting

Traditional rifles were the most popular firearm when sport shooters were initiated into the activity (more than half used them when learning). Next are shotguns and handguns (each at a little more than a third).





Target/sport shooters most commonly were taught to shoot by their father (52%), far exceeding any other person or entity. The full results are shown in the graph. Another graph shows the person who first took respondents shooting, again with father being the top response (this includes those who were self-taught and were not asked the first question).





**Who or which group taught you to shoot? (Asked of those who went target or sport shooting in 2020 and who said a group or person taught them to shoot when they first learned.)**





Who first took you target shooting?
(Asked of those who went target or sport shooting in 2020.)
Multiple Responses Allowed
Father
47
49
50
54
Friend / neighbor
20
11
5
11
Grandfather
4
7
13
7
Spouse / boyfriend / girlfriend
6
6
10
3
Uncle
8
5
3
7
Brother
5
3
6
3
No one; went myself
5
6
4
0
Mother
2
3
4
2
Military
0
4
3
1
Scouting organization
0
2
1
7
Family (nonspecific or distant)
2
4
2
0
In-law
0
0
1
1
Grandmother
0
0
1
0
0
20
40
60
80
100
Percent
Northeast Region (n=136)
South Region (n=293)
Midwest Region (n=175)
West Region (n=175)

**Growing Up With Firearms and Its Effect on Shooting Participation**

The analyses in this report include crosstabulations according to whether the respondent grew up with a firearm or not. Those growing up with a firearm (or at least being aware that they did), compared to their counterparts not growing up with a firearm, are three times more likely to have participated in sport shooting in 2020. Additionally, they are more likely to be male, older, rural, and from the South Region.







Do you consider your place of residence to be a large city or urban area, a suburban area, a small city or town, a rural area on a farm or ranch, or a rural area not on a farm or ranch?
Large city or urban area
19
30
Suburban area
21
31
Small city or town
29
28
Rural area on a farm or ranch
10
3
Rural area NOT on a farm or ranch
20
7
Grew up with firearm in house (n=2012)
Did not grow up with firearm in house (n=930)
0
20
40
60
80
100
Percent

Region of residence.
Northeast Region
13
26
South Region
40
33
Midwest Region
23
18
West Region
24
23
Grew up with firearm in house (n=2012)
Did not grow up with firearm in house (n=930)
0
20
40
60
80
100
Percent

The study looked at how growing up with a firearm in the house affects target/sport shooting participation, showing that those who went shooting in 2020 are much more likely to have grown up with a firearm, compared to those who did not go shooting: 83% of 2020 shooters compared to 56% of non-shooters grew up with a firearm. This question allows the identification of defined market groups, as discussed in the following pages.



The two groups of interest in the previous graph are further examined. The first group is composed of people who intuitively would seem predisposed to be interested in target/sport shooting—those who grew up with a firearm—but who nevertheless did not go target/sport shooting in 2020. They are compared to all respondents.

Non-shooters who grew up with a firearm are slightly more female than the United States population as a whole. They also tend to be slightly older than the general population as a whole.



Another graph shows the interaction of age and gender—note that older women make up a greater proportion of those who grew up with a firearm but did not shoot in 2020 than they do of the general population.



Non-shooters in 2020 who grew up with a firearm are about the same as the population as a whole in the type of residential area in which they live. Regional differences are also slight.



Analyses were conducted on the second group of interest, which consisted of 2020 shooters who did *not* grow up with a firearm. These would be people who appear to have entered the sport of shooting in a nontraditional path (the "traditional" path is being initiated into shooting as a child by a family member). The following are the demographic characteristics of this group.

Shooters in 2020 who did not grow up with a firearm are predominantly males (72% of them are), and they tend to be younger than Americans as a whole.



The graphs below show that 2020 shooters who grew up without a firearm in the household are disproportionally young males.





These 2020 shooters from a non-firearm background tend to be slightly less urban/suburban than the population as a whole, although the differences are slight. Finally, the final crosstabulation in this section shows the regions; these shooters who did not grow up with a firearm are disproportionally from the Northeast and West Regions.



## Nontraditional Shooters

There are seven characteristics that were used to identify nontraditional shooters, as presented in the table below. Each variable was made to be dichotomous, meaning each had two sides: a variable had either a traditional or nontraditional side. Most of these characteristics were based on a single survey question, but two characteristics were based on the results of multiple questions. The characteristics and the question responses on which they are based are shown in the tabulation that follows.

| Nontraditional Characteristic | Question Used as Basis |
|---|---|
| Not growing up in a household with a firearm that was actively used at least two times per year | When you were growing up, did your family own any firearms? |
| | (IF YES) When you were growing up, about how many times per year did someone in your family use the firearm for target shooting? |
| Did not shoot until an adult | How old were you when you first went target shooting? |
| First experienced shooting with a handgun or a modern sporting rifle | Which of the following firearms did you use when you first learned how to target shoot? |
| Not mentored by a father or other close male relative | Did you have a person or group who taught you how to shoot? |
| | (IF YES) Who or which group taught you? |
| Ethnically non-white | What races or ethnic backgrounds do you consider yourself? Please mention all that apply. |
| Female | Respondent's gender. |
| Urban/suburban | Do you consider your place of residence to be a large city or urban area, a suburban area, a small city or town, a rural area on a farm or ranch, or a rural area not on a farm or ranch? |

For the purposes of this analysis, a respondent was nontraditional if four of the seven characteristics were nontraditional—in other words, if more than half of the characteristics were in the nontraditional side of the dichotomy. In the sample of shooters, 28% had at least four of the seven variables in the nontraditional side; 72% of shooters were considered traditional. These two groups (traditional and nontraditional shooters) were then crosstabulated by region, by their reasons for shooting, by what shooting activities they did, by the types of firearms they shot, and by the number of days that they did various shooting activities.

The findings suggest that the Northeast and South Regions have the highest percentages of shooters who are nontraditional shooters.

Nontraditional shooters are less concerned about being with family and friends when they shoot, compared to traditional shooters. They also put less importance on shooting for sport and recreation, to prepare for hunting, and to mentor a new shooter. They are about the same in the importance of training for self defense.

Nontraditional shooters are target shooting with handguns at a slightly higher rate than traditional shooters. Also, they are shooting in indoor ranges at a much higher rate than traditional shooters.

Nontraditional shooters tend to shoot fewer days than traditional shooters. They have a lower mean number of days for each type of shooting.



Traditional and nontraditional shooters by region.

*Responsive Management*































**To practice or prepare for hunting. (How important is this as a reason you go target shooting?)**

**For self defense. (How important is this as a reason you go target shooting?)**

I'd like to know about the types of shooting that you did in 2020. Did you do any of the following? Did you go...?
Multiple Responses Allowed
Target shooting with a handgun
75
84
Target shooting with a rifle
76
53
Target shooting at an outdoor range
51
46
Target shooting with a modern sporting rifle
39
34
Sporting clays
33
22
Skeet shooting
31
19
Target shooting at an indoor range
21
39
Trap shooting
27
13
Long-range shooting
20
17
3-gun shooting
9
9
0
20
40
60
80
100
Percent
Traditional shooter (n=601)
Nontraditional shooter (n=177)

How many days did you target shoot with a traditional rifle, in other words a rifle with bolt or lever action, in 2020? (Asked of those who went target shooting with a traditional rifle in 2020.)
More than 30 days
21-30 days
11-20 days
6-10 days
5 days
4 days
3 days
2 days
1 day
Don't know
7
3
4
2
14
4
17
16
11
13
7
9
13
10
11
8
13
24
5
11
Means
Traditional: 12.40
Nontraditional: 9.97
Medians
Traditional: 5
Nontraditional: 4
Traditional shooter (n=456)
Nontraditional shooter (n=100)
0
20
40
60
80
100
Percent

How many days did you target shoot with a modern sporting rifle in 2020? (Asked of those who went target shooting with a modern sporting rifle in 2020.)
More than 30 days
21-30 days
11-20 days
6-10 days
5 days
4 days
3 days
2 days
1 day
Don't know
11
8
4
5
14
6
21
9
10
4
9
13
4
4
11
18
11
28
6
5
Means
Traditional: 14.37
Nontraditional: 7.79
Medians
Traditional: 6
Nontraditional: 3
Traditional shooter (n=205)
Nontraditional shooter (n=47)
0
20
40
60
80
100
Percent

How many days did you target shoot with a handgun in 2020? (Asked of those who went target shooting with a handgun in 2020.)
More than 30 days
21-30 days
11-20 days
6-10 days
5 days
4 days
3 days
2 days
1 day
Don't know
8
2
6
7
17
11
16
15
10
5
7
12
11
14
8
12
12
19
6
3
Means
Traditional: 14.21
Nontraditional: 12.18
Medians
Traditional: 5
Nontraditional: 4
Traditional shooter (n=446)
Nontraditional shooter (n=144)
0
20
40
60
80
100
Percent

How many days did you trap shoot in 2020? (Asked of those who went trap shooting in 2020.)
More than 30 days
21-30 days
11-20 days
6-10 days
5 days
4 days
3 days
2 days
1 day
Don't know
5
10
3
2
16
2
17
16
10
7
4
7
10
3
14
17
16
27
4
9
Means
Traditional: 10.01
Nontraditional: 9.42
Medians
Traditional: 5
Nontraditional: 3
Traditional shooter (n=152)
Nontraditional shooter (n=23)
0
20
40
60
80
100
Percent

How many days did you skeet shoot in 2020? (Asked of those who went skeet shooting in 2020.)
More than 30 days
21-30 days
11-20 days
6-10 days
5 days
4 days
3 days
2 days
1 day
Don't know
3
3
1
1
17
9
16
1
9
8
8
9
11
3
15
17
15
35
6
14
Means
Traditional: 7.76
Nontraditional: 5.86
Medians
Traditional: 4
Nontraditional: 2
Traditional shooter (n=155)
Nontraditional shooter (n=33)
0
20
40
60
80
100
Percent

How many days did you shoot sporting clays in 2020? (Asked of those who shot sporting clays in 2020.)
More than 30 days
21-30 days
11-20 days
6-10 days
5 days
4 days
3 days
2 days
1 day
Don't know
2
2
2
1
12
0
24
10
7
9
6
0
9
9
16
20
16
38
5
11
Means
Traditional: 8.51
Nontraditional: 4.60
Medians
Traditional: 5
Nontraditional: 2
Traditional shooter (n=164)
Nontraditional shooter (n=33)
0
20
40
60
80
100
Percent

How many days did you go 3-gun shooting in 2020? (Asked of those who participated in 3-gun shooting in 2020.)
More than 30 days
11-20 days
6-10 days
5 days
4 days
3 days
2 days
1 day
Don't know
4
0
25
13
17
3
3
8
7
0
15
18
7
14
15
26
7
18
Means
Traditional: 10.06
Nontraditional: 4.95
Medians
Traditional: 5
Nontraditional: 3
Traditional shooter (n=51)
Nontraditional shooter (n=15)
0
20
40
60
80
100
Percent

How many days did you go long-range target shooting in 2020? (Asked of those who went long-range target shooting in 2020.)
More than 30 days
21-30 days
11-20 days
6-10 days
5 days
4 days
3 days
2 days
1 day
Don't know
10
0
6
15
16
6
14
0
6
19
2
0
13
7
16
35
14
14
3
5
Means
Traditional: 13.62
Nontraditional: 6.69
Medians
Traditional: 5
Nontraditional: 2
Traditional shooter (n=117)
Nontraditional shooter (n=26)
0
20
40
60
80
100
Percent

Approximately how many times did you go target shooting at a range in 2020? (Asked of those who shot at a range in 2020.)

**Means**
Traditional: 11.24
Nontraditional: 6.36
**Medians**
Traditional: 4
Nontraditional: 3

Traditional shooter (n=342)
Nontraditional shooter (n=118)

| Category | Traditional | Nontraditional |
|---|---|---|
| More than 30 times | 6 | 2 |
| 21-30 times | 4 | 3 |
| 11-20 times | 16 | 10 |
| 6-10 times | 12 | 9 |
| 5 times | 7 | 9 |
| 4 times | 7 | 14 |
| 3 times | 12 | 15 |
| 2 times | 15 | 14 |
| 1 time | 16 | 22 |
| Don't know | 4 | 3 |

Percent

## OVERLAP OF PARTICIPATION IN TARGET SHOOTING AND HUNTING

The pie graph below shows the proportions of hunting/shooting participants who went target shooting, hunting with firearms, or both in 2020. The entire pie consists of those who *either* hunted with firearms or went target/sport shooting. Just under half of this pool went target/sport shooting but did not hunt.



The trends analysis found that hunting took a bigger share of the participation breakdown, with *hunting and target shooting* as well as *hunting, but not target shooting* being higher in 2020 than they were in 2018, the former being statistically significant ($p \leq 0.05$). In looking at the entire time period, however, target shooting still has a bigger share now than it did in 2012, at the expense of hunting. Asterisks indicate statistical significance between 2018 and 2020.



*Statistically significant difference between 2018 and 2020.

Of those who both hunted and target shot, 15% indicated that their target/sport shooting was done "just while preparing for hunting." The overwhelming majority of them (85%) spend some of their time simply shooting as a separate activity from hunting. (All hunters, including those exclusively bowhunting, were asked this question.)



## TYPES OF FIREARMS USED IN TARGET/SPORT SHOOTING

The following graph shows the percentages of target or sport shooters using various types of firearms (in total, 24.1% of all adult U.S. residents went target or sport shooting). At the top of the list are handguns and traditional rifles—both used by two thirds or more of sport shooters. This is followed by shotguns, being used by just more than half, and modern sporting rifles, used by a bit less than half. Graphs of regional results and trends follow.

Two questions in the survey asked about equipment, such as modern sporting rifles. In the first, respondents were asked if they had participated in various activities, such as "target shooting with a modern sporting rifle." A later question simply asked all target or sport shooters to name all the types of firearms that they had used in 2020 for any activities. Note that, typically, these percentages in the latter question are slightly more than those who reported that they "went target shooting" with the type of firearm. This discrepancy is accounted for by those who may have done other activities with these firearms (e.g., plinking, hunting) but not what they consider "target shooting" with them.





**Which of the following firearms or equipment did you use when target shooting in 2020? (Asked of those who went target or sport shooting in 2020.)**

There was an increase in the rate of use of each type of firearm, with large increases in use of modern sporting rifles and muzzleloaders.



**LIKELIHOOD TO GO TARGET OR SPORT SHOOTING IN THE FUTURE**

This section shows the results among those who shot in 2020, those who did not, and the total among respondents overall. It then looks at each group separately, as was done in the analysis contained in previous reports. Overall, 23% of adult Americans say that it is *very* likely they will go shooting in the next 2 years. The rate of being *very* likely among those who did not go shooting is only 12%; the rate among those who shot, however, is 61%.



Case 1:24-cv-01955-DLF Document 12-6 Filed 07/26/24 Page 311 of 410

The next analysis looks at the groups separately: 12% of those who did *not* go target or sport shooting in 2020 are *very* likely to do so in the following 2 years. Regional results are shown, as well. Demographic analyses compare those who say that they are *very* likely to those who are *not at all* likely.



The crosstabulations are analyzed among those who did *not* go shooting in 2020. This looks at those who said that they are *very* likely to go shooting (as the *somewhat* likely people should probably be discounted vis-à-vis their actual likelihood to go shooting), and then it looks at those who said that they are *not at all likely*.

Among those who did not go shooting in 2020, men show a little more interest in target/sport shooting. Men make up 58% of those *very* likely to shoot but only 37% of those *not at all* likely to shoot in the next 2 years (note that this is among non-shooters in 2020). Middle-aged people have a greater propensity to say that they are very likely to go target/sport shooting in the next 2 years, compared to either the youngest category or the oldest category.



Median split of age. (Among those who did not go shooting in 2020.)
Median age (47) or higher
Below the median age (47)
42
57
58
43
Very likely to shoot in next 2 years (n=210)
Not at all likely to shoot in next 2 years (n=1558)
0
20
40
60
80
100
Percent

Age and gender split.
(Among those who did not go shooting in 2020.)
Male, at or above median age (47)
Male, below median age (47)
Female, at or above median age (47)
Female, below median age (47)
23
20
35
18
19
36
23
26
Very likely to shoot in next 2 years (n=210)
Not at all likely to shoot in next 2 years (n=1558)
0
20
40
60
80
100
Percent



Among non-shooters, rural and small city/town residency is positively correlated with being very likely to go shooting in the next 2 years. Regionally, the West shows a slightly greater percentage in the very-likely-to-shoot category.



The above looked at those who had *not* participated in target or sport shooting in 2020. The report now examines those who *had* participated in 2020. Of 2020 sport shooting participants, 61% are *very* likely to go sport shooting in the following 2 years. The same demographic analyses were run comparing those who are *very* likely to those who are *not at all* likely (again ignoring the *somewhat* likely).



The gender crosstabulation found that women appear to be more likely to drop out of target/sport shooting: females make up only 24% of those who had shot in 2020 and are *very* likely to continue (i.e., shoot in the next 2 years), while they make up 37% of those who had shot in 2020 but are likely to quit (i.e., not at all likely to shoot in the next 2 years). The age crosstabulation does not show consistent differences in one direction or the other.



Older females have a disproportionate share of the group that plans to quit. As shown in the graphs, when the age and gender splits are combined, older females have a high percentage in the *not at all likely* group compared to the *very likely* group.



The place-of-residence crosstabulation found that rural areas and small cities/towns have a higher representation of 2020 shooters who are *not at all* likely to go shooting, compared to those shooters who plan to continue shooting in the next 2 years. The regional crosstabulation does not show large differences.



*Responsive Management*

Planned shooting activities among those who had indicated being very or somewhat likely to target or sport shoot in the next 2 years is shown below. Two stand out at the top: target shooting with a handgun and target shooting with a rifle. These are distantly followed by target shooting at an outdoor range, target shooting with a modern sporting rifle, and various clay games (they could choose multiple activities). A regional graph is included, as well.





Which of those activities do you plan to do in the coming year? (Asked of those very or somewhat likely to go sport shooting in the next 2 years.)
Multiple Responses Allowed
Target shooting with a handgun
67
82
65
77
Target shooting with a rifle
73
70
74
72
Target shooting at an outdoor range
51
44
46
48
Target shooting with a modern sporting rifle
40
39
39
46
Sporting clays
39
32
47
32
Skeet shooting
33
30
39
38
Trap shooting
32
27
39
27
Target shooting at an indoor range
27
28
18
29
Long-range shooting
26
23
26
25
3-gun shooting
18
16
11
21
0
20
40
60
80
100
Percent
Northeast Region (n=108)
South Region (n=230)
Midwest Region (n=135)
West Region (n=139)

## REASONS FOR NOT PARTICIPATING IN TARGET OR SPORT SHOOTING IN 2020 AND NON-SHOOTERS' DEMOGRAPHIC CHARACTERISTICS

Those who did not participate in target/sport shooting were asked about their reasons for not doing so (75.9% of U.S. residents did *not* go target or sport shooting in 2020). Other than lack of interest, important reasons include lack of equipment, COVID-19 (which closed some indoor ranges), lack of time, and age/health.



The regional results are shown on the following page. On this question, there were few marked differences. One notable difference is that Northeast Region non-shooters are more likely than non-shooters from other regions to say that lack of access is a constraint. Age and health are more of an issue to Midwest Region non-shooters than to those from other regions.



In just a few words, tell me why you did not go target shooting in 2020? (Asked of those who did not go target or sport shooting in 2020.)
Multiple Responses Allowed
No interest
55
57
57
52
Don't have firearm / can't own firearm
15
13
13
15
COVID
7
7
7
10
No time / obligations for family or work
8
8
5
9
Age / health
6
7
9
5
Not in favor of firearms
5
4
4
3
No place to go nearby / don't know where to go / no access
7
3
2
4
Did other activities / have other hobbies
3
3
2
3
Cost / can't afford to go
1
2
3
3
Nobody to go with / not invited to go
2
3
1
3
0
20
40
60
80
100
Percent
Northeast Region (n=422)
South Region (n=790)
Midwest Region (n=520)
West Region (n=512)

Two questions asked those who had not target or sport shot in 2020 about their status regarding having ever participated in target/sport shooting and having ever shot a firearm. The data from these questions and about participation in target/sport shooting in 2020 were put together. A little under a quarter of U.S. residents (24%) indicate that they have never shot a firearm, and somewhat under half of the residents (43%) have never done any target or sport shooting. Regional results are also shown.



The next analysis is of the 33% in the graph previously shown who did not target or sport shoot in 2020 but did so at some time in the past. They are compared to the 43% who never participated in target or sport shooting (including those who never even shot a firearm).

Among those who did not shoot in 2020, the "ever" group is much more male than the "never" group. Simply put, among non-2020 shooters, men are more likely than women to have gone target or sport shooting at some time in the past.

The age crosstabulation shows little consistent difference in the two groups. The combination of age and gender just reinforces that males are more prevalent in the group who did not shoot in 2020 but shot at some time before.

Among the final graphs is the rural-urban crosstabulation, which does not show great differences in the groups. The last graph is the regional breakdown, which does not show great differences either.







Case 1:24-cv-01955-DLF Document 12-6 Filed 07/26/24 Page 327 of 410

## REASONS FOR NOT PARTICIPATING IN HUNTING IN 2020

A new question in this year's survey asked about reasons for not hunting in the previous year. Other than lack of interest, top reasons include a dislike of killing animals, age/health, lack of time because of family and/or work obligations, lack of a firearm, and lack of good access. The regional graph is included, with no notable differences.



# ABOUT RESPONSIVE MANAGEMENT

Responsive Management is an internationally recognized survey research firm specializing in natural resource and outdoor recreation issues. The firm's mission is to help natural resource and outdoor recreation agencies, businesses, and organizations better understand and work with their constituents, customers, and the public.

Focusing only on natural resource and outdoor recreation issues, Responsive Management has conducted telephone, mail, and online surveys, as well as multi-modal surveys, on-site intercepts, focus groups, public meetings, personal interviews, needs assessments, program evaluations, marketing and communication plans, and other forms of human dimensions research measuring how people relate to the natural world for more than 30 years. Utilizing an in-house, full-service survey facilities with 75 professional interviewers, Responsive Management has conducted studies in all 50 states and 15 countries worldwide, totaling more than 1,000 human dimensions projects *only* on natural resource and outdoor recreation issues.

Responsive Management has conducted research for every state fish and wildlife agency and every federal natural resource agency, including the U.S. Fish and Wildlife Service, the National Park Service, the U.S. Forest Service, Bureau of Land Management, U.S. Coast Guard, and the National Marine Fisheries Service. Additionally, the firm has provided research for all the major conservation NGOs, including the Archery Trade Association, the American Sportfishing Association, the Association of Fish and Wildlife Agencies, Dallas Safari Club, Ducks Unlimited, Environmental Defense Fund, the Izaak Walton League of America, the National Shooting Sports Foundation, the National Wildlife Federation, the Recreational Boating and Fishing Foundation, the Rocky Mountain Elk Foundation, Safari Club International, the Sierra Club, Trout Unlimited, and the Wildlife Management Institute.

Other nonprofit and NGO clients include the American Museum of Natural History, the BoatUS Foundation, the National Association of Conservation Law Enforcement Chiefs, the National Association of State Boating Law Administrators, and the Ocean Conservancy. As well, Responsive Management conducts market research and product testing for numerous outdoor recreation manufacturers and industry leaders, such as Winchester Ammunition, Vista Outdoor (whose brands include Federal Premium, CamelBak, Bushnell, Primos, and more), Trijicon, Yamaha, and others.

Responsive Management also provides data collection for the nation's top universities, including Auburn University, Clemson University, Colorado State University, Duke University, George Mason University, Michigan State University, Mississippi State University, North Carolina State University, Oregon State University, Penn State University, Rutgers University, Stanford University, Texas Tech, University of California-Davis, University of Florida, University of Montana, University of New Hampshire, University of Southern California, Virginia Tech, West Virginia University, Yale University, and many more.

Responsive Management's research has been upheld in U.S. Courts, used in peer-reviewed journals, and presented at major wildlife and natural resource conferences around the world. The firm's research has also been featured in many of the nation's top media, including *Newsweek*, *The Wall Street Journal*, *The New York Times*, CNN, National Public Radio, and on the front pages of *The Washington Post* and *USA Today*.

**responsivemanagement.com**



© 2021 National Shooting Sports Foundation, Inc. All Rights Reserved

Item #33143-21  5/21

EXHIBIT 17

**NSSF® REPORT** 2021 EDITION

# FIREARMS
# RETAILER

SURVEY REPORT



Conducted for the
National Shooting Sports Foundation®
by: Southwick Associates



*The Firearm Industry
Trade Association*

©2021 National Shooting Sports Foundation, Inc. All Rights Reserved. No part of this publication may be republished, reproduced or redistributed in any form or by any means, electronic or mechanical, except in the case of brief quotations in articles. NSSF members in good standing may share this publication with their employees, including making it available for internal viewing or download via their company intranet sites, provided 1.) the publication is offered in its entirety, including this paragraph, and 2.) is accompanied by the following notice: "This publication is made available to employees for job reference purposes only, not for redistribution outside the company." A reward is provided to persons who provide conclusive evidence of illegal republication, reproduction, redistribution or other violation of NSSF's rights in this publication.

**TABLE OF CONTENTS**

Overview ........................................................................................................................ 1
Products Sold ................................................................................................................ 1
Sales Trends ................................................................................................................. 11
Sales Margins and Net Profit...................................................................................... 15
Inventory ..................................................................................................................... 16
Selected Operating Measures ..................................................................................... 18
Markets and Customers  ............................................................................................. 19
Website and Online Marketing  .................................................................................. 21
Social Media and Current Issues ................................................................................ 24
Shooting Ranges and Other Offerings ........................................................................ 26
Background Checks and Operating Systems................................................................ 27

**OVERVIEW**

This report is the result of an in-depth analysis of the U.S. firearms retail industry sponsored by the National Shooting Sports Foundation.  The information for the report was collected through an online survey of retailers that was conducted from February through March 2020.  The survey respondents included 313 retail establishments located in 50 states. They range in size from single proprietors to large outdoor specialty retailers.

This report shows results for 2018 and 2020. Due to significant changes in survey design during 2020, several questions only show results for the most recent year. Results for 2019 are not available since the retailer survey was not conducted that year.

**PRODUCTS SOLD**

From which business activity does your business earn a majority of its annual revenues?



Total number of responses in 2020: n = 423

*Of those that selected "Retail" as earning the majority of annual revenues:*

Please check the category that best describes your retail business:



| | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Local / Independent Shop | 82.9% | 76.9% | 246 |
| Online Retailer | 5.9% | 5.3% | 17 |
| Gun Show / Outdoor Expo | 2.7% | 2.8% | 9 |
| Outdoor Specialty Store | 1.4% | 2.8% | 9 |
| General Sporting Goods | 0.9% | 1.3% | 4 |
| Pawn | 0.5% | 4.1% | 13 |
| Mass Merchant | 0.5% | 0.0% | 0 |
| Cataloguer | 0.0% | 0.0% | 0 |
| Other | 5.4% | 6.9% | 22 |
| **Total** | **100%** | **100%** | **320** |

2

*Of those that selected "Wholesale", "Manufacturing" or "Other" as earning the majority of annual revenues:*

Do you earn any revenues from retail sales (sales directly to customers)?



|  | 2020 | Responses (2020) |
|---|---|---|
| Yes | 60.2% | 62 |
| No | 39.8% | 41 |
| Total | 100% | 103 |

3

Which categories of NEW products do you currently sell retail?



|  | 2020 | Responses (2020) |
|---|---|---|
| Handguns | 86.9% | 272 |
| Shotguns | 83.4% | 261 |
| AR-style / modern sporting rifles | 82.1% | 257 |
| Traditional rifles | 79.9% | 250 |
| Muzzleloaders | 23.6% | 74 |
| None of these | 9.6% | 30 |

Total number of responses for 2020: n = 313

Please check the top three calibers sold for NEW modern sporting rifles:



| | 2020 | Responses (2020) |
|---|---|---|
| 223/556 cal | 87% | 221 |
| 22 LR | 43% | 109 |
| 300 Blackout | 41% | 103 |
| 9 mm | 39% | 98 |
| 308 Winchester | 30% | 75 |
| 5.56 mm | 26% | 66 |
| 6.5 Creedmoor | 10% | 25 |
| 45 ACP | 2% | 5 |
| Other | 2% | 5 |
| 350 Legend | 1% | 3 |
| 40 cal | 1% | 3 |
| 450 Bushmaster | 1% | 2 |
| 6.5 PRC | 1% | 2 |
| Not sure | 1% | 2 |
| 280 Ackley Improved | 0% | 1 |
| 458 Socom | 0% | 1 |
| 6 mm | 0% | 0 |

Total number of responses in 2020: n = 253

Which categories of USED products do you currently sell retail?



Number of responses selling at least one of these firearm types USED in 2020: n = 310

| | 2020 | Responses (2020) |
|---|---|---|
| Handguns | 75.5% | 234 |
| Shotguns | 67.4% | 209 |
| Traditional rifles | 66.8% | 207 |
| AR-style / modern sporting rifles | 63.2% | 196 |
| None of these | 22.3% | 69 |
| Muzzleloaders | 20.0% | 62 |

Of your annual AR-style/modern sporting rifle sales in 2020, please report the percentages you think were sold primarily for hunting purposes, target-shooting purposes and personal-protection purposes.



| AR-style/modern sporting rifles | 2018 | 2020 |
|---|---|---|
| Hunting purposes | 29.6% | 20.5% |
| Personal-protection purposes | 36.1% | 41.4% |
| Target/informal shooting | 34.3% | 38.2% |

Total number of responses in 2020: n = 244

7

Approximately what percentage of the firearms you sold in 2020 were:



| Firearms sold | 2018 | 2020 |
|---|---|---|
| New | 82.0% | 79.4% |
| Used | 18.0% | 20.6% |

Total number of responses in 2020: n = 250

Approximately what percentage of the firearms you sold in 2020 were:



|  | 2018 | 2020 |
|---|---|---|
| Semi-auto pistol | 43.5% | 44.2% |
| AR/ modern sporting rifle | 17.7% | 20.3% |
| Traditional rifle | 12.7% | 11.3% |
| Shotgun | 13.7% | 12.4% |
| Revolver | 8.8% | 7.2% |
| Muzzleloader | 2.0% | 1.6% |
| Other | 1.5% | 1.5% |

Total number of responses in 2020: n = 241

Which of these product categories do you currently sell?



|  | 2020 | Responses (2020) |
|---|---|---|
| Ammunition | 91.9% | 239 |
| Optics | 87.3% | 227 |
| Firearm accessories such as grips, slings, bipods, etc. | 86.9% | 226 |
| Gun-cleaning equipment and supplies | 85.8% | 223 |
| Safety equipment | 82.7% | 215 |
| Gunsmithing | 56.9% | 148 |
| Hunting- or shooting-related gifts and home items | 45.0% | 117 |
| Apparel | 42.3% | 110 |
| Reloading equipment and supplies | 40.8% | 106 |
| Hunting accessories | 31.2% | 81 |
| Products not related to hunting/shooting | 26.2% | 68 |
| Archery and bowhunting equipment | 15.8% | 41 |

Total number of responses in 2020: n = 260

10

**SALES TRENDS**

What percent of your gross annual sales were from the following categories?



- ■ New firearms
- ■ Hard goods
- ■ Products not related to hunting and shooting
- ■ Archery and bowhunting
- ■ Ammunition
- ■ Used firearms
- ■ Soft goods

| | 2018 | 2020 |
|---|---|---|
| New firearms | 51.5% | 43.4% |
| Ammunition | 13.2% | 20.5% |
| Hard goods | 11.2% | 10.8% |
| Used firearms | 11.9% | 11.4% |
| Products not related to hunting and shooting | 4.3% | 6.7% |
| Soft goods | 4.1% | 2.9% |
| Archery and bowhunting | 2.5% | 1.4% |

Total number of responses in 2020: n = 288

Total sales compared to the previous year:



- ■ This year's sales were UP compared to last year's
- ■ This year's sales were FLAT compared to last year's
- ■ This year's sales were DOWN compared to last year's

|       | 2018  | 2020  | Responses (2020) |
|-------|-------|-------|------------------|
| Up    | 40.5% | 85.6% | 172              |
| Flat  | 25.2% | 7.0%  | 14               |
| Down  | 34.4% | 7.5%  | 15               |

What was the average change of total sales compared to the previous year?

|               | 2018  | 2020  | Responses (2020) |
|---------------|-------|-------|------------------|
| Avg. Increase | 22.9% | 80.8% | 170              |
| Avg. Decrease | 18.2% | 42.5% | 15               |

12

Please compare your sales this year to your sales last year in the following categories listed below.  For each category please say whether sales were UP or DOWN.



*Total responses (year over year sales) in 2020: Optics (163); Ammunition (179); Muzzleloaders (122); Handguns (180); Shotguns (181); AR-Style rifles (180); Traditional rifles (180).*

In 2020, what were your total sales of shooting and hunting-related items only, including firearms, ammo, accessories, apparel, etc.?

| Year | Average Total Sales |
|---|---|
| 2018 | $1,252,011 |
| 2020 | $2,666,719 |
| # of 2020 Responses | 170 |

Of all your FIREARM sales last year, please estimate the percentage of sales dollars attributable to each type of firearm:



Total responses in 2020: n = 194

**SALES MARGINS and NET PROFIT**

What is your average margin on the sale of NEW firearms?

|  | 2018 | 2020 |
|---|---|---|
| **NEW Firearms** | 15.8% | 18.6% |
| Handguns | 16.3% | 20.2% |
| Rifles | 16.8% | 20.1% |
| Shotguns | 16.4% | 20.0% |
| Muzzleloaders | 5.7% | 12.6% |

Total responses in 2020: n = 155

|  | 2018 | 2020 |
|---|---|---|
| Centerfire | 24.1% | 34.0% |
| Rimfire | 21.4% | 30.7% |

Total responses in 2020: n = 156

Did your net profit increase, decrease or stay the same compared to the previous year?



Total number of responses in 2020: n = 159

Estimated changes in net profit (for those who reported an increase or decrease).

|  | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Average Increase | 15.2% | 70.2% | 118 |
| Average Decrease | 38.9% | 37.1% | 12 |

15

## INVENTORY

How did your spending on inventory change in 2020 versus 2019 for:

**Firearms**



**Ammunition**



| Product | Change in Spending on Inventory | 2020 |
|---------|---------------------------------|------|
| Firearms | Increased | 74.1% |
| | Decreased | 10.8% |
| | Stayed the Same | 10.8% |
| | Unknown | 4.4% |
| Ammunition | Increased | 71.3% |
| | Decreased | 15.9% |
| | Stayed the Same | 8.9% |
| | Unknown | 3.8% |

Total number of respondents for FIREARMS (2020):  n = 94
Total number of respondents for AMMUNITION (2020): n = 94

For 2020, what was the percentage change in your spending on inventory for each of the following items?

| | | 2020 | Responses (2020) |
|---|---|------|------------------|
| Firearms | Average Increase | 93.3% | 74 |
| | Average Decrease | 44.5% | 7 |
| Ammunition | Average Increase | 121.3% | 73 |
| | Average Decrease | 50.4% | 8 |

**SELECTED OPERATING MEASURES**

*NOTE: The following tables are based on a subset of respondents who provided complete information for sales, inventory, square footage, and cost of goods sold. Results are broken out into two categories: retailers with $1 million or more in total annual sales of shooting and hunting-related items only, and those with less than $1 million in sales.*

What was the average value (replacement value, not retail value) of the total inventory you had on hand in 2020 for shooting- and hunting-related merchandise only, including firearms, ammo, accessories, apparel, etc.)? DO NOT include inventory for other activities such as fishing, hardware, camping, etc.

| | 2020 | Responses (2020) |
|---|---|---|
| Retailers less than $1 million | $112,673.78 | 67 |
| Retailers $1 million or more | $3,352,872.20 | 46 |

*Does not include inventory for other activities such as fishing, hardware, camping, etc.

To the best of your ability, please estimate the number of inventory turns you achieved in 2020:

| | 2020 | Responses (2020) |
|---|---|---|
| Retailers less than $1 million | 7.34 | 23 |
| Retailers $1 million or more | 7.56 | 33 |

*78 retailers were not able to answer this question.

What was the <u>total square footage</u> of retail space dedicated to shooting- and hunting-related items only, as of December 31?

| | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Retailers less than $1 million | 1,116 | 2,087 | 71 |
| Retailers $1 million or more | 4,788 | 9,299 | 47 |

Please tell us how many full-time employees your store had in 2018 for hunting and shooting related merchandise including firearms, ammunition, etc.

| | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Retailers less than $1 million | | | |
| Full Time Employees | 2.4 | 1.8 | 77 |
| Part Time Employees | 2.0 | 1.2 | 47 |
| | | | |
| Retailers $1 million or more | | | |
| Full Time Employees | 5.6 | 10.1 | 77 |
| Part Time Employees | 4.6 | 9.9 | 48 |

18

**MARKETS and CUSTOMERS**

What percentage of your shooting- and hunting-related sales revenue do you attribute to female customers?

|  | 2018 | 2020 |
|---|---|---|
| % of sales revenue | 20.3% | 28.0% |

Total number of responses in 2020: n = 143

What type of firearm did female buyers purchase most often? (ranked from 1 (most likely) to 6 (least likely)

|  | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Semi-automatic handgun | 1.2 | 1.2 | 126 |
| Revolver | 2.4 | 2.4 | 110 |
| AR platform (MSR) rifle | 3.5 | 3.2 | 105 |
| Shotgun | 3.8 | 3.4 | 104 |
| Traditional rifle | 3.9 | 4.3 | 89 |
| Muzzleloader | 5.8 | 6.0 | 60 |

*These results show how firearms retailers rank the observed preferences of female firearm buyers for given types of firearm on a scale of 1 (very likely) to 6 (not likely at all). For instance, the average respondent suggested that female hunters/shooters who purchased firearms from their business in 2020 most likely purchased a semi-automatic handgun (average rank of 1.2 out of 6) and was least likely to purchase a muzzleloader (average rank of 6 out of 6).*

In your opinion, what percent of your customers were first-time gun buyers?

|  | 2018 | 2020 |
|---|---|---|
| % of all customers who were first time gun buyers | 24.0% | 34.0% |

Total number of responses in 2020: n = 162

What type of firearm did first-time buyers purchase most often?

|  | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Semi-automatic handgun | 1.3 | 1.2 | 142 |
| AR platform (MSR) rifle | 2.9 | 2.5 | 128 |
| Revolver | 3.1 | 3.2 | 125 |
| Shotgun | 3.6 | 3.3 | 112 |
| Traditional rifle | 3.9 | 4.5 | 130 |
| Muzzleloader | 5.9 | 6.0 | 75 |

*These results show how firearms retailers rank the observed preferences of first-time firearm buyers for given types of firearm on a scale of 1 (very likely) to 6 (not likely at all). For instance, the average respondent suggested that first time gun buyer who purchased firearms from their business in 2020 was more likely to purchase a revolver (average rank of 3.2 out of 6), than a traditional rifle (average rank of 4.5 out of 6).*

19

To the best of your knowledge, what was your total customer demographic in 2020?

|  | 2018 | 2020 |
|---|---|---|
| Male | 78.5% | 73.8% |
| Female | 21.5% | 26.2% |
|  |  |  |
| White | 74.4% | 68.9% |
| Black | 9.3% | 12.9% |
| Hispanic | 12.1% | 10.6% |
| Asian | 4.1% | 3.9% |
|  |  |  |
| White Male | 59.5% | 51.6% |
| White Female | 15.0% | 17.4% |
| Black Male | 7.0% | 9.0% |
| Black Female | 2.4% | 3.9% |
| Hispanic Male | 9.0% | 7.9% |
| Hispanic Female | 3.1% | 2.7% |
| Asian Male | 3.1% | 2.6% |
| Asian Female | 1.0% | 1.2% |
| Other | NA | 3.7% |

Total number of responses in 2020: n = 140

Do you have a system you use to collect demographic information (age, gender, race/ethnicity) on your customers?

|  | 2018 | 2020 |
|---|---|---|
| Yes | 3.8% | 8.6% |
| No | 96.2% | 91.4% |

Total number of responses in 2020: n = 139

20

**WEBSITE and ONLINE MARKETING**

Does your business currently have a website?



Total number of responses in 2020: n = 143

Do you sell any hunting and shooting-related products via the Internet?



|      | 2018  | 2020  |
|------|-------|-------|
| Yes  | 41.3% | 58.0% |
| No   | 58.8% | 42.0% |

Total number of responses in 2020: n = 143

This year, did your online sales increase or decrease?

|                | 2018  | 2020  |
|----------------|-------|-------|
| Increase       | 30.3% | 69.9% |
| Stay the same  | 51.5% | 18.1% |
| Decrease       | 18.2% | 12.0% |

Total number of responses in 2020: n = 83

Please estimate as best as possible the percentage of annual shooting and hunting-related sales revenues that were generated online:

|                                   | 2018  | 2020  |
|-----------------------------------|-------|-------|
| % sales revenue generated online  | 26.0% | 28.1% |

Total number of responses in 2020: n = 78

If you are not currently selling hunting and shooting products online, do your future business plans include selling online?



Total number of responses in 2020: n = 59

**SOCIAL MEDIA AND CURRENT ISSUES**

In 2020, were you denied the ability to advertise on any platforms?



|  | 2020 |
|---|---|
| Yes | 48.3% |
| No | 41.3% |
| I don't know | 10.5% |

Total number of responses in 2020: n = 139

24

Which social media platforms does your store use to communicate with customers?



| Social Media Platform | 2020 |
| --- | --- |
| Facebook | 87.5% |
| Instagram | 59.2% |
| Twitter | 28.3% |
| YouTube | 26.7% |
| LinkedIn | 20.8% |
| Yelp | 13.3% |
| Other | 10.0% |
| MeWe | 7.5% |
| Parlor | 3.3% |
| Snapchat | 2.5% |
| Pinterest | 1.7% |
| Reddit | 1.7% |
| TikTok | 0.8% |
| Rumble | 0.8% |

Total number of responses in 2020: n = 120

**SHOOTING RANGES AND OTHER OFFERINGS**

Do you have an active shooting range on-site?



Total number of responses in 2020: n = 260

Do you offer any of the following general firearm instruction classes at your store? (select all that apply)

| Class | 2018 | 2020 |
|---|---|---|
| Basic Pistol | 36.6% | 54.6% |
| Concealed Carry | 39.8% | 50.6% |
| Basic Rifle | 23.6% | 33.9% |
| Advanced Pistol Shooting | 19.3% | 33.5% |
| Women Only | 20.5% | 33.1% |
| Self-Defense | 24.2% | 31.5% |
| Basic Shotgun | 21.1% | 25.9% |
| Youth Classes | 16.1% | 25.9% |
| Tactical | 14.3% | 23.9% |
| Advanced Rifle Shooting | 13.7% | 20.3% |
| Hunter Education | 11.8% | 14.7% |
| Gunsmithing | 9.9% | 14.3% |
| Advanced Shotgun Shooting | 8.7% | 14.3% |
| Close Quarters Combat | 3.7% | 13.6% |
| Other | 3.7% | 7.6% |
| Reloading | 5.0% | 5.6% |
| We do not offer any firearm-related classes | 49.1% | 33.5% |

Total number of responses in 2020: n = 251

## BACKGROUND CHECKS AND OPERATING SYSTEMS

What percent of firearms sales (if any) in your store(s) use the approved alternate permits (such as concealed carry license) when completing a firearm sale? In other words, out of 100 firearms sold, what percent do not utilize the NICS system?

|  | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Average response | 38.4% | 40.0% | 117 |

*Question shown only to respondents located in the following states: Alaska, Arizona, Arkansas, Georgia, Hawaii, Idaho, Iowa, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Montana, Nebraska, Nevada, North Carolina, North Dakota, Ohio, South Carolina, South Dakota, Texas, Utah, Washington, West Virginia and Wyoming.*

You are in a state that requires background checks on Private Party Transfers. Approximately what percent of total NICS background checks conducted by your store are for such Private Party Transfers?

|  | 2020 | Responses (2020) |
|---|---|---|
| Average response | 11.2% | 65 |

*Question shown only to respondents located in the following states: California, Colorado Connecticut, Delaware, Illinois, Iowa, Maryland, Massachusetts, Michigan, Nebraska, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, Washington and Washington D.C.*

To the best of your recollection, on average how many firearms are sold per completed Form 4473?

|  | 2018 | 2020 | # 2020 Responses |
|---|---|---|---|
| Average number of firearms sold per completed form 4473 | 1.1 | 1.3 | 91 |

*For example, in 2020 there were about 10 Form 4473s completed for every 13 firearms sold.*



11 Mile Hill Road
Newtown, CT 06470-2359
T: 203.426.1320
F: 203.426.1087
nssf.org

©2021 National Shooting Sports Foundation, Inc. All Rights Reserved

Item# 30383-21   3/21

EXHIBIT 18

# NSSF® REPORT 2019 EDITION

# FIREARMS RETAILER

## SURVEY REPORT | TREND DATA 2009-2018



Conducted for the National Shooting Sports Foundation® by: Southwick Associates


SOUTHWICK ASSOCIATES


THE FIREARMS INDUSTRY TRADE ASSOCIATION | NSSF.ORG |     

**Exhibit 5**
**0097**

©2019 National Shooting Sports Foundation, Inc. All Rights Reserved. No part of this publication may be republished, reproduced or redistributed in any form or by any means, electronic or mechanical, except in the case of brief quotations in articles. NSSF members in good standing may share this publication with their employees, including making it available for internal viewing or download via their company intranet sites, provided 1.) the publication is offered in its entirety, including this paragraph, and 2.) is accompanied by the following notice: "This publication is made available to employees for job reference purposes only, not for redistribution outside the company." A reward is provided to persons who provide conclusive evidence of illegal republication, reproduction, redistribution or other violation of NSSF's rights in this publication.

**Exhibit 5**
**0098**

**TABLE OF CONTENTS**

Overview ............................................................................................................. 1
Products Sold ...................................................................................................... 1
Sales Trends ....................................................................................................... 14
Sales Margins and Net Profit ............................................................................ 18
Inventory ............................................................................................................ 20
Selected Operating Measures ........................................................................... 22
Markets and Customers .................................................................................... 23
Advertising and Online Marketing .................................................................... 27
Shooting Ranges and Other Offerings .............................................................. 30
Social Media and Current Issues ....................................................................... 33
Background Checks and Operating Systems ...................................................... 34

**Exhibit 5**
**0099**

Which categories of USED products do you currently sell retail?



Legend: 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2018

Number of responses selling at least one of these firearm types USED in 2018: n = 166

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2018 | Responses (2018) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Handguns | 92.9% | 92.8% | 91.0% | 92.1% | 95.8% | 95.0% | 95.0% | 94.7% | 91.8% | 97.0% | 161 |
| Rifles | 92.4% | 94.3% | 91.0% | 92.6% | 93.5% | 93.0% | 89.5% | 94.1% | 96.2% | 94.0% | 156 |
| Shotguns | 86.2% | 90.1% | 88.2% | 85.3% | 88.8% | 87.4% | 85.8% | 84.9% | 84.2% | 88.0% | 146 |
| Muzzleloaders | 40.1% | 41.8% | 39.8% | 30.0% | 30.6% | 33.0% | 28.7% | 26.3% | 24.0% | 33.7% | 56 |

6

Exhibit 5
0105

# EXHIBIT 19

# INDUSTRY INTELLIGENCE REPORTS℠
## HELPING OUR MEMBERS MAKE INFORMED DECISIONS

# FIREARM PRODUCTION
## IN THE UNITED STATES
### WITH FIREARM IMPORT AND EXPORT DATA
#### 2023 EDITION

**KEY FINDINGS**

- The average annual production of firearms in the U.S. was 5,753,055 for the last 30 years.

- Total firearm production reported in the 2021 AFMER was 12,521,614 – an increase of 28.6% over 2020 reported figures.

- Long guns totaled 4,609,800 and accounted for 36.8% of total 2021 U.S. firearm production. Of that, rifles totaled 3,934,374 (85.3% of long gun production) and shotguns totaled 675,426 (14.7%).

  **\* See back page for all Key Findings**

Providing a comprehensive overview of firearm production trends spanning a period of 31 years, this report is based primarily on the data sourced from the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF's) Annual Firearms Manufacturing and Export Reports (AFMER). Every effort has been made to provide accurate and updated information so the reader may keep this edition as a reliable resource for trend information. Production data is a leading indicator of industry performance; this is especially true when combined with other valuable sources of information.

This edition includes manufacturing trends for ammunition as sourced from Census Bureau's Annual Survey of Manufacturers (ASM) used for all years that fall between the fifth-year economic census reports. Import and export statistics for firearms compiled from the U.S. International Trade Commission (USITC) are presented in conjunction with the AFMER numbers to provide a more accurate picture of the historical production that has been made available to the U.S. market. These data sources, when used collectively, help to provide an overview of the firearm and ammunition manufacturing industries.

Information on production, imports, exports and other manufacturing variables are only a piece of a more complex puzzle of the firearm industry. Other factors outside of the manufacturing sector, such as the retail sector, the economy and frequently the political climate, must all be taken into consideration.  The limitation of the AFMER data is that it reflects historic trends; however, using the data in combination with other reports does provide a more complete picture of the industry. Firearm and ammunition production provide a very significant contribution to the national economy in terms of jobs, wages and benefits. In addition, capital expenditures on materials (energy, equipment, fuels) help boost local economies.



**NSSF**®
**The Firearm Industry Trade Association**

**INDUSTRY INTELLIGENCE REPORTS**

# U.S. Firearm Production (1991 – 2021)

| Year | Pistols | Revolvers | Total Handguns | Rifles | Shotguns | Total Long Guns | Production Total (a) | % Change in Total Production Year over Year |
|------|---------|-----------|----------------|--------|----------|-----------------|----------------------|--------------------------------------------|
| 1991 | 1,378,252 | 456,966 | 1,835,218 | 883,482 | 828,426 | 1,711,908 | 3,547,126 | -7.8% |
| 1992 | 1,669,537 | 469,413 | 2,138,950 | 1,001,708 | 1,018,204 | 2,019,912 | 4,158,862 | 17.2% |
| 1993 | 2,093,362 | 562,292 | 2,655,654 | 1,173,694 | 1,148,939 | 2,322,633 | 4,978,287 | 19.7% |
| 1994 | 2,004,298 | 586,450 | 2,590,748 | 1,316,607 | 1,254,924 | 2,571,531 | 5,162,279 | 3.7% |
| 1995 | 1,195,284 | 527,664 | 1,722,948 | 1,441,120 | 1,176,958 | 2,618,078 | 4,341,026 | -15.9% |
| 1996 | 987,528 | 498,944 | 1,486,472 | 1,424,315 | 925,732 | 2,350,047 | 3,836,519 | -11.6% |
| 1997 | 1,036,077 | 370,428 | 1,406,505 | 1,251,341 | 915,978 | 2,167,319 | 3,573,824 | -6.8% |
| 1998 | 960,365 | 324,390 | 1,284,755 | 1,345,899 | 1,036,520 | 2,382,419 | 3,667,174 | 2.6% |
| 1999 | 995,446 | 335,784 | 1,331,230 | 1,569,685 | 1,106,995 | 2,676,680 | 4,007,910 | 9.3% |
| 2000 | 962,901 | 318,960 | 1,281,861 | 1,583,042 | 898,442 | 2,481,484 | 3,763,345 | -6.1% |
| 2001 | 626,836 | 320,143 | 946,979 | 1,284,554 | 679,813 | 1,964,367 | 2,911,346 | -22.6% |
| 2002 | 741,514 | 347,070 | 1,088,584 | 1,515,286 | 741,325 | 2,256,611 | 3,345,195 | 14.9% |
| 2003 | 811,660 | 309,364 | 1,121,024 | 1,430,324 | 726,078 | 2,156,402 | 3,277,426 | -2.0% |
| 2004 | 728,511 | 294,099 | 1,022,610 | 1,325,138 | 731,769 | 2,056,907 | 3,079,517 | -6.0% |
| 2005 | 803,425 | 274,205 | 1,077,630 | 1,431,372 | 709,313 | 2,140,685 | 3,218,315 | 4.5% |
| 2006 | 1,021,260 | 382,069 | 1,403,329 | 1,496,505 | 714,618 | 2,211,123 | 3,614,452 | 12.3% |
| 2007 | 1,219,664 | 391,334 | 1,610,998 | 1,610,923 | 645,231 | 2,256,154 | 3,867,152 | 7.0% |
| 2008 | 1,387,271 | 431,753 | 1,819,024 | 1,746,139 | 630,710 | 2,376,849 | 4,195,873 | 8.5% |
| 2009 | 1,868,268 | 547,547 | 2,415,815 | 2,253,103 | 752,699 | 3,005,802 | 5,421,617 | 29.2% |
| 2010 | 2,087,577 | 558,927 | 2,646,504 | 1,830,556 | 743,378 | 2,573,934 | 5,220,438 | -3.7% |
| 2011 | 2,464,255 | 572,857 | 3,037,112 | 2,305,854 | 862,401 | 3,168,255 | 6,205,367 | 18.9% |
| 2012 | 3,311,081 | 667,357 | 3,978,438 | 3,109,940 | 949,010 | 4,058,950 | 8,037,388 | 29.5% |
| 2013 | 4,314,550 | 725,282 | 5,039,832 | 3,996,673 | 1,203,072 | 5,199,745 | 10,239,577 | 27.4% |
| 2014 | 3,602,577 | 744,047 | 4,346,624 | 3,379,009 | 935,411 | 4,314,420 | 8,661,044 | -15.4% |
| 2015 | 3,553,035 | 884,578 | 4,437,613 | 3,701,443 | 777,273 | 4,478,716 | 8,916,329 | 2.9% |
| 2016 | 4,705,930 | 856,288 | 5,562,218 | 4,198,692 | 848,615 | 5,047,307 | 10,609,525 | 19.0% |
| 2017 | 3,691,006 | 720,917 | 4,411,923 | 2,821,945 | 667,350 | 3,489,295 | 7,901,218 | -25.5% |
| 2018 | 3,842,344 | 664,832 | 4,507,176 | 2,905,178 | 536,119 | 3,441,297 | 7,948,473 | 0.6% |
| 2019 | 3,046,009 | 580,601 | 3,626,610 | 2,062,966 | 480,735 | 2,543,701 | 6,170,311 | -22.4% |
| 2020 | 5,509,183 | 993,078 | 6,502,261 | 2,761,297 | 476,682 | 3,237,979 | 9,740,240 | 57.9% |
| 2021 | 6,751,906 | 1,159,908 | 7,911,814 | 3,934,374 | 675,426 | 4,609,800 | 12,521,614 | 28.6% |
| TOTALS (1991–2021) | 69,370,912 | 16,877,547 | 86,248,459 | 64,092,164 | 25,798,146 | 89,890,310 | 176,138,769 | |

Source: Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Annual Firearms Manufacturing and Export Report (AFMER).

(a): Does not include AFMER MISC firearms category which includes items such as: pen guns and starter guns. Also adjusted to exclude/include, as noted:

From 2011 – 2018 several adjustments were made to the data in this chart due to omissions in the AFMER report (i.e.: figures for long guns manufactured by Savage Arms were omitted from the 2017 AFMER), duplication of production due to parts manufactured by machine shops (i.e.: parts reported by machine shop in addtion to being reported by the firearm manufacturer resulting in double-counting) and adjustments to the miscellaneous category (i.e: Aero Precision).



**INDUSTRY** INTELLIGENCE REPORTS

# Modern Sporting Rifle Production in the United States 1990-2021

| Year | US Production less exports of MSR platform | US Import less exports of MSR platform | ANNUAL TOTAL |
|------|------|------|------|
| 1990 | 43,000 | 31,000 | 74,000 |
| 1991 | 46,000 | 69,000 | 115,000 |
| 1992 | 33,000 | 72,000 | 105,000 |
| 1993 | 62,000 | 226,000 | 288,000 |
| 1994 | 103,000 | 171,000 | 274,000 |
| 1995 | 54,000 | 77,000 | 131,000 |
| 1996 | 27,000 | 43,000 | 70,000 |
| 1997 | 44,000 | 81,000 | 125,000 |
| 1998 | 70,000 | 75,000 | 145,000 |
| 1999 | 113,000 | 119,000 | 232,000 |
| 2000 | 86,000 | 130,000 | 216,000 |
| 2001 | 60,000 | 119,000 | 179,000 |
| 2002 | 97,000 | 145,000 | 242,000 |
| 2003 | 118,000 | 262,000 | 380,000 |
| 2004 | 107,000 | 207,000 | 314,000 |
| 2005 | 141,000 | 170,000 | 311,000 |
| 2006 | 196,000 | 202,000 | 398,000 |
| 2007 | 269,000 | 229,000 | 498,000 |
| 2008 | 444,000 | 189,000 | 633,000 |
| 2009 | 692,000 | 314,000 | 1,006,000 |
| 2010 | 444,000 | 140,000 | 584,000 |
| 2011 | 653,000 | 163,000 | 816,000 |
| 2012 | 1,308,000 | 322,000 | 1,630,000 |
| 2013 | 1,882,000 | 393,000 | 2,275,000 |
| 2014 | 950,000 | 237,000 | 1,187,000 |
| 2015 | 1,360,000 | 245,000 | 1,605,000 |
| 2016 | 2,217,000 | 230,000 | 2,447,000 |
| 2017 | 1,406,000 | 158,000 | 1,564,000 |
| 2018 | 1,731,000 | 225,000 | 1,956,000 |
| 2019 | 1,679,000 | 169,000 | 1,848,000 |
| 2020 | 2,466,000 | 332,000 | 2,798,000 |
| 2021 | 3,178,000 | 520,000 | 3,698,000 |
| TOTALS | 22,079,000 | 6,065,000 | 28,144,000 |

Source: ATF AFMER, US ITC, Industry Reporting



# EXHIBIT 20



The Future of the Gun

# THE
# FUTURE OF
# THE GUN

## FRANK MINITER



REGNERY PUBLISHING
*A Salem Communications Company*

The Future of the Gun

Copyright © 2014 by Frank Miniter

All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means electronic or mechanical, including photocopy, recording, or any information storage and retrieval system now known or to be invented, without permission in writing from the publisher, except by a reviewer who wishes to quote brief passages in connection with a review written for inclusion in a magazine, newspaper, website, or broadcast.

Library of Congress Control Number: 2014942665

ISBN 978-1-62157-244-2

Published in the United States by
Regnery Publishing
A Salem Communications Company
300 New Jersey Ave NW
Washington, DC 20001
www.Regnery.com

10 9 8 7 6 5 4 3 2 1

Books are available in quantity for promotional or premium use. For information on discounts and terms, please visit our website: www.Regnery.com.

Distributed to the trade by
Perseus Distribution
250 West 57th Street
New York, NY 10107

Appendix photos credit: NRA Museums, NRAmuseums.com, except for the Remington R-51 photo, which is courtesy of Remington Arms.



popular with civilians and law enforcement around the world because they're accurate, light, portable, and modular. Its design also allows it to be accessorized. A civilian can buy after-market sights, vertical forward grips, lighting systems, night-vision devices, laser-targeting devices, muzzle brakes/flash hiders, bipods, and more, making the AR the most versatile rifle platform. It's also easy to shoot and has little recoil, making it popular with women.

The AR-15 is so user-friendly that a group called "Disabled Americans for Firearms Rights," which has about twenty thousand members, says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves. Also, its .223 caliber makes it safer to use as a home-defense gun because this lighter caliber is less likely to travel through walls.

Phil adds, "Politicians who say the AR-15 is a 'weapon of war' that civilians shouldn't be allowed to own are ignorant of our history or are lying. Historically, Americans have always owned similar gun types to those used in the military. Besides, semiautomatic AR-15s for sale to civilians are internally different from the full-automatic M16. Sure they look similar, but their hammer and trigger mechanisms are different designs. The bolt carrier and internal lower receiver of semiautomatic versions are even milled differently so that their firing mechanisms can't be interchanged."

Phil leads me to the vault located beneath the National Firearms Museum and we handle American guns from every era. As he gives me this hands-on lesson, he says, "The mainstream media doesn't tell this important story about guns and our freedom. Sure, many of them don't know it—why would they, as it's not taught. But the thing is, they're also not curious enough to ask. This leads me to conclude they'd rather the American people didn't know this history. When people understand the gun's link to freedom they tend . . . [to cherish] their right to keep and bear arms, a freedom men and women fought and died for here and on foreign battlefields."

It's a freedom that's at risk today, even as gun technology continues to advance in ways that can benefit not only the U.S. military but the individual American citizen, as we'll see.

# EXHIBIT 21

# TARGETING
# GUNS

## FIREARMS
## AND THEIR
## CONTROL

Gary Kleck

# Targeting Guns

*Firearms and Their Control*

## Gary Kleck



LONDON AND NEW YORK

Case 1:24-cv-01955-DLF   Document 12-6   Filed 07/26/24   Page 379 of 410

exclude from restriction the most widely owned models that have these attributes, since this severely limits the impact of regulation by allowing an ample supply of legally available semiautomatic models to be substituted for the handful of banned models.

## The Prevalence of AWs as Crime Weapons

It was commonplace for news sources in the late 1980s and 1990s to refer to either "assault weapons" or "assault rifles" as the "favored" weapon of criminals, or, more narrowly, of drug dealers and youth gangs (e.g., *New York Times*, 21 February 1989; *Newsweek*, 14 October 1985, p. 48). This claim was not true, either for criminals in general or for these specific types of criminals. This claim was largely based on guns the police agencies asked BATF to trace. In 1986–1990, 8.2% of BATF-traced guns were classified as "assault weapons" (reported in U.S. Congressional Research Service 1992:10). Unfortunately, the guns traced by BATF are not representative of guns used in crime, nor does BATF claim they are. Crime guns are rarely traced, and the few that are traced are not selected in a way that would ensure they are representative of all crime guns. In 1994, only 1.8% of homicides, robberies, and aggravated assaults known to the police and committed with a gun resulted in a BATF gun trace (computed from data in U.S. BATF 1995:43; U.S. FBI 1995:18, 29, 32, 58). As the Congressional Research Service noted, "the firearms selected for tracing do not constitute a random sample and cannot be considered representative of the larger universe of all firearms used by criminals, or of any subset of that universe" (U.S. Congressional Research Service 1992: 65).

Table 4.1 summarizes the available evidence on the share of crime guns that are AWs. These studies are mostly analyses of guns recovered by police from criminals, and typically cover *all* of the guns recovered in a given period, rather than some small, unrepresentative subset. The findings indicate that less than 2% of crime guns are "assault weapons" (the median was about 1.8%) and well under 1% are "assault rifles." Only two estimates, of forty-seven total, were over 4.3%. The estimate based on guns traced by BATF was double that of the next highest one, and over four times the typical figure obtained in studies of complete populations of guns recovered by police, indicating that trace data grossly overstate AW involvement in crime. Since about 14% of violent crimes are committed with guns (U.S. Bureau of Justice Statistics 1994a:83), this means that only about 1 in 400 ($1.8\% \times 14\% = 0.25\%$) violent crimes are committed with AWs.

One can artificially increase the share of crime guns that are "AWs"

Copyrighted material

EXHIBIT 22

# Explorer Page Filters

Location Select    National

**Year**

2022

---

# United States

Expanded Homicide Data for the nation are derived from Summary Reporting System (SRS) and National Incident-Based Reporting System (NIBRS) reports voluntarily submitted to the FBI.

The **2022** Expanded Homicide Crime statistics for the nation are based on **16,100** of **18,930** participating law enforcement agencies in the country who elected to submit an expanded homicide report that year.



---

| Resources |
|---|

> CDE General FAQ's
> Download Participation and Population Data
> FBI UCR Program ↗
> Effects of NIBRS on Crime Data
> Methodologies Explain Potential Differences in UCR Data
> FBI Press Releases ↗
> Law Enforcement Bulletin ↗

---

## Expanded Homicide Offense Counts in the United States

| From |
|---|
| 2012 |

| To |
|---|
| 2022 |

**2021 Expanded Homicide Data includes fewer homicides due to an overall decrease in participation from agencies that are not yet reporting via NIBRS.**

*Click legend to show/hide elements*



---

Explore our developer-friendly HTML to PDF API    Printed using PDFCrowd    HTML to PDF

Chart Type: Line

⌄ DOWNLOAD

### Expanded Homicide Offense Counts



Source: FBI expanded homicide data for United States

**HOW THESE NUMBERS ARE CALCULATED**

Footnotes ⌄

## Expanded Homicide Offense Characteristics in the United States

| Year Select | Include Previous Years |
|---|---|
| 2022 ⌄ | Current Year ⌄ |

### Offender vs. Victim Demographics

View by: [ # ] [ % ]

| AGE | SEX | RACE | ETHNICITY |

**Offender Age**

Sort By: **Category**

20-29

5,948





30-39

3,669

10-19

3,347

Unknown

3,131

40-49

1,910

50-59

1,106

Offenders with reported age

19,781

⭳ DOWNLOAD                                    SHOW MORE

## Victim Age

Sort By: **Category**



20-29

5,324

30-39

4,664

40-49

2,740

10-19

2,413

50-59

1,702

60-69

1,021

Victims with reported age

19,200

Explore our developer-friendly HTML to PDF API          Printed using PDFCrowd          HTML to PDF

DOWNLOAD    SHOW MORE

---

*Source: FBI expanded homicide data for United States*

HOW THESE NUMBERS ARE CALCULATED

---

## Victim Demographics

View by:  #  %

### Victim Circumstance

Sort By: **Category**

All instances where the facts provided do not permit determination of circumstances

9,295


Other Arguments

4,718

Other

2,832

Narcotic Drug Laws

454

Robbery

369

Other - not specified

361

Juvenile Gang Killings

316

Gangland Killings

279

Arson

123

Institutional Killings

88

---

Explore our developer-friendly HTML to PDF API    Printed using PDFCrowd    HTML to PDF

Burglary

86

Motor Vehicle Theft

63

Total

19,171

⏷ **DOWNLOAD**                    **SHOW MORE**

**The available Homicide Circumstances have changed with the 2021 data year due to the transition to NIBRS.**

## Victim's Relationship to the Offender

Sort By: **Category**

Unknown

10,298

Acquaintance

2,273

Stranger

2,103

Other - known to victim

1,447

Girlfriend

612

Friend

601

Wife

448

Other Family

405

Son

262

Boyfriend

237

Mother

221

Father

199

Total

20,117

[ ⬇ DOWNLOAD ]                                    SHOW MORE

## Murder Victims by Weapon

Sort By: **Category**

Handguns

7,937

Firearms, type not stated

5,706

Knives or cutting instruments

1,630

Other weapons or weapons not stated

1,327

Personal weapons (hands/fists/feet/etc.)

665

Rifles

542

Other guns

422

Blunt objects (clubs/hammers/etc.)

367

Narcotics

187

Shotgun

Explore our developer-friendly HTML to PDF API        Printed using PDFCrowd        **HTML to PDF**



| | 186 |
|---|---|
| Asphyxiation | |
| | 98 |
| Fire | |
| | 94 |
| Total | |
| | 19,200 |

DOWNLOAD                                SHOW MORE

## About the Data

The FBI collects crime data through the Uniform Crime Reporting (UCR) Program. ⧉

Related Offenses ⌄

What Do Expanded Homicide Offenses Include? ⌄

Data Collection ⌄

Data Considerations ⌄

Avoid Ranking and Comparisons ⌄

EXHIBIT 23

An official website of the United States government. Here's how you know

Home • Crime in the U.S. • 2019 • Crime in the U.S. 2019 • Tables • Expanded Homicide Data Table 8



Home   Offenses Known to Law Enforcement   Violent Crime   Property Crime   Clearances   Persons Arrested   Police Employee Data

**Murder Victims**
by Weapon, 2015–2019

Download Excel

| Weapons | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **Total** | **13,847** | **15,355** | **15,206** | **14,446** | **13,927** |
| Total firearms: | 9,143 | 10,398 | 11,014 | 10,445 | 10,258 |
| Handguns | 6,194 | 6,778 | 7,052 | 6,683 | 6,368 |
| Rifles | 215 | 300 | 389 | 305 | 364 |
| Shotguns | 248 | 247 | 263 | 237 | 200 |
| Other guns | 152 | 172 | 178 | 164 | 45 |
| Firearms, type not stated | 2,334 | 2,901 | 3,132 | 3,056 | 3,281 |
| Knives or cutting instruments | 1,533 | 1,562 | 1,608 | 1,542 | 1,476 |
| Blunt objects (clubs, hammers, etc.) | 438 | 466 | 474 | 455 | 397 |
| Personal weapons (hands, fists, feet, etc.)[1] | 651 | 668 | 715 | 712 | 600 |
| Poison | 8 | 12 | 15 | 6 | 16 |
| Explosives | 1 | 1 | 0 | 4 | 3 |
| Fire | 63 | 78 | 93 | 76 | 81 |
| Narcotics | 70 | 119 | 112 | 102 | 93 |
| Drowning | 12 | 9 | 8 | 9 | 7 |
| Strangulation | 96 | 97 | 90 | 75 | 64 |
| Asphyxiation | 105 | 93 | 112 | 92 | 92 |
| Other weapons or weapons not stated | 1,727 | 1,852 | 965 | 928 | 840 |

- [1] Pushed is included in personal weapons.
- NOTE: The Uniform Crime Reporting Technical Refresh enables updating of prior years' crime data; therefore, data presented in this table may not match previously published data.

| Most Wanted | News | What We Investigate | Services | Additional Resources |
|---|---|---|---|---|
| Ten Most Wanted | Stories | Terrorism | CJIS | Accessibility |
| Fugitives | Videos | Counterintelligence | CIRG | eRulemaking |
| Terrorism | Press Release | Cyber Crime | Laboratory Services | Freedom of Information / Privacy Act |
| Kidnappings / Missing Persons | Speeches | Public Corruption | Training Academy | Legal Notices |
| Seeking Information | Testimony | Civil Rights | Operational Technology | Legal Policies & Disclaimers |
| Bank Robbers | Podcasts and Radio | Organized Crime | Information Management | Privacy Policy |
| ECAP | Photos | White-Collar Crime | | USA.gov |
| ViCAP | Español | Violent Crime | **FBI Jobs** | White House |
| | Apps | WMD | Submit a Tip | No FEAR Act |
| **About** | | | Crime Statistics | Equal Opportunity |
| Mission & Priorities | **Resources** | **Contact Us** | History | |
| Leadership & Structure | Law Enforcement | Field Offices | FOIPA | |
| Partnerships | Businesses | FBI Headquarters | Scams & Safety | |
| Community Outreach | Victim Assistance | Overseas Offices | FBI Kids | |
| FAQs | Reports & Publications | | FBI Tour | |





**FBI.gov Contact Center**
Email updates

EXHIBIT 24

# PRACTICAL INSTRUCTIONS

FOR

# MILITARY OFFICERS:

COMPREHENDING

A CONCISE SYSTEM OF MILITARY GEOMETRY, FIELD
FORTIFICATION AND TACTICS OF RIFLE-
MEN AND LIGHT INFANTRY.

ALSO

THE SCHEME FOR FORMING A CORPS OF A PARTI-
SAN, AND CARRYING ON THE *PETITE GUERRE*,
BY *ROGER STEVENSON*, Esq. REVISED,
CORRECTED, AND ENLARGED.

TO WHICH IS ANNEXED,

## A NEW

# MILITARY DICTIONARY;

CONTAINING

THE FRENCH WORDS, AND OTHER TECHNICAL
TERMS, NOW USED IN THE *ART OF WAR;*

WITH

OTHER MATTER CONNECTED WITH
MILITARY OPERATIONS.

*ILLUSTRATED WITH PLATES.*

## By E. HOYT,

BRIGADE MAJOR AND INSPECTOR IN THE MILITIA OF
MASSACHUSETTS.

To be prepared for War is one of the moſt effectual means of pre-
ſerving Peace.                                    WASHINGTON.

## Greenfield:

PRINTED BY JOHN DENIO.

1811.

Generated on 2024-07-25 18:22 GMT / https://hdl.handle.net/2027/hvd.hxjg8q
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
HARVARD UNIVERSITY

War 3408.11

HARVARD COLLEGE
DEC 12 1917
LIBRARY
Bright fund

## DISTRICT OF MASSACHUSETTS, *To wit :*

(L. S.) BE IT REMEMBERED, that on the fifth day of May, in the thirty-fourth year of the independence of the United States of America, EPAPHRAS HOYT, of the said diftrict, has depofited in this office the title of a book, the right whereof he claims as author, in the words following, *to wit :*

" Practical Inftructions for military officers : comprehending a concife fyftem of military geometry, field fortification and tactics of riflemen and light infantry. Alfo the fcheme for forming a corps of a partifan, and carrying on the petite guerre, by *Roger Stevenfon*, Efq. revifed, corrected, and enlarged. To which is annexed, a new military dictionary ; containing the French words, and other technical terms, now ufed in the art of war ; with other matter connected with military operations. Illuftrated with plates. By E. HOYT, Brigade major and Infpector in the militia of Maffachufetts. To be prepared for war is one of the moft effectual means of preferving peace—WASHINGTON."

In conformity to the act of the congrefs of the United States, intitled, " An act for the encouragement of learning, by fecuring the copies of maps, charts and books, to the authors and proprietors of fuch copies during the times therein mentioned ;" and alfo to an act, intitled, " An act fupplementary to an act, intitled, an act for the encouragement of learning, by fecuring the copies of maps, charts and books, to the authors and proprietors of fuch copies during the times therein mentioned ; and extending the benefits thereof to the arts of defigning, engraving and etching hiftorical and other prints."

WM. S. SHAW,
*Clerk of the Diftrict of Maffachufetts.*

Generated on 2024-07-25 18:22 GMT / https://hdl.handle.net/2027/hvd.hxj08q
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
HARVARD UNIVERSITY

## ARMS AND APPOINTMENTS OF RIFLEMEN.

The officers of rifle, and alfo of light infantry
corps, are to be armed with cut and thruft fwords,
to hang upon the left fide, perpendicularly down
the left thigh, by a belt buckled round the waift.
To the belt muft be fitted a cafe, to contain a piftol,
fuitable ammunition, and a whiftle, the latter for giv-
ing fignals for the movements in the field exercifes.

The non-commiffioned officers and privates of ri-
fle corps are to be armed with good rifle guns, the
barrel of which fhould be from three to three and
an half feet in length, and always kept brown.
Moft of the rifles ufed in hunting, by our back-
woods-men have calibers too fmall for military pur-
pofes. Some are made to carry balls of forty, fome
fifty, and fome more, to the pound. Thefe will not
give a fufficient range ; for one hundred and fifty
yards they will project a ball with tolerable precifion ;
but for greater diftances they are fubject to confid-
erable aberrations. The fize moft fuitable for a
military rifle is from twenty-five to thirty balls to
the pound, and thefe will project a ball three hund-
red yards with the requifite precifion.* A larger
fize will throw a ball to a greater diftance, but they
are too heavy for dexterous management.

* Balls fhot from the common mufket are liable to great
*aberrations*, and the beft markfman is very uncertain of his
object when his diftance exceeds one hundred yards. This
aberration or deflection is principally owing to two caufes.

1ft. A whirling motion of the ball, arifing from an unequal
friction againft the fides of the barrel.

Thus, when a mufket is fired horizontally, if the ball meet
with more friction on the *right* than the left fide, it will ro-
tate to the right on an axis perpendicular to the horizon, and
be deflected to the right. When the friction on the ball is
greateft on the *left* fide, it will revolve on the fame axis, but
in an oppofite direction and produce a deflection to the left.
If the upper fide of the ball meet the greateft friction, it

# EXHIBIT 25



HOURS

CLASSES

TAP TO CALL

MENU

# AMERICAN SERVICE PISTOLS & CIVILIAN COUNTERPARTS

HOME | UNCATEGORIZED | **AMERICAN SERVICE PISTOLS & CIVILIAN COUNTERPARTS**



## HISTORY OF THE US MILITARY PISTOL AND ITS CIVILIAN COUNTERPARTS
## A BLAST FROM THE PAST

Throughout the history of the United States, many pistols have been used for protection by our armed forces. Whether it was the flintlocks of the Revolution, the revolvers of the Civil War or the newest and sleekest semi-automatic. Handguns have always had a place in this country, both on the battlefield and on the civilian market. These handguns have all been trusted by our

RESERVE RANGE TIME

TOP ∧

military to protect our veterans lives. While some may assume these handguns are outdated, they all have a strong presence within the modern civilian handgun market. Each of these handguns are trusted, reliable firearms that are still beloved today.

For practicality and simpler reading, we've chosen to highlight the handguns of the 20th and 21st century. Handguns prior to these can still be found and are as important, if not more so than the handguns mentioned here, so please do not think we are forgetting them.

## M1911



## M1911-SERVICE HISTORY

At the turn of the 20th century, the introduction of smokeless powder cartridge's meant firearms were rapidly evolving. One of the first major American firearm innovations was John Browning's M1911 handgun. Its hard to find any sidearm more synonymous with the United States military than the M1911.

In service from 1911 until 1985, the M1911 saw combat in WWI, WWII, Korea, Vietnam and other fields of combat. At the time of its adoption, the M1911 was the first semiautomatic pistol to be adopted by the US military. Standard M1911s were single action, chambered in .45ACP

with a 7+1 capacity. Variations of the standard design could be found throughout the years, most notably the Colt Commander, which featured a 4+¼" barrel and rounded hammer as opposed to the standard 5" barrel.

The M1911 was so popular thanks to ergonomics, stopping power and relatively low recoil. Although the M1911 was formerly replaced in 1985, many servicemen continued to carry the M1911 as they preferred it over newer handguns in the 9mm cartridge. To this day, the M1911 remains one of the most famous pistols used by the military.

## M1911-CIVILIAN VARIANTS

When it comes to the civilian market, M1911's are actually one of the easiest finds. Many of the current major firearms manufacturers still produce M1911's that you can buy today. Brands like Colt, Springfield, Sig Sauer, Kimber, Smith & Wesson, Wilson Combat & Cabot are making easily purchasable recreations and variants of M1911's. Many of these current M1911s have been converted to 9mm, .380 and 10mm, but .45ACP is still one of the easiest to find. These newer civilian M1911s often focus on concealability.

Kimber has made a name for themselves with their Micro 9 series. Which takes the M1911 design and scales it down to a more concealable size. These modern M1911s have made adjustments to benefit the user, different grips, triggers, sights and barrel lengths have all become common place. The M1911 adapted from being a military weapon, to being a handgun fit for defense and sporting purposes. If you're interested in M1911s, please check our **store**.

RESERVE RANGE TIME                    TOP ⌃

## BERETTA M9



### BERETTA M9-SERVICE HISTORY

As time went on, many countries began to adopt the 9mm cartridge into service. Originally designed by the Austrians, 9x19mm Parabellum was a small round that packed a lot of punch. The main benefit of 9mm was higher magazine capacity. The M1911s only held 7 round, where as newer 9mm pistols could hold around 15. In 1985, the US military formally adopted the Beretta M9 as the new sidearm. The M9 is lighter than the 1911, with more than double the magazine capacity. The M9 also holds the benefit of being Double and Single Action, as opposed to the M1911 which was only single action. Upon the M9s adoption, many troops hated it in comparison to their old M1911s, however as time went on, the M9 became beloved to many servicemen. The M9 has become one of the most famous pistols used by the military.

The M9 continued to innovate and improve over its service history. Later models such as the M9A1 featured a picatinny rail, giving the user the ability to mount lights, lasers and other accessories to the gun. Modifiable grips, sights and red-dot compatible slides became commonplace in models like the M9A3 and M9A4.

Uniquely, the M9 wasn't originally designed for military use. The Beretta 92 was designed 10 years prior to its adoption by the military. In a lot of ways the Beretta 92 is both a descendant of WWII era sidearms as well as a modern defensive handgun. The 92 features a double stack magazine and an open slide design. Beretta continues to produce the 92 with it still remaining one of the most popular defensive and sporting handguns. Beretta produces tons of 92 variants, such as their many 92FS' and the 92X. Because the M9 started as a civilian handgun, its one of the most accessible guns on the market. Whether its in the M9 or 92 configuration, one of these Berettas belong in everyone's collection.

If you're interested in M9s or firearms within the same family as them, check out our **store**.

## SIG SAUER P320



## SIG SAUER M17-SERVICE HISTORY

As striker-fires became more and more commonplace, the US military decided it was time to update their 30 year old sidearm. In 2017, the Army decided to switch out their Beretta's for a Sig Sauer. The Military learned that modularity is key. The easier it is to make simple modifications and adjustments, the longer the firearm can stay in service. The M17 was a modified variant of the P320, which Sig Sauer had developed several years prior. The M17

holds the advantage of how simple modifications on it can be made. Users can easily swap out grips, slides, barrels, triggers and sights; as well as optics, lasers and lights. Shortly after the Army adopted the M17, the M18 would be adopted by the Marine Corps. Going forward, these pistols will be the primary sidearm of the military.

Because of the M17s recent adoption, it has yet to form a long lasting legacy. That being said, admirers can easily get their hands on this innovative firearm as it carves its own place in history. The M17 and M18 bring a new level of capability and adaptability to keep todays soldiers safe. It may be a newcomer, but this gun is already becoming an icon of American firearms.

## SIG SAUER M17-CIVILIAN VARIANTS

Unmatched in its modularity, the P320 has become an extremely popular civilian handgun. Finding parts to modify your P320 is extremely easy with Sig Sauer producing many of them themselves. The M17 can be found in many variations, including both the M17 and M18 which are commonly available. The standard P320 along with compacts and P320X, are easy to find as well. Because of their reliability and their modularity, the P320 line is one of the most common handguns for defense or sport. The P320 line not only comes in its standard 9mm caliber, but also .45ACP and 10mm. This pistol is perfect for not only the military, but for the needs of any user.

To find M17 and other P320 Handguns, **click here.**

## OTHER MILITARY PISTOLS

There are countless other handguns that have seen service from the United States Military. Many of them were adopted around the same time as the handguns mentioned above. Weapons like the Sig Sauer MK25 and M11 saw service amongst special forces groups, like the Navy Seals. These guns can be easily found in similar and identical forms, such as the P226 and P229. Where as more common civilian handguns see service, such as the Glock 19.

The US Military depends on every weapon to protect the lives of all of their soldiers. They're weapons are tough and reliable, the best of the best. Whether you're interested in sporting use or practical use, these service pistols are the best of the best. These handguns protect our brave men and women on the front lines, and they can protect you too. All of these handguns come in multiple variations on our range. Feel free to check our **Rentals** to see our lineup of pistols used by the military.

**RESERVE RANGE TIME**                                            **TOP** ⌃



As somebody that is completely new to shooting, this place was a great place to start. The sales staff is friendly, courteous, patient, and willing to answer any questions that you may have. The same can be said about the ROs.

# MATT W.



VIEW MORE TESTIMONIALS

STAY ON

# TARGET

Stay up to date with everything Keystone Shooting Center has going on right in your inbox.

*email@example.com*                    SIGN UP

**RESERVE RANGE TIME**                    TOP ⌃



📱 (412) 357-8000

✉ SALES@KEYSTONESHOOTINGCENTER.COM

📍 ADDRESS

925 SHERATON DR

MARS, PA 16046

Get Directions

🕐 HOURS

MONDAY-FRIDAY: 10AM - 8PM

SATURDAY: 10AM-9PM

SUNDAY: 10AM - 6PM



## QUICK LINKS

FIREARM CLASSES & TRAINING

RENTALS

RANGE RESERVATION

SERVICES

ONLINE STORE

MEMBERSHIPS

RESERVE RANGE TIME          ABOUT US          TOP 

BLOG

FAQS

CAREERS

CONTACT US







Site Credits      Sitemap      Privacy Policy      Featured Events

Copyright © 2024. All Rights Reserved

**RESERVE RANGE TIME**                                              **TOP** ⌃

EXHIBIT 26

Case 1:24-cv-01955-DLF   Document 12-6   Filed 07/26/24   Page 405 of 410

# Crime Data | DC

**Historical DC Crime Data by:** Offense, Ward, ANC, Map
**DC Crime Data to Date by:** Offense, Ward, ANC, Map

---

*As of July 24, 2024 there have been 104 Homicides in DC, a decrease of 27% from the same period in 2023 (142). Meanwhile, Motor Vehicle Thefts are down 34% (2,690 vs 4,068) so far this year compared to 2023. Assault with a dangerous weapon is down 27% from 2023. Theft has decreased 2% in 2024 (vs. 2023) while "Theft from Auto" is down 18% (3,570 vs. 4,368). Robbery is down 40% from 2023 numbers and Burglary has decreased 22%.*

## DC Crime Data over the past 365 days (compared to the year prior)

|  | July 24, 2022 - July 24, 2023 | July 24, 2023 - July 24, 2024 | % change |
|---|---|---|---|
| Homicide | 225 | 234 | ↑ **4%** |
| Motor Vehicle Theft | 5,922 | 5,463 | ↓ 8% |
| Assault with a Dangerous Weapon | 1,416 | 1,185 | ↓ 16% |
| Theft | 12,080 | 13,215 | ↑ **9%** |
| Theft from Auto | 7,848 | 6,999 | ↓ 11% |
| Robbery | 2,794 | 2,739 | ↓ 2% |
| Burglary | 1,049 | 962 | ↓ 8% |

## DC Violent Crime Data to Date (2024)

Homicides in DC from 01/01 to 07/24, by year
(2013-2024)



Assaults with a Dangerous Weapon in DC from 01/01 to 07/24, by year (2013-2024)



Robberies in DC from 01/01 to 07/24, by year (2013-2023)



# DC Motor Vehicle Theft Data to Date (2024)

2,690 incidents of Motor Vehicle Theft in 2024 - Top 5
Neighborhoods

| Rank | Neighborhood | Incidents | % of Total |
|------|--------------|-----------|------------|
| 1 | Edgewood, Bloomingdale, Truxton Circle, Eckington | 222 | 8% |
| 2 | Union Station, Stanton Park, Kingman Park | 192 | 7% |
| 3 | Ivy City, Arboretum, Trinidad, Carver Langston | 176 | 6% |
| 4 | Columbia Heights, Mt. Pleasant, Pleasant Plains, Park View | 171 | 6% |
| 5 | Congress Heights, Bellevue, Washington Highlands | 148 | 5% |

\* Data references "Neighborhood Clusters" that have been used for
community planning for many years. / The District of Columbia does not have
official neighborhood boundaries.


Motor Vehicle Thefts in DC from 01/01 to 07/24, by year



Top 30 locations for Motor Vehicle Theft in 2024

| Total ⬍ | Address ⬍ |
|---------|-----------|
| 25 | 500 - 799 BLOCK OF RHODE ISLAND AVENUE NE |
| 22 | 4000 - 4121 BLOCK OF MINNESOTA AVENUE NE |
| 13 | 2200 - 2226 BLOCK OF TOWN CENTER DRIVE SE |
| 12 | 3100 - 3299 BLOCK OF 14TH STREET NW |

| Total | Address |
|-------|---------|
| 11 | 1 - 99 BLOCK OF MASSACHUSETTS AVENUE NE |
| 10 | 1250 - 1299 BLOCK OF 4TH STREET NE |
| 9 | 3400 - 3599 BLOCK OF COMMODORE JOSHUA BARNEY DRIVE NE |
| 8 | 1200 - 1299 BLOCK OF HALF STREET SE |
| 6 | 2200 - 2299 BLOCK OF 5TH STREET NE |
| 6 | 1300 - 1399 BLOCK OF 4TH STREET NE |

Showing 1 to 10 of 30 entries

Previous   1   2   3   Next



## Compare Data by Ward

Homicide ∨   in   Ward 1 ∨   and   Ward 2 ∨

Compare Wards

## Compare Data by ANC

Case 1:24-cv-01955-DLF Document 12-6 Filed 07/26/24 Page 409 of 410



Homicide ▾ in   ANC 1A ▾   and   ANC 2A ▾

Compare ANC

by Offense

Homicide
Motor Vehicle Theft
Assault with a Dangerous Weapon
Theft (other)
Theft from Auto
Robbery
Burglary
2023 Heat Map
2013-2023 Heat Map
2013-2023 Map of gun incidents

by Ward

Ward 1                     Ward 2
Ward 3                     Ward 4
Ward 5                     Ward 6
Ward 7                     Ward 8

by ANC

1A    1B    1C    1D    1E
2A    2B    2C    2D    2E    2F    2G
3A    3B    3C    3D    3E    3F
4A    4B    4C    4D    4E
5A    5B    5C    5D    5E    5F
6A    6B    6C    6D    6E
7B    7C    7D    7E    7F
8A    8B    8C    8D    8E    8F

to Date

Homicide
Motor Vehicle Theft
Assault with a Dangerous Weapon
Theft (other)
Theft from Auto
Robbery
Burglary

By ANC
by Ward/ANC/Hood
by Offense (map)
by Gun (map)

@CrimeDataDC