## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ADIKA CLEMENDOR**, *et al.*,<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>    **Defendants.** | **No. 1:24-cv-01955-DLF** |

## DEFENDANTS' MOTION TO STAY THE CASE OR, ALTERNATIVELY, EXTEND THE TIME TO RESPOND TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND TO HOLD DEFENDANTS' RESPONSIVE PLEADING DEADLINE IN ABEYANCE

Defendants District of Columbia, Metropolitan Police Department (MPD) Chief Pamela A. Smith, and Attorney General Brian L. Schwalb (collectively, the District) move to (1) stay this case pending *Hanson v. District of Columbia*, No. 23-7061 (D.C. Cir.) or, alternatively, (2) extend the deadline to respond to Plaintiffs' Motion for a Preliminary Injunction [12] by 90 days and hold the deadline to respond to the Complaint [1] in abeyance until a decision is issued on Plaintiffs' Motion.[1]  The District's response to Plaintiffs' Motion is currently due on August 2, 2024, assuming the application of LCvR 65.1(c), although Plaintiffs also move for summary judgment, *see* LCvR 7(b).  If the Court grants this motion, the District's new deadline would be October 31, 2024, calculated as 90 days from August 2.  This is the District's first request for an extension.  A memorandum of points and authorities as well as a proposed order are attached.

---

[1]    A similar motion in a related case was granted yesterday.  Order [20], *Yzaguirre v. District of Columbia*, No. 24-cv-1828 (D.D.C. July 29, 2024).  The District filed a notice [14] signaling the relation between this case and that one on July 28, 2024, but files this motion now, understanding that the Court's decision on reassignment is forthcoming, because of the emergency pace of these proceedings.

The District conferred with Plaintiffs.  *See* LCvR 7(m).  Plaintiffs do not consent to a stay.  Plaintiffs expressed that they would consent to an extended briefing schedule if the District agreed to treat their Motion as one for summary judgment.  The District cannot agree to that proposal because 90 days is not enough time for the District to complete the discovery necessary for this case to reach final judgment.  For example, the District would need to take full discovery from Plaintiffs (not just targeted discovery), and the District's experts would need to file full reports (not just short declarations).

Date: July 30, 2024.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
MATEYA B. KELLEY [888219451]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ADIKA CLEMENDOR**, *et al.*, | |
| **Plaintiffs,** | |
| v. | **No. 1:24-cv-01955-DLF** |
| **DISTRICT OF COLUMBIA**, *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTION TO STAY THE CASE OR, ALTERNATIVELY, EXTEND THE TIME TO
RESPOND TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND
TO HOLD DEFENDANTS' RESPONSIVE PLEADING DEADLINE IN ABEYANCE**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 2

    I.    Facts and Procedural History .................................................................. 2

    II.    The Evolving Law of Second Amendment Challenges ........................... 2

LEGAL STANDARDS ................................................................................................ 6

    I.    Motion to Stay ......................................................................................... 6

    II.    Motion to Extend Deadlines ................................................................... 6

ARGUMENT .............................................................................................................. 7

    I.    The Court Should Briefly Stay the Case Pending *Hanson*. ................... 7

        A.    A Stay Serves Judicial Economy. .............................................. 7

        B.    The Balance of Hardships Weighs Decidedly in Favor of a Stay............ 10

            1.    Denying a Stay Will Create Hardships for the Parties.................. 10

            2.    Granting a Stay Will Not Create Hardships for Plaintiffs. ........... 13

    II.    Alternatively, the Court Should Extend the Time to Respond to Plaintiffs' Motion and Hold the Responsive Pleading Deadline in Abeyance. ...................... 16

        A.    The Issues Presented by Plaintiffs' Motion Require More Time. ............ 16

        B.    Plaintiffs Will Not Suffer Prejudice From the Additional Time Requested. ........................................................................................ 19

        C.    Holding the Responsive Pleading Deadline in Abeyance Serves the Parties and Court........................................................................ 19

CONCLUSION........................................................................................................ 20

## INTRODUCTION

This case is a Second Amendment challenge to a longstanding District law that bans assault weapons.  Second Amendment challenges, the Supreme Court instructs, require careful examination of the historical record to determine the original meaning of the Amendment and "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024).  Casting that aside, Plaintiffs (two individuals and an interest group) move for a preliminary injunction and thus ask this Court to issue relief on a short-fuse and undeveloped record.  *See* Mem. of P. & A. in Supp. of Pls.' Mot. for a Prelim. Inj. (Pls.' Mot.) [12-2].  Not content with just preliminary relief, they also seek—in the same motion—a permanent injunction and summary judgment.  *Id.* at 3.

But such a rush to judgment is unwise.  The legal tests at the center of this case are highly contested.  Yet, the D.C. Circuit is poised to decide the applicable tests soon in an already argued case, *Hanson v. District of Columbia*, No. 23-7061.  Accordingly, the Court should briefly stay this case pending *Hanson*.  Recognizing as much, a court in this district hearing another challenge to the assault weapons ban has stayed that case.  Order [20], *Yzaguirre v. District of Columbia*, No. 24-cv-1828 (D.D.C. July 29, 2024) (*Yzaguirre* Order).

If the Court does not stay the case, it should at least extend the District's time to respond to Plaintiffs' Motion.  Courts in this district have consistently extended the time to respond to motions for a preliminary injunction in recent Second Amendment cases.  Those extensions are needed to allow the government a limited period to gather a historical record for the Court and take targeted discovery relevant to the preliminary injunction.  In addition, the District moves to hold its deadline to respond to the Complaint in abeyance pending resolution of Plaintiffs' Motion.

## BACKGROUND

### I.    Facts and Procedural History

Through interlocking statutory provisions, the District bans assault weapons.  District law generally requires that any person in the District who "possess[es] or control[s]" a firearm must register it.  D.C. Code § 7-2502.01(a).  But an "assault weapon" cannot be registered.  *Id.* § 7-2502.02(a)(6); *see id.* § 7-2501.01(3A) (defining "assault weapon").

The individual Plaintiffs in this case, however, have not tried to register any assault weapon.  Instead, they only allege a generalized desire to purchase assault weapons or alter their existing weapons to become assault weapons.  Decl. of Adika Clemendor (Clemendor Decl.) [12-3] ¶ 3; Decl. of David MacMillan (MacMillan Decl.) [12-4] ¶ 3.  The other Plaintiff in this case is not an individual who wants an assault weapon for self-defense.  Instead, that Plaintiff is an interest group, Firearms Policy Coalition (FPC), that "promot[es]" the Second Amendment.  Decl. of Brandon Combs [12-5] ¶ 2.

On July 3, 2024, Plaintiffs sued the District alleging that the assault weapons ban violates the Second Amendment.  Compl. ¶ 1.  They seek injunctive and declaratory relief.  *Id.*, Prayer.  Plaintiffs then took over three weeks to move for a preliminary injunction.  Pls.' Mot.  In that same motion, they also ask the Court to enter a final judgment and permanently enjoin the ban.  *Id.* at 3.

### II.    The Evolving Law of Second Amendment Challenges

When, as here, a plaintiff brings a Second Amendment challenge, courts formerly followed a two-step framework.  A court would first ask "whether a particular provision impinges upon a right protected by the Second Amendment."  *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1252 (D.C. Cir. 2011).  If the right was implicated, a court would apply some form of means-end scrutiny depending on how much the right was burdened.  *Id.*

2

The D.C. Circuit previously applied this framework in *Heller II*, which was a challenge to the same assault weapons ban challenged here as well as the District's ban on large capacity magazines (LCMs).  *Id.* at 1260.  LCMs are magazines or devices that, when attached to a firearm, allow it to fire more than 11 rounds.  *See* D.C. Code § 7-2506.01(b).  The *Heller II* Court explained that the Second Amendment only protected arms that are in common use for self-defense today.  670 F.3d at 1260.  The record in that case, however, only showed that certain assault weapons and LCMs were in common use but not whether they were in common use for self-defense.  *Id.* at 1261.  So the Court could not be certain whether the bans affected arms protected the Second Amendment.  *Id.*  Nonetheless, the Court assumed that the bans infringed on the Second Amendment and held that the bans survived heightened scrutiny.  *Id.*

Over a decade later, in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Supreme Court declined to adopt a test for Second Amendment challenges using means-end scrutiny, *id.* at 19.  The Court instead announced that a Second Amendment challenge requires a challenger to first show that the law infringes on activity protected by "the Second Amendment's plain text," as originally understood.  *Id.* at 24.  If the law infringes upon protected conduct, it nonetheless must be upheld if it "is consistent with the Nation's historical tradition of firearm regulation."  *Id.*  Still, the Court held that step one of the D.C. Circuit's framework was valid.  *Id.* at 19; *United States v. Richardson*, No. 23-cv-200, 2024 WL 402948, at *3 (D.D.C. Feb. 2, 2024).

To determine whether a law is consistent with historical tradition, the court asks whether it "is consistent with the principles that underpin our regulatory tradition."  *Rahimi*, 144 S. Ct. at 1898.  The government need not identify an "identical" Founding-Era law.  *Id.*  Rather, a court gleans principles and traditions from the historical record and asks whether the challenged law

3

fits within that tradition.  *Id.* at 1897–98.  A challenged law will fit into a historical tradition

when it burdens the right for similar reasons and to a similar extent as historical precursors.  *Id.*

at 1898.  But the law need only "comport with the principles underlying the Second Amendment,

[and] it need not be a 'dead ringer' or a "historical twin."  *Id.* (quoting *Bruen*, 597 U.S. at 30).

And there is certainly no need for close similarity when the lack of a Founding-era analogue can

be explained.  *See Bruen*, 597 U.S. at 27.  That is, "cases implicating unprecedented societal

concerns or dramatic technological changes may require a more nuanced approach."  *Id.*

     *Bruen* sparked a new challenge to the LCM ban in *Hanson v. District of Columbia*, 671

F. Supp. 3d 1, 3 (D.D.C. 2023), *argued*, No. 23-7061 (D.C. Cir. Feb. 13, 2024).  The *Hanson*

plaintiffs moved for a preliminary injunction.  *Id.*  The plaintiffs and the District disagreed on the

test that the court should use to decide whether LCMs were protected by the Second

Amendment.  *Id.* at 10–11.  The plaintiffs argued that LCMs were protected simply if they were

in common use.  *Id.* at 11.  The District explained that LCMs were protected if they were in

common use for lawful purposes, particularly self-defense.  *Id.*  The court agreed with the

District and held that the applicable test was "whether LCMs are 'typically possessed by law-

abiding citizens for lawful purposes.'"  *Id.* at 10 (quoting *Heller II*, 670 F.3d at 1260).

     The District also explained that LCMs are not in common use for self-defense because

(1) their military characteristics make them a poor fit for self-defense, and (2) law-abiding

individuals do not in fact use LCMs for self-defense, as evidenced by the fact that incidents

where a civilian fires more than ten bullets in self-defense are rare.  *Id.* at 11.  The plaintiffs

disputed whether these were relevant criteria.  The plaintiffs argued that usefulness in military

service was not a test laid out in Supreme Court precedent.  *Id.* at 11–12.  And the plaintiffs

argued that LCMs are "used" in self-defense even if a person does not fire more than ten bullets

during a single self-defense incident.  *Id.* at 16.  The court agreed with the District on both scores and held that LCMs were not protected by the Second Amendment.  *Id.* at 11.

Nonetheless, the court proceeded to *Bruen*'s step two and held, in the alternative, that the LCM ban was consistent with the Nation's tradition of firearm regulation.  *Id.* at 16.  The plaintiffs argued, among other things, that the court could only consider Founding-era laws.  *Id.* at 22.  But the court, adopting arguments from the District, disagreed.  *Id.* at 17–21.  The court held that LCM bans responded to social and technological changes, which explained their absence at the Founding, and required a "nuanced" approach.  *Id.*  LCM bans were similar to historical bans on high-capacity firearms arising post-Founding and other bans on dangerous and unusual weapons.  *Id.* at 21–25.  Accordingly, the court held that the plaintiffs were unlikely to succeed on the merits of their claim and denied a preliminary injunction.  *Id.* at 25.

The plaintiffs appealed, and the D.C. Circuit heard argument in February.  Primarily at issue are the legal tests for deciding whether an arm is covered by the Second Amendment and the continued import of *Heller II*.  Again, the plaintiffs argue that an arm is protected if it is commonly used.  Appellants' Br. at 23, *Hanson v. District of Columbia*, No. 23-7061 (D.C. Cir. Aug. 28, 2023) (*Hanson* Appellants' Br.).  The District, on the other hand, explains that an arm is protected if a challenger shows that it is in common use for self-defense.  Appellees' Br. at 21–22, *Hanson v. District of Columbia*, No. 23-7061 (D.C. Cir. Oct. 19, 2023) (*Hanson* Dist. Br.).  In addition, the parties dispute, among other things, (1) whether usefulness in military service is relevant to the analysis, *compare Hanson* Appellants' Br. at 28, *with Hanson* Dist. Br. at 23; (2) what type of evidence shows "use" in self-defense, *compare Hanson* Appellants' Br. at 29, *with Hanson* Dist. Br. at 27; (3) whether the district court properly applied a nuanced approach at *Bruen*'s step two, *compare Hanson* Appellants' Br. at 33, *with Hanson* Dist. Br. at 30;

(4) whether the LCM ban follows in a historical tradition of regulating dangerous and unusual weapons, *compare Hanson* Appellants' Br. at 32–33, *with Hanson* Dist. Br. at 35; and (5) how a district court should weigh the other preliminary injunction factors in a Second Amendment case, *compare Hanson* Appellants' Br. at 53–54, *with Hanson* Dist. Br. at 48–52.

## LEGAL STANDARDS

### I.   <u>Motion to Stay</u>

A court has "inherent" power to stay a case. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). This power is "appropriately exercised where a separate proceeding bearing upon the case is pending." *Hulley Enters. Ltd. v. Russian Fed'n*, 211 F. Supp. 3d 269, 276 (D.D.C. 2016); *see also, e.g.*, *P.J.E.S. by & through Francisco v. Mayorkas*, No. 20-cv-2245, 2023 WL 387570, at *5 (D.D.C. Jan. 25, 2023) (staying case pending appellate proceedings); *Fonville v. District of Columbia*, 766 F. Supp. 2d 171, 173 (D.D.C. 2011) (same). When deciding whether to stay a case pending other proceedings, a court considers (1) possible judicial economy gains and (2) the balance of hardships. *Allen v. District of Columbia*, No. 20-cv-2453, 2024 WL 379811, at *2 (D.D.C. Feb. 1, 2024).

### II.   <u>Motion to Extend Deadlines</u>

Under Rule 6(b)(1)(A), a court may extend a deadline for good cause. The Rule gives a court "wide discretion" to grant such requests. 4B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1165 (4th ed. June 2024); *see Cohen v. Bd. of Trs. of the Univ. of the Dist. of Columbia*, 819 F.3d 476, 479–80 (D.C. Cir. 2016) ("We give great deference to a district court's Rule 6(b) decision . . . ."). "[A]n application for extension of time under Rule 6(b)(1)(A) normally will be granted in the absence of bad faith on the part of the party seeking relief or prejudice to the adverse party." Wright & Miller, *supra*, § 1165.

## ARGUMENT

**I.   The Court Should Briefly Stay the Case Pending *Hanson*.**

The D.C. Circuit in *Hanson* is poised to decide core Second Amendment issues presented here, so this Court should briefly stay the case until the Court and Parties receive critical guidance from that higher court.  Such a brief stay will serve all Parties and work no cognizable harm.

### A.   A Stay Serves Judicial Economy.

On the first prong, judicial economy weighs in favor of staying this case because the D.C. Circuit will decide or at least clarify the legal tests that will be applied here.  *Yzaguirre* Order at 1; *see also Allen*, 2024 WL 379811, at *3 (staying Second Amendment case when the Supreme Court would clarify the applicable legal test); Mem. Op. & Order [44] at 9, *Millard v. Gov't of the Dist. of Columbia*, No. 22-cv-2672 (D.D.C. Feb. 29, 2024) (*Millard* Op.) (same); *Miller v. Bonta*, No. 23-2979, 2024 WL 1929016 (9th Cir. Jan. 26, 2024) (staying challenge to assault weapons ban pending resolution of a challenge to LCM ban).  As in *Hanson*, Plaintiffs here argue that assault weapons are protected by the Second Amendment because they are in common use.  Pls.' Mot. at 1–2.  And as in *Hanson*, the District disagrees that a popularity contest determines protection under the Second Amendment.  Also as in *Hanson*, Plaintiffs argue that *Heller II* is no longer good law.  *Id.* at 1.  And as in *Hanson*, the District disagrees that the D.C. Circuit's precedential and considered analysis can be so easily jettisoned.  *See Brookens v. Acosta*, 297 F. Supp. 3d 40, 49 (D.D.C. 2018) (explaining that district courts must leave to the D.C. Circuit "the prerogative of overruling its own decisions" (internal quotation marks omitted) (quoting *Agostini v. Felton*, 521 U.S. 203, 207 (1997))).  Thus, how the D.C. Circuit decides the test for protection under the Second Amendment will "narrow the issues" for this Court to

decide, *Landis*, 299 U.S. at 253, and "assist it in 'determin[ing] the questions of law involved,'"

*Allen*, 2024 WL 379811, at *3 (quoting *Hulley*, 211 F. Supp. 3d at 276).

Besides this top-line issue, corollary issues also overlap in both cases.  As in *Hanson*,

Plaintiffs argue that (1) usefulness in military service is irrelevant to the analysis, Pls.' Mot. at

21; (2) the actual "utility" of assault weapons for self-defense (*e.g.*, whether they are fired rather

than just possessed) is not relevant, *id.* at 11; (3) the District cannot justify the ban by

analogizing to historical regulations and traditions; *id.* at 6; (4) the ban does not follow in a

historical tradition of regulating dangerous and unusual weapons, *id.* at 15; and (5) the Court is

forced to enter a preliminary injunction if Plaintiffs show likely success on the merits, never

mind the other factors, *id.* at 23–27.  The "overlap" in the "arguments" here and at the D.C.

Circuit means that judicial economy would be served by a stay.  *Allen*, 2024 WL 379811, at *3.

More broadly, both cases involve application of a historical test using similar historical

sources.  As the *Yzaguirre* court explained, "[t]he [P]arties and the [C]ourt will benefit from the

decision in *Hanson*, as it will be the first D.C. Circuit ruling post-*Bruen* . . . and post-*Rahimi*."

*Yzaguirre* Order at 1.  Quite right, in creating a new historical test, "*Bruen* 'radically redrew the

landscape' regarding Second Amendment challenges."  *Millard* Op. at 9.  Yet, the D.C. Circuit

has not yet "applied its standard."  *Id.*  That standard is intensely disputed to say the least.

*Rahimi*, 144 S. Ct. at 1927 (Jackson, J., concurring).  *Hanson* will—to the District's

knowledge—be the D.C. Circuit's first opportunity to apply *Bruen*.  Accordingly, the D.C.

Circuit's decision in *Hanson* "applying—and clarifying—*Bruen*'s historical test for the first time

since its inception will assist the Court in applying the test as well, especially given the lack of

guidance from the D.C. Circuit" thus far.  *Millard* Op. at 11.  In applying that test, *Hanson* will

require consideration of similar historical sources to those that the District plans to marshal here.

The D.C. Circuit's "appraisal and the weight given to those sources will necessarily guide this [C]ourt's evaluation of the same sources."  *Allen*, 2024 WL 379811, at *4; *see also Millard* Op. at 9.  Those are reasons enough to stay the case.  *Yzaguirre* Order at 1.

Plaintiffs may respond that the Court should not pause for *Hanson* because, to them, the issues there and here are settled.  *See, e.g.*, Pls.' Mot. at 6 ("[*District of Columbia v. Heller*, 554 U.S. 570 (2008)] already did the work").  But every court of appeals to thus far consider arguments like Plaintiffs' here in challenges to assault weapons bans or LCM bans has disagreed with the challengers.  *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.* (*DSSA*), --- F.4th ----, No. 23-1633, 2024 WL 3406290 (3d Cir. July 15, 2024); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024); *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, Nos. 23-877, 23-878, 23-879, 23-880, 23-944, & 23-1010, 2024 WL 3259606 (U.S. July 2, 2024); *see Duncan v. Bonta*, 83 F.4th 803 (9th Cir. 2023) (en banc); *Miller v. Bonta*, No. 23-2979, 2023 WL 11229998 (9th Cir. Oct. 28, 2023).  Put another way, Plaintiffs' marquee position—that this case begins and ends with *Heller*—is identical to the plaintiffs' position in *Hanson*.  *Hanson* Appellants' Br. at 12–15.  And the problem with that position is that courts have been *rejecting* it by relying on *Heller* and *Bruen*, as could the D.C. Circuit in *Hanson*.  The issues are hardly settled in Plaintiffs' favor.

What is more, a court in this district disagreed with them on just about every legal issue relevant here.  *Hanson*, 671 F. Supp. 3d at 10–25.  And now the D.C. Circuit is poised to settle the disagreement over these issues in the appeal.  Accordingly, because "litigating essentially the same issues in two separate forums is not in the interest of judicial economy or in the [P]arties' best interests regarding time, cost, and effort, it would be prudent to allow the D.C. Circuit to

weigh in before proceeding here." *Campaign Legal Ctr. v. Correct the Rec.*, No. 23-cv-75, 2023 WL 2838131, at *4 (D.D.C. Apr. 7, 2023) (internal quotation marks and citation omitted).

**B.**   **The Balance of Hardships Weighs Decidedly in Favor of a Stay.**

On the balance of hardships, both the District and Plaintiffs face hardships by charging forward without regard for the D.C. Circuit.  Any harm Plaintiffs may claim from a slight delay is unfounded and is far outweighed by the benefits *Hanson* will provide.

**1.**   **Denying a Stay Will Create Hardships for the Parties.**

To start, both Parties—not just the District—and the Court face burdens and prejudice if this case gets ahead of *Hanson*.  *See Yzaguirre* Order at 1 ("[A] brief stay will benefit the [P]arties and conserve judicial resources . . . .").  As a threshold matter, this stay is likely to be brief and no longer than a few months.  The D.C. Circuit's median time to issue an opinion after hearing oral argument is less than four months.  U.S. Courts, *U.S. Courts of Appeals—Median Time Intervals in Months for Civil and Criminal Appeals Terminated on the Merits, by Circuit, During the 12-Month Period Ending September 30, 2023*, https://tinyurl.com/yvp65cdh.  And the D.C. Circuit heard oral argument in *Hanson* five months ago.  That means that *Hanson* may issue any day now.  Further, "[t]he D.C. Circuit historically has resolved cases submitted during a term by the start of the next one.  If past is prologue, then [*Hanson*] very well could be decided in the coming weeks."  *Yzaguirre* Order at 1.  Given the limited nature of the stay to one case that is due to be decided in months at the most, the District's showing of hardship absent a stay need not be great.  *Campaign Legal Ctr.*, 2023 WL 2838131, at *3.  But it is substantial in any event.

Namely, proceeding here "would impose litigation costs . . . which may later be obviated by" a decision in *Hanson*.  *Id.*  As explained, *Hanson* is likely to decide core issues in this case. How those issues get decided could well determine who prevails here or limit the issues

requiring factual development or argument.  Any time, money, resources, and effort spent on

discovery, motions, or decisions by the Court would be wasted if and when the D.C. Circuit

decides the major issues in this case.  *Allen*, 2024 WL 379811, at *5; *Millard* Op. at 11.

Accordingly, the *Yzaguirre* court concluded that "[f]orging ahead on Plaintiffs' motion for

preliminary injunction only to pause it to allow the [P]arties to supplement their submissions in

light of *Hanson* makes little sense.  It is better to have their filings developed once precedent is

announced in *Hanson*."  *Yzaguirre* Order at 1.

Two illustrations further demonstrate the wisdom of this approach.  First, consider the

use of experts.  *Bruen*'s inquiry is demanding and one that the District takes seriously.  To satisfy

that inquiry requires extensive historical research and the use of expert historians (which cost

taxpayer money).  For example, to carry its burden in *Hanson*, the District provided declarations

from ten experts.  Def.'s List of Exs. [17-2], *Hanson v. District of Columbia*, No. 22-cv-2256

(D.D.C. Nov. 23, 2022).  This case may require a similar cadre.  Yet, much of this expert work

and historical discovery may be wasted if it precedes *Hanson*.  The experts here will explore

many of the same issues and sources as in *Hanson*.[2]  But the D.C. Circuit's resolution of *Hanson*

may obviate the need for experts to explore certain issues.  *Millard* Op. at 11.  For example, if

the D.C. Circuit decides that an arm is protected by the Second Amendment if it is in common

---

[2]     Although the expert team may be similar here, that does not mean the District can move
at a breakneck speed.  To name a few reasons, while the historian experts may be similar or the
same, the District also needs time to determine if other experts (*e.g.*, experts on assault weapons
technology) are necessary.  Next, the historian experts will still need time to review the materials
in this case and revise their testimony.  And because there is a small pool of historians with
relevant experience, they are pulled by demands of several cases across the country at once.  *See*
Brian DeLay, *The Myth of Continuity in American Gun Culture* 5 (Feb. 7, 2024),
https://tinyurl.com/ymcnaxcu ("This is not a crowded field.").

use, then the District will have wasted any efforts to develop an expert on opinion on whether assault weapons are in common use for self-defense.

Second, consider how proceeding without a stay could affect briefing.  If the D.C. Circuit decides *Hanson* in the middle of briefing this case, then "[i]t would be 'highly inefficient'" for the Parties "to have to incorporate the [D.C. Circuit's] ruling into their oppositions or replies." *Allen*, 2024 WL 379811, at *5 (quoting Order [29] at 2, *Woodward Health Sys., LLC v. Becerra*, No. 20-cv-3098 (D.D.C. Feb. 23, 2022)).  If the D.C. Circuit decides *Hanson* after briefing or argument, then the Parties will have to re-brief Plaintiffs' Motion or at least file supplemental briefs.  Double briefing is inefficient and adds time to this case and paper to this Court's desk, thus pushing off the moment when the Court can decide the motion.  *See Yzaguirre* Order at 1.

Then there is the problem of deciding Plaintiffs' Motion before *Hanson*.  If the Court decides the motion, and then the D.C. Circuit disagrees with the Court on any of the legal issues, then either the District will have been wrongfully enjoined or Plaintiffs will have been wrongly denied the relief they seek.  For the District, that means "clear[ ]" irreparable harm.  *Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018).  That also means putting the public at risk because the District will have been wrongfully enjoined from enforcing one of its most important, democratically enacted, public safety laws.  *See* Quoctrung Bui, Alicia Parlapiano, & Margot Sanger-Katz, *The Mass Shootings Where Stricter Gun Laws Might Have Made a Difference*, N.Y. Times (June 7, 2022), https://tinyurl.com/4ntzd2es (listing mass shootings that could have been prevented by an assault weapons ban); *Duncan*, 83 F.4th at 806 (finding that enjoining an LCM ban "indisputably" would cause "an influx of large-capacity magazines like those used in mass shootings in California and elsewhere"); *Miller*, 2023 WL 11229998, at *1 (staying an injunction against California's assault weapons ban because of "the similarities between *Duncan*

and this case"). Thus, proceeding in the haste that Plaintiffs demand while ignoring the D.C.

Circuit is a recipe for problems down the line—for the Parties, for the Court, and for the public.[3]

### 2.    <u>Granting a Stay Will Not Create Hardships for Plaintiffs.</u>

Although a stay would thus inhere to everyone's benefit, Plaintiffs will likely respond

that they suffer irreparable harm (a violation of their Second Amendment rights) until their

motion is decided, and a stay delays that decision. *See* Pls.' Mot. at 38–39. This objection

should fail for three reasons.

First, the Court has not decided whether Plaintiffs have shown irreparable harm. The

D.C. Circuit "require[s] movants to do more than merely allege a [constitutional] violation" to

make a showing of irreparable harm. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d

290, 301 (D.C. Cir. 2006); *see Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)

(requiring affirmative "proof" of irreparable harm not "[b]are allegations"). But "the Court has

not yet determined whether Plaintiffs have plausibly alleged a Second Amendment violation" or

shown a likelihood of success on their Second Amendment claim. *Millard* Op. at 11. So claims

of irreparable harm from a stay are too premature and should hold little sway. *Id.*

And there is strong reason to doubt that Plaintiff will be able to prove a Second

Amendment violation. Another court in this district rejected all their main legal arguments.

*Hanson*, 671 F. Supp. 3d at 10–25. Plus, the courts of appeals to thus far address challenges to

assault weapons bans or LCM bans have rejected those challenges, including many of the same

arguments that Plaintiffs raise here. *E.g.*, *Ocean State Tactical*, 95 F.4th 38.

---

[3]    Plaintiffs, when conferring with the District, expressed that they thought an extended briefing period obviated the need for a stay. The points above show why that is mistaken. At bottom, one rationale of the stay is that the Parties and Court should not *begin* proceedings here without *Hanson* in hand. The *Yzaguirre* court recognized as much. *Yzaguirre* Order at 1.

Still further, even if an assault weapons ban violates the Second Amendment, that does not mean that Plaintiffs are irreparably harmed.  The D.C. Circuit has rejected a per se rule that constitutional violations always establish irreparable harm.  *England*, 454 F.3d at 299–304. Rather, whether a constitutional violation equates to irreparable harm depends on the right and the specific facts.  *Id.*; *see also Ayele v. District of Columbia*, No. 23-cv-1785, 2023 WL 8354883, at *5–7 (D.D.C. Dec. 1, 2023) (adopting same argument and holding that plaintiffs failed to establish irreparable harm when they, like Plaintiffs here, assumed that alleging a constitutional violation sufficed).

Here, the Second Amendment protects "the right of an ordinary, law-abiding citizen" to keep and carry firearms for self-defense.  *Bruen*, 597 U.S. at 8–9.  But one Plaintiff, FPC, is not an individual at all.  As for Clemendor and MacMillan, they own or can obtain other firearms that can be used for self-defense.  Clemendor Decl. ¶ 2; MacMillan Decl. ¶ 2.  So, as the D.C. Circuit already held, the District's assault weapons ban "do[es] not impose a substantial burden upon" their right to keep and bear arms.  *Heller II*, 670 F.3d at 1262; *see also Bevis v. City of Naperville*, 657 F. Supp. 3d 1052, 1076 (N.D. Ill. 2023) (rejecting argument that assault weapons ban caused irreparable harm), *aff'd*, 85 F.4th 1175; *Herrera v. Raoul*, 670 F. Supp. 3d 665, 680– 83 (N.D. Ill. 2023) (same), *aff'd sub nom. Bevis*, 85 F.4th 1175.  In fact, Clemendor's and MacMillan's declarations resemble the declarations that the Third Circuit found inadequate to establish irreparable harm in a challenge to Delaware's assault weapons ban.  *DSSA*, 2024 WL 3406290, at *6–7.  Thus, the alleged harms Plaintiffs face are minimal at best.  And a court can stay a case even if there are some harms to an opposing party.  *See Vallejo Ent. LLC v. Small Bus. Admin.*, No. 22-cv-1548, 2023 WL 3275634, at *3 (D.D.C. May 5, 2023) ("[A] stay is

appropriate if it results in an efficient and accurate decision, so long as the gains outweigh the harm.").

Second, even if Plaintiffs face irreparable harm, Plaintiffs "cannot credibly claim" that a stay will prolong the time until they receive a decision on their Motion. *Allen*, 2024 WL 379811, at *5. The D.C. Circuit's decision could come down at any minute and at most would "arrive in a matter of 'months, rather than years,'" so a stay would not work a substantial hardship to Plaintiffs. *Campaign Legal Ctr.*, 2023 WL 2838131, at *3 (quoting *Unión Fenosa Gas, S.A. v. Arab Republic of Egypt*, No. 18-cv-2395, 2020 WL 2996085, at *5 (D.D.C. June 4, 2020)). Plus, because this Court can expect a decision soon, a stay would have "a limited duration," and such a stay "is more likely to be granted than an indefinite one." *Doe v. Sipper*, 869 F. Supp. 2d 113, 118 (D.D.C. 2012); *see also Vallejo Ent.*, 2023 WL 3275634, at *2 (finding that the fact that parties in another case were already on a briefing schedule "puts a clear and finite timeline on the length of a stay here"). Yet, if this case proceeds, "only for the [D.C. Circuit] to clarify or change existing legal standards," then "reopening discovery and re-briefing [Plaintiffs' Motion] will undoubtedly take longer than the [the time that] this case will be stayed." *Allen*, 2024 WL 379811, at *5. "A brief stay to allow the [P]arties and the [C]ourt the benefit of the [D.C. Circuit's] ruling clarifying the law in this muddied field will ultimately take less time than the alternative." *Id.* And as in *Yzaguirre*, the court can craft a stay that "mitigates the harm Plaintiffs assert a stay will cause." *Yzaguirre* Order at 1.

Third, Plaintiffs' tactics undermine any claim of irreparable harm from a stay. For one, "Plaintiffs themselves have 'long delayed [their] day in court on [their] claim[s].'" *Millard* Op. at 11 (quoting *Feld Ent., Inc. v. A.S.P.C.A.*, 523 F. Supp. 2d 1, 4 (D.D.C. 2007)). Plaintiffs suggest that their claim arose when *Bruen* "abrogated" *Heller II*. Pls.' Mot. at 1. But *Bruen* was

15

issued more than two years ago.  The D.C. Circuit has held that a 44-day delay undercut claims of irreparable harm.  *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975).  Plaintiffs here delayed bringing their case by more than two years.  And when they finally brought their case, they took more than three weeks to move for a preliminary injunction.

For another, Plaintiffs are not treating their Motion like a true preliminary injunction motion seeking quick relief.  Instead, they have asked the Court to enter a final judgment, and they have moved for summary judgment.  Pls.' Mot. at 3.  Because they are asking for final— rather than emergency—relief, the Court should not rush this case.  *See Allen*, 2024 WL 379811, at *5 (staying Second Amendment case that was heading towards summary judgment).  The Supreme Court long ago explained that precisely this type of case warrants waiting for critical guidance:  "Especially in cases of extraordinary public moment, the individual may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted."  *Landis*, 299 U.S. at 256.  That is so here.

## II.   **Alternatively, the Court Should Extend the Time to Respond to Plaintiffs' Motion and Hold the Responsive Pleading Deadline in Abeyance.**

If the Court does not stay the case, it should at least adjust the current deadlines because the claims in Plaintiffs' Motion require more time to defend against, Plaintiffs will not face prejudice from such an extension, and the responsive pleading deadline should fall after the Court decides the motion for preliminary injunction.

### A.   **The Issues Presented by Plaintiffs' Motion Require More Time.**

*Bruen*'s historical inquiry plus the factual issues posed by Plaintiffs require development of the record that cannot occur in the normal time allotted for preliminary injunction proceedings or without discovery.  Again, the burden imposed by *Bruen* on government defendants is significant.  In certain cases, as here, it calls for substantial historical research using a wide

variety of sources, including statutes, ordinances, treatises, newspapers, and other primary sources scattered across centuries. *See Bruen*, 597 U.S. at 34–70 (analyzing "a variety of historical sources from the late 1200s to the early 1900s"); *see also Wrenn v. District of Columbia*, 864 F.3d 650, 658 (D.C. Cir. 2017) (explaining that determining the scope of the Second Amendment "pulls us—and both parties and several scholars—into dense historical weeds"). Unlike materials that a defendant would ordinarily rely upon to defend against a motion for preliminary injunction (*e.g.*, case law), these historical materials are not readily available online or otherwise. Even just locating the sources can be beyond the ken of the average non-historian litigator.

Accordingly, in recent Second Amendment cases, the District has enlisted the help of expert historians. Those historians have also provided testimony that has been helpful—and critical—to the analysis. *See Hanson*, 671 F. Supp. 3d at 18–20 (relying on expert declarations submitted by the parties). Bringing historians onto a new case takes time, and then those historians need time to research and write.

Besides historical research, the District also needs time to gather facts relevant to the Motion. A preliminary injunction cannot rest on allegations. *England*, 454 F.3d at 301. Same goes for summary judgment. *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015). As a general matter then, the District needs to investigate Plaintiffs' allegations for their veracity. And the District needs time to review Plaintiffs' 400-plus pages of exhibits. Further still, a preliminary injunction requires a plaintiff to prove standing and irreparable harm. *Id.*; *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017). In other cases, the District has, with court approval, issued targeted discovery for facts related to these exact issues. Min. Order, *Hanson v. District of Columbia*, No. 22-cv-2256

17

(D.D.C. Sept. 7, 2022); Min. Order, *Angelo v. District of Columbia*, No. 22-cv-1878 (D.D.C. July 21, 2022).  The District is considering doing the same here.[4]

Giving the District sufficient time to investigate these issues and prepare its defense serves both the Court and the public.  It serves the Court because the Court can make a better informed decision if it has a fuller historical record.  And it serves the public because it gives the District a fair opportunity to defend a democratically enacted law aimed at protecting public safety.  *Cf. Abbott*, 585 U.S. at 603 n.17.

The need to develop the record is all the more pronounced because Plaintiffs seek a final judgment.  Pls.' Mot. at 3.  In other words, the claim here may be finally decided, even over the District's objection, at this stage without further opportunity for record development down the line.  The District should not be forced to defend constitutional challenges to important public safety laws to final judgment in just a week or two.  *Cf.* Fed. R. Civ. P. 1 (requiring the Rules to be construed to secure the "just" determination of every action).[5]

For these reasons, courts faced with similar circumstances have given the District a window to perform the historical inquiry required by *Bruen* and seek targeted discovery.  Min. Order, *Heller v. District of Columbia*, No. 22-cv-1894 (D.D.C. July 14, 2022); Min. Order, *Angelo v. District of Columbia*, No. 22-cv-1878 (D.D.C. July 15, 2022); Min. Order, *Hanson*; Min. Order, *Dotson v. District of Columbia*, No. 24-cv-1864 (D.D.C. July 3, 2024); Min. Order, *Russell v. District of Columbia*, No. 24-cv-1820 (D.D.C. July 12, 2024).  True, some of these

---

[4]     The District will move as soon as possible for expedited discovery once it is able to determine its needs and draft targeted requests.

[5]     To be clear, the District opposes Plaintiffs' request for a final judgment and to advance a trial on the merits, for reasons the District will explain further in its opposition brief.  *See*, *e.g.*, *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.").

courts have given the District 60 or 70 days, while the District here seeks 90.  But 90 days is

warranted because challenges to a weapons ban like the one here require more record

development than other Second Amendment cases.  That is because just understanding what an

assault weapon is and how it differs from other firearms can require fact development.[6]  On top

of that, such a challenge is expert-heavy.  The District hopes to use similar experts as in

*Hanson*—and that was ten.  Gathering the facts and experts cannot feasibly be accomplished in

60 days.  Recognizing as much, the *Hanson* court gave the District an 89-day extension.  Min.

Order, *Hanson*.  This Court should do the same.

###    B.    Plaintiffs Will Not Suffer Prejudice From the Additional Time Requested.

The proposed extension will not prejudice Plaintiffs.  As explained, although they seek

emergency relief, there is no emergency.  Argument § I.B.2, *supra*.  And their delay in seeking

injunctive relief undermines any assertion that they face irreparable harm and need immediate

relief.  *Id.*  Recognizing as much, courts have uniformly granted extensions in Second

Amendment cases over plaintiffs' objections.  *E.g.*, Min. Order, *Hanson*.[7]

###    C.    Holding the Responsive Pleading Deadline in Abeyance Serves the Parties and Court.

Holding the responsive pleading deadline in abeyance promotes efficiency and judicial

economy for everyone involved in this case.  Because Plaintiffs move for emergency relief, the

Parties' efforts should first be focused on briefing and arguing that motion.  But keeping the

responsive pleading deadline as is would force the Parties to brief another major motion.

Likewise, the Court would be faced with an additional motion to decide.  Yet, a motion to

---

[6]    Simply because there are some fact issues here that do not perfectly overlap with *Hanson* does not counsel against a stay.  *E.g.*, *Allen*, 2024 WL 379811, at *4; *Bridgeport Hosp. v. Sebelius*, No. 09-cv-1344, 2011 WL 862250, at *1 (D.D.C. Mar. 10, 2011).

[7]    The District consents to an extension of Plaintiffs' time to file a reply brief.

dismiss need not be briefed or decided now because there is nothing time-sensitive about that motion.  Moreover, focusing on the motion for a preliminary injunction first would allow the Parties to later brief the motion to dismiss with the benefit of the Court's opinion on the preliminary injunction.  That could streamline briefing and even obviate the need for a motion to dismiss.  Appreciating this common-sense approach, courts have held responsive pleading deadlines in abeyance pending a preliminary injunction motion in Second Amendment cases. *E.g.*, Min. Order, *Hanson*; Min. Order, *Yzaguirre v. District of Columbia*, No. 24-cv-1828 (D.D.C. July 15, 2024).

## CONCLUSION

The Court should stay the case pending *Hanson*.  In the alternative, the Court should extend the District's deadline to oppose Plaintiffs' Motion by 90 days and hold the District's deadline to respond to the Complaint in abeyance until after the Court's order on the Motion.

Date: July 30, 2024.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
MATEYA B. KELLEY [888219451]
Assistant Attorneys General
Civil Litigation Division

400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendants*